JEROME J. SCHLICHTER (SBN 054513)
jschlichter@uselaws.com
SCHLICHTER, BOGARD & DENTON
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone:  (314) 621-6115
Facsimile:  (314) 621-5934
*Counsel for Plaintiffs*

WILLIAM A. WHITE (SBN 121681)
wwhite@hillfarrer.com
HILL, FARRER & BURRILL LLP
One California Plaza, 37th Floor
300 South Grand Avenue
Los Angeles, CA 90071-3147
Telephone: (213) 620-0460
Facsimile:  (213) 620-4840
*Local Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**(Western Division)**

| | |
|---|---|
| CLIFTON W. MARSHALL,<br>THOMAS W. HALL,<br>MARIA E. MIDKIFF,<br>MANUEL A. GONZALEZ,<br>RICKY L. HENDRICKSON,<br>PHILLIP B. BROOKS,<br>AND HAROLD HYLTON,<br>individually and as representatives of a class<br>of similarly situated persons on behalf of the<br>Northrop Grumman Savings Plan,<br><br>                    *Plaintiffs*,<br><br>  v.<br><br>NORTHROP GRUMMAN<br>CORPORATION,<br>NORTHROP GRUMMAN SAVINGS PLAN<br>ADMINISTRATIVE COMMITTEE, | CIVIL ACTION NO. 16-6794<br><br><br>COMPLAINT CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

1  NORTHROP GRUMMAN SAVINGS PLAN
2  INVESTMENT COMMITTEE,
   DENISE PEPPARD,
3  IAN ZISKIN,
4  MICHAEL HARDESTY,
   KENNETH L. BEDINGFIELD,
5  KENNETH N. HEINTZ,
6  TALHA A. ZOBAIR,
   PRABU NATARAJAN,
7  DANIEL HICKEY,
8  MARIA T. NORMAN,
   STEPHEN C. MOVIUS,
9  MARK A. CAYLOR,
10 MARK RABINOWITZ,
   SILVA THOMAS,
11 JOHN DOES 1–10,

12
                    *Defendants.*
13

14     1.     Plaintiffs Clifton W. Marshall, Thomas W. Hall, Maria E. Midkiff,

15  Manuel A. Gonzalez, Ricky L. Hendrickson, Phillip B. Brooks, and Harold Hylton,

16  individually and as representatives of a class of participants and beneficiaries in the

17  Northrop Grumman Savings Plan (the "Plan"), bring this action under 29 U.S.C.

18  §1132(a)(2) and (3) on behalf of the Plan against Defendants Northrop Grumman

19  ("Northrop"), the Northrop Grumman Savings Plan Administrative Committee, the

20  Northrop Grumman Savings Plan Investment Committee, and the members of both

21  Committees and known delegees thereof for breach of fiduciary duties.

22     2.     As fiduciaries to the Plan, Defendants were obligated to act for the

23  exclusive benefit of participants and beneficiaries without self-interest, while

24  ensuring that the Plan's fees were reasonable. These duties are the "highest known

25  to the law" and must be performed with "an eye single to the interests of the

26  participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8

27  (2d Cir. 1982). Rather than complying with their strict fiduciary obligations,

28  Defendants acted to benefit themselves and Northrop by paying Plan assets to

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

Northrop purportedly for administrative services Northrop provided to the Plan, which were not necessary for administration of the Plan or worth the amounts paid. Defendants also caused the Plan to pay unreasonable recordkeeping fees to the Plan's recordkeeper and mismanaged the Plan's Emerging Markets Equity Fund.

3.   To remedy these fiduciary breaches, Plaintiffs seek to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek to prevent further breaches of ERISA's fiduciary duties and seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.   This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. §1132(e)(1).

5.   This Court is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because the Plan was administered at Northrop's headquarters in Los Angeles, California, within this district and is where at least one of the alleged breaches took place. A related action, *In re Northrop Grumman Corp. ERISA Litig.,* No. 06-6213-AB (C.D. Cal.), is pending in this Court. All Defendants are subject to nationwide service of process under 29 U.S.C. §1132(e)(2).

## PARTIES

### The Northrop Grumman Savings Plan

6.   The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) in which certain employees of Northrop may participate. Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

current value of that account, which will depend on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

7.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a).

8.     The assets of the Plan are held in the Northrop Grumman Defined Contribution Master Trust under the terms of a written trust agreement, along with the assets of all of Northrop's other defined contribution retirement plans. The Trustee of the Defined Contribution Master Trust at all relevant times has been and is State Street Bank and Trust Company. Northrop's Board of Directors controls who serves as the Trustee of the Defined Contribution Master Trust. The Administrative Committee and Investment Committee have full authority over the Trustee as to the disposition of Plan assets.

9.     As of December 31, 2015, the Plan had over $19 billion in assets and 102,565 participants with an account balance.

**Plaintiffs**

10.     Clifton W. Marshall is a retired Logistics Engineer for Northrop. He resides in Las Vegas, Nevada, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

11.     Thomas W. Hall is a retired Subcontract Administrator for Northrop. He resides in Henderson, Nevada, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

12.     Maria E. Midkiff is a retired Senior Financial Analyst for Northrop. She resides in Chatsworth, California, and is a participant in the Plan under 29 U.S.C.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4th STREET
ST. LOUIS, MO 63102

§1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

13.     Manuel A. Gonzalez is a retired Shipping Coordinator, Senior Lead for Northrop. He resides in Carson, California, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

14.     Ricky L. Hendrickson is a retired Senior Stockroom Clerk for Northrop. He resides in Carson, California, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Phillip B. Brooks is a former Asset Management Manager for Northrop. He resides in Oxon Hill, Maryland, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

16.     Harold Hylton is a former Senior Desktop Support provider for Northrop. He resides in Accokeek, Maryland, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

**Defendant Northrop Grumman Corporation**

17.     Northrop is the Plan sponsor under 29 U.S.C. §1002(16). Northrop is also the employer of the Plan's other fiduciaries. As alleged herein, Northrop Grumman exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition  of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) & (iii).

