1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA
10
11   CLIFTON MARSHALL, et al.,         Case No.  CV 16-06794 AB (JCx)
                     Plaintiffs,        **ORDER GRANTING IN PART AND
12                                       DENYING IN PART DEFENDANTS'
     v.                                  MOTION TO DISMISS**
13
     NORTHROP GRUMMAN CORP., et
14   al,
15                   Defendants.
16
17
18
19        Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Complaint,

20   noticed for hearing on January 23, 2017.  (Dkt. No. 45.)  Plaintiffs filed an opposition on

21   December 30, 2016 (Dkt. No. 64), and Defendants filed a reply on January 9, 2017.

22   (Dkt. No. 66.)  The Court heard oral argument on January 23, 2017, and took the matter

23   under submission.  (Dkt. No. 67.)

24        For the following reasons, the Court **GRANTS IN PART** and **DENIES IN**

25   **PART** Defendants' Motion to Dismiss.

26   **I.    BACKGROUND**

27        Plaintiffs Clifton W. Marshall, Thomas W. Hall, Maria E. Midkiff, Manuel A.

28   Gonzalez, Ricky L. Hendrickson, Phillip B. Brooks, and Harold Hylton commenced this

1

proposed class action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., on September 9, 2016.  (Dkt. No. 1, Compl. ¶ 1.)  Plaintiffs are retired and/or former employees of Northrop Grumman Corporation ("Northrop") who, in addition to their beneficiaries, are or may become eligible to receive benefits under the Northrop Grumman Saving Plan.  (Compl. ¶¶ 10-16.)  Plaintiffs allege several claims for breaches of the duties ERISA imposes on plan fiduciaries.

Plaintiffs are also members of the certified class in *In re Northrop Grumman ERISA Litigation*, No. 06-CV-06213-AB (JCx), currently pending before this Court.  In that case, the Court certified a class of Plan participants seeking legal and equitable relief for breach of fiduciary duties under ERISA.  (No. 06-CV-06213, Dkt. No. 643, Order Denying Motions for Reconsideration at 1.)  The Court established May11, 2009, as the cutoff date for the plaintiffs' class claims in that action, and despite a significant stall in the litigation, the Court declined to extend the cutoff date at the plaintiffs' request.  (*See* No. 06-CV-06213, Dkt. No. 652, Order Denying Plaintiffs' Motion to Modify Discovery Period End Date.)  Plaintiffs here subsequently filed the instant lawsuit, representing the present claims "arise[ ] from the same scheme of diverting plan assets to Northrop in the guise of administrative fees—only for the time period following the point at which the Court cut off damages discovery in" *In re Northrop Grumman*. (Opp'n at 1.)

Plaintiffs here make the following allegations.

The Northrop Grumman Savings Plan ("Plan") is an employee pension benefit plan in which participants invest their individual accounts in a variety of investment options controlled by Plan fiduciaries.  (*Id.* at ¶ 6.)  "Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account."  (*Id.*)  The Northrop Grumman Defined Contribution Master Trust holds the assets of the Plan in accordance with the terms of a written trust agreement.  (*Id.* at ¶ 8.)  Northrop's Board of Directors appoints the Trustee of the Master Trust, and the Plan's fiduciaries have full authority over the Trustee as to the

2

disposition of Plan assets.  (*Id.*)

The document governing the Plan designates two committees—an "Administrative Committee" and an "Investment Committee"—which, along with their members, are administrators and named fiduciaries of the Plan.[1]  (Compl. ¶¶ 18, 22.)  Each committee is comprised of three members, to be appointed by Northrop's Board of Directors.[2]  (*Id.* at ¶¶ 19, 23.)   The Board designates certain executives, by virtue of their positions, to sit on these committees regardless of their qualifications or suitability to be an ERISA fiduciary.  (*Id.* at ¶¶ 20, 24.)  These Committees and their members, along with Northrop, are Defendants in this action.  (*See id.* at ¶¶ 23-49.)

Administrative Services Agreements ("ASAs"), entered into by Northrop and the Committees, govern which of Northrop's departments provide administrative and investment services to the Plan.  (*Id.* at ¶ 51.)  The ASAs authorized only Benefits Administration and Services, Benefits Accounting and Analysis, Benefits Compliance, and Investment and Trust Management departments to be reimbursed for services they provided on behalf of Northrop to the plan.  (*Id.* at ¶ 52.)  The Committees were tasked with approving each of the departments' reimbursements and ensuring all charges to the Plan were authorized by the ASAs.[3]  (*Id.* at ¶¶ 53, 54.)

According to Plaintiffs, the Committees failed to comply with the terms of the ASAs, violating their "fiduciary duty to operate the plan solely in the interest of the plan participants" by "allow[ing] the heads of the very departments that were to be paid from Plan assets the authority to authorize payment of Plan assets to those departments."

---

[1] The Investment Committee and its members are fiduciaries of the Plan for investment matters, and the Administrative Committee and its members are fiduciaries of the Plan for all other purposes.  (Compl. ¶¶ 18, 22.)

[2] The Compensation Committee of the Board of Directors appoints individuals to the Administrative Committee, and since 2011, Northrop's CEO appoints individuals to the Investment Committee.  (Compl. ¶¶ 19, 23.)

[3] The ASAs required the Investment Committee to approve expenses of the Investments and Trust Management Department, and the Administrative Committee was required to approve reimbursements from all other authorized departments. (Compl. ¶¶ 53, 54.)

(Compl. ¶ 55.)  "In other words, Northrop effectively exercised unfettered control over its payment from Plan assets, including payments to departments not authorized by the ASAs and payments for services that were not authorized by the ASAs or authorized under ERISA."  (*Id.*)  These departments maximized the expenses charged to the Plan with no regard as to whether those expenses were reasonable, necessary, competitive, or in the exclusive interest of Plan participants.  (*Id.* at ¶¶ 56-58.)

