# Daubert Motion Ex. A

Page 1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3    CLIFTON W. MARSHALL, et

4    al.                          Case No:

5            Plaintiffs,      16-cv-6794 AB (JCx)

6        vs.

7    NORTHROP GRUMMAN

8    CORPORATION, ET AL.

9            Defendants.

10

11

12

         Videotape Deposition of David Witz

13

         Wednesday, November 7, 2018

14

         Charlotte, North Carolina

15

         At 8:35 a.m.

16

17

18

19

    Reported by LeShaunda Cass-Byrd, CSR, RPR

20

    TSG Job No. 150161

21

22

23

24

25

1    APPEARANCES OF COUNSEL:

2    On behalf of Plaintiffs:

3         KURT STRUCKHOFF, Esq.
          Schlichter Bogard & Denton

4         100 South 4th Street

5         St. Louis, Missouri 63102

6

     On behalf of Defendant:

7

          NANCY ROSS, Esq.

8         SAMUEL MYLER, Esq.
          Mayer Brown

9         71 South Wacker Drive
          Chicago, Illinois 60606

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          with my attorney.  And my attorney, as I

2          understand it, will be addressing that

3          directly with you.

4     BY MS. ROSS:

5          Q.     Okay.  I want to go back a little bit and

6     explore your background as an expert.  You actually

7     have a company that is dedicated, at least in part, to

8     providing expert work, correct?

9          A.     Yes, that is correct.

10         Q.     And what is the name of that company?

11         A.     That would be Fiduciary Risk Assessment.

12         Q.     Okay.  And has Fiduciary Risk Assessment

13    provided any expert witness reports in which you were

14    not involved?

15         A.     I'm not sure I understand the question.  If

16    I am providing an expert witness report, I would be

17    involved.  So I'm not sure I understand what you --

18         Q.     Are you and Fiduciary Risk Assessment one

19    in the same?

20                So I'm asking, is there anybody else at

21    Fiduciary Risk Assessment that provides expert reports

22    other than you?

23         A.     No.

24         Q.     Okay.  And so you have said -- you said you

25    have issued roughly I think -- did you say 10 to 12

1    reports, expert reports?

2        A.      No, I said 25 to 30.

3        Q.      Okay.  All right.  So you have given 10 to

4    12 depositions --

5        A.      Correct.

6        Q.      Or that order of magnitude?

7                Okay.  So you've issued 25 to 30 reports.

8    Over what time period?

9        A.      That would be since 2008.

10       Q.      Have all of those reports been on behalf of

11   the plaintiffs in the lawsuit?

12       A.      No.

13       Q.      Okay.  How many of those reports have been

14   on behalf of defendants in a lawsuit?

15       A.      Two.

16       Q.      Okay.  Can you tell me what those two cases

17   were?

18       A.      I'm under- -- I'm under disclosure because

19   those were cases that I was not disclosed in.  So I

20   can't discuss the issues pertaining to those

21   particular cases.

22       Q.      So you prepared a report that was never

23   used then?

24       A.      I would say it was used.  I -- I suspect it

25   was used.  I am not sure.  That would be counsel

1    A.    No.

2    Q.    Was it a 403(b)?

3    A.    It was.

4    Q.    Okay.  Was it a nongovernmental

5 organization?

6    A.    It was.

7    Q.    Okay.  And how many employees did this

8 particular plan have?

9    A.    Over 100,000.

10    Q.    And did this plan have more than one record

11 keeper?

12    A.    No, it did not.

13    Q.    Okay.  All right.  What is the next largest

14 benefit plan in terms of assets regarding which you

15 have consulted?

16    A.    About 400 million.

17    Q.    Okay.  So 400 million other than the 4.2

18 billion nonprofit 403(b) plan would be the largest

19 plan on which you have consulted?

20    A.    That is the one that I can remember right

21 now.  When I did a search through my database, I

22 looked for the largest in anticipation of that

23 question.  But I -- I did not pay attention to the

24 other plans that we have in our --

25    Q.    What was the nature -- I'm sorry.

1      A.      -- in our database.  I didn't -- so that is

2   -- but the last one that I -- the other one that I can

3   recall is about a 400 million.

4              Actually, it was -- it was more like 330

5   million, I think now that I am thinking about it.

6      Q.      Okay.  You maintain this database that you

7   refer to?

8      A.      Yes.  We have about 60,000 plans in our

9   database.  We benchmarked close to 5,000 of those

10  plans, recordkeeping, advisor services, custody trust

11  services, administration, communication, education.

12  Pretty much the whole -- whole gambit.

13     Q.      And what is the range of the assets held by

14  those plans in the database?

15     A.      Well, if you are asking me the total,

16  because we publish this on our client's website when

17  they -- when they log into their account, at this

18  point I think we have benchmarked over $336 billion of

19  assets.

20     Q.      I'm asking something different.  I'm

21  talking about individual plans not in the aggregate.

22     A.      Okay.

23     Q.      So in the database, you said that you have

24  a number of plans.  Client plans, I assume, correct?

25     A.      That is correct.

Page 38

1    A.    I don't remember.  I would have to look at

2    my database.

3    Q.    Are your consulting plans generally falling

4    into the 100 million and less?

5    A.    I would say that is fair.

6    Q.    Okay.  Would you say it's fair to say that

7    they fall into the 50 million and less?

8    A.    Well, I would say that probably 95 percent

9    of the work that I do is on plans we will say under 20

10   million.

11   Q.    Okay.  And how many plan participants are

12   in the plans of those 95 percent?

13   A.    I don't know offhand.  I don't recall

14   offhand what the number is.  But you know, smaller

15   plans are typically somewhere between 20 to 2,000

16   employees.

17   Q.    And of the 5 percent from the 95 percent,

18   the 5 percent, how many plans does that equate to?

19   A.    I -- I don't know.

20   Q.    Order of magnitude, would that have been

21   five plans that would be more than 20 million that you

22   have consulted on, less than five, more than five?

23   A.    That would be more than five.

24   Q.    Would it be more than ten?

25   A.    Let's say if you are -- if you are holding

1   deductions from the plan assets.

2         So yeah, it comes up.  Is it a specific

3   plan?  It's regarding a specific plan.  In many cases,

4   they don't know the name of the plan because I'm

5   advising the advisor whose client is their client.

6      Q.      In the past ten years, you have not had a

7   client directly that you have advised who has billed

8   its services back to the plan, correct?

9      A.      Outside of benchmarking it on the one plan

10  that I just told you about earlier, no, I have not

11  been engaged directly by a PlanSponsor to go through

12  the reimbursement process.

13     Q.      And when you said other than benchmarking

14  for the plan you told me about previously, what plan

15  was that?

16     A.      The one that I can't mention because I'm

17  subject to a confidentiality order.

18     Q.      Okay.  Was that the 4.2 billion one?

19     A.      That is correct.

20     Q.      Okay.  Were they billing back their

21  services to the plan?

22     A.      They were billing their services back to

23  the plan.

24     Q.      Okay.  And do they continue to bill their

25  services back to the plan?

1   BY MS. ROSS:

2        Q.    Sure.  Other than what you've told me here

3   today, have you had any other engagements where you

4   provided consulting services or any services to a

5   PlanSponsor who was charging for their services to

6   their own plan?

7              MR. STRUCKHOFF:  The same objection.

8              THE WITNESS:  Yes.  I have had a

9        couple of others, yes.

10  BY MS. ROSS:

11       Q.    And tell me about each of those, please.

12       A.    The other one that we did -- that I did

13  specifically was multiple employer plan.  And we did

14  benchmarking.  We did spot benchmarking.  So we did

15  benchmarking, not on the whole plan itself but we did

16  benchmarking on specific size plans so that they could

17  evaluate how those fees were, reasonable or not

18  reasonable, relative to the alternative of their plans

19  going to a single employer plan and going to the

20  market to get their own option, their own benefits

21  directly.

22             So we -- we did a spot check on a -- a --

23  it's -- it's a billion plus multiple employer plan.