**Defendant Northrop Grumman Savings Plan Administrative Committee**

18.     The written document that establishes and maintains the Plan under 29 U.S.C. §1102(a)(1), as amended and restated ("Plan document"), has designated and presently designates an "Administrative Committee" and its members to be the plan administrators and named fiduciaries of the Plan under 29 U.S.C. §1102(a)(2) for all purposes other than investment matters.

19.     The Plan document calls for at least three individuals to constitute the Administrative Committee and authorized the Compensation Committee of Northrop's Board of Directors to appoint members of the Administrative Committee to serve at the pleasure of the Compensation Committee. As of October 25, 2011, the Plan document has provided for Northrop's Chief Executive Officer (CEO) to appoint the members of the Administrative Committee to serve at the pleasure of the CEO. At all times relevant to this complaint, the members of the Administrative Committee have been executive officers and/or directors of Northrop.

20.     Despite the provisions of the Plan document, neither Northrop's Compensation Committee nor its CEO has screened individuals for their qualification and suitability to be an ERISA fiduciary or appointed specific individuals to be members of the Administrative Committee. Instead, Northrop, through its Board of Directors, has provided that whatever individuals occupy the following Northrop offices are to be the members of the Administrative Committee: Northrop's Corporate Vice President and Chief Human Resources and Administrative Officer; Northrop's Corporate Vice President, Strategy and Technology; Northrop's Corporate Vice President and Controller; Northrop's Vice President, Taxation; Northrop's Vice President, Trust Administration and Investments; Northrop's Vice President, Compensation and Benefits; and Northrop's Corporate Director, Benefits Administration and Services. Those same officers are the administrative committee for all of Northrop's employee benefit

plans. In other words, the members of the fiduciary Administrative Committee are appointed by Northrop regardless of any individual's training, education, or experience in administration, investment management, or fiduciary responsibilities in ERISA-governed plans.

21.     In addition to being the named fiduciary and plan administrator, the Administrative Committee and its members have entered into contracts on behalf of the Plan and caused the payment of Plan assets to Northrop and third parties, and thus are fiduciaries with respect to the Plan within the meaning of 29 U.S.C. §1002(21)(A).

**Defendant Northrop Grumman Savings Plan Investment Committee**

22.     The Plan document has designated and presently designates an "Investment Committee" and its members to be the named fiduciaries of the Plan under 29 U.S.C. §1102(a)(2) for investment matters.

23.     The Plan document calls for at least three individuals to constitute the Investment Committee and authorized Northrop's Board of Directors to appoint members of the Investment Committee to serve at the pleasure of the Board. As of October 25, 2011, the Plan document has provided for Northrop's Chief Executive Officer (CEO) to appoint the members of the Investment Committee to serve at the pleasure of the CEO. At all times relevant to this complaint, the members of the Investment Committee have been executive officers of Northrop.

24.     As with the Administrative Committee, despite the provisions of the Plan document, neither Northrop's Board of Directors nor its CEO has screened individuals for their qualification and suitability to be an ERISA fiduciary or appointed specific individuals to be members of the Investment Committee. Instead, Northrop, through its Board of Directors, has provided that whatever individuals occupy the following Northrop offices are to be the members of the Investment Committee: Northrop's Corporate Vice President and Chief Human Resources and Administrative Officer; Northrop's Corporate Vice President and

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

Treasurer; Northrop's Vice President, Trust Administration and Investments; and Northrop's Corporate Director, Investments and Compliance. Those same officers are the investment committee for all of Northrop's employee benefit plans. In other words, the members of the fiduciary Investment Committee are appointed by Northrop regardless of any individual's training, education, or experience in administration, investment management, or fiduciary responsibilities in ERISA-governed plans.

25.     Because the Investment Committee selects the investment options available to Plan participants, hires the investment managers and trustees, gives them their investment directives, oversees their performance, and has the authority to change the investment directives and/or investment managers and trustees, it and its members are fiduciaries with respect to the Plan within the meaning of U.S.C. §1002(21)(A). The Investment Committee has the responsibility to periodically review the performance of the investment managers it hires and to report those results to the Northrop Board of Directors for further review and action.

26.     As a corporation, Northrop can only act through its directors and officers. As alleged herein, Northrop's directors and officers have acted on behalf of Northrop for the purpose of benefitting Northrop, not the Plan or Plan participants. Their actions thus constitute the actions of Northrop itself, meaning that Northrop itself is a fiduciary under 29 U.S.C. 1002(21)(A) and liable for the breach of fiduciary duties alleged herein.

27.     At all times relevant, Northrop has agreed to indemnify the Administrative Committee and the Investment Committee and its members for any and all expenses, liabilities, or losses arising out of any act or omission relating to the rendition of services for or the management and administration of the Plan, except in instances of gross misconduct.

**Individual Defendants**

28.     Defendant Denise Peppard has been Northrop's Corporate Vice

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

President and Chief Human Resources and Administrative Officer since 2011 and as such was a member of the Administrative Committee and Investment Committee and named fiduciary under 29 U.S.C. §1102(a).

29.     Defendant Ian Ziskin was Northrop's Corporate Vice President and Chief Human Resources and Administrative Officer and member of the Administrative Committee and Investment Committee until April 2010. Plaintiffs cannot presently determine who held that office and positions from April 2010 until Defendant Peppard and therefore names that individual (or individuals) John Doe 1 until that individual (or individuals) can be identified and named as a defendant herein.