According to Plaintiffs, the Plan also paid unreasonable recordkeeping fees to its recordkeeper, a fault attributable to Defendants.  (*Id.* at ¶ 63.)  From January 1, 2007, to April 1, 2016, Hewitt Associates LLC ("Hewitt") served as the Plan's recordkeeper.  From at least 2010 to 2016, Hewitt was compensated for its services at a fixed rate of $500,000 per month in addition to transaction-specific payments.[4]  (*Id.* at ¶ 68.)  In addition to its set monthly rate plus a per-participant rate per year, Hewitt allegedly received payments from Financial Engines, a provider of investment advice to individual Plan participants who opt in to paying for this service.  According to Plaintiffs, Financial Engine pays Hewitt a portion of the fees Plan participants pay for Financial Engine's advice for nothing in return.  This "kickback" suggests, in Plaintiffs' view, Defendants paid Financial Engines excessive fees for the services provided to participants, and furthermore, that Defendants "failed to properly monitor Hewitt's total compensation from all sources in light of the services Hewitt provided and thus caused the Plan to pay unreasonable administrative expenses to Hewitt."  (*Id.* at ¶¶ 68-71.)

Plaintiffs further allege despite a 23% decrease in the number of Plan participants from 2009 to 2015, Hewitt's per-participant compensation was not likewise reduced, which effectively caused "Hewitt's total recordkeeping compensation to increase over 54% on a per-participant basis to $73 per participant per year, even though Hewitt's recordkeeping services remained the same or declined."  (*Id.* at ¶ 72.)  Plaintiffs allege that from Financial Engines, in particular, Hewitt's compensation increased from

---

[4] Plaintiffs calculate this set rate on a per participant basis, alleging Hewitt was compensated $37-$39.47 per participant per year.  (Compl. ¶ 68.)

$258,120 to over $2.3 million in a two-year period.  (Compl. ¶ 73.)  And in general, the Plan's payments to Hewitt from 2010 to 2015 for recordkeeping services were unreasonably high, ranging from $5.9-7.5 million.  Plaintiffs contend these figures are significantly higher than the $2.5-3.3 million dollar range that they allege is the "outside limit of a reasonable recordkeeping fee" in light of "the nature of the administrative services provided by Hewitt, the Plan's number of participants (100,000-130,000), and the recordkeeping market."  (*Id.* at ¶¶ 74, 75.)  Plaintiffs allege Defendants failed to gauge the reasonableness of Hewitt's fees against an independent third party since 2007, and since 2010, Defendants failed to seek competitive bids for the recordkeeping it required.  (*Id.* at ¶¶ 76, 77.)

Plaintiffs also allege Defendants mismanaged the Emerging Markets Equity Fund since at least 2010.  The Emerging Markets Fund was a Plan investment option that invested in securities issued by developing countries.  (*Id.* at ¶ 79.)  Plaintiffs allege the Fund consistently underperformed its benchmark since 2010, and Defendants failed to determine whether maintaining a strategy of active management continued to be in the best interests of Plan participants.  (*Id.* at ¶¶ 86-88.)  Plaintiffs contend Defendants' failure to more prudently manage the fund earlier cost Plan participants $30 million in performance losses and $12 million in unreasonable investment management fees.  (*Id.* at ¶¶ 89-90.)

In light of these allegations, Plaintiffs seek to certify as a class Plan participants or beneficiaries since May 11, 2009, who were affected by Defendants' alleged conduct.  (*Id.* at ¶ 99.)  Plaintiffs allege three counts of breach of fiduciary duties for (1) payments to Northrop, (2) unreasonable administrative and recordkeeping fees, and (3) management of the Emerging Markets Equity Fund; three counts of prohibited transactions (1) between the Plan and Northrop as a party in interest, (2) between the Plan and Northrop, and (3) between the Plan and its service providers; one count of failure to monitor; and one count for other remedies against Northrop.

///

5

1  **II.   LEGAL STANDARD**

2  **A. Rule 12(b)(1) Subject Matter Jurisdiction[5]**

3  A motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(1)

4  examines the court's subject matter jurisdiction.  When a party moves to dismiss for

5  lack of subject matter jurisdiction, "the plaintiff bears the burden of demonstrating

6  that the court has jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

7  375, 377 (1994).   If a plaintiff lacks standing, the court lacks subject matter

8  jurisdiction under Article III of the U.S. Constitution.  *Cetacean Cmty. v. Bush*, 363

9  F.3d 1160, 1174 (9th Cir. 2004).

10  **B. Rule 12(b)(6) Failure to State a Claim**

11  Rule 8 requires a "short and plain statement of the claim showing that the

12  pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2).  The statement must provide

13  enough detail to "give the defendant fair notice of what the . . . claim is and the

14  grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

15  (quotations omitted).  The complaint must also be "plausible on its face," allowing the

16  Court to "draw the reasonable inference that the defendant is liable for the misconduct

17  alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is

18  not akin to a 'probability requirement,' but it asks for more than a sheer possibility

19  that a defendant has acted unlawfully." *Id.*  Labels, conclusions, and a "formulaic

20  recitation of the elements of a cause of action will not do." *Id.*  (quoting *Twombly*,

21  550 U.S. at 555).

22  Under Rule 12(b)(6), a defendant may move to dismiss a pleading for "failure

23  to state a claim upon which relief can be granted." Fed. R. Civ. Proc. 12(b)(6).  When

24  ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual

25  allegations contained in the complaint" and construe the pleading in the light most

26

27  [5] The Court construes Defendants' motion to dismiss for lack of standing as a Rule
12(b)(1) motion, though Defendants do not characterize it as such.  *See* Fed. R. Civ.
28  Proc. 12(b)(1).

favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

## III.   DISCUSSION

Defendants seek dismissal of Plaintiffs' claims on three grounds. First, Defendants argue the claims are time-barred. Second, Defendants argue Plaintiffs have not established Article III standing with respect to the Emerging Markets Fund and Financial Engines services. And third, Defendants argue Plaintiffs fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Court addresses each argument in turn.