24       Q.    What does a spot check mean?

25       A.    Well, in -- I feel confident I'm not -- I

Page 52

1    don't need to educate you on multiple employer plans.

2    You know what those are.  I suspect if you don't, I am

3    happy to go into detail.  But it's obviously, a group

4    of independent firms that are consolidating and

5    aggregating their assets under one -- one plan.  And

6    instead of benchmarking the whole plan, they

7    selectively use -- as we discussed it, they

8    selectively picked different size plans that were

9    common and they were tied primarily to the ranges of

10   plans that we benchmarked.  And so we benchmarked the

11   single plan because that -- that single plan employer

12   had -- has an option to either be a participating

13   employer in the MEP where they have the option to go

14   to the marketplace and get their own plan directly.

15          So we were benchmarking not the entire plan

16   but different size plans within the MEP so they can

17   see exactly what the pricing would be if those

18   particular clients went direct to the market.  And so

19   that is what they were using as a -- as a gauge.

20      Q.    How many single plans under the MEP did you

21   benchmark?

22      A.    You know, I only benchmarked one in each of

23   the different ranges that they gave me.  They only

24   gave me, as I recall, I think six other ranges.

25      Q.    And what were the ranges?

Page 55

1    participating in their plan.  In Northrop Grumman, you

2    have you a variety of different companies.  They

3    acquired a lot of different companies.  They owned 100

4    percent of those companies.  They were charging them

5    to participate in their plan.  So --

6        Q.      What was the largest plan in terms of

7    participants that were participating in that all-time

8    employer plan that were you benchmarking?

9        A.      In that spot check project, I believe the

10   largest plan had about 2500 employees in it, the

11   largest plan.

12       Q.      Okay.  And what was the -- how many plans

13   were there?

14       A.      There were thousands.  I don't remember the

15   number offhand.

16       Q.      What percentage had more than a thousand

17   employees?

18       A.      I -- I don't know because, again, they gave

19   me the plans that they wanted me to benchmark.  So I

20   know they had thousands of plans, and they said we're

21   going to select plans at different levels and have

22   those plans benchmarked.  So I don't -- I don't know

23   how many plans they had above --

24       Q.      How many plans did you benchmark?  How many

25   plans did you benchmark?

1      A.     As I said earlier, about six.

2      Q.     Okay.  And tell me the size of each of

3    those six in terms of participants?

4      A.     I -- I don't recall offhand.  I know one of

5    them was above a thousand employees.  The other ones

6    were smaller.  They were, you know, two to 10 lives,

7    11 to 25.  I think was one in there that was 100 to

8    250.  So we were --

9      Q.     Participants?

10     A.     That is correct.

11     Q.     Okay.  Any other engagements which in your

12   view involved a PlanSponsor billing for services to

13   its home plan?

14     A.     Not that I recall.

15            MS. ROSS:  Okay.  We can take a

16      break.  Do you want to take a break?

17            THE VIDEOGRAPHER:  We are pausing the

18      recording at the end of the first tape.

19      Going off the record at 9:43 a.m.

20            (Recess taken.)

21            THE VIDEOGRAPHER:  We are back on

22      record at 9:57 a.m.  We are beginning the

23      second tape in the deposition of David

24      Witz.

25   BY MS. ROSS:

1      Q.      Okay.  Mr. Witz, have you ever served as an

2   inhouse fiduciary to an ERISA plan?

3      A.      No.

4      Q.      Okay.  Have you ever been designated a

5   fiduciary of a third-party plan?

6      A.      Explain what you mean by that.

7      Q.      Have you ever served as a fiduciary to any

8   plan?

9      A.      Yes.  As a 321, yes.

10      Q.      Okay.  And as a 321, you mean as an

11   investment advisor?

12      A.      That would be correct.

13      Q.      Okay.  And other than serving as an

14   investment advisor for a plan, did you serve in any

15   other capacity as a fiduciary to a plan?

16      A.      No, I have not.

17      Q.      How many plans have you served as a 321

18   fiduciary?

19      A.      I don't recall.

20      Q.      And in that capacity, you had nothing to do

21   with the recordkeeping fees of those plans, correct?

22      A.      Not -- not completely true because when I

23   was operating as a 321, I was also operating as the

24   recordkeeping administrator -- TPA, excuse me, not the

25   plan administrator but the TPA.  So we -- we did offer

1    multiple services for plans.

2         Q.    And for how many plans was that?

3         A.    I -- I don't recall.  It wasn't all of the

4    plans that I had on the books.  At that time we had

5    about 200 plans.  And then when I merged with BGS&G, I

6    still continued to service that book and added

7    additional plans.  So I don't recall the number of

8    plans, but it wasn't on all of them.

9         Q.    Well, okay.  Was this back in the 1990s?

10        A.    This would have been back in the 1990s,

11   yes, through 2000 -- through 2001, 2002.  I then took

12   the position with Geller & Wind, and I took a position

13   after that with Newport Group.  And in both cases, I

14   was an IAR of the RIA, which was 321, and we were also

15   selling recordkeeping and administrative services to

16   those clients.

17        Q.    Were you a fiduciary?

18        A.    I -- I would have been, yes, considered a

19   fiduciary on those plans because I was part of the

20   RIA, and I was delivering the recommendations.

21        Q.    Would you be -- have been considered a

22   fiduciary for purposes of recordkeeping?

23        A.    No, I would not.

24        Q.    And you've never administered a benefit

25   plan from an inhouse perspective, correct?

1      A.      That is correct.

2      Q.      You have never provided a legal opinion

3   concerning ERISA compliance, correct?

4           MR. STRUCKHOFF:  Objection, vague.

5           THE WITNESS:  No, I -- I am not

6       eligible to provide legal opinion.

7   BY MS. ROSS:

8      Q.      Okay.  And you have never provided a legal

9   opinion with respect to a PlanSponsor charging back

10  for services to plan?

11     A.      I have never provided a legal opinion on

12  anything.

13     Q.      Okay.  Have you ever provided a written

14  opinion to a client directly with respect to the

15  reasonableness of the appropriateness of charging back

16  services to the plan?

17          MR. STRUCKHOFF:  Objection, compound.

18          THE WITNESS:  I have provided written

19      opinion that fees were reasonable on the

20      plans, some of the plans that I was

21      directly involved with benchmarking, yes.

22  BY MS. ROSS:

23     Q.      Are you talking about internal fees or

24  external fees?

25     A.      I'm talking about fees regardless of where

1    they were.  But in -- in the cases that I am -- I

2    think specific to what you are getting, Ms. Ross, is

3    that none of the plans that I provided an opinion on

4    involved a PlanSponsor charging their fees back to the

5    plan itself.  They were all utilizing a third party.

6        Q.     You are not aware of any rule or provision

7    of ERISA that prevents an employer from charging a

8    benefit plan for its own services that are reasonable

9    and necessary, correct?

10       A.     That is correct.

11       Q.     Okay.  In fact, ERISA permits that,

12   correct?

13       A.     That is correct.

14       Q.     And ERISA also permits its employees to

15   serve as fiduciaries of the plan, correct?

16       A.     That is correct.

17       Q.     And you're also not aware of any rule or

18   provision of ERISA that says that a plan and a service

19   provider must have a written contract for services,

20   correct?

21       A.     Repeat that question, please.

22       Q.     You are not aware of any rule or provision

23   of ERISA that says that a plan and a service provider

24   must have a written contract for services?

25       A.     I -- I know of nothing that specifically

1   were acting as the record keeper were fully outsourced

2   in their recordkeeping needs, correct?

3       A.      That is correct.

4       Q.      Okay.  So they -- they were not doing

5   anything inhouse with respect to the benefit plan?

6       A.      No, except those plans that we took over

7   that were doing it initially themselves, producing

8   their own statements, balancing the assets, allocating

9   gains and losses, working with their CPA potentially

10  or doing it inhouse, their 5500 forms.  I mean, those

11  are plans that we would take over to outsource that

12  responsibility and the liability.