30.     Plaintiffs cannot presently determine who held and presently holds the office of Northrop's Corporate Vice President, Strategy and Technology, who is a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a), from 2010 to present and therefore names that individual (or individuals) John Doe 2 until that individual (or individuals) can be identified and named as a defendant herein.

31.     Defendant Michael Hardesty has been Northrop's Corporate Vice President and Controller since 2013 and as such was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a) and a delegee of fiduciary responsibilities from the Administrative Committee, including unlimited authority to instruct the Plan's Trustee to disburse Plan assets.

32.     Defendant Kenneth L. Bedingfield was Northrop's Corporate Vice President and Controller in 2011–2013 and as such was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a) and a delegee of fiduciary responsibilities from the Administrative Committee. In 2015, Defendant Bedingfield also assumed the responsibility of the Vice President, Trust Administration and Investments on the Administrative Committee and Investment Committee and as the delegee of the authority over Plan investments by the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

Administrative Committee.

33.     Defendant Kenneth N. Heintz was Northrop's Corporate Vice President and Controller in 2009–2011 and as such was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a) and a delegee of fiduciary responsibilities from the Administrative Committee.

34.     Defendant Talha A. Zobair has been Northrop's Vice President, Taxation since 2014 and as such was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a).

35.     Defendant Prabu Natarajan was Northrop's Vice President, Taxation in 2011–2014 and as such was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a). Defendant Natarajan also served as Northrop's Corporate Vice President and Treasurer in 2013–2014 and as such was a member of the Investment Committee and named fiduciary under 29 U.S.C. §1102(a).

36.     Plaintiffs cannot presently determine who held the office of Northrop's Vice President, Taxation in 2009–2011, who was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a), and therefore names that individual (or individuals) John Doe 3 until that individual (or individuals) can be identified and named as a defendant herein. Northrop's Vice President, Taxation also was granted unlimited authority to instruct the Plan's Trustee to disburse Plan assets.

37.     Plaintiffs cannot presently determine who held the office of Northrop's Vice President, Trust Administration and Investments and as such served as a member of the Administrative Committee and Investment Committee and named fiduciary under 29 U.S.C. §1102(a) apart from Defendant Bedingfield, and therefore names that individual (or individuals) John Doe 4 until that individual (or individuals) can be identified and named as a defendant herein.

38.     Defendant Daniel Hickey was Northrop's Vice President, Compensation and Benefits in 2013–2016 and as such was a member of the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

Administrative Committee and named fiduciary under 29 U.S.C. §1102(a) and was delegated fiduciary responsibilities over payments from the Plan by the Administrative Committee, including unlimited authority to instruct the Plan's Trustee to disburse Plan assets.

39.     Plaintiffs cannot presently determine who held the office of Northrop's Vice President, Compensation and Benefits and as such was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a) apart from Defendant Hickey, and therefore names that individual (or individuals) John Doe 5 until that individual (or individuals) can be identified and named as a defendant herein.

40.     Defendant Maria T. Norman is and at all times relevant has been Northrop's Corporate Director, Benefits Administration and Services and as such was a member of the Administrative Committee and named fiduciary under 29 U.S.C. §1102(a) and was delegated fiduciary responsibility to approve payments of Plan assets to outside parties by the Administrative Committee, including unlimited authority to instruct the Plan's Trustee to disburse Plan assets.

41.     Defendant Stephen C. Movius is and since 2014 has been Northrop's Corporate Vice President and Treasurer and as such was a member of the Investment Committee and named fiduciary under 29 U.S.C. §1102(a).

42.     Defendant Mark A. Caylor was Northrop's Corporate Vice President and Treasurer and as such was a member of the Investment Committee and named fiduciary under 29 U.S.C. §1102(a) in 2011–2012.

43.     Defendant Mark Rabinowitz was Northrop's Corporate Vice President and Treasurer and as such was a member of the Investment Committee and named fiduciary under 29 U.S.C. §1102(a) in 2009–2011.

44.     Defendant Silva Thomas is and at all times relevant has been Northrop's Corporate Director, Investments and Compliance and as such was a member of the Investment Committee and named fiduciary under 29 U.S.C.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

§1102(a).

45.     Plaintiffs believe that the Investment Committee delegated to Northrop's Vice President, Trust Administration and Investments and Northrop's Director, Research and Trust Compliance fiduciary authority to oversee and direct the day-to-day investment and all other related activities of the Plan.

46.     Plaintiffs cannot determine who held the office of Northrop's Director of Research and Trust Compliance and as such was a member of the Investment Committee and named fiduciary under 29 U.S.C. §1102(a) and delegee of fiduciary responsibilities over Plan investments by the Investment Committee, and therefore names that individual (or individuals) John Doe 6 until that individual (or individuals) can be identified and named as a defendant herein.

47.     Plaintiffs cannot determine who held the office of Northrop's Corporate Director, Benefits Accounting and as such was a member of the Investment Committee and named fiduciary under 29 U.S.C. §1102(a) and delegee of fiduciary responsibilities over Plan investments by the Investment Committee, and therefore names that individual (or individuals) John Doe 7 until that individual (or individuals) can be identified and named as a defendant herein. Plaintiffs believe Northrop's Corporate Director, Benefits Accounting also was granted unlimited authority to instruct the Plan's Trustee to disburse Plan assets.

48.     To the extent that any of the Defendants named herein delegated their fiduciary responsibilities to others, Plaintiffs cannot presently determine who are those individuals and therefore names those individuals John Does 8–10 until those individuals can be identified and named as defendants herein.

49.     Because the specific action taken by each Defendant is not divulged to Plan participants and is not otherwise publicly known, Plaintiffs cannot fully allege specifically how each Defendant acted as described herein, and therefore refers to Defendants collectively herein, unless otherwise specified.