### A. Statute of Limitations

Defendants argue Plaintiffs' breach of fiduciary duty claims are barred under ERISA's statute of limitations. The statute provides that "no action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation . . . after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. Subsection one is a "prototypical statute of repose," which "demarcates a fixed period of time within which a plaintiff can file a complaint." *Arivella v. Lucent Techs., Inc.*, 623 F. Supp. 2d 164, 173 (D. Mass. 2009). Subsection two is a "standard statute of limitations, requiring that a plaintiff file suit within a certain period of time after he or she becomes aware of an injury suffered." *Id.* The fraud and concealment provision is

7

considered an exception to the six-year statute of repose.  Thus, in the overall

framework, to extend the statute beyond six years, a plaintiff must allege fraud or

concealment (allegations that are not present here), and to shorten the statute to three

years a defendant must show actual knowledge—that is, knowledge of the transaction

that constituted the alleged violation, not knowledge of the law.  *Blanton v. Anzalone*,

760 F.2d 989, 992 (9th Cir. 1985).

Under § 1113(2), "actual knowledge" is measured from the earliest date a plaintiff

knew of the breach, even if the conduct at issue "may be viewed as a series of breaches,"

so long those breaches "all were of the same character."  *Phillips v. Alaska Hotel & Rest.*

*Emps. Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991) (rejecting the district court's

reasoning that even discrete-yet-related breaches would begin anew the statute of

limitations); *see also Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) ("[F]or

claims subject to § 1132(2), the earliest date of actual knowledge of a breach begins the

limitations period, even if the breach continues.  When a plaintiff has actual knowledge

of a breach, § 1113(2) operates to keep her from sitting on her rights and allowing the

series of related breaches to continue.").  In other words, "if the breaches are of the

same kind and nature and the plaintiff had actual knowledge of one of them more than

three years before commencing suit, § 1113(2) bars the action."  *Phillips*, 944 F.2d at

521.

However, when a plaintiff does not have actual knowledge of a breach of

fiduciary duty that is continuing in nature, "each new breach begins a six-year

limitations period under § 1113(1)."  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th

Cir. 2016).  For example, the Supreme Court stated a fiduciary's continuing duty to

monitor investments would fall into this category and thus trigger section 1113(1) even

if the initial selection of the investment fell outside of the six-year period.  *Tibble v.*

*Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("In short, under trust law, a fiduciary

normally has a continuing duty of some kind to monitor investments and remove

imprudent ones.  A plaintiff may allege that a fiduciary breached the duty of prudence by

8

failing to properly monitor investments and remove imprudent ones.  In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely.").  Thus, the Supreme Court directed lower courts to consider the nature of the fiduciary duty in analyzing the when the statute of limitations was triggered under § 1113(1) if the shorter statute was not triggered by a plaintiff's actual knowledge of the alleged violation.  *Id.* at 1827-28.

The requisite analysis to determine whether Plaintiffs' claims are time-barred thus involves examining (1) when the alleged breaches occurred, (2) whether Plaintiffs had actual knowledge of them so as to trigger the three-year statute, and if not, (3) whether the six-year statute of limitations has expired, or (4) if the nature of the duty allegedly breached was continuing such that the six-year statute of limitations was re-triggered by a later and continuing breach.

Defendants first argue Plaintiffs' claims here are barred by the three-year statute because they had actual knowledge of their reimbursement claims when they sought to extend the discovery period in *In re Northrop Grumman* past the May 11, 2009, cutoff date.  (Mot. at 5.)  Defendants rely on statements made by plaintiffs in that case—a case in which Plaintiffs here are class members—which indicate the discovery extension they sought related to the same conduct underlying the claims already set for trial and were continuing at least up to the point the discovery motion was filed.  (Dkt. No. 650 at 33:25-34:14.)  Defendants assert these statements in *In re Northrop Grumman* therefore reveal Plaintiffs here had actual knowledge of their claims more than three years prior to filing this Complaint.[6]

---

[6] Defendants argue that as members of the certified class in *In re Northrop Grumman*, Plaintiffs here have an attorney-client relationship with class counsel—who are also counsel here—and are/were therefore on notice of all facts known to their lawyers. (Mot. at 5 n.5 (citing *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141-42 (9th Cir. 1989).).  Plaintiffs argue this is "imputed," not "actual," knowledge.  Because Defendants have not effectively    argued Plaintiffs' purported knowledge of the Defendants' conduct bars their claims, the Court need not address this point at this time.

1    But Defendants have not pointed the Court to any facts particular to each claim

2    that would support this theory, and the Court will not sift through Defendants' haystack

3    of supporting exhibits to find them.  Nor have Defendants attempted to characterize *of*

4    *what* or *from when* Plaintiffs had actual knowledge so as to assist the Court in applying

5    the statute of limitations to the claims here.  Instead, Defendants' argument on this issue

6    is limited to the following: "Although actual knowledge cannot always be discerned

7    from the face of a complaint (or by taking judicial notice), Plaintiffs here can hardly

8    dispute their actual knowledge.  Indeed, in seeking to extend the discovery period in *In*

9    *re Northrop*, Plaintiffs contended that they were actively pursuing the claim[7] in this

10   Complaint related to the services provided by Northrop."  (Mot. at 5.)  Following several

11   citations to Plaintiffs' statements in *In re Northrop Grumman*,[8] Defendants conclude:

12

13   _____

[7] Nowhere do Defendants clarify to which claim in this action they refer, nor do they
point to the claims in *In re Northrop Grumman* they contend Plaintiffs attempt to
14   litigate anew here.
[8] These statements Defendants cite also lack any specificity that would aid the Court
15   in evaluating *of what* Plaintiffs knew that would bar their claims.