13      Q.      And what about the more common situation

14  where a large plan has a record keeper but it doesn't

15  fully outsource everything to that record keeper, you

16  have had no experience with that?

17      A.      Well, what is interesting is that there

18  is -- there is no difference between a large and small

19  plan.  The -- the application of the ERISA rules

20  applies the same, and the application of the -- of the

21  various services that are being rendered are -- are

22  pretty much the same, just one has more money and

23  more -- more employees.  There is not much difference

24  between the two.  Unless there is, you know, a -- some

25  complexities that that would demand some additional

1  level of service, and -- and that's very possible that

2  exists in some plan.  But when you say typically, I

3  would say no.  Typically, there is a lot of plans that

4  outsource -- even large plans -- their entire

5  recordkeeping and administrative responsibilities.

6  It's not much different.

7       Q.     That wasn't my question.  Let me ask it

8  again.

9              In the situation where a plan,

10  regardless -- regardless its size, outsources -- or

11  strike that -- has a record keeper but does not fully

12  outsource recordkeeping, you have no experience with

13  that, correct?

14      A.     I -- I don't -- I don't recall any of my

15  clients not outsourcing all the recordkeeping to us.

16      Q.     Okay.  Have you ever reviewed the job

17  descriptions of the Northrop employees who serviced

18  the plan?

19      A.     I recall a document that outlined names,

20  title and a description of the services.

21      Q.     Have you ever reviewed job descriptions of

22  the Northrop employees who serviced the plan?

23             MR. STRUCKHOFF:  Objection, asked and

24         answered.

25             THE WITNESS:  I -- I believe that

Page 67

```
1        document disclosed their job
2        responsibilities.
3   BY MS. ROSS:
4        Q.    Okay.  Have you ever seen anything that
5   more formally was a job description written up for a
6   particular job at Northrop?
7             MR. STRUCKHOFF:  Objection, vague.
8             THE WITNESS:  I recall two particular
9        documents.  One was some type of review
10        that outlined certain job responsibilities
11        or evaluation, and I also recall there
12        being a document that was maybe seven or
13        eight pages long and that had, like I said,
14        employee names, a job title and then a
15        series of job descriptions or
16        responsibilities that they provided.
17   BY MS. ROSS:
18        Q.    How many employees were servicing the
19   Northrop Grumman 401K plan during 2010?
20        A.    During 2010, I -- I don't recall.  I recall
21   there being somewhere in the neighborhood of 70 to 100
22   employees that were on the plan.  That one report that
23   I mentioned to you had about 50 people on it.  So it
24   didn't match up specifically with the other -- other
25   documents that I saw.
```

Page 68

1       Q.      And did you review 50 to 75 -- strike that.

2               Did you review 70 to 100 individual job

3    descriptions?

4       A.      No.  I -- I looked, but I didn't find job

5    descriptions for that many people.  I only found that

6    document that had, like I said, about 50 people on it

7    that were mentioned.

8       Q.      How did you look?

9       A.      How did I look?  Well, they were the

10   documents that were given to me to review.  So as I

11   was going through the document, I came upon that

12   document.  I also found it I think attached to

13   Marsha's expert opinion.  So I think she referenced it

14   as well.

15      Q.      Marsha's opinion was written after your

16   opinion, correct?

17      A.      That is correct.

18      Q.      Okay.  So short order, but for the

19   documents that you talked about, the couple of

20   documents that you mentioned here today, you never

21   reviewed any individual job descriptions of any

22   Northrop employees, correct?

23      A.      Outside of the documents that I just

24   mentioned, those are the only ones that I've had

25   access to.

1    surveys that Northrop generated?

2         A.    Yes.   I recall some market studies that

3    were done and some -- I think some third-party surveys

4    that were done on compensation as well.

5         Q.    I seem to recall that you stated in your

6    report that you were not provided with the market

7    studies?

8         A.    When I went through the -- Marsha's report,

9    I requested all of the identification -- all of the

10   identification documents on hers.  So I got a chance

11   to review those last night.

12        Q.    But at the time that you wrote your report,

13   you didn't have those, correct?

14        A.    I don't recall.

15        Q.    Did you identify them in the list of

16   documents that you looked at?

17        A.    I did not compare my report to look at the

18   documents in the back list to the documents that I got

19   from Marsha's reports.  So I don't know if I have them

20   on there or not.

21        Q.    So the truth of the matter is that at the

22   time you wrote your report, you had not reviewed the

23   compensation surveys generated by Northrop, correct?

24             MR. STRUCKHOFF:   Objection.

25         Misstates the record.

1          THE WITNESS:  I -- I can tell you

2      that the truth of the matter is that what

3      I've reviewed doesn't change my opinion.

4    BY MS. ROSS:

5      Q.     That is not my question.

6          MS. ROSS:  Could you read back my

7      question, please?

8          (The question was read back.)

9          MR. STRUCKHOFF:  The same objection.

10   BY MS. ROSS:

11     Q.     It's a yes or no, correct?

12     A.     Yeah.  I'm not sure I can answer yes to

13   that.  I -- I am not sure that I can answer yes to

14   that.  I would have to take a look at my document to

15   see if I mentioned that those -- those were in the

16   list, the Bates numbers that I have at the back of my

17   report.  I would just have to check it.  I don't know.

18     Q.     If I provide you with your report, would

19   you be able to help me whether or not you did?

20     A.     If you provide me with the report and then

21   the Bates numbers on those particular market studies

22   that you are referencing, the ones that I am

23   visualizing in my head are for the ITA.  I can cross

24   and·see if they are in there.

25     Q.     What is your understanding of the process

1   that Northrop engages in to benchmark the compensation

2   of its employees?

3        A.     My understanding -- basically, the

4   understanding is that they are to follow the ASP, the

5   administrative service agreement that they put into

6   effect, which tells them that they should do internal

7   and external reviews.  That is -- that is what I

8   recall.

9        Q.     My question was explain to me the process

10  that Northrop engages in to benchmark the compensation

11  of its employees.

12       A.     Yeah.  And what I would say is if you

13  provide me with a copy of the ASA, I can walk through

14  and tell you what they said they were going to do.

15       Q.     That is not my question.  I'll say it

16  again.

17              Explain to me the process that Northrop

18  engages in to benchmark the compensation of its

19  employees.

20       A.     So the compensation, the process that they

21  would utilize, as outlined in those particular

22  documents, the ITA, for example, they would go to

23  Mercer, I think Hewitt.  There's a few other firms

24  that were mentioned in there where they would gather

25  some information to make an assessment to whether or

1    not those fees were reasonable or not reasonable.

2    There is also a compensation report.  I don't recall

3    the name of the report offhand.  It's compensation

4    stats or something that's kind of an explanation of

5    the process that outlines what their process is.  I

6    don't remember it verbatim.  My memory is not that

7    good.  But I recall it outlines, you know, what their

8    process should be.  I -- I'd refer you to that

9    document.

10       Q.      Is there anything else?

11       A.      Yeah, there is one other.  There is -- one

12    of the documents had a timekeeping process so that

13    they could track salaries for purposes of providing

14    the information for doing benchmarking.  But that is

15    the other report that I remember.

16       Q.      Are you aware of the fact that Northrop is

17    a defense contractor?

18       A.      I am.

19       Q.      Are you the aware of the reporting

20    requirements that Northrop has to the department of

21    defense with respect to the compensation of the

22    employees?

23       A.      No, not specifically.

24       Q.      Did you do any inquiry into how Northrop

25    benchmarked the compensation of all of its employees?

Page 74

1    A.    Again, I believe that is -- I -- I suspect,

2    I'm not sure, but I suspect that that compensation

3    report is something that they use for everyone.  But

4    I -- I'm not sure that is the case.

5    Q.    Let me repack my question because that was

6    not responsive.

7          Did you do any inquiry into how Northrop

8    benchmarked the compensation of all of its employees?

9    A.    Outside of the materials that I had to

10   review, no, I did nothing in addition to that.