//

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### FACTS APPLICABLE TO ALL COUNTS

**I.     Defendants unlawfully caused the Plan to pay Plan assets to Northrop.**

50.     The predominant administrative expense for a defined contribution retirement plan is recordkeeping. See ¶64 below. Recordkeeping for the Plan was provided by a third party for millions of dollars, as described below. No additional services were necessary to administer the Plan, or, if any additional services were necessary, they were limited and could have been provided by a third party. Defendants, however, caused the Plan to hire Northrop—that is, for Northrop to hire itself—to provide purported administrative services, which served as a scheme to direct Plan assets to Northrop that were not payments reasonably related to any service the Plan needed or was provided.

51.     The Administrative and Investment Committees entered into Administrative Services Agreements ("ASAs") by which they arranged for paying Plan assets to Northrop purportedly in return for Northrop providing  certain administrative and investment-related services to the Plan.

52.     Northrop provided these purported services to the Plan through various Northrop corporate departments. The only departments that the ASAs authorized to perform services to the Plan or to receive reimbursement of expenses were: Benefits Administration and Services; Benefits Accounting and Analysis; Benefits Compliance; and Investments and Trust Management.

53.     The ASAs required the Administrative Committee to approve the reimbursement of expenses to Northrop's Benefits Administration and Services, Benefits Accounting and Analysis, and Benefits Compliance departments.

54.     The ASAs required the Investment Committee to approve the reimbursement of expenses to Northrop's Investments and Trust Management department.

55.     Although the ASAs contain detailed requirements by which Northrop's services and payments had to be approved before any services were

-13-

provided and again after the service were provided but before payment was made, the Administrative Committee and Investment Committee failed to follow those requirements. They failed to follow the requirements of, among others, obtaining the opinion of an independent consultant that these services were necessary for administration of the Plan and that the charges therefore were reasonable and that the quality of the services and amount of the charges were equivalent to what an independent third party would charge. Instead, in violation of the fiduciary duty to operate the plan solely in the interest of plan participants, on Northrop's instruction, the Administrative Committee and Investment Committee allowed the heads of the very departments that were to be paid from Plan assets the authority to authorize payment of Plan assets to those departments. In addition, the Investment Committee allowed Northrop's Vice President, Trust Administration and Investments and Director of Research and Trust Compliance to oversee and direct the day-to-day investment and all other related activities of the Plan and the Trust. In other words, Northrop effectively exercised unfettered control over its payment from Plan assets, including payments to departments not authorized by the ASAs and payments for services that were not authorized by the ASAs or authorized under ERISA.

56.     Moreover, Northrop sought to maximize the amounts charged to the Plan for expenses incurred by Northrop's corporate departments regardless of whether those expenses were reasonable and necessary for the services provided or directly incurred in the operation and administration of the Plan. Northrop employees were motivated to, and did, charge time and expenses to the Plan which were impermissible in nature, unreasonable, and unnecessary.

57.     The payments to Northrop were collected through asset-based charges imposed on each of the Plan's investment options.

58.     Defendants never determined whether the services provided by Northrop were even necessary for the administration of the Plan or in the exclusive interest of Plan participants, whether any such services as were necessary for Plan

-14-

administration should have been outsourced, or whether the charges for such services were reasonable expenses of administering the Plan. Defendants also did not put the services purportedly provided by Northrop out for competitive bidding to determine the market rate for such services for the Plan, which would have shown that, if they were necessary, other parties could have performed the same services at substantially lower cost to the Plan. Consequently, the Committees, acting for Northrop, allowed Northrop to receive Plan assets in the guise of compensation that was not reasonable or necessary for the administration of the Plan.

59.     Defendants were repeatedly informed that the payments they made to Northrop from Plan assets were excessive when compared to market rates.

60.     From 2009 through 2013, Northrop received $1.7 million to $2.1 million per year from the Plan. Through 2015, Northrop has taken nearly $10 million from the Plan. That has caused Plan losses of over $13 million, accounting for the lost investment gains on those assets.

61.     Defendants failed to loyally and prudently monitor this purported compensation to ensure that only reasonable and necessary expenses were charged for services actually provided to the Plan.

62.     Had Defendants performed their fiduciary duties, the Plan would not have suffered over $13 million dollars in losses from mid-2009 through 2015.

**II.     Defendants caused the Plan to pay unreasonable recordkeeping fees to the Plan's recordkeeper.**

63.     From January 1, 2007 to April 1, 2016, Hewitt Associates LLC has been the Plan's recordkeeper, providing recordkeeping services to the Plan. Effective April 1, 2016, Fidelity Investments replaced Hewitt as the Plan's recordkeeper.

64.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

numerous recordkeepers in the marketplace who are capable of providing a high level of service to a jumbo defined contribution plan, like the Plan, and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price. The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 100,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

65.     Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount per participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services, leading to unreasonable fees.

66.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years, and monitor recordkeeping costs regularly within that period.

67.     In order to make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, the responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

68.     From 2010 to 2016, Hewitt was compensated for recordkeeping services at a fixed rate of $500,000 per month plus transaction-specific payments, or a rate of $39.47 per participant per year on the basis of 152,000 participants in all Northrop defined contribution plans, with that rate reduced to $37 per participant per year when the plans had over 152,000 participants. At the same time, Hewitt provided recordkeeping services to Northrop's health and welfare plans, defined benefit plans, and non-qualified plans for highly compensated executives.

69.     However, the payment set forth above was not the only payment made to Hewitt. Beginning in 2012, Hewitt also received indirect compensation from another Plan service provider—Financial Engines. Financial Engines provides individualized investment advice to Plan participants to assist them with investing their retirement assets in the Plan. Financial Engines receives a fee based on the percentage of assets in the participant's 401(k) account. Financial Engines shares or kicks back to Hewitt 25% of the asset-based advice fee and 35% of the asset-based professional management fees that Plan participants pay to Financial Engines for advice, yet Hewitt provides no advice. Hewitt provides no service to Financial Engines or the Plan participant to justify this payment to Hewitt from participants' Plan assets.