16       The first reads, "The payments arise out of the same course of conduct that is
the subject of Plaintiffs' administrative fee claims that will go to trial, and the Plans
17   and class have continued to be harmed by the improper payments."  (Mot. at 5 (citing
Dkt. No. 644 at 9-10).)  Defendants do not explain whether these "improper
18   payments" Plaintiffs' counsel referred to involved the recordkeeping fees paid to
Hewitt, the unauthorized charges from Northrop to the Plan, or something else
19   entirely.
20       The second statement reads, "Plaintiffs' motion does not involve 'new claims.'"
(*Id.* (citing Dkt. No. 647 at 1).)  But it does not necessarily follow that the Complaint
21   filed *after* this statement was made contained no new claims or allegations such that
the entire Complaint in this action would be barred by this statement.  Defendants do
22   not demonstrate otherwise.
23       The third statement reads, "It's our contention and our belief, based on just
what's been filed with the Department of Labor, that nothing changed after 2009.
24   They just kept making the same payments to themselves under the exact same system
that they had before."  (*Id.* (citing Dkt. No. 650 at 33:25-34:4.)  At least from this
25   quotation it can plausibly be inferred Plaintiffs' counsel was discussing the
unauthorized charges Northrop departments allegedly made to the Plan, but still, even
26   this bare citation does not direct the Court to which of Plaintiffs' claims warrant
27   dismissal.
         Put simply, a single paragraph that imprecisely asserts actual knowledge falls
28   short of satisfying Defendants' burden in seeking to dismiss the Complaint, no matter

"That acknowledgment estops Plaintiffs from denying knowledge here." (*Id.*)

Defendants' sweeping conclusions are insufficient to support the outright dismissal of Plaintiffs' Complaint.  Surely the representations by Plaintiffs' counsel in *In re Northrop Grumman* can be construed to suggest Plaintiffs here had actual knowledge of the alleged violations more than three years prior to the filing of this Complaint.  But suggestions do not satisfy Defendants' burden on this motion, where all inferences are to be drawn in favor of Plaintiffs.  And, as Plaintiffs point out, the request for additional discovery in the prior case can also be construed to suggest Plaintiffs did not have the requisite knowledge to sufficiently allege these claims at the time of their motion. (Opp'n at 8.)   The existence of a pending lawsuit alleging similar claims, in itself, does not reveal Plaintiffs here had actual knowledge so as to trigger the three-year statute as to each of their claims.  That is all Defendants have argued here—that an unspecified course of conduct, the same or similar to that alleged in *In re Northrop Grumman*, was ongoing and Plaintiffs knew about it.  Defendants' argument is overbroad, and the Court will not so bluntly dismiss an entire case.

Defendants also argue the six-year statute bars Plaintiffs' claims because Plaintiffs define the putative class as "all persons . . . who are, or since May 11, 2009 were, participants or beneficiaries of the Northrop Grumman Savings Plan," but the Complaint was filed over six years after May 11, 2009.  (Opp'n at 7.)  This argument ignores the Supreme Court's guidance in *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), to evaluate the nature of the fiduciary duty at issue.  The fact that the Complaint was filed more than six years after 2009 does not automatically bar claims of breaches of continuing fiduciary duties.  Defendants do not address this point or attempt to characterize the duties at issue in such a way that the 2009 cutoff date would be dispositive.  Once again, the Court will not make Defendants' case for them.

Plaintiffs have alleged breaches of fiduciary duties in the six years prior to the

how straightforward their general theory may be.

1    filing of the Complaint.  For example, Plaintiffs allege the Plan paid unreasonably high

2    recordkeeping fees to Hewitt between 2010 and 2016.  (Compl. ¶¶ 68-75.)  It is not

3    immediately clear, and Defendants do not argue, that the fiduciary duties relating to

4    recordkeeping fees are not of the continuing type described in *Tibble*.  If they are

5    continuing, or if the duties were breached as late as 2010 as the number of Plan

6    participants decreased, Plaintiffs' Complaint, filed in September 2016, could very well

7    be timely.  At the same time, however, these allegations look similar to those set forth in

8    the Second Amended Complaint in *In re Northrop Grumman.*  (*See* No. CV 06-6213-

9    AB, Dkt. No. 338, Plaintiffs' Revised Consolidated Second Amended Complaint ¶

10   57(D).)  It is equally plausible to the Court Plaintiffs may have had actual knowledge of

11   the ongoing violations far earlier than three years prior to the filing of this action.

12   Without sufficient briefing from either side on this matter, the Court will not dismiss the

13   case on this basis.

14        However, defining the putative class as Plan participants or beneficiaries as of

15   May 11, 2009, is problematic.  (*See* Compl. ¶ 99.)  Under no circumstance would claims

16   on that date be timely under section 1113.  Based on the filing of the Complaint, the

17   earliest point in time Plaintiffs' claims could have arisen such that they would be timely

18   would be September 9, 2010—six years prior to filing.  *See* 29 U.S.C. § 1113(1).  And it

19   is quite possible, depending on whether Plaintiffs' had actual knowledge of their alleged

20   violations, that Defendants' conduct prior to September 10, 2013, would be barred by

21   the three-year statute.  *See* 29 U.S.C. § 1113(2).  In either case, section 1113 bars

22   Plaintiffs from defining the class by the May 11, 2009, cutoff date.

23        On this point, Plaintiffs argue the filing of the class action in *In re Northrop

24   Grumman* tolled the statute of limitations in this case.  (Opp'n at 10.)  According to

25   Plaintiffs, the statute of limitations was tolled in accordance with *American Pipe &

26   Construction Company v. Utah*, 414 U.S. 538 (1974), because "the improper payment

27   claims in this case are encompassed within the scope of the *Northrop* complaint" such

28   that "Defendants had fair notice of these claims."  (Opp'n at 11.)  But this argument

1    misreads *American Pipe*, and if anything, further suggests Plaintiffs had actual

2    knowledge of continuing violations occurring long before May 11, 2009.