11   Q.    So you never looked into how the corporate

12   compensation department of Northrop benchmarks

13   employees' compensation?

14   A.    I did nothing more than review the

15   documents that were given me.

16   Q.    Okay.

17         (Defendant's Exhibit 212 was marked

18    for identification.)

19   BY MS. ROSS:

20   Q.    Let's mark this as the next exhibit,

21   please.

22         Mr. Witz is this one of the documents that

23   you were referring to earlier that you looked at when

24   I asked you whether or not you had ever reviewed job

25   descriptions?

Page 80

1    services agreement?

2        A.      I did.

3        Q.      Okay.

4                (Defendant's Exhibit 214 was marked

5         for identification.)

6    BY MS. ROSS:

7        Q.      Mr. Witz, is Exhibit 214 the Hewitt

8    administrative services agreement that you looked at

9    in preparing your report?

10       A.      I actually looked at the contract.  This is

11   a statement of work.

12       Q.      It says in the lower right-hand corner

13   administrative services agreement, Exhibit A, correct?

14       A.      I see that, and it does.

15       Q.      So you didn't look at this part of the

16   administrative services agreement?

17       A.      No.  I did review this, but I also looked

18   at the -- there was actually a separate contract.  So

19   I was just thinking you were going to give me the

20   contract that was actually signed.

21       Q.      Well, this is signed, Mr. Witz.  If you

22   look at Bates number MGCO-1726 -- 669, do you see that

23   it is signed?  It's the second page.

24       A.      Yes, I do see that.

25       Q.      Did you look at this document?

1          MR. STRUCKHOFF:  Objection.  Asked

2     and answered.

3          MS. ROSS:  He hasn't answered it.

4          MR. STRUCKHOFF:  Yes, he has.

5          THE WITNESS:  I believe I did.  I'm

6     just drawing a blank.

7     BY MS. ROSS:

8     Q.     But you are not sure?

9     A.     I am not sure.

10    Q.     Okay.  Well, you would agree that Northrop

11    Grumman did not entirely outsource its recordkeeping,

12    correct?

13    A.     No, I wouldn't agree with that.

14    Q.     Why wouldn't you agree with that?

15    A.     Well, because the recordkeeping services

16    that were outlined that are -- that are being

17    provided -- and I think this -- this has a lot to do

18    with interpretation and definition of -- of

19    recordkeeping.  They perform some administrative

20    tasks, but the recordkeeping in terms of calculating

21    the gains and losses identifying contributions,

22    distributions, loan processing, loan repayments, all

23    of those things were done not by -- by Northrop

24    Grumman.  They were done by Hewitt.  So I think the

25    recordkeeping is primarily done by -- by Hewitt.  I

1  his report last time, he's got four pages of things he

2  did that were remiss in terms of the -- of Marsha's

3  report.  I mean, it -- it seemed to me that Northrop

4  was claiming they did things that Gissiner is claiming

5  he's doing.  So if there is a redundancy, it shouldn't

6  be a reimburseable expense.  I mean, if they're paying

7  somebody to do the work --

8      Q.    So you're -- you're testifying here today

9  that Gissiner provided services to the Northrop

10  Grumman benefit plan?

11     A.    I'm -- I'm providing testimony that I read

12  Gissiner's report.  And in his report, he provides

13  about four or five pages of services that Hewitt

14  delivered to Northrop Grumman.  Those services, in

15  many cases, are also services claimed by Northrop

16  Grumman employees that they did that work.

17     Q.    But you didn't talk to any Northrop Grumman

18  employees about what work they were doing, correct?

19     A.    No.  That's why I said to you the only way

20  that I would know what they did if they really did

21  what they said they did would be to do a forensic

22  analysis, and I haven't done that.  So I don't know if

23  they really delivered that service or if they didn't

24  deliver the service.

25     Q.    So you just don't know?

Page 84

1        A.      No, I don't.

2        Q.      So you actually don't know anything about

3    the services that Northrop was doing inhouse, correct?

4               MR. STRUCKHOFF:   Objection,

5         argumentative.

6               THE WITNESS:   I know what they told

7         me, okay?  So I can see what they are

8         saying they claimed they did, and I can see

9         Hewitt's claiming they did many of the same

10        things.

11   BY MS. ROSS:

12        Q.      They told you?  You talked to Northrop

13   employees?

14               MR. STRUCKHOFF:   Objection, asked and

15        answered.

16               THE WITNESS:   No.  I said that I read

17        the report, and in the report it says

18        here's what they do.  This one report that

19        you just gave me, this is Exhibit No. 12 --

20        212, it basically lays out here is what we

21        do.

22   BY MS. ROSS:

23        Q.      And that's your basis for your whole

24   understanding of what Northrop employees were

25   providing in the way of services to the plan?

Page 86

1    it for the committee to make a decision on whether or

2    not they should be reimbursed.

3         Q.    So you don't have firsthand knowledge of

4    the services that Northrop provided to the plan,

5    correct?

6         A.    I don't.

7         Q.    How many assets were in the plan in 2010?

8         A.    I think somewhere around 14 billion.

9         Q.    What about in 2011?

10        A.    I don't recall 2011.

11        Q.    What about 2012?

12        A.    I don't recall.

13        Q.    What about 2013?

14        A.    I don't recall that offhand either.

15        Q.    And how many participants were there in the

16   plan in 2010?

17        A.    It was over 100,000, but I don't recall the

18   exact number.  I would have to review in my report.

19        Q.    What about 2011?

20        A.    As I recall through -- 2010 through 2015,

21   it was above 100,000 employees.

22        Q.    How many acquisitions did Northrop have

23   between 2000 and 2014?

24        A.    Based on the document, there were -- it was

25   over 50.  During the time frame that was applicable to

Page 94

1    to make a decision about investment advice, but they

2    obviously did that.  I'm assuming they didn't do it

3    for free.  I'm sure they charged for it.  In fact, I

4    recall there even being e-mails or -- or -- yeah, I

5    think it would be an e-mail where they said, yes, hire

6    them to go forward and -- and do that particular

7    project.

8            So they -- they relied heavily on Callan,

9    and rightfully so.  They are a very good organization.

10   Q.    How many employees in ITA billed their time

11   to the plan?

12   A.    You know, I couldn't tell.  When I looked

13   at the invoicing documents that I had, I could not

14   tell exactly how many.  And -- and also, because the

15   reports weren't like monthly where I could see month

16   to month who was being invoiced.  You know, there is

17   obviously some turnover, and it was hard to track

18   that.

19           So I -- I can't -- I couldn't really tell

20   the total number that were being charged against the

21   plan.

22   Q.    How many external managers in a given year

23   did Northrop utilize for their investments?

24   A.    I -- I don't recall the total number.

25   Q.    Did you know the total number and you just

Page 95

1    don't recall it here, or did you never know?

2         A.    I -- what I recall as I looked through

3    various reports is a list of different managers, some

4    of which they just applied to the DC plan because they

5    were using them on the DB side.  I don't remember the

6    number, but I recall there being a report page that

7    listed like a number of different managers.  So I know

8    on the DB side they had many more managers that they

9    were overseeing than they did on the DC side, but I

10   don't recall the total number.

11        Q.    Did you ever review any job descriptions

12   for the employees in ITA?

13        A.    Yes.

14        Q.    Is that on that one document that you

15   referred to earlier?

16        A.    That has -- that has descriptions.

17        Q.    And what is the exhibit number, just for

18   reference?

19        A.    It's -- it's 213.

20        Q.    And did you review any other job

21   descriptions for ITA?

22        A.    I can't visualize another document in my

23   mind.  But I -- I -- I would have to look back at the

24   Bates numbers that I reviewed to see, but I -- I

25   suspect there is something in there.  I just don't

1    remember.

2         Q.    Did all the people in ITA bill their time

3    to the plan?