70.     Thus, since Financial Engines provided its advice services for less than the fee that was being charged to participants who paid it, participants paid Financial Engines excessive fees for the services Financial Engines provided to them.

71.     Defendants failed to properly monitor Hewitt's total compensation from all sources in light of the services Hewitt provided and thus caused the Plan to pay unreasonable administrative expenses to Hewitt.

72.     From 2009 through 2015, the number of participants, and in turn 401(k) accounts, Hewitt was required to recordkeep declined by over 31,000 (23%), from 134,000 to 103,000. However, Hewitt's flat compensation was not reduced.

-17-

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

This caused Hewitt's total recordkeeping compensation to increase by over 54% on a per-participant basis to $73 per participant per year, even though Hewitt's recordkeeping services remained the same or declined.

73.     The amount of asset-based compensation Hewitt received from Financial Engines skyrocketed nearly ten-fold, increasing from approximately $258,120 in 2013 to over $2.3 million in 2015,[1] even though the recordkeeping services provided by Hewitt to the Plan remained the same or declined.

74.     Based on the Plan's features, the nature of the administrative services provided by Hewitt, the Plan's number of participants (100,000–130,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan in the time frame of 2010 through 2015 would have been $2.5–$3.3 million per year (or at most $25 per participant with an account balance).

75.     The Plan paid $5.9–$7.5 million (or approximately $48 to $73 per participant) per year from 2010 to 2015 for recordkeeping services, nearly triple a reasonable fee for these services, resulting in millions of dollars in unreasonable recordkeeping fees each year, all of which was paid from Plan assets, meaning from participants' retirement investments.

76.     Upon information and belief, since January 1, 2007, Defendants did not engage an independent third party to benchmark the reasonableness of the direct and indirect compensation received by Hewitt to ensure that only reasonable fees were charged to Plan participants for recordkeeping services and advice.

77.     Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services in 2010, approximately three years after Hewitt was first hired as the Plan's recordkeeper, or

---

[1] Because Defendants did not disclose in their annual reports to the U.S. Department of Labor (except for one year—2013) the total compensation Hewitt received from Financial Engines, Plaintiffs must estimate that compensation based on the information available to them.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

until the end of Hewitt's recordkeeping contract. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. That is particularly so because recordkeeping fees for large plans such as the Plan have been declining since Defendants last put the Plan's recordkeeping services out to competitive bid. By failing to engage in a competitive bidding process for Plan recordkeeping fees, Defendants caused the Plan to pay excessive recordkeeping fees.

78.     Had Defendants ensured that participants were charged only reasonable fees for recordkeeping services, Plan participants would not have lost in excess of $30 million in their retirement savings through unreasonable recordkeeping fees and lost returns.

## III.    The Emerging Markets Equity Fund.

79.     Since at least 2010, Defendants have provided the Emerging Markets Equity Fund as a Plan investment option. The Fund invests in securities issued by companies in developing countries. The Fund held over $1.3 billion as of December 31, 2010, before declining to $496 million as of December 31, 2015.

80.     Before November 2014, Defendants directed the use of an active investment strategy for the Fund and employed active managers to invest Fund assets. Effective November 2014, Defendants changed the investment strategy to a passive investment strategy and removed the Fund's active managers for passive managers.

81.     In an active investment strategy, the investment manager uses her judgment in buying and selling individual securities (e.g., stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees that are higher in actively managed than passively managed funds. In a passive investment strategy, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index. Because no stock selection or research is necessary for the manager to track

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4th STREET
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

the index and trading is limited, passively managed investments charge significantly lower fees for investment management services.

82.     Prudent fiduciaries of large defined contribution plans analyze whether actively managed funds are likely to outperform their benchmarks net of fees. Prudent fiduciaries must make a reasoned decision as to whether it is in the participants' interest to offer an actively managed option for the particular investment style and asset class, considering expected returns relative to passive options net of fees.

83.     Upon information and belief, during 2010, Defendants determined that an active investment strategy for the Plan's equity and fixed income investment options was no longer prudent or in the Plan participants' best interest.  Effective December 2010 and January 2011, Defendants changed the investment strategy for the U.S. Fixed Income Fund, the Balanced Fund, the U.S. Equity Fund, the International Equity Fund, and the Small Cap Fund, from an active investment strategy to a passive investment strategy. However, for the Emerging Markets Equity Fund, Defendants took no action and continued to mandate an active investment strategy for that Fund.

84.     As of 2010, the Emerging Markets Equity Fund was the most expensive investment option in the Plan, charging an asset-based fee of 57 bps of the value of the Fund.[2] The Emerging Markets Equity Fund also had consistently and dramatically underperformed its benchmark index, the Morgan Stanley Capital International Emerging Markets Index (MSCI Emerging Markets Index). As of year-end 2009, the fund underperformed by *586 bps* over one year, underperformed by *97 bps* over three years, underperformed by *30 bps* over five years, and underperformed by *151 bps* over seven years.

85.     Even though the actively managed U.S. Fixed Income Fund and the

_____

[2] One basis point (bps) equal one-tenth of one percent.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

U.S. Equity Fund *did not* underperform their benchmark indices for one-, three-, five-, seven-, and ten-year periods as of December 31, 2009, Defendants nonetheless moved those funds to a passive investment strategy as of December 2010 and January 2011, respectively.