3        In *American Pipe*, the Supreme Court held "the commencement of a class action

4    suspends the applicable statute of limitations as to all asserted members of the class who

5    would have been parties had the suit been permitted to continue as a class action."  414

6    U.S. at 553.  The Supreme Court confirmed this rule in *Crown, Cork & Seal Co. v.*

7    *Parker*, 462 U.S. 345, 354 (1983): "Once the statute of limitations has been tolled, it

8    remains tolled for all members of the putative class until class certification is denied.  At

9    that point, class members may choose to file their own suits or intervene as plaintiffs in

10   the pending action."  The purpose of this rule is to protect plaintiffs who justifiably rely

11   on a class action to litigate their claims from prejudice if that class is later decertified

12   after the statute of limitations has run.   But the rule is wholly inapplicable here.  The

13   class action in *In re Northrop Grumman* has not been dismissed, but instead is weeks

14   away from trial.  Even if that class were to lose certification, the class members' claims

15   *in that case* would be tolled under *American Pipe*.  But the *American Pipe* rule does not

16   extend to distinct lawsuits, no matter how similar the claims, and Plaintiff has not cited

17   any authority that suggests it does.  Moreover, the pendency of *In re Northrop Grumman*

18   would not toll the statute of limitations for claims arising *after* the cutoff date in that

19   case—as Plaintiffs concede, this case arises out of conduct after May 11, 2009, because

20   the Court established this discovery cutoff date in the prior case.

21       Plaintiffs' reliance on *William Inglis & Sons Baking Co. v. ITT Continental*

22   *Baking Co.*, 688 F.2d 1014 (9th Cir. 1981), is similarly misplaced.  (*See* Opp'n at 11.)

23   In *Inglis*, the Ninth Circuit discussed supplemental pleadings filed after the

24   commencement of suit under the relation-back back doctrine and Federal Rule of Civil

25   Procedure 15.  *Inglis*, 688 F.2d at 1057.  The court stated that the statute of limitations

26   should not be an issue where "the original pleading gave notice that the alleged wrongful

27   conduct was of a continuing nature," and the "supplemental pleadings addressed [ ] the

28   same conduct."  *Id.*  As Plaintiffs well know, there are no supplemental pleadings in this

1    action.  Plaintiffs filed a lawsuit separate from *In re Northrop Grumman*, and the

2    Complaint Defendants seek to dismiss is the original pleading in this action.  There is no

3    other document *in this case* that would give Defendants "notice that the alleged

4    wrongful conduct was of a continuing nature," such that the statute of limitations would

5    not be implicated.  *Id.*  Plaintiffs' suggestion that original complaints in entirely new

6    actions could be construed as "supplemental" pleadings to those filed in different

7    lawsuits would obliterate the statute of limitations entirely.

8           Plaintiffs knew of the May 11, 2009 cutoff date as early as 2010.  They filed this

9    action as a result of this cutoff, yet they did not do so until 2016.  The mere existence of

10   a related case alleging similar claims does not toll the statute of limitations until a

11   plaintiff finds it convenient to file another action.  Plaintiffs here knew of the 2009 cutoff

12   and were therefore on notice that the statute of limitations for claims arising from

13   conduct after that time was not tolled.

14          Despite that Defendants have failed to secure dismissal on their statute of

15   limitations argument, and in light of the fact that the statute of limitations was not tolled

16   by *In re Northrop Grumman*, the Complaint must be dismissed insofar as the class

17   definition dates back to May 11, 2009.  The Court therefore **GRANTS** Defendants'

18   Motion.  But finding this defect could reasonably be cured by amendment, the Court

19   also grants Plaintiffs leave to amend the class definition.

20          **B. Standing**

21          Defendants next argue Plaintiffs do not sufficiently allege they suffered an injury-

22   in-fact so as to establish standing under Article III of the Constitution with respect to the

23   Plan's losses from the Emerging Markets Equity Fund and management fees involving

24   Financial Engines.  (Mot. at 8.)

25          To establish Article III standing, a plaintiff must demonstrate "(1) an injury-in-

26   fact, (2) [that is] fairly traceable to the challenged conduct of the defendant, and (3)

27   [that is] likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.

28   Robins*, 136 S.Ct. 1540, 1543 (2016).  The injury-in-fact requirement calls for a

Plaintiff to demonstrate that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61(1992).

### 1.    Emerging Markets Equity Fund

With respect to the Emerging Markets Equity Fund claim, Defendants argue Plaintiffs fail to allege they invested in this fund, such that they have not shown they suffered an injury-in-fact from the poor returns allegedly cause by the imprudent investment. (Mot. at 8-9.) Plaintiffs counter they are authorized to sue derivatively on behalf of the Plan.[9] (Opp'n at 23.) ERISA does "authorize plan participants to sue fiduciaries for losses the plan suffers from a breach of their duties." *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1124 (9th Cir. 2006); *see* 29 U.S.C. § 1132(a). But this statutory authorization does not itself confer Article III standing; Plaintiffs must sufficiently allege they suffered an injury-in-fact. *Id.* at 1127 ("ERISA plan beneficiaries may bring suits on behalf of the plan in a representative capacity . . . so long as plaintiffs otherwise meet the requirements for Article III standing.").

The Court agrees with Defendants that allegations of injury suffered by the named Plaintiffs in this action are lacking. The Complaint simply does not allege any of the named Plaintiffs invested in the Emerging Markets Equity Fund. Plaintiffs do allege "Plan participants would have avoided in excess of $30 million in performance losses comparted to the investment returns of the Fund's benchmark index and lower-cost

---

[9] Plaintiffs also argue they have standing because the "losses occasioned by a breach of fiduciary duty are redressable . . . ." (Opp'n at 23 (citing *Harris v. Amgen*, 573 F.3d 728, 736 (9th Cir. 2009.) But this statement conflates injury-in-fact with redressability, two distinct standing inquiries. Plaintiffs are correct that losses sustained by defined benefit plans are redressable—that is, able to be remedied—if a plaintiff sues to have those losses restored to the plan. But that a plan's losses may be restored does not itself establish that the particular plaintiff has suffered an injury-in-fact and thus has a "direct stake in the outcome of the litigation." *Glanton*, 465 F.3d at 1126. Though perhaps argued imprecisely in the moving papers, the injury-in-fact prong is at issue here.