4         A.    I could not tell because, like I said, I --

5    I could not identify all of the IT people on the

6    invoices.  So I could not tell if all of them billed

7    a -- an amount of time.  Some of the invoice sheets

8    for given periods would identify that, you know,

9    individuals billed 25 hours, you know, or -- or zero

10   hours to the DC plan.  But I -- I don't recall if --

11   if everyone billed time.  I don't think they all did,

12   but I don't recall.

13        Q.    And did you review any time sheets for the

14   ITA employees?

15        A.    The time sheets that I have reviewed, I

16   don't recall if they include -- well, the one -- the

17   one invoice -- there is an invoice that I reviewed,

18   but I'm not sure I reviewed a time sheet for a

19   specific employee of ITA.  I don't recall.

20        Q.    Did you review any time sheets for a

21   specific employee of the benefits divisions?

22        A.    Yeah.  As -- as I mentioned, I think -- I

23   think there were a couple of individuals where I saw

24   some individual time sheets that were laid out.

25        Q.    Okay.  I don't recall you mentioning that

Page 103

1    Q.    Do you know how the benefits administration

2    group was structured as far as a breakdown of the

3    different organizations working on the plan?

4    A.    I -- no, not specifically.  I am more

5    familiar with the people in terms of the layout of the

6    people.  The question you're asking -- are you

7    suggesting that they worked at different companies but

8    worked together on those committees, is that what you

9    are asking?

10   Q.    I'm not suggesting anything.  I'm asking

11   what is your understanding of how Northrop structured

12   the benefits administration different divisions.

13   A.    Yeah.  I -- I couldn't write out a report

14   for you to give you that.

15   Q.    So you don't know?

16   A.    I don't know.

17   Q.    In your report, which we are going to take

18   a look at in a bit, you maintain that no more than

19   four full-time employees, if any, would be needed to

20   provide non-recordkeeping services to the plans.  Do

21   you recall that opinion?

22   A.    I do.

23   Q.    What are non-recordkeeping services,

24   Mr. Witz?

25   A.    Well, again, as I explained earlier,

Page 154

1  beneficial calc, what's his benefit, what's present

2  value, accrued benefit, when's he allowed to get it,

3  what if he did it now, is there a lump sum provision

4  built into it?

5      Q.     All right.  But before we -- we veer off

6  too much down an irrelevant road, I want to stay

7  focused on I had asked you about your encounters with

8  employers who were charging the plans for their

9  services.

10      A.     Right.

11      Q.     And I want to narrow that even more to

12  encounters with employers who were charging their

13  defined contribution plans for their services.  So

14  tell me about those encounters.

15      A.     And again, back in the -- in the early days

16  of my career, it was not unusual to find a define

17  contribution plan where the PlanSponsor was actually

18  doing the admin inhouse including the recordkeeping,

19  not just the admin but the recordkeeping as well.  In

20  my position I was --

21      Q.     And charging it to the plan?

22      A.     And charging it to the plan.  Not all of

23  them, but there were plans that were being charged.

24  There was a deduction coming out of the plan assets to

25  cover a reimbursement of cost associated with the work

Page 155

1    that was being done.

2         Q.    Okay.  So in -- at that time, in any of

3    your roles, did you provide advice, consultation to

4    those employers who were charging back to their

5    defined contribution plan back then?

6         A.    Actually, the -- the consultation that I

7    gave them was that they needed to stop doing it and

8    outsource it, and I would go through what I felt were

9    the issues.  Now, back then we didn't have the

10   advisory opinions that we had that came out in the

11   '90s.  So -- so I was operating with a little bit

12   different perspective than I did in the '90s when the

13   other operating advisory opinions came out.

14        Q.    How many plans did you provide this advice

15   to?

16        A.    I don't remember.

17        Q.    Was it more than one?

18        A.    Oh, yes.

19        Q.    Was it 10?

20        A.    I would suspect it was probably more than

21   10, but I don't remember how many total.

22        Q.    That were actually billing back their

23   services to the plan, in a defined contribution plan.

24   So it was that prevalent?

25        A.    It -- back in those days, people -- like I

Page 156

1   said, they were using Lotus Notes.  They were charging

2   back fees.  Doing a lot of -- it was kind of the Wild

3   West.  They were doing a lot of things.  What helped

4   move the -- what helped them move the needle was the

5   401K plan because at that point they needed something

6   that they couldn't do.

7       Q.     But you were not providing -- you were not

8   going in reviewing the services that they were

9   charging for, were you?

10      A.     No, I was not looking at the services that

11  they were -- I mean, it didn't make a difference to me

12  what services they were providing.

13      Q.     And you weren't looking at the

14  reasonableness of the fees?

15      A.     No, I was not looking at the reasonableness

16  of the fees.

17             MS. ROSS:  Tape?  I'm getting the

18      word.

19             THE VIDEOGRAPHER:  We are pausing the

20      recording at the end of the third tape.

21  Going off the record at 12:34 p.m.

22             (Lunch recess taken.)

23             THE VIDEOGRAPHER:  We are back on

24      record after a lunch break.  The time is

25      1:15 p.m.  We are beginning the fourth tape

1   same thing with respect to community involvement.  I

2   can't imagine that participating in the, you know, ADF

3   and the Rotary and the Southern Evangelical Seminary

4   had anything to do with your opinion in this case?

5          A.     No.

6          Q.     Okay.  And I guess the same thing, custom

7   development accomplishments, right?

8          A.     That would be correct.

9          Q.     Okay.  So then let me ask the same question

10  about the speaking engagements and the publications,

11  because obviously, over your span of 36 years, you

12  have given a tremendous number of speeches and

13  published a lot.

14         Are any of these speaking engagements or

15  publications listed in this section, do any of them

16  specifically address the issue on which you are

17  opining here regarding the charge-back of fees?

18         A.     Not regarding the charge-back of fees.  I

19  mean, I've made some comments about RFPs and

20  benchmarking in the report, and of course there are

21  presentations that I've done, articles that are

22  written regarding that.  But nothing regarding the

23  reimbursement of fees.

24         Q.     Okay.  Okay.  Okay, that will help.

25         All right.  So now I am going to ask you to

Page 181

1           You are not making that legal conclusion,
2   correct?  You can't, you are not a lawyer, right?
3       A.    I'm not a lawyer.  I'm just telling you,
4   based on my understanding and my experience, that
5   408(b)(2) requires it be in writing.  408(b)(2)
6   requires it to be understood who the parties are and
7   what they are delivering.  And if it's not --
8       Q.    Well, we are talking about the ASA, not
9   408(b)(2).
10      A.    But 408(b)(2) deals with the idea, it's the
11  exemption.  You know that.  It's the exemption for the
12  services being provided.  So if you are providing
13  services to a plan -- you can't provide services to a
14  plan unless you are under that exemption.
15      Q.    Are you opining on whether or not Northrop
16  complied with 408(b)(2) in this case?
17      A.    I'm suggesting to you that they did not
18  provide me with the evidence, what I read.
19      Q.    Are you opining -- are you giving an
20  opinion in this case --
21      A.    In my opinion, in my opinion, I did not see
22  Northrop Grumman comply with 408(b)(2) in terms of
23  complying with the rules, dealing with their contract,
24  the services that they render and in providing that
25  information.  I didn't see anything that would support

Page 212

1   ability to charge for internal services to the plan?

2       A.     I answered that before.  I don't -- I don't

3   know the total number.

4       Q.     In fact, you don't really have any clients

5   that have asked that exact question, right?

6       A.     No, that is not true.

7              MR. STRUCKHOFF:   Objection.

8        Misstates his testimony.

9   BY MS. ROSS:

10      Q.     And who are these clients that you've

11  advised to get an Advisory Opinion on the issue of

12  charging their services back to the plan?

13      A.     Who -- what specific clients?

14      Q.     Uh-huh (affirmative).

15      A.     As I shared with you before, we've got

16  confidentiality agreements with our clients.  I can't

17  divulge that.

18      Q.     Well, you are making a statement that is

19  integral to your opinion here.

20      A.     That is correct.

21      Q.     And you are telling me that you are not

22  going to tell me who those clients are?