86.     In contrast, despite the Emerging Markets Equity Fund's consistently tremendous underperformance, high fees, and inability to generate returns above its benchmark, Defendants failed to engage in a prudent process to determine whether maintaining the fund's active strategy was likely to result in the fund outperforming its benchmark, net of fees, after dramatically underperforming for one-, three-, five-, and seven-year periods. Defendants also failed to make a reasoned decision that maintaining the actively managed strategy was in the best interest of Plan participants or prudent, particularly when Defendants changed the Plan's other equity and fixed income investment funds to a passive investment strategy.

87.     Since 2010, the Fund has continued to underperform its benchmark. At the end of 2013 it underperformed the MSCI Emerging Markets Index by *50 bps* over the preceding one and three years, *130 bps* over the preceding five years, and *70 bps* over the preceding ten years. The Fund continued to underperform in 2014. At no point during this time, however, did Defendants as part of their monitoring of this Fund, determine whether it was prudent and in the best interest of the participants to continue their active investment strategy for this Fund.

88.     The Emerging Markets Equity Fund also underperformed lower-cost passively managed alternatives that were available to the Plan, such as the Vanguard Emerging Markets Stock Index Fund.[3] The Vanguard Emerging Markets Stock Index Fund charged investment fees as low as 10 bps, but the Defendants'

---

[3] The institutional share class (VEMIX), with an inception date of June 22, 2000, was used for comparison purposes for 2010, and the institutional plus share class (VEMRX), with an inception date of December 15, 2010, was used for subsequent years.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

Emerging Markets Equity Fund charged 57 bps—570% more. On average, between 2010 and 2014, the Emerging Markets Equity Fund underperformed the Vanguard Emerging Markets Stock Index Fund by approximately *115 bps* per year.

89.     When Defendants finally converted the Emerging Markets Equity Fund to a passive investment strategy in 2014, the Fund's investment management fee at that time had been 47 bps, almost 400% of the 12 bps fee that was charged after that change. Had Defendants made this change in 2010, as they should have, Plan participants would have saved over $5 million in investment management expenses in 2011 alone, and millions of dollars of their retirement savings and lost earnings each year from 2012 to 2014.

90.     Had Defendants replaced the Emerging Markets Equity Fund's active investment strategy with a passive investment strategy and employed proper managers as of December 2010, Plan participants would have avoided in excess of $30 million in performance losses compared to the investment returns of the Fund's benchmark index and lower-cost passively managed emerging markets equity funds, such as the Vanguard Emerging Markets Stock Index Fund. Plan participants would also have avoided over $12 million in unreasonable investment management fees compared to lower-cost passively managed alternatives that were available to the Plan, such as the Vanguard Emerging Markets Stock Index Fund.[4]

## DEFENDANTS' FIDUCIARY DUTIES

91.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

---

[4] Plan losses have been brought forward to the present value using the investment returns of the Vanguard Emerging Markets Stock Index Fund to compensate participants who have not been reimbursed for their losses.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

92.     These duties are the "highest known to the law," *Bierwirth*, 690 F.2d at 272 n.8, and require that fiduciaries make decisions "with an eye single to the interests of the participants and beneficiaries," which, "in turn, imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan", *id.* at 271.

93.     Defendants' fiduciary obligations under ERISA require that they ensure, at all times, that Plan assets are *never* used for the benefit of the employer, e.g., Northrop. Under 29 U.S.C. 1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

94.     Defendants' fiduciary obligations under ERISA require them to scrupulously avoid any transaction in which Plan assets would be used by, or inure to the benefit of, a party in interest in connection with the Plan, including Northrop.

95.     The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are supplemented by a list of transactions that are expressly prohibited by 29 U.S.C. §1106, as *per se* violations. Section 1106(a)(1) states, in pertinent part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a

transaction, if he knows or should know that such transaction constitutes a direct or indirect –

    (A)    sale or exchange, or leasing, of any property between the plan and a party in interest; ...

    (C)    furnishing of goods, services, or facilities between the plan and a party in interest;

    (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

Section 1106(b) provides, in pertinent part, that:

    [A] fiduciary with respect to the plan shall not –

    (1)    deal with the assets of the plan in his own interest or for his own account,

    (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

    (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

96.      Under 29 U.S.C. §1105(a), a fiduciary is liable for the breach of a cofiduciary:

    (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

    (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    (3)    if he has knowledge of a breach by such other fiduciary, unless he

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4th STREET
ST. LOUIS, MO 63102

makes reasonable efforts under the circumstances to remedy the breach.

97.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

98.     29 U.S.C. §1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

## CLASS ACTION ALLEGATIONS

99.     In acting as representatives on behalf of the Plan and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All persons, excluding defendants and/or other individuals who are liable for the conduct described in the complaint, who are, or since May 11, 2009 were, participants or beneficiaries of the Northrop Grumman

-25-

Savings Plan are were affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries Northrop Grumman Savings Plan.

100.     This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

A.     The Class includes over 100,000 members and is so large that joinder of all its members is impracticable.

B.     There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

C.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

D.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

E.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

(A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B). For these reasons, a similar class action was certified in the related case *In re Northrop Grumman Corp. ERISA Litig.,* No. 06-6213-AB (JCx), Doc. 421 (C.D.Cal. Mar. 29, 2011).

101.    The court in *In re Northrop Grumman* recently ruled that it would not allow the plaintiffs in that case to obtain discovery to support the class' claims for the period after May 11, 2009. Doc. 652. Prior to that order, the class putatively sought recovery of all amounts paid to Northrop through the date of judgment. Plaintiffs in this case are members of that class. Accordingly, the pendency of *In re Northrop Grumman* tolled the statute of limitations on these claims.

102.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B). The class action in the related case *In re Northrop Grumman Corp. ERISA Litig.,* No. 06-6213-AB (JCx), Doc. 421 (C.D. Cal. Mar. 29, 2011), was certified under Rule 23(b)(1).