1  passively managed emerging markets equity funds, such as the Vanguard Emerging

2  Stock Index Fund." (Compl. ¶ 90.)  They continue, "Plan participants would also have

3  avoided over $12 million in unreasonable investment management fees compared to

4  lower-cost passively managed alternatives that were available to the Plan. . . ." (*Id.*)  It is

5  not entirely clear from the Complaint, but it appears that although the management fees

6  may have been borne by all Plan participants such that Plaintiffs could assert a

7  cognizable injury, the alleged performance losses were sustained by only those who

8  invested in the Emerging Markets Equity Fund.  At least as to this latter allegation,

9  Plaintiffs have not alleged they individually invested in that fund such that they have

10  suffered a concrete injury.

11        Plaintiffs attempt to cure this defect by attaching to their opposition declarations

12  demonstrating their investments, but at this stage of the litigation, this effort does not

13  suffice.  Though the Court may "look beyond the complaint to matters of public record"

14  to establish jurisdictional facts,[10] *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 983 (N.D.

15  Cal. 2009), Plaintiffs' retirement fund statements are not public record—a fact that is

16  evident, at the very least, from the redactions on each exhibit.  (*See, e.g.*, Declaration of

17  Sean E. Soyars in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss ¶

18  2, Ex. 1.)

19                    **2.      Financial Engines**

20        Defendants argue Plaintiffs also fail to allege they enrolled in Financial Engines'

21

22  [10]Article III standing issues concern the Court's subject matter jurisdiction, an issue
   properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1),
23  not Rule (12)(b)(6) as Defendants assert.  *See Sanders*, 672 F. Supp. 2d at 983.  Under
   Rule 12(b)(1), a defendant may make a facial attack, in which the Court's review is
24  limited to the allegations in the complaint, or a factual attack, in which the court may
   consider certain extrinsic evidence without converting the motion to one for summary
25  judgment.  *Richter v. CC-Palo Alto, Inc.*, 176 F. Supp. 3d 877, 884-85 (N.D. Cal.
26  2016); *Cal. Sportfishing Protection Alliance v. All Star Auto Wrecking, Inc.*, 860 F.
   Supp. 2d 1144, 1147 (E.D. Cal. 2012.)  Defendants do not distinguish whether their
27  challenge is a facial or factual one, but under either challenge, Plaintiffs' Complaint
   would still fail.
28

Professional Management Services, such that they suffered injury from excessive fees or kickbacks to Hewitt, the entity that provided recordkeeping services to the Plan.  (Mot. at 9.)  Plaintiffs allege both that "participants paid Financial Engines excessive fees for the services Financial Engines provided to them" (Compl. ¶ 70), and that Hewitt, the entity that provided recordkeeping services from 2010-2016, "received indirect compensation from . . . Financial Engines" but "provide[d] no services to Financial Engines or the Plan participant to justify this payment to Hewitt from participants' Plan assets." (*Id.* at ¶ 69.)  Plaintiffs' allegations also indicate that participants who opted to receive Financial Engines' services paid those fees, not the Plan itself: "Financial Engines receives a fee based on the percentage of assets in the participant's 401(k) account.  Thus, since Financial Engines provided its advice services for less than the fee that was being charged to participants *who paid it*, participants paid Financial Engines excessive fees for the services Financial Engines provided to them."  (*Id.* at ¶¶ 69, 70 (emphasis added).)  Plaintiffs have not alleged they opted to receive Financial Engines' services such that they would have been injured by Financial Engines' payment to Hewitt, or Hewitt's receipt of these additional fees.

Thus, because Plaintiffs failed to allege both that they invested in the Emerging Markets Equity Fund and that they paid for Financial Engines' services, the Court finds they lack standing to claims relating to these investment options.  However, considering the declarations submitted in support of Plaintiffs' Opposition, amending the Complaint will likely cure at least some of these defects, so the Court grants Plaintiffs leave to amend allegations claims involving the Emerging Market Equity Fund and Financial Engines.  Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss.

### C. Failure to State a Claim

#### 1.        Counts IV, V, VI: Prohibited Transactions

Under Count IV, Defendants claim Plaintiffs fail to allege Northrop received compensation that was not reasonable to overcome the exemption provided in 29 U.S.C. 1108.  (Mot. at 8.)  But Plaintiffs allege a violation of 29 U.S.C. § 1106(a), which "does

1  not by its terms demand that a plaintiff make any allegation of unreasonableness.  The

2  exemption for reasonable compensation is in a separate section of the statute, and it is a

3  general rule of statutory construction that the burden of proving justification or

4  exemption under a special exception to the prohibitions of a statute generally rests on

5  one who claims its benefits."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601-02

6  (8th Cir. 2009); *see also Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 676 (7th Cir.

7  2016) ("[A]n ERISA plaintiff need not plead the absence of exemptions to the prohibited

8  transactions.  It is the defendant who bears the burden of proving a section 408 [29

9  U.S.C. § 1108] exemption.").  Plaintiffs' Complaint does not warrant dismissal on this

10  basis.