23      A.     I cannot tell you if I'm subject to a

24  confidentiality agreement.

25      Q.     Well, that is not going to stand up with

Page 213

1    the Court.  You are under subpoena here to testify.

2         A.    I am.

3         Q.    Do you understand that?

4         A.    I do.

5         Q.    And do you understand that that subpoena

6    requires you to answer the questions that I am asking?

7         A.    And I am.

8         Q.    And that a private confidentiality

9    agreement doesn't give you license not to tell me who

10   those clients are that you have advised?

11              MR. STRUCKHOFF:  Objection.

12              THE WITNESS:  I'll have to review

13      that with my -- with my attorney then.

14   BY MS. ROSS:

15        Q.    Well --

16        A.    I'm telling you that I have talked to

17   clients regarding the decision to either or not,

18   deduct fees from the plans.  That is a fact.  I am

19   telling you that when people talk to me about that

20   particular issue, I have told them you should seek an

21   opinion from an attorney.  And when we have a

22   discussion about whether or not to seek it from an

23   attorney, I have told them that you most likely would

24   -- should get either a PTE, or an Advisory Opinion, or

25   something to document it before you do it so that you

Page 214

1    don't get yourself into a problem.

2        Q.    Do you have any clients that have sought

3    such an opinion or an exemption from the Department of

4    Labor?

5        A.    No.

6              THE VIDEOGRAPHER:  Three minutes

7         remaining on tape.

8    BY MS. ROSS:

9        Q.    Because you don't have any clients who are

10   charging back to the plans, correct?

11             MR. STRUCKHOFF:  Objection.  Asked

12        and answered.

13             THE WITNESS:  I have answered that.

14        As I've shared with you, right now I

15        have -- outside of the couple of clients

16        that I have done our benchmarking on, no,

17        right now I don't have any clients that are

18        actually charging to the plan.

19   BY MS. ROSS:

20       Q.    And in the past, remind me, how many

21   clients have you had that are charging to the plan?

22       A.     I -- as you and I talked earlier, my number

23   of plans is very small.  My personal client plans, I

24   think which is what you are referencing, I don't have

25   any right now that are charging outside of the plans

Page 221

1  services?

2       A.      Well, they were charging it against the

3  plans assets that they were plan administrator on and

4  the trustee -- and the sponsor of.  So, yes.  So 316

5  is now a service that they are providing.

6       Q.      And could you have used an RFP, or were the

7  services too unusual?

8       A.      No.  No, we could have used an RFP.  That

9  is not what they hired us to do though.  They wanted

10 to go through a benchmarking service first to see what

11 the results were to determine if they should go

12 through another one.  So we -- we did the

13 benchmarking.

14      Q.      And so that was that one-time assignment

15 that you talked about, correct?

16      A.      That is correct.

17      Q.      Okay.  Were there any other occasions that

18 you were asked to opine on the reasonableness of fees

19 being charged back to a client?

20      A.      There were -- there was -- there was the --

21 yeah, there was another plan that -- that I did have

22 to -- well, that we were engaged.  If you recall I was

23 telling you about the spot checking.

24      Q.      Right.

25      A.      And part of that engagement was for me to

Page 222

1    tell them whether or not I felt the fees were

2    reasonable given the service platform.  So that was

3    another one that -- that I did that on.

4         Q.    Wasn't the spot checking for the little

5    plans within the MIP -- MEP?

6         A.    MEP.  That is correct.

7         Q.    So was it the same -- it's the same client,

8    essentially?

9         A.    It -- yeah, that is -- that is the one

10   client.  The other client that I am referencing that I

11   was talking about initially was also a MEP.

12        Q.    So you had -- both of your --

13        A.    There were two MEPs.

14        Q.    -- encounters with reviewing an arrangement

15   where services are charged back to the plan intend for

16   MEPs, correct?

17        A.    That is correct.

18        Q.    Okay.  And with respect to those MEPs, did

19   you give them an opinion as to whether or not the

20   arrangement was reasonable, charging back, or did you

21   just look at whether the fees were reasonable?

22        A.    We looked at --

23              MR. STRUCKHOFF:  Objection.

24        Compound.

25              Go ahead.

Page 234

1    suspect that you could spend 20 percent of your time

2    elsewhere.  Maybe -- maybe more.  I don't know.  The

3    Advisory Opinions only go down to 80.  But, no, I

4    would not say that you have to spend a hundred percent

5    of your time on it.  I don't see any guidance that

6    would dictate that that is the requirement.

7         Q.    Are you aware of the fact that it was ITA

8    that had the authority to instruct the trustee to pay

9    the plan expenses?

10             MR. STRUCKHOFF:  Objection.  Assumes

11        facts.

12             THE WITNESS:  What I recall is that

13        it was the BPAC group that had the primary

14        authority to make -- or approve payments.

15        There is one document I recall where it

16        said that the -- ITA -- or the investment

17        committee, excuse me, could also do it.

18        But I recall -- most what I recall is that

19        it was the BPAC that had authority to make

20        any payments from the plan assets.

21    BY MS. ROSS:

22        Q.    And the plan also provided that the BPAC

23    could delegate its duties, correct?

24        A.    Yeah, that is true.

25        Q.    Okay.  And are you aware of the fact that

Page 235

1    the BPAC delegated to others to interface with the

2    trustee?

3              MR. STRUCKHOFF:   Objection.   Assumes

4         facts.

5              THE WITNESS:   I -- I recall that the

6         BPAC delegated responsibility to other

7         directors, managers, delegates, a variety

8         of different words that were used,

9         supervisors, to collect data.   I don't

10        recall that they were -- that they

11        delegated some of the process, the payments

12        direct to -- you know, from the plan

13        assets.   I don't recall that.   I don't

14        recall anything that indicated that.

15   BY MS. ROSS:

16        Q.    But you are not giving an opinion in this

17   case as to whether or not the delegations issued were

18   proper, correct?

19        A.    No.   I -- I am not offering an opinion on

20   that.   It appears to me there needs to be, you know,

21   approvals and resolutions in place that support

22   whatever they are doing or procedures in place.   I

23   didn't see a lot of that, but, you know, it doesn't

24   mean that they can't delegate.

25        Q.    So in your report, you identify in

1    was missing.  It was just aggregated for the whole

2    group.  If you have a copy of that, I would be happy

3    to point that out to you.

4         Q.    How did you go about -- strike that.

5               In Paragraph 99, you state that the

6    expenses paid to Northrop for performing services --

7    inhouse services exceeded a reasonable fee for similar

8    services.

9               Did you actually benchmark each of the

10   services that Northrop provided?

11        A.    No.

12        Q.    Okay.  Did you do anything to determine

13   what you believed would be a reasonable fee for that

14   service?

15        A.    No.

16        Q.    When you were at BGS&G, you state in your

17   report that you had 2500 defined contribution plans

18   and 50,000 participants.

19               Do you see that?

20        A.    That is correct.

21        Q.    And you state that you had a staff of 12 to

22   15?

23        A.    That is correct.

24        Q.    And you recognized earlier today, that

25   Northrop plan is in excess of a hundred thousand

Page 255

1    as a result they'd have to go to their law firm, which

2    has nothing to do with the company outside of the fact

3    that, hey, the law has changed, and this is the new

4    amendment that you have got to add to your plan.  It's

5    going to require changing the summary plan

6    description.  In my experience, if it's a custom

7    designed plan, the law firm ends up providing the new

8    summary description.

9         Q.    Who is going to draft the 5500s?

10        A.    The 5500s were prepared in house by us when

11   we did 5500.  Again, that is a once-a-year thing.  It

12   happens -- if we did it right, we got most of them

13   done because most of our plans were 1231.  We'd get

14   them done, you know, before we had to do 630 quarter

15   ends so that they were going out quicker unless --

16   unless they were a plan that needed an audit, then of

17   course we finished our part and had to turn

18   information over to the auditor to do their part.