103.      Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans, including in the related case *In re Northrop Grumman Corp. ERISA Litig.,* No. 06-6213-AB (JCx), Doc. 421 (C.D. Cal. Mar. 29, 2011). As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field." *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D.Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D.Ill. Oct. 15, 2013). "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

b.      The U.S. District Court Judge G. Patrick Murphy recognized the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work…, investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D. Ill. Nov. 22, 2010).

   c.      Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist. LEXIS 157428 at 10 (W.D.Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and courts about the importance of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the

Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.*, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D.Mo. Dec. 9, 2015).

d.       Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison Int'l*, in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S.Ct. 1823, 1829 (2015). Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the Tibble decision will affect all ERISA defined contribution plans.

e.       The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);  Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);  Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);  Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);  Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015);   Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);  Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as*

*Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

104.    To the extent the Court does not certify any claim asserted herein as a class action, each Plaintiff is entitled to pursue that claim directly on behalf of the Plan under 29 U.S.C. §1132(a)(2).

## COUNT I

### Breach of Fiduciary Duties of Loyalty and Prudence —
### Payments to Northrop

105.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

106.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' failure to solicit bids from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

107.    Defendants caused the Plan to pay improper and unreasonable administrative fees to Northrop by failing to engage in a prudent and loyal process for the selection and retention of Northrop to provide in-house administrative services to the Plan or through the payment of Plan assets to Northrop despite Northrop having provided no valuable services, or services of only limited value, to the Plan. Because of the conflicted internal process to maximize expenses charged to the Plan to cover the expense of Northrop's employee benefits departments, Defendants failed to engage in a competitive bidding process for the services provided by Northrop employees, or consider outsourcing such services to an independent third party, to ensure that only reasonable and necessary expenses were incurred in the operation and administration of the Plan.

108.    As a direct result of Defendants' breach, Defendants caused the Plan to

-31-

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

suffer losses in the amount of Plan assets paid to Northrop and the amount those assets would have gained had they remained in the Plan.

109.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and to restore to the Plan any profits through their use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

110.     Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT II

### Breach of Fiduciary Duties of Loyalty and Prudence—
### Unreasonable Administrative and Recordkeeping Fees

111.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

112.     Defendants caused the Plan to pay unreasonable recordkeeping fees to the Plan's recordkeeper, Hewitt. Defendants failed to engage in a prudent and loyal process for the ongoing retention of Hewitt. Defendants failed to monitor Hewitt's compensation, particularly as the number of participants with account balances declined between 2009 and 2015, and after Hewitt began receiving additional compensation through revenue sharing payments from Financial Engines from 2012 through 2015. Defendants failed to put the Plan's recordkeeping services out for competitive bidding on a regular basis, at least every three years, to ensure that the Plan's recordkeeper only received reasonable compensation for the services provided.

113.     To the extent that Financial Engines paid Hewitt a portion of its asset-

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4th STREET
ST. LOUIS, MO 63102

-32-

based fees for no apparent services by Hewitt, that portion of Financial Engines' fees from the Plan were unreasonable expenses of administering the Plan.

114.     Defendants therefore breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B), as a direct result of which the Plan and Plan participants suffered losses from the reduction of Plan assets by the amount of the excessive fees and the lost investment returns on those retirement assets.

115.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

116.     Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

### Breach of Fiduciary Duties of Loyalty and Prudence—
### Emerging Markets Equity Fund

117.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

118.     Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by failing, until November 2014, to remove underperforming managers and move the Emerging Markets Equity Fund's assets to passive-investing mangers who were expected not to underperform the Fund's index when the Fund and its prior managers and investments had a history of pervasive, very substantial underperformance compared to its benchmark index and Defendants had determined that actively managed investment was imprudent and

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

not in the interest of Plan participants for the Plan's other fixed income and equity investment options. Defendants' actions caused the Plan to incur significant performance losses and unreasonable investment management expenses.

119.     Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

120.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

121.     Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### 29 U.S.C. §1106(a) Prohibited Transactions

### Between the Plan and Northrop as a Party in Interest

122.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

123.     Northrop is a party in interest because it is a Plan fiduciary, an entity providing services to the Plan, and an employer whose employees are covered by the Plan.

124.     Defendants caused Northrop to provide non-recordkeeping administrative services to the Plan and caused the Plan to pay Plan assets to Northrop.

125.     By causing the Plan to pay Plan assets to Northrop, Defendants caused the Plan to engage in a transaction that they knew or should have known constituted

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A).

126.     By causing the Plan to use Northrop to provide purported services to the Plan and causing the Plan to pay Plan assets to Northrop, Defendants caused the Plan to engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C).

127.     By causing the Plan to pay Plan assets to Northrop, Defendants caused the Plan to engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

128.     As a direct result of these prohibited transactions, Defendants caused the Plan to suffer losses in the reduction of Plan assets in amount of the payments to Northrop and the lost investment returns on those assets.

129.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

## COUNT V
### 29 U.S.C. §1106(b) Prohibited Transactions
### Between the Plan and Northrop

130.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

131.     In causing the Plan to pay Plan assets to Northrop, Defendants, as executive officers and directors of Northrop, dealt with the assets of the Plan in their own interest or for their own account, in violation of 29 U.S.C. §1106(b)(1).

132.     In causing the Plan to use Northrop to provide putative services to the

-35-

Plan and causing the Plan to pay Plan assets to Northrop, Defendants acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

133.    In causing the Plan to pay Plan assets to Northrop, Defendant Northrop received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

134.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and to restore to the Plan all profits they made through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a fiduciary of the Plan.

### COUNT VI
### 29 U.S.C. §1106(a) Prohibited Transactions
### Between the Plan and its Service Providers

135.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

136.    Defendants' hiring of Hewitt, Financial Engines, and the actively investing managers of the Emerging Markets Equity Fund and the payment of fees to same constitute prohibited transactions under 29 U.S.C. §1106(a).