11       As to the remaining counts of prohibited transactions, Defendants argue they must

12  be dismissed because Northrop is permitted to be both a Plan sponsor and service

13  provider, and that Plaintiffs have not alleged any facts to support their claim that

14  Northrop's role of a service provider exceeded the statutory parameters to amount to

15  disloyalty.  (Mot. at 16.)  But Plaintiffs do allege Northrop made unauthorized payments

16  to its own departments, and that it "sought to maximize the amount charged to the Plan

17  for expenses incurred by Northrop's corporate departments regardless of whether those

18  expenses were reasonable and necessary for the services provided or directly incurred in

19  the operation and administration of the Plan."  (Compl. ¶¶ 55, 56.)  Contrary to

20  Defendants' argument, the Court reads these statements as allegations that Defendants'

21  conduct went beyond what was legally permissible and at Plaintiffs' expense.  But

22  Defendants do not address these allegations, or how they would be insufficient to defeat

23  a motion to dismiss.  Without argument that actually addresses Plaintiffs' allegations, the

24  Court will not dismiss them.  Accordingly, the Court **DENIES** Defendants' Motion as to

25  Counts IV, V, and VI.

26

27

28

18

1
2

**2.      Count II: Breach of Fiduciary Duties for Fees Paid to**

**Hewitt and Financial Engines[11]**

3      ERISA requires that "fiduciaries act with the type of 'care, skill, prudence, and

4   diligence under the circumstances' not of a lay person, but of one experienced and

5   knowledgeable with these matters. [ ] Fiduciaries also must act exclusively in the interest

6   of beneficiaries." *Tibble v. Edison International*, 729 F.3d 1110, 1133 (9th Cir. 2013),

7   *overruled on other grounds*, 133 S. Ct. 1823 (2015) (citing 29 U.S.C. § 1104(a)).

8   Defendants appear to limit their challenge to the allegedly imprudent nature of the

9   recordkeeping agreement with Hewitt (*see* Mot. at 18), and the Court will limit its

10  analysis accordingly.

11      In discussing the duty of prudence, the Ninth Circuit recently stated that "cost-

12  conscious management is fundamental to prudence in the investment function and

13  should be applied not only in making investment but also in monitoring and reviewing

14  investments." *Tibble*, 729 F.3d at 1198.  The duty of prudence ERISA imposes "focuses

15  on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks

16  whether a fiduciary employed the appropriate methods to investigate and determine the

17  merits of a particular investment." *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016

18  WL 4502808, at *5 (N.D. Cal. Aug. 29, 2016) (citing *Pension Benefit Guar. Corp. ex rel*

19  *St. Vincent v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 716 (2d Cir. 2012).

20      Defendants argue (1) Plaintiffs' allegations that recordkeeping fees could have

21  been lower are "broad generalizations" that fail to state a claim, (2) ERISA imposes no

22  obligation to put contracts out to bid at particular intervals, and (3) a "gamut of

23  legitimate reasons Financial Engines would share its profits with Hewitt" exists.  (Mot.

24  at 17-18.)

25

26  _____

[11] Defendants argue for dismissal of Counts II and VI on the same grounds (*see* Mot.
27  at 17), but it appears Defendants' arguments only pertain to Count II.  To the extent
the arguments also apply to Count VI, the Court denies Defendants' Motion to
28  Dismiss for the same reasons discussed in this section.

With respect to Defendants' first and second contentions, Plaintiffs allege "prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount per participant in the plan rather than as a percentage of plan assets." (Compl. ¶ 65.) "Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services, leading to unreasonable fees." (*Id.*) Plaintiffs allege Hewitt was overcompensated when the number of plan participants dwindled by over 31,000 accounts from 2009 to 2015 because "the recordkeeping services provided by Hewitt to the Plan remained the same or declined," but because compensation was based on assets rather than per participant, "Hewitt's total recordkeeping compensation [increased] by over 54% on a per-participant basis." (*Id.* at ¶ 72.) This resulted in, according to Plaintiffs, paying Hewitt "nearly triple a reasonable fee for these services, resulting in millions of dollars in unreasonable recordkeeping fees each year" from Plan participants' retirement investments. (*Id.* at ¶ 75.)

Specifically, Plaintiffs allege the per-participant cost of recordkeeping in 2007, when the arrangement was negotiated, was between $37 and $39.47 year (*Id.* at ¶ 68), and that the fee per participant increased to between $48 and $73 per year between 2007 and 2016. (*Id.* at ¶75.) They allege competitive bids per participant fees for plans with over 100,000 participants would have amounted to $25. (*Id.* at ¶ 74.) Plaintiffs allege Defendants failed to conduct any fee monitoring—either by hiring a consultant to provide benchmark comparisons with other plans or by conducting a competitive bidding process. (*Id.* at ¶¶ 76, 77.)

Defendants' main challenges to these allegations are (1) Plaintiffs provide no support that prudent fiduciaries negotiate recordkeeping fees on a per participant basis, (2) Plaintiffs ignore the potential downsides of calculating fees on a per participant basis, and (3) Plaintiffs have not shown the fee arrangement was unreasonable at its negotiation. (Mot. at 12-13.) But these arguments attempt to litigate the claim—they do

1    not address the sufficiency of Plaintiffs' allegations at the pleading stage.  It may well

2    turn out the terms of the recordkeeping arrangement were the most favorable and

3    prudent under the circumstances, despite Plaintiffs' calculations otherwise.  But that is

4    not the relevant inquiry here.  Plaintiffs have alleged Plan participants paid

5    recordkeeping fees significantly in excess of competitive terms for a period of at least

6    six years, when information was available to Plan fiduciaries that could have mitigated

7    or avoided these losses.  These allegations are sufficient to survive a motion to dismiss.

8         Defendants rely on *White v. Chevron Corp.*, a case alleging a similar breach of the

9    duty of prudence claim, to argue Northrop's replacement of Hewitt with Fidelity for

10   recordkeeping services demonstrates its prudent monitoring of the Plan's fees, and that

11   ERISA does not require that fiduciaries provide a competitive bidding process to

12   determine the reasonableness of plan fees.  (Mot. at 14-15.)  But the facts in *White* are

13   distinguishable.  There, fiduciaries replaced their recordkeepers after two years.  *White*,

14   2016 WL 4502808, at *13.  Here, it took six, during which time Plaintiffs argue

15   Defendants never engaged in monitoring, at an alleged cost of nearly $30 million

16   dollars.  (Compl. ¶¶ 76, 78.)  As to the second point—that this claim warrants dismissal

17   because Defendants were not required to solicit competitive bids—*White*'s discussion

18   was more nuanced.  There, discussing a different case, the court recognized a failure to

19   solicit bids may be warranted if facts are available that indicate "the same services were

20   available for less on the market."  *White*, 2016 WL 4502808, at *14.  Plaintiffs here

21   allege an objective fee per participant during the relevant time period would have been

22   $25, nearly $50 less than highest fee charged to Plan participants, according to Plaintiffs'

23   allegations.  (*See* Compl. ¶¶ 72, 74.)  Based on these differences, the Court finds this

24   claim does not warrant dismissal in light of *White*.