19             So I mean, we handle 200 plans with four

20   people in my office, three people in my office.  I

21   don't -- you know, this is one plan with the

22   technology.  You know, I don't see why they would need

23   more than four people internally, especially with all

24   of the horsepower that Hewitt it has.

25        Q.    In fact, Mr. Witz, you don't have a clue

Page 256

1    how Northrop administers its plan, do you?

2            MR. STRUCKHOFF:   Objection.

3        Argumentative.

4            THE WITNESS:   From the standpoint of

5        understanding how they administer their

6        plan, unless I did a forensic analysis, no.

7        The information that was provded to me

8        doesn't provide me with the absolute

9        details of how they actually administer the

10       plan.

11   BY MS. ROSS:

12       Q.    And you didn't do a forensic analysis,

13   correct?

14       A.    No, I did not.

15       Q.    You opined that ITA should have no more

16   than one full-time employee.

17            Do you see that?

18       A.    I do.

19       Q.    And you don't have any idea of all of the

20   services that ITA provides, do you?

21       A.    No, I don't have an idea of all the

22   services that they provide.  No, I don't.

23       Q.    Okay.  And you don't even know how ITA

24   structures their oversight of investment managers, do

25   you?

Page 261

1      Q.      Did they tell you to use the S&P?

2      A.      It was agreed to.

3      Q.      What do you mean "it was agreed to"?

4      A.      It was agreed to.  I felt it was

5  appropriate to use a -- an investable index as opposed

6  to a non-investable index.  The S&P is pretty --

7  pretty common.  I cited the ABB case because I was

8  part of that case as well, and it seemed to be

9  something that was acceptable.  It's been used in a

10  couple of other cases that I have been involved in as

11  well.  So it seemed like that made sense to utilize

12  the S&P as a general guideline.

13      Q.      You are not providing a legal opinion as to

14  what the right alternative is to use, are you?

15      A.      No.

16      Q.      Do you have a belief or an opinion as to

17  whether or not it's more appropriate to use the S&P

18  500 or the plan of returns to determine the losses?

19      A.      No, I don't have an opinion on it.

20      Q.      And when you -- you state that you looked

21  at the median annual salaries and concluded that for

22  the benefit staff it would be less than 50 percent --

23  I'm sorry -- 50,000 hours in 2002?

24      A.      Yes.  I used median, I think I even when --

25  I guess it was the investment -- the IT side, I

Page 262

1    averaged them.

2        Q.    Did you compare the services that are

3    provided by the -- I guess you looked at compensation

4    benefits and job analysis specialists.

5            Did you compare the services that they

6    provide to the services that the Northrop benefit

7    staff provides?

8        A.    No, I didn't compare the services.  I

9    looked at the job titles.  I looked at the Bureau of

10   Labor Statistics and...

11       Q.    So you don't know if you were comparing

12   apples to apples?

13       A.    I was looking at titles.

14       Q.    So you don't know if you were comparing

15   apples --

16       A.    I don't -- I don't -- I can't say for

17   certain that the job description of one matched the

18   other or not.

19       Q.    And that is true with respect to the

20   pension officer and those jobs for ITA?

21       A.    Again, I looked at the statistics that were

22   available for the ITA.  I was utilizing stats that

23   come from the CFA Institute for people that are in

24   similar job positions.  To what extent their job

25   responsibilities were identical, I -- I can't attest

Page 263

1    to that.

2         Q.      What did you have that provided the job

3    descriptions for the ITA people that you were

4    comparing to these job descriptions from third-party

5    sources?

6                 MR. STRUCKHOFF:  Objection.  Vague.

7                 THE WITNESS:  In other words, what --

8          what document I did review from ITA --

9    BY MS. ROSS:

10        Q.      Yeah.  What did you have --

11        A.      -- versus --

12        Q.      -- that told you what the ITA person was

13   doing so that you could tell that it was the same job

14   description as the jobs that you were comparing them

15   to?

16        A.      The documents that I had had some level of

17   description about services that some of the ITA folks

18   were delivering.

19        Q.      What documents were those?

20        A.      I don't recall them offhand.  I mean, one

21   of them -- let's see.  Well, I don't know if this one

22   has it in here or not.  Here you go.

23        Q.      You can just give me the exhibit number.

24        A.      It's 213.

25        Q.      And what are you looking at, what page?

Page 275

1  report.

2      Q.     Did you identify your report among the

3  documents reviewed?

4      A.     I believe I referenced it in a footnote.

5  That is when I referenced Gilmer I think.

6      Q.     Did you look at your -- did you review your

7  deposition in the Gray Beck case for this report?

8             MR. STRUCKHOFF:  Objection.  Asked

9       and answered.

10            THE WITNESS:  No, I did not.

11  BY MS. ROSS:

12     Q.     Did you look at the trial transcript in the

13  earlier Northrop case for this report?

14     A.     I did not.

15     Q.     Have you ever published any material

16  related to plan sponsors billing for their services to

17  the plan?

18     A.     I have not.

19     Q.     You have never spoken at any conferences of

20  that issue either, right?

21     A.     No, I have not.

22     Q.     And you have never been quoted by any

23  publications on that issue?

24     A.     I have not.

25     Q.     Have you ever discussed the issue with

Page 276

1    anybody at the DOL?

2        A.    No, I have not.

3        Q.    Or the IRS?

4        A.    I have not.

5        Q.    Have you ever served as an expert for the

6    DOL?

7        A.    No.

8        Q.    Have you ever served as an expert for the

9    IRS?

10       A.    No.

11       Q.    Have you ever served as a consultant for

12   the DOL?

13       A.    No.

14       Q.    And the IRS?

15       A.    No.

16       Q.    Have you ever served as a consultant for

17   any regulator on ERISA topics?

18       A.    No.

19             THE VIDEOGRAPHER:   Five minutes

20        remaining on the tape.

21             MS. ROSS:   I think we can take a

22        break.

23             THE VIDEOGRAPHER:   We are pausing the

24        recording at the end of the fifth tape.

25        Going off record at 4:05 p.m.

Page 284

1     Q.    Did you ever perform a calculation based

2  upon the total hours that was billed to the defined

3  contribution plan in a year to determine how many

4  full-time employees that equated to?

5     A.    No.  There were -- there were reports that

6  had aggregate numbers on it, and it had numbers of

7  people.  I think that was in the ITA.  There was --

8  there was a -- there wasn't enough information for me

9  to really identify that.

10     Q.    Okay.  So you don't know the full-time

11  equivalent -- full-time employee equivalent that was

12  working on the savings plan --

13     A.    No.

14     Q.    -- in any given near?

15     A.    No.  There wasn't enough information in

16  there to draw that conclusion.

17     Q.    Okay.

18         MS. ROSS:  I have no further

19    questions.  Thank you.

20                 EXAMINATION

21  BY MR. STRUCKHOFF:

22     Q.    Mr. Witz, I just have a few follow-up

23  questions.  If you could pull out your report.  I

24  guess it's right front of you, Exhibit 215.

25     A.    (Witness complies.)

Page 293

1    redundant services that -- or services that you

2    believe were redundant, are there any additional

3    services other than the ones that you have just

4    refreshed your recollection with that you are claiming

5    are redundant?

6        A.     Well, the Gissiner report I think had four

7    or five pages of service outlined by Hewitt provided

8    by Hewitt or that he's claiming Hewitt provides, and

9    so the list is pretty exhaustive.  Again, that is why

10   I started to make my own notes on that and compare it

11   to what Marsha was saying and trying to compare it to

12   my own notes.  So I -- I -- as I recall, in putting

13   that together for my own purposes, it seems like there

14   was a lot more services that were mentioned in more

15   detail than what I had available to me and what I

16   included in my report.

17       Q.     So are you answering my question in the

18   affirmative, that there are additional services that

19   you believe that are redundant?

20       A.     Yes.

21       Q.     Okay.  So I am still going to ask you to

22   outline for us and provide a list of the services that

23   you feel are redundant.  Okay.  So my request stands.

24              Okay.  Now I want to refer to some of the

25   services that you have identified in Paragraph 100.