137.    By causing the Plan to deliver Plan assets to Hewitt, Financial Engines, and the actively investing managers of the Emerging Markets Equity Fund, Defendants caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A).

138.    By causing the Plan to use Hewitt, Financial Engines, and the actively investing managers of the Emerging Markets Equity Fund to provide services to the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

Plan and causing the Plan to pay Plan assets to Hewitt, Financial Engines, and the actively investing managers of the Emerging Markets Equity Fund, Defendants caused the Plan to engage in transactions they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C).

139.    By causing the Plan to deliver Plan assets to Hewitt, Financial Engines, and the actively investing managers of the Emerging Markets Equity Fund, Defendants caused the Plan to engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

140.    As a direct result of these prohibited transactions, Defendants caused the Plan to suffer losses in the reduction of Plan assets and the lost investment returns on those assets.

141.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

## COUNT VII

### Failure to Monitor

142.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

143.    Northrop, acting through its Board of Directors, is authorized to appoint members of the Administrative and Investment Committees and therefore had a duty to monitor the performance by those appointees of their fiduciary duties. Each Committee and fiduciary likewise had a duty to monitor the performance of each individual to whom it delegated any fiduciary responsibilities.

144.    A monitoring fiduciary must ensure that the monitored fiduciaries are

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

145. To the extent any of Northrop's fiduciary responsibilities were delegated to another fiduciary, Northrop's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

146. Northrop breached its fiduciary monitoring duties by, among other things:

a. failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b. failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unreasonable administrative fees and imprudent investment options in violation of ERISA;

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments and kickbacks; a process to prevent the recordkeeper Hewitt from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; a process to avoid paying unreasonable fees to Financial Engines for advice; a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan; a process to determine whether maintaining particular investment strategy was in participants' interest; and a process

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

to ensure the fiduciaries monitored the Emerging Markets Equity Fund's investment management fees and investment returns; and

d. failing to remove appointees whose performance was inadequate in that they continued to allow improper and unreasonable administrative expenses to be charged to Plan participants and imprudent investment options to remain in the Plan, all to the detriment of Plan participants' retirement savings.

147.    Each fiduciary who delegated its fiduciary responsibilities to another fiduciary likewise breached its fiduciary monitoring duty by, among other things:

a. failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b. failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unreasonable administrative fees and imprudent investment options in violation of ERISA;

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments and kickbacks; a process to prevent the recordkeeper Hewitt from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; a process to avoid paying unreasonable fees to Financial Engines for advice; a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan; a process to determine whether maintaining

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102

particular investment strategy was in participants' interest; and a process to ensure the fiduciaries monitored the Emerging Markets Equity Fund's investment management fees and investment returns; and

d. failing to remove appointees whose performance was inadequate in that they continued to allow improper and unreasonable administrative expenses to be charged to Plan participants and imprudent investment options to remain in the Plan, all to the detriment of Plan participants' retirement savings.

148.    As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Northrop and the other delegating fiduciaries discharged their fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses.

## COUNT VIII

### 29 U.S.C. §1132(a)(3)

### Other Remedies against Northrop

149.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

150.    Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of proceeds from a breach of a fiduciary duty or prohibited transaction is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

151.    By virtue of the roles and responsibilities of Northrop's Board of Directors in appointing and monitoring the Plans' named fiduciary committee members and of other Northrop officers who served as committee members and controlled the payments to Northrop, Northrop knew or should have known that Northrop employees were providing purported services to the Plan and that

Northrop was receiving payments of Plan assets, which were the circumstances constituting the prohibited transactions as alleged in Counts IV and V and the inuring of Plan assets to the benefit of an employer in violation of 29 U.S.C. §1103(c)(1).

152.    To the extent any proceeds from those transactions and the profits Northrop made through its use of Plan assets are not recovered under the above Counts, the Court should order restitution and disgorgement under 29 U.S.C. §1132(a)(3) to restore these funds to the Plan.

153.    On information and belief, Northrop has not dissipated the entirety of the proceeds on nontraceable items, and the proceeds can be traced to particular funds or property in Northrop's possession.

## DEMAND FOR JURY TRIAL

154.    Plaintiffs demand a trial by jury under Fed.R.Civ.P. 38 and the Constitution of the United States.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries of the Plans, respectfully request that the Court:

- find and declare that the Defendants breached their fiduciary duties as described above;
- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties and prohibited transaction and to restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;
- order Defendants to restore to the Plan all profits they made through the use of Plan assets;
- order the disgorgement of all amounts paid by the Plan to Northrop;
- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4th STREET
ST. LOUIS, MO 63102

-41-

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- reform the Plan to render it compliant with ERISA;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and grant other equitable or remedial relief as the Court deems appropriate.

1    September 9, 2016

2    Respectfully submitted,

3    s/  Jerome J. Schlichter

4    SCHLICHTER, BOGARD & DENTON LLP        WILLIAM A. WHITE (SBN

5    Jerome J. Schlichter (SBN 054513)       121681)
     100 South Fourth Street, Suite 1200     wwhite@hillfarrer.com

6    St. Louis, Missouri 63102               HILL, FARRER & BURRILL LLP

7    Telephone: (314) 621-6115               One California Plaza, 37th Floor
     Facsimile: (314) 621-5934               300 South Grand Avenue

8    jschlichter@uselaws.com                 Los Angeles, CA 90071-3147

9    *Counsel for Plaintiffs*                Telephone: (213) 620-0460
                                             Facsimile:  (213) 620-4840

10                                           *Local Counsel for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4ᵗʰ STREET
ST. LOUIS, MO 63102