25        Turning to Financial Engines, the Court declines to address Defendants' argument

26   because Plaintiffs have not shown they have standing to challenge Defendants' conduct

27   with respect to Financial Engines.

28        Thus, the Court **DENIES** Defendants' Motion to Dismiss Count II with respect to

Defendants' failure to assess Hewitt's recordkeeping fees.  The Court **GRANTS** the Motion to the extent the breach of fiduciary duty claim turns on Hewitt's receipt of fees from Financial Engines.  This partial dismissal is without prejudice, as discussed in Section B.2., *supra*.

### 3.      Count III: Breach of Fiduciary Duty Regarding the Emerging Markets Equity Fund

As discussed in Section B.1., *supra*, Plaintiffs have not sufficiently alleged standing as it relates to this claim.  Accordingly, the Court declines to address Defendants' arguments under Rule 12(b)(6) for this claim.

### 4.      Count VII: Failure to Monitor

Defendants seek dismissal of Count VII on three grounds.  First, Defendants argue this claim should be dismissed because "an ERISA 'duty to monitor' claim is derivative in nature and requires a plaintiff to first demonstrate that there was an underlying breach of fiduciary duty."  (Mot. at 21.)  But Plaintiffs' other claims have, at least in part, survived Defendants' Motion such that dismissal of Count VII is not warranted on this ground.

Second, Defendants argue Plaintiffs "do not allege any specific facts to support a supposed monitoring failure."  (*Id.*)  But Plaintiffs essentially allege Defendants did nothing at all to monitor their appointed fiduciaries: Northrop failed to "evaluate their [appointees'] performance, or to have a system in place for doing so," and "ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive," and "remove appointees whose performance was inadequate."  (Compl. ¶ 146.)  These allegations, in addition to those underlying the breach of fiduciary duties claims, are sufficient to state a claim for failure to monitor.

Third, Defendants argue Northrop was not a fiduciary because its CEO, not its Board of Directors, appoints members of the Administrative and Investment Committees.  (Mot. at 22.)  But in their Reply papers, Defendants assert a different

position regarding Northrop's fiduciary status.  There, Defendants argue, "by merely exercising its powers to appoint fiduciaries and delegate administrative responsibility, Northrop did not expose itself to the type of open-ended liability alleged in the Complaint."  (Reply at 19-20.)  In essence, Northrop conceded its limited role as a fiduciary in arguing any liability should be limited to claims for failure to monitor its appointees.  Northrop's failure to deny its fiduciary role in its Reply thus negates Defendants' argument in its Motion.  Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Count VII on these grounds.

### 5.        Northrop as a Fiduciary

Defendants next seek dismissal of the breach of fiduciary duty claims against Northrop because they claim Northrop is not a named or functional fiduciary with respect to the duties of loyalty and prudence Plaintiffs allege were violated.  (Mot. at 22; Reply at 19-20.)  Plaintiffs concede Northrop is not a named fiduciary under the Plan, but argue it has sufficiently alleged Northrop is a functional fiduciary under 29 U.S.C. § 1002(21)(A).[12]  (Opp'n at 24.)  In particular, Plaintiffs assert Northrop appoints its executives to serve on the Administrative and Investment Committees, and they in turn determine how much to pay Northrop from the Plan.  (Opp'n at 24; Compl. ¶¶ 19-24, 53-54.)  Thus, according to Plaintiffs, "[b]y controlling committee membership and appointing high-ranking executives—Northrop agents—to serve in those positions, Northrop exercised de facto and "unfettered control" over Plan assets and its own compensation."  (Opp'n at 24.)

"[T]he power [ ] to appoint, retain and remove plan fiduciaries constitutes

---

[12] 29 U.S.C. § 1002(21)(A) provides: "Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title."

'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996). But a fiduciary's duties are limited to the extent "it retains or exercises any discretionary authority over the management or administration of a plan." *Id.*; *see also* 29 C.F.R. § 2509.75-8 ("Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act. For example, the board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise 'discretionary authority or discretionary control respecting management of such plan' and are, therefore, fiduciaries with respect to the plan. However, their responsibility, and, consequently, their liability is limited to the selection and retention of fiduciaries.").

Defendants are correct that Plaintiffs do not allege Northrop acted in a fiduciary capacity beyond appointing executives to serve on the Committees such that Northrop could be liable for the breaches of fiduciary duties alleged against its appointees. (Mot. at 22.) And Plaintiffs do not cite authority for the proposition Northrop's fiduciary capacity can somehow be extended beyond the limited discretionary authority it retained to appoint members of the Investment and Administrative Committees. Accordingly, Plaintiffs fail to state a claim for breaches of the fiduciary duties of loyalty and prudence against Northrop. The Court **GRANTS** Defendants' Motion to Dismiss Counts I through VI against Northrop. This dismissal is without prejudice.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss. The Court **GRANTS** Plaintiffs leave to amend the following:

- The putative class period to comport with the statute of limitations;
- Allegations involving Financial Engines and the Emerging Markets Equity Fund in order to establish Plaintiffs' standing; and

1       -   Allegations regarding the extent of Northrop's role as a fiduciary, as discussed in

2           Section 3.C.5., to the extent Plaintiffs are able to supplement their allegations and

3           support their position with relevant, binding authority.

4    Plaintiffs shall file any amended pleading within 21 days of this order or the dismissal

5    will be with prejudice.

6

7         **IT IS SO ORDERED.**

8

9    Dated:  January 30, 2017   _____

10             HONORABLE ANDRÉ BIROTTE JR.

11             UNITED STATES DISTRICT COURT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28