Page 294

1    And you say that the benefits department performed

2    general day-to-day administrative functions, and then

3    you say such as.  So from that, I assume that you are

4    not stating all of them, all of the day-to-day

5    administrative functions that they provided here?

6        A.      Yeah.  I'm just referencing the ones that I

7    found in documents that I reviewed.

8        Q.      Okay.  And you state that that includes

9    coordinating the delivery of participant

10   communications?

11       A.      Correct.

12       Q.      What does that mean to you?

13       A.      Participant communication is a pretty broad

14   category.  It can cover a lot of things.  It can cover

15   information about the investments, about the plan,

16   about benefits.  It could be newsletters.  I don't

17   know what all is involved in terms of the

18   communications that were provided by Northrop Grumman,

19   but that was one of the items that was listed.

20       Q.      So you don't know exactly what

21   communications were provided?

22       A.      No.  There wasn't -- there wasn't enough

23   information provided to define here is what all the

24   communication materials were.

25       Q.      What does "coordinating the delivery of"

Page 295

1    mean to you?

2        A.      Coordinating the delivery, that is

3    terminology that I pulled from the reports.

4    Coordination of the delivery I suspect deals with

5    making sure that the proper communication materials

6    are sent to the right -- to the participants, meaning

7    that they have updated addresses if it's mailed or

8    they've got their e-mail addresses or they are

9    distributing it through their online, the daily

10   evaluation system that the participants can access it

11   through that process.

12       Q.      But you are assuming, you don't know,

13   correct?

14       A.      You asked me what the definition was.  I'm

15   telling you what I think it is.

16       Q.      I asked what it means to you.

17       A.      Yeah, that is right.

18       Q.      Okay.  But you don't know what that means

19   with respect to Northrop, correct?

20       A.      The documents did not define it.

21       Q.      So you don't know?

22       A.      So I don't know.

23       Q.      Okay.  And responding to participant

24   inquiries, what does that include?

25       A.      It was --

Page 296

| | | |
|---|---|---|
| 1 | Q. | Again, with respect to the Northrop plan. |
| 2 | A. | Right. |
| 3 | Q. | Not in general. |
| 4 | A. | Right.  It was not specifically defined. |
| 5 | Q. | So you don't know? |
| 6 | A. | I don't know the specifics. |
| 7 | Q. | And what about the providing education to |

8  employees, what does that include?

| 9 | A. | It was not specifically defined. |
| 10 | Q. | So you don't know? |
| 11 | A. | That is correct. |
| 12 | Q. | And supporting planned enrollment and new |

13  hires, what does that include?

| 14 | A. | It was not defined. |
| 15 | Q. | So you don't know? |
| 16 | A. | That is correct. |
| 17 | Q. | Managing the relationship with service |

18  providers, what does that include?

| 19 | A. | It was not defined. |
| 20 | Q. | So you don't know? |
| 21 | A. | That is correct. |
| 22 | Q. | And supporting plan audits, you don't know |

23  what that includes either?

| 24 | A. | It was not defined. |
| 25 | Q. | So you don't know that? |

Page 297

1      A.      That is correct.

2      Q.      So notwithstanding the fact that you don't

3   know what was included in each of these categories,

4   you are opining that these services are overwhelmingly

5   provided by the plan's record keeper?

6      A.      That is correct.

7      Q.      Turning to Paragraph 105, you are outlining

8   the services -- some of the services that ITA

9   performed.

10          Do you see that?

11     A.      I do.

12     Q.      Okay.  And you say:  They were tasked with

13   general oversight of plan investments.

14          What does that include?

15     A.      It was not defined.

16     Q.      So you don't know?

17     A.      Correct.

18     Q.      And you say that ITA was responsible for

19   recommending and implementing investment objectives.

20          What does that include?

21     A.      It was not defined in the IPS.

22     Q.      So you don't know; is that correct?

23     A.      That would be correct.

24     Q.      Okay.  Selecting or removing investment

25   managers, what did that include?

Page 298

1     A.     I think it's pretty evident, but it wasn't

2  specifically defined in the IPS.  So I can't say for

3  sure what all of that means to Northrop Grumman.  I

4  can only tell you what it means to me in a sense of

5  what I see on a practical basis, as with all of these

6  that you've asked me about.

7     Q.     So you don't know what was involved in the

8  selection process by ITA, correct?

9     A.     Yeah.  Northrop Grumman did not provide the

10  details to be able to give us an idea of specifically

11  everything they did within each of these categories.

12     Q.     So you don't know?

13     A.     That is correct.

14     Q.     And the same thing with the process for

15  removing investment managers?

16     A.     Yes, that would be the same case.

17     Q.     You don't know?

18     A.     I don't know how they -- how they actually

19  processed it.  It was not defined.

20     Q.     Do you know if Northrop Grumman had a watch

21  list for its investment managers?

22     A.     I don't recall that.  I would be surprised

23  if they didn't, but I don't recall.

24     Q.     But you say you don't know?

25     A.     I don't recall it.

Page 299

1      Q.      Okay.  What about monitoring investment

2   performance and related fees, what did that include?

3      A.      In terms of Northrop Grumman?

4      Q.      Correct.

5      A.      I -- I can tell you that I don't know.

6   In -- what's a little bit unique about this paragraph,

7   though, Ms. Ross, is that the paragraph that follows,

8   these items were provided by Callan.  So I can assume

9   and I will assume that monitoring investment

10  performance related fees was tied to the reports that

11  were provided by Callan on a monthly basis, so they

12  were monitoring the work that Callan did for them.

13  That -- there wasn't specific definitions in the IPS

14  statement, but it's pretty clear to me in my

15  familiarity with the 60,000 plans that are using our

16  investment management system that -- that that is what

17  they do, they provide quarterly reports, monthly

18  performance reports, fun fact sheets.

19      Q.      But you don't know what ITA was doing -- or

20  is meant by monitoring investment performance and

21  related fees?

22      A.      No, they --

23              MR. STRUCKHOFF:  Objection.

24        Compound.

25              MS. ROSS:  It's stated in his report.

```
1        It's not compound.

2             MR. STRUCKHOFF:  No, it is because

3        you changed -- you changed your question.

4        But I understand.  You may answer.

5             THE WITNESS:  Northrop Grumman did

6        not define each of these in detail in terms

7        of what it meant to them, so I can only

8        give you what it means to me based on my

9        experience.

10   BY MS. ROSS:

11       Q.     So you don't know the scope of --

12       A.     I don't know -- I don't know the scope of

13   it, based on Northrop Grumman's definition.  I have no

14   idea.  They didn't define it.

15       Q.     And what about reporting the results to the

16   investment committee, what did that involve?

17       A.     Never attended one of their meetings.

18   There wasn't anything in their reports that defined

19   exactly what it was.  I did read the minutes.  They

20   did provide -- the minutes were so vague, but they did

21   provide the report.  And I assume they reviewed it and

22   discussed it, but there was no clarification on what

23   they discussed.  So I don't know what went on behind

24   closed doors.  I just know that they make these

25   recommendations, and they give it to the investment
```

Page 301

1    committee, and then they make decisions.

2         Q.    So you don't know the scope of the

3    reporting to the investment committee, correct?

4         A.    Yeah.  Outside of being able to draw

5    analogies to what I am familiar with in the industry

6    as a whole, I don't know specifically what they did

7    behind closed doors.

8         Q.    Okay.  Did you review any PowerPoint

9    presentations that were put together by ITA for the

10   committee?

11        A.    I did.

12        Q.    Okay.  And about how many of those did you

13   review?

14        A.    I don't recall.

15        Q.    Order of magnitude --

16        A.    I don't recall.

17        Q.    -- less than a dozen?

18        A.    Don't recall.

19        Q.    More than a dozen?

20        A.    Don't recall.

21        Q.    Are they identified in your documents that

22   you've listed here?

23        A.    They would be.

24        Q.    Okay.  And in Paragraph 106, you say:  The

25   investment committee retained Callan to provide