Nancy G. Ross
 nross@mayerbrown.com
Brian D. Netter
 bnetter@mayerbrown.com
Laura Hammargren
 lhammargren@mayerbrown.com
Samuel P. Myler
 smyler@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:  312.782.0600
Facsimile:   312.701.7711

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFTON W. MARSHALL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NORTHROP GRUMMAN CORPORATION, et al. <br><br> Defendants. | Case No. 16-CV-6794 AB (JCx) <br><br> **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:    June 7, 2019 <br> Time:   10 a.m. <br> Judge:  Hon. André Birotte Jr. |

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND.................................................................................. 1

    A.    The Plan ...................................................................................... 1

    B.    The Emerging Markets Fund ...................................................... 2

    C.    Hewitt's Recordkeeping Services ............................................... 3

ARGUMENT ......................................................................................................... 4

I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
      THE EMERGING MARKETS CLAIM .......................................... 5

    A.    Plaintiffs' claim is premised on allegations that discovery has
          shown to be false ......................................................................... 7

    B.    Actively managed emerging markets funds were substantively
          prudent...................................................................................... 10

II.    PLAINTIFFS' CHALLENGE TO HEWITT'S RECORDKEEPING
      FEES IS LEGALLY AND FACTUALLY BASELESS ................................ 10

    A.    Plaintiffs' excessive recordkeeping fee claim relies on legally
          deficient and factually inaccurate allegations about Hewitt's fee
          structure and the Defendants' monitoring of that structure ............. 11

    B.    ERISA does not mandate requests for proposals at any
          particular frequency, and no evidence demonstrates that the
          NGSP could have obtained lower recordkeeping fees for the
          same services............................................................................. 14

    C.    Fees paid by Financial Engines to Hewitt did not make Hewitt's
          fees excessive ............................................................................ 16

III.    PLAINTIFFS' DUTY-OF-LOYALTY CLAIMS FAIL .................................. 19

IV.    THE FAILURE TO MONITOR CLAIM IS SIMILARLY BELIED BY
      THE EVIDENCE ..................................................................................... 20

V.    PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS FAIL AS A
      MATTER OF LAW AND ARE TIME BARRED ......................................... 22

VI.    INDIVIDUAL DEFENDANTS WERE NOT ERISA FIDUCIARIES.......... 24

CONCLUSION................................................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

2                                            **Page(s)**

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................... 5, 21

*In re Bank of Am. Corp. ERISA Litig.*,
756 F. Supp. 2d 330 (S.D.N.Y. 2010) ......................................... 21

*Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*,
259 F.3d 1036 (9th Cir. 2001) ..................................................... 7

*Cassell v. Vanderbilt Univ.*,
285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ................................... 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................... 4, 5

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006) ....................................................... 15

*Chendes v. Xerox HR Sols., LLC*,
2017 WL 4698970 (E.D. Mich. Oct. 19, 2017) ........................... 17

*In re Computer Scis. Corp. ERISA Litig.*,
635 F. Supp. 2d 1128 (C.D. Cal. 2009) ............................... 6, 21, 22

*Cunningham v. Cornell Univ.*,
2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ............................. 23

*Danza v. Fidelity Mgmt. Trust Co.*,
2013 WL 3872118 (3d Cir. 2013) ............................................... 14

*David v. Alphin*,
704 F.3d 327 (4th Cir. 2013) ..................................................... 24

*Davis v. Wash. Univ.*,
2018 WL 4684244 (E.D. Mo. Sept. 28, 2018) ............................. 13

*Divane v. Northwestern Univ.*,
2018 WL 2388118 (N.D. Ill. May 25, 2018) ....................... 11, 13, 23

*Donovan v. Mazzola*,
    716 F.2d 1226 (9th Cir. 1983) ................................................................ 6, 10

*Dorman v. Charles Schwab Corp.*,
    2018 WL 6803738 (N.D. Cal. Sept. 20, 2018) ...................................... 21, 22

*Ellis v. Fid. Mgmt. Tr. Co.*,
    257 F. Supp. 3d 117 (D. Mass. 2017), *aff'd*, 883 F.3d 1 (1st Cir.
    2018) ........................................................................................................... 9, 10

*George v. Kraft Foods Glob., Inc.*,
    641 F.3d 786 (7th Cir. 2011) ......................................................................... 15

*Harper v. Wallingford*,
    877 F.2d 728 (9th Cir. 1989) ........................................................................... 5

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
    530 U.S. 238 (2000) ......................................................................................... 23

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ......................................................................... 15

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ......................................................................... 13

*Monper v. Boeing Co.*,
    104 F. Supp. 3d 1170 (W.D. Wash. 2015) ............................................. 21, 22

*Newton v. Am. Debt Servs., Inc.*,
    75 F. Supp. 3d 1048 (N.D. Cal. 2014) ............................................................ 9

*Nuh Nhuoc Loi v. Scribner*,
    671 F. Supp. 2d 1189 (S.D. Cal. 2009) ......................................................... 12

*Patrico v. Voya Fin., Inc.*,
    2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018) ......................................... 17, 18

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ................................................................................... 25, 26

*Pfeil v. State St. Bank & Tr. Co.*,
    806 F.3d 377 (6th Cir. 2015) ................................................................. 6, 9, 10

*Pickern v. Pier 1 Imps. (U.S.), Inc.*,
    457 F.3d 963 (9th Cir. 2006) ......................................................................... 14

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ................................................................ 13

*Sacerdote v. N.Y. Univ.*,
    2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ........................................ 20, 23

*Scott v. Aon Hewitt Fin. Advisors, LLC*,
    2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) ........................................ 17, 18

*Sulyma v. Intel Corp. Investment Policy Committee*,
    909 F.3d 1069 (9th Cir. 2018) ............................................................ 24

*Sweda v. Univ. of Pa.*,
    2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) .................................... 13, 23, 24

*Terraza v. Safeway Inc.*,
    241 F. Supp. 3d 1057 (N.D. Cal. 2017) .................................................. 6

*Tibble v. Edison Int'l*,
    2010 WL 2757153 (C.D. Cal. July 8, 2010), *vacated on other
    grounds*, 843 F.3d 1187 ................................................................... 6, 19

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 135
    S.Ct. 1823, 191 L.Ed.2d 795 (2015) .................................................... 15

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ............................................................... 6

*White v. Chevron Corp.*,
    2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), *aff'd*, 2018 WL
    5919670 ........................................................................... 13, 14, 16

*White v. Chevron Corp.*,
    2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 2018 WL
    5919670 (9th Cir. Nov. 13, 2018) ...................................................... 16, 19

*White v. Chevron Corp.*,
    2018 WL 5919670 (9th Cir. Nov. 13, 2018) ........................................ 12, 13, 16

*Wilcox v. Georgetown Univ.*,
    2019 WL 132281 (D.D.C. Jan. 8, 2019) ............................................... 12, 13

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) ........................................................... 25

**Statutes**

29 U.S.C. § 1102(14)(B) ..................................................................... 23

29 U.S.C. § 1104(a)(1) ........................................................................ 19

29 U.S.C. § 1104(a)(1)(B) ..................................................................... 5

29 U.S.C. § 1106(a)(1) ........................................................................ 22

29 U.S.C. § 1108(b) ............................................................................ 24

29 U.S.C. § 1113 ................................................................................ 24

29 U.S.C. § 1113(1)(A) ................................................................. 12, 24

**Other Authorities**

29 C.F.R. § 2550.404a–1(b) ......................................................... 5, 6, 10

Ninth Cir. R. 36-3 .............................................................................. 12

Fed. R. Civ. P. 56(a) ............................................................................ 4

Local Rule 56-1 ................................................................................... 1

Rule 8 ............................................................................................... 14

Rule 56 .............................................................................................. 4

## INTRODUCTION

In this ERISA action, Plaintiffs challenge a variety of decisions made and actions taken by alleged fiduciaries to the 401(k) retirement plan ("the NGSP" or "the Plan") sponsored by Northrop Grumman Corporation ("Northrop"). Through this motion, Defendants seek partial summary judgment on Counts II, III, VI, and VII of Plaintiffs' Second Amended Complaint ("SAC"). Through those claims, Plaintiffs asserted that Northrop failed to consider whether to convert the Emerging Markets Fund to passive management and failed to renegotiate the recordkeeping contract when the plan's circumstances changed. But discovery has shown that the factual premises underlying these claims are not true, such that Plaintiffs cannot identify evidence to support a sustainable legal theory.[1]

## FACTUAL BACKGROUND[2]

### A.    The Plan

Northrop maintains one of the largest defined contribution retirement plans in the country: the NGSP. SUF ¶¶ 1-2. By the end of 2016, the NGSP had approximately 110,000 participants and more than $19 billion in assets. SUF ¶ 2. Northrop employees may choose to contribute to their individual accounts in the NGSP through payroll withholding, and Northrop matches a percentage of those individual contributions. SUF ¶ 3. All of the NGSP's investments are participant-directed, meaning that the participants choose how to invest their account balances among the options made available by the Plan. SUF ¶ 4.

The NGSP is governed by a plan document, which allocates responsibility for the governance of the Plan between an Administrative Committee and an Investment

---

[1] This motion does not address Plaintiffs' remaining claims, which concern reimbursements that Northrop received from its 401(k) plan for work that Northrop benefits employees provided to the plan. Although those claims also fail, this motion focuses on the claims for which Plaintiffs' factual deficiencies are most glaring.

[2] This section provides contextual background information for the convenience of the Court. A full recitation of the facts relevant to this motion is set out in Defendants' Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law ("SUF").

Committee. SUF ¶¶ 8, 65. Northrop's Board of Directors appointed the Committee members until December 2011, at which time that responsibility was delegated to Northrop's Chief Executive Officer. SUF ¶ 68. The Plan document provides that the Investment Committee is the named fiduciary for investment matters and is responsible for approving investment options and objectives. SUF ¶ 8. The Investment Committee is authorized to delegate certain responsibilities, including day-to-day responsibility for selecting investment managers and investment options, which it has delegated to Northrop's Investments and Trust Administration Department ("ITA"). SUF ¶ 8. The Administrative Committee and its delegates are responsible for management of the Plan "for all purposes other than investment matters," SUF ¶ 65, including retention and management of third-party service providers. SUF ¶¶ 67, 72-74.

### B.   The Emerging Markets Fund

Throughout the relevant time period, the NGSP offered an Emerging Markets Fund ("the EM Fund") as an investment option. In addition to target-date funds and a brokerage window through which participants could invest in over 4,700 mutual funds and individual securities, the NGSP offered eight core investment fund options, representing a range of investment strategies with correspondingly different risks and returns. SUF ¶¶ 5, 16. The EM Fund was one of these eight options; it focuses on securities issued by companies based in emerging markets such as China, Brazil, Russia, and India. SUF ¶ 16. The unique characteristics of emerging markets—including illiquidity and institutional and political risks—have historically created market inefficiencies that have presented opportunities for active management to outperform passive indexing strategies. *Id.*

The Investment Committee decided to divide the EM Fund's assets among multiple emerging markets asset managers.  By combining the strategies of multiple managers, the resulting fund was more diversified, and participants had access to a broader mix of investment strategies. SUF ¶¶ 6-7. The Investment Committee and

ITA conducted a series of analyses to refine the array of managers. Through that continuous review process, the Investment Committee and ITA had repeated, robust discussions about the merits and risks of active and passive management for the EM Fund, including at least ten presentations specifically analyzing the issue. SUF ¶¶ 21-52. As circumstances dictated, the allocation of the EM Fund was changed: In 2005, the fund was actively managed in full; in 2009, 25% was transitioned to passive management; in early 2011, a 50%-50% split was instituted; and by November 2014 the passive component was increased to 100%. SUF ¶¶ 27, 42, 52.

## C.    Hewitt's Recordkeeping Services

All 401(k) plans require "recordkeeping" services: maintaining participant accounts, processing contributions, withdrawals, and distributions, enrolling and terminating participants, and preparing required disclosures, among other tasks. SUF ¶ 64. As of 2006, after a competitive bidding process involving a Request for Proposals ("RFP"), the Administrative Committee retained Hewitt Associates ("Hewitt") as the NGSP's recordkeeper. SUF ¶¶ 76-80. The 2006 agreement entitled Hewitt to a flat monthly fee for the Plan's first 152,000 participants, plus an early-termination payment should the NGSP retain a different recordkeeper prior to 2014. SUF ¶ 81. In late 2010, Northrop contemplated a corporate spinoff that would reduce the number of NGSP participants by potentially 40,000. SUF ¶ 85. Northrop engaged a consultant to benchmark how Hewitt should be compensated after part of the Plan was divested. SUF ¶¶ 86-89. The spinoff closed on March 30, 2011; as of April 1, 2011, Northrop and Hewitt agreed to amend their agreement to replace the flat monthly fee with a per-participant fee of $45 per year—an amount within the benchmark range for comparable plans. SUF ¶ 90. In 2014, Northrop put the contract out to bid. SUF ¶¶ 91-93. As a result of that process, in 2015, Northrop awarded the recordkeeping contract to Fidelity, which completed the transition in April 2016. SUF ¶ 94.

Northrop also used a competitive bidding process in 2011 to choose a firm to

-3-

offer optional individualized investment advice to Plan participants, ultimately selecting Financial Engines for that advisory service starting in 2012. SUF ¶¶ 96-107. Just three years later, Northrop benchmarked the fees and determined that there was a window for a new round of negotiations. SUF ¶¶ 108-110. The ensuing negotiations reduced fees for individualized investment advice in 2015. SUF ¶ 111.

In order to do its advisory work, Financial Engines requires information about its clients' accounts and the ability to transact on their behalf. SUF ¶ 112-113. In 2009, Financial Engines entered into a "data connectivity agreement" with Hewitt, thereby allowing Financial Engines to offer its services to Hewitt's recordkeeping clients. *Id.* Under that bilateral agreement, Hewitt provides Financial Engines with up-to-date participant data and a portal to make investment changes on participants' behalf; Financial Engines provides Hewitt a specified portion of the fees it receives. *Id.* The arrangement between Hewitt and Financial Engines, to which the NGSP was not a party, had no effect on the amount of fees the NGSP paid to either Hewitt or Financial Engines. SUF ¶¶ 116, 120.

## ARGUMENT

Rule 56 requires summary judgment when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial burden of informing the court of the basis for the motion and the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. On an issue as to which the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id.* Evidence that is "merely colorable" is insufficient to create a genuine dispute of material fact; instead, the proffered evidence must be "significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.

-4-

1989) ("[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment.").

## I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE EMERGING MARKETS CLAIM.

Plaintiffs' emerging markets claim is premised on their allegation that Northrop decided to transition certain NGSP investment options to passive management in December 2010, but "continued to mandate an active investment strategy" for the EM Fund without evaluating whether such a strategy was "prudent and in the best interests of participants." SAC ¶¶ 84, 88, 118. But the undisputed evidence shows (a) that Defendants followed a detailed analytical process to evaluate the merits of active management; and (b) that employing active management was objectively prudent in the emerging markets context. Each of these revelations is an independent basis for summary judgment.

ERISA requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The requirements of this section will be met where the fiduciary "[h]as given appropriate consideration to those facts and circumstances that . . . are relevant to the particular investment or investment course of action involved, including the role the investment . . . in that portion of the plan's investment portfolio" and the fiduciary has acted accordingly. 29 C.F.R. § 2550.404a–1(b). "Appropriate consideration" includes a determination that the investment "is reasonably designed, as part of the portfolio . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment," along with various other factors related to that specific portion of the portfolio. *Id.*

To determine whether an ERISA fiduciary has breached the duty of prudence, courts consider both the substantive reasonableness of the fiduciary's actions and

the procedures by which the fiduciary made its decision. *In re Computer Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1139 (C.D. Cal. 2009) (requiring plaintiffs to establish that defendants' process was imprudent and that the imprudent process resulted in losses to the plan).

Procedural prudence examines "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983). "[C]ourts have readily determined that fiduciaries who act reasonably—i.e., who appropriately investigate the merits of an investment decision prior to acting—easily clear this bar." *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384–85 (6th Cir. 2015) (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014)). Prudence is not to be judged in hindsight; the analysis "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1069 (N.D. Cal. 2017) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)).

By contrast, substantive or objective prudence asks whether, regardless of any flaws in the defendant's decision-making process, "a hypothetical prudent fiduciary would have made the same decision anyway." *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014). *Accord, e.g.*, *Tibble v. Edison Int'l*, 2010 WL 2757153, at *21 (C.D. Cal. July 8, 2010) ("In sum, if the investment decision is one that a prudent person would make at the time it was made, there is no liability for loss to the Plan participants."), *vacated on other grounds*, 843 F.3d 1187. And because ERISA's duty of prudence is a relative standard—incorporating the conduct of a fiduciary's peers as the duty of care—industry practice is key to objective prudence. *See, e.g.*, *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044 (9th Cir. 2001) (rejecting claim that "the Bloomberg system" was an imprudent method of investigating investments because "the Bloomberg system was the tool

-6-

prevalently used in the industry").

###    A.    Plaintiffs' claim is premised on allegations that discovery has shown to be false.

At its core, the central premise of Plaintiffs' emerging markets claim is that Defendants imprudently maintained an "active management" strategy for the EM Fund until November 2014 despite having decided to transition certain other funds to passive management four years earlier.  Plaintiffs further allege that over the course of this four year period, Defendants maintained an active management approach, "took no action" with respect to evaluating passive management, and "at no point" determined which approach (active or passive) was in the best interest of participants.  SAC ¶ 84, 87-88.  Now that discovery has closed, Plaintiffs can no longer stand on these allegations, each of which has proved to be false.

The most fundamental problem with Plaintiffs' emerging markets claim relates to its central premise—*i.e.*, that the EM Fund was actively managed from its inception until November 2014, at which point Defendants finally decided to transition the fund to passive management.  But Defendants actually began the process of transitioning the EM Fund to passive management *in 2009* when they decided to allocate 25% of the fund's assets to passive management.  SUF ¶ 27. Soon thereafter, Defendants transitioned another 25% from active to passive management, thereby making the EM Fund as much of a "passively managed" investment as it was an actively managed fund.  Then, in 2014, Defendants completed the transition to passive management by reallocating the remaining actively managed assets. The decision to transition the EM Fund from active to passive management over time and in phases was based on an analysis of the relative strengths and weaknesses of passive and active management for this particular asset class. SUF ¶ 21.

As the above facts suggest, Plaintiffs' allegations that Defendants "took no action" to transition the EM Fund to passive management and did not even evaluate passive management as an alternative until implementing such an approach in 2014

are also false. In fact, Defendants began evaluating the strengths and weaknesses of both active and passive management for all of the NGSP's investment options, including the EM Fund, as early as *2007*.  SUF ¶¶ 21-23.  This process included the preparation of at least ten presentations between 2007 and 2014. In nine of these presentations, Defendants analyzed the relative performance of the two approaches, identified strengths, and highlighted the unique problems associated with the passive management of emerging markets assets. SUF ¶ 21.  The  2007 strategic review of the EM Fund noted, for example, that the median active manager had consistently outperformed emerging market benchmarks by as much as 283 basis points (bps),[3] while passive management had simply "not been effective in replicating index performance" due to the particular characteristics of emerging markets. SUF ¶22.

Thus, where Plaintiffs allege that Defendants "failed to make a reasoned decision" about the management of the EM Fund (SAC ¶ 87), the undisputed evidence shows that Defendants were *constantly* assessing the relative performance of active and passive managers in emerging markets, and making their decisions based on that analysis. And where they allege that Defendants "took no action" regarding the management of the EM Fund (SAC ¶ 84), the undisputed evidence shows that Defendants *did* increase the fund's passively managed component based on improvements in the performance of passive managers over time. The theory of Plaintiffs' complaint—that Defendants stood by and did nothing—does not reflect the reality uncovered through discovery.

That alone is enough for summary judgment. Having pleaded a claim based on allegations that Defendants had *no* process and took *no* action, Plaintiffs may not switch their theory of the case now that discovery has proven that idea baseless. "As the Ninth Circuit has repeatedly held, 'summary judgment is not a procedural second chance to flesh out inadequate pleadings.'" *Newton v. Am. Debt Servs., Inc.*, 75 F.

---

[3] A basis point is one one-hundredth of one percent (0.01%).

Supp. 3d 1048, 1063 (N.D. Cal. 2014) (quoting *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)); *see also id.* ("[Plaintiff] may not 'effectively amend her complaint by raising a new theory in response to a motion for summary judgment.'") (alterations incorporated) (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010)).

In any event, the decision-making process uncovered in discovery is prudent as a matter of law. *See Pfeil*, 806 F.3d at 388 (holding—at summary judgment—that fiduciary's "actual processes demonstrated prudence" where fiduciary "repeatedly discussed at length whether to continue the [challenged] investments;" fiduciary "discussed the performance of" those investments "and factors that may have affected that performance;" and the process "culminated in decisive votes, ultimately to divest the funds" of the challenged investments); *Ellis v. Fid. Mgmt. Tr. Co.*, 257 F. Supp. 3d 117, 129 (D. Mass. 2017) (granting summary judgment for fiduciary whose "process appears procedurally prudent" because it "periodically explored changing" the challenged benchmark by "regularly conducting quantitative analyses of potential alternative[s]"), *aff'd*, 883 F.3d 1, 11 (1st Cir. 2018) (affirming because "a wealth of undisputed evidence support[ed] the conclusion that [the fiduciary] engaged in an evaluative process prior to making investment decisions").[4]

After discovery, it cannot genuinely be disputed that Defendants "employed the appropriate methods to investigate the merits of" active and passive management for the EM Fund. *Donovan*, 716 F.2d at 1232; *see also Pfeil*, 806 F.3d at 385 ("[F]iduciaries who . . . appropriately investigate the merits of an investment decision prior to acting . . . easily clear this bar.") (quoting *Tatum*, 761 F.3d at 358). Summary judgment is therefore warranted.

---

[4]   Notably, the district court in *Ellis* granted summary judgment for the defendants despite the contrary opinion of the very expert Plaintiffs proffer here: Steve Pomerantz. 257 F. Supp. at 124–25; *see generally Daubert* Motion, ECF 167.

**B.    Actively managed emerging markets funds were substantively prudent.**

Summary judgment on this claim is also appropriate for a second, independent reason: Active management was objectively, substantively prudent for emerging markets funds during the relevant period. It is undisputed that the use of active management in emerging markets investments was prevalent in the 2010–2014 timeframe among retirement plans and institutional investors, and remains so today. SUF ¶ 17. Indeed, active management was overwhelmingly the strategy employed in emerging markets funds overall—because, as Defendants recognized, unique features of emerging markets made passive strategies less effective. Of all emerging markets funds, 90% were actively managed in 2006, and 77.2% remained actively managed in 2017. SUF ¶ 17. There is thus no genuine dispute that the idiosyncrasies of emerging markets rendered active management a prudent strategy for emerging markets funds, no matter the purported advantages of passive management in other contexts. *See* 29 C.F.R. § 2550.404a–1(b) ("Appropriate consideration" requires specific consideration of the particular portion of the portfolio); *Pfeil*, 806 F.3d at 388 (holding that fiduciary decision was substantively prudent based on "the decision of other expert professionals" making the same decision at the same time).

**II.    PLAINTIFFS' CHALLENGE TO HEWITT'S RECORDKEEPING FEES IS LEGALLY AND FACTUALLY BASELESS.**

Plaintiffs next claim that Defendants breached their fiduciary duty of prudence by causing the NGSP to pay excessive fees to its recordkeeper, Hewitt, from 2010 until the NGSP switched recordkeepers in April 2016. But even a simple look at total administrative costs belies Plaintiffs' assertion: The NGSP's total administrative costs dropped from 4 bps in 2010 to 3 bps in 2015, well below levels recognized by courts as reasonable. *See* SUF ¶ 124; *Divane v. Northwestern Univ.*, 2018 WL 2388118, at *10 (N.D. Ill. May 25, 2018) (holding that administrative fees between 12.5 and 20 bps are "reasonable as a matter of law").

Plaintiffs therefore attempt to manufacture an excessive recordkeeping claim

-10-

by challenging Hewitt's fixed rate fee structure (SAC ¶¶ 69, 73) fabricating a non-existent requirement to put recordkeeping services out to bid every three years (SAC ¶ 78), and attacking separate payments Financial Engines made to Hewitt for access to participant data that Financial Engines needed to do its job (SAC ¶¶ 70-72)—all theories that have failed repeatedly. *See infra* at 17. None of Plaintiffs' challenges have any grounding in ERISA; moreover, Plaintiffs' claim turns on several factual inaccuracies about which the record is now clear and undisputed. With the correction of the record and the uncontroverted evidence of the fiduciaries' prudent RFP and benchmarking processes, Plaintiffs can only speculate that the NGSP may have been able to pay less.  Such speculation, however, does not create a genuine issue of material fact. As one court held in dismissing a nearly identical claim, "[t]he mere allegation that [the plan sponsor] could continue to offer the same Plans and the same associated services for $35/year has no factual support, is entirely speculative, contrary to caselaw and common sense, and does not warrant discovery." *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *13 (D.D.C. Jan. 8, 2019).

Indeed, the Ninth Circuit recently affirmed the dismissal of a similarly unsupported recordkeeping-fee claim, holding that allegations "show[ing] only that Chevron could have . . . sought lower fees for the administration of the fund" did not "ma[ke] it more plausible than not that any breach of a fiduciary duty had occurred." *White v. Chevron Corp.*, 2018 WL 5919670, at *1 (9th Cir. Nov. 13, 2018).[5] Just so here. Plaintiffs' recordkeeping claim is legally and factually baseless.

    **A.**    **Plaintiffs' excessive recordkeeping fee claim relies on legally deficient and factually inaccurate allegations about Hewitt's fee structure and the Defendants' monitoring of that structure.**

Plaintiffs do not claim that Defendants breached their fiduciary duties in 2006 by agreeing to pay Hewitt $500,000 per month to provide recordkeeping services to the 115,127 participants in the NGSP at the time (a rate of approximately $52 per

---

[5] "Although [] not binding precedent, unpublished decisions have persuasive value and indicate how the Ninth Circuit applies binding authority." *Nuh Nhuoc Loi v. Scribner*, 671 F. Supp. 2d 1189, 1201 n.10 (S.D. Cal. 2009); *see* Ninth Cir. R. 36-3.

participant per year).[6] Instead, Plaintiffs claim that Defendants breached their duty of prudence by failing to reduce Hewitt's fees as the number of NGSP participants decreased between 2009 and 2015 and the compensation Hewitt received from Financial Engines increased. (SAC ¶¶ 69, 73). Although Plaintiffs make an unsupported assertion that annual recordkeeping fees should have been no more than $25 per participant, the only breach Plaintiffs allege relates to the fixed-fee amount paid to Hewitt and the failure to re-negotiate that structure and amount. (SAC ¶ 73, 75).

As an initial matter, Plaintiffs' argument that per-participant fees are the only prudent structure for recordkeeping contracts is legally groundless, as proven by cases brought by the same plaintiffs' counsel here. As has been recognized by numerous courts, ERISA does not mandate a particular fee structure for service providers, as there are advantages and disadvantages to different structures depending on the plan's circumstances. *See Loomis v. Exelon Corp.,* 658 F.3d 667, 672-73 (7th Cir. 2011) (noting that, with regard to recordkeeping fees, "flat payments per participant may help some participants but hurt others, depending on the size of each participant's account"); *Renfro v. Unisys Corp.*, 671 F.3d 314, 327-28 (3d Cir. 2011) (rejecting plaintiffs' allegation that an asset-based fee structure was per se unreasonable); *White v. Chevron Corp.*, 2016 WL 4502808, at *12-14 (N.D. Cal. Aug. 29, 2016) (same), *aff'd*, 2018 WL 5919670. As observed by these and other courts, it is the fiduciary process used to arrive at the fee structure and amount that drives whether the arrangement is appropriate, and unsupported, speculative assertions that the fees might have been lower had the defendants engaged in some other process with the benefit of hindsight are insufficient to state a claim at the pleading stage, much less create a genuine factual issue justifying a

---

[6] Nor could they have brought a claim related to this agreement given ERISA's six-year statute of repose. 29 U.S.C. § 1113(1)(A). Moreover, if Plaintiffs objected to any aspect of the 2006 Hewitt agreement they could have raised those objections as part of the *Grabek* Litigation, which Plaintiffs' counsel filed that same year.

trial.  *See, e.g.*, *White*, 2018 WL 5919670, at *1; *Wilcox*, 2019 WL 132281, at *13; *Davis v. Wash. Univ.*, 2018 WL 4684244, at *3 (E.D. Mo. Sept. 28, 2018) (rejecting the "false premise" that Defendants breached their fiduciary duties simply because "the Plan's fees could have been lower"); *Divane v. Nw. Univ.*, 2018 WL 2388118, at *8 (N.D. Ill. May 25, 2018) (similar); *Sweda v. Univ. of Pa.*, 2017 WL 4179752, at *8 (E.D. Pa. Sept. 21, 2017) (similar).

Furthermore, the undisputed record demonstrates that the NGSP's process was prudent. The Plan chose Hewitt as a recordkeeper as a result of a competitive RFP process that included five different vendors. SUF ¶¶ 76-79.  After a several-month process, Hewitt was chosen as the NGSP's new recordkeeper, SUF ¶ 79-80, and on January 1, 2006, the NGSP entered into an agreement with Hewitt for recordkeeping services.  SUF ¶ 80.  There is no allegation or evidence that the contract was not negotiated at arms' length, and the monthly fixed fee provided for in the contract was a fee structure that recordkeepers used at the time.  SUF ¶ 82; *see generally Danza v. Fidelity Mgmt. Trust Co.*, 2013 WL 3872118, at *1, *3 (3d Cir. 2013) (reviewing 2008 Fidelity recordkeeping contract with fixed fees).

Importantly, Plaintiffs' allegation that this $500,000 fixed fee went unreviewed and unchanged is indisputably wrong.  Even though the 2006 contract imposed early termination penalties that lasted until 2014, NGSP fiduciaries were able to negotiate a fee reduction from Hewitt as a result of the March 2011 divestiture of Northrop's shipbuilding division. SUF ¶ 90. In that process, Northrop retained an outside consultant to provide benchmarking data and used the benchmarking data to negotiate a lower fee, which was computed on a per-participant basis (SUF ¶¶ 85-90)—exactly what Plaintiffs say was prudent (SAC ¶ 66). As the early-termination fee expired, the NGSP's fiduciaries put the contract back out to bid; that 2014 RFP resulted in the transition to Fidelity that was completed in April 2016. SUF ¶¶ 91-94.  Under this factual record, no reasonable trier of fact could uphold Plaintiffs' claim that Defendants breached their fiduciary duty of prudence by failing to monitor

-13-

and re-negotiate Hewitt's $500,000 monthly fixed fee—indeed, Defendants did exactly that in both 2010 and 2014.[7]

### B. ERISA does not mandate requests for proposals at any particular frequency, and no evidence demonstrates that the NGSP could have obtained lower recordkeeping fees for the same services.

Plaintiffs' theory that Defendants breached their fiduciary duty because competitive bidding was required every three years similarly fails as a matter of law. "[N]othing in ERISA compels periodic bidding." *White*, 2016 WL 4502808, at *13-15. In fact, nothing in ERISA dictates "*any* particular course of action" with regard to fees or negotiations. *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (emphasis added; internal quotation omitted). The Ninth Circuit has specifically rejected a "bright-line approach to prudence" that hinges only on finding the lowest cost, noting that "[t]here are simply too many relevant considerations for a fiduciary" for that approach to be tenable. *See Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013), *vacated on other grounds*, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (ERISA does not require fiduciaries to "scour the market" to find the lowest fees available). Fiduciaries are instead only required to "exercise care prudently and with diligence under the circumstances then prevailing." *See Chao*, 452 F.3d at 182.

Defendants satisfied their fiduciary duties with respect to Hewitt's fees by conducting an RFP before they engaged Hewitt, by benchmarking Hewitt's fees through an external consultant in 2010, and by renegotiating the fees in 2011. *See* SUF ¶¶ 76, 79, 86, 90. In addition to the review and involvement in that process by the Administrative Committee chair, the Administrative Committee was presented with the periodic reviews of Hewitt's fees and performance. SUF ¶ 95. The NGSP's

---

[7]  Plaintiffs cannot shift the underlying factual allegations of their claims on summary judgment. F.C.R.P. 8(a)(2); *see also Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (rejecting plaintiff's "attempts to justify these new factual allegations as falling within the original complaint" because Rule 8 "requires that the allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

all-in fees were reduced from 4 bps to 3 bps, which is low relative to market and survey data. SUF ¶ 124, 126. Further, the contract was put out to bid again in 2014, three years after Hewitt's fees were renegotiated. SUF ¶¶ 91-92. Thus, even assuming best practices call for frequent comprehensive fee reviews, that requirement was met during the relevant time period by the Administrative Committee's benchmarking and fee renegotiations starting in 2010 and 2011, and the new RFP for recordkeeping services issued in 2014.

This extensive record of review and renegotiations distinguishes this case from *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011)—cited by Plaintiffs at the motion-to-dismiss stage—where the court found that the lack of an RFP presented an issue for trial when coupled with a lack of evidence that plan fiduciaries reviewed fees for reasonableness. The court in *White* explained the difference:

> [T]he court in *George* held that the failure to solicit competitive bids might be imprudent where (1) plaintiffs presented concrete evidence about the objective level of fees and why they were unreasonable; and (2) the plan fiduciaries had not renegotiated their recordkeeping arrangement for more than fifteen years. . . . [I]n contrast to the facts at issue in *George*, the Plan fiduciaries did renegotiate their recordkeeping arrangement with Vanguard to limit compensation to annual, per-participant fees.

*White*, 2016 WL 4502808, at *15.

Beyond the evidence of benchmarking, re-negotiations, and RFPs discussed above, all of the objective evidence shows the NGSP's fees were in line with or lower than other similarly sized plans. SUF ¶ 123-127. These fees, as even Plaintiffs' proposed recordkeeping fee expert, Martin Schmidt, has acknowledged, were consistent every year, even as the NGSP's assets grew substantially and participant counts varied.[8] SUF ¶ 131. Importantly, Plaintiffs have failed to dispute

---

[8]    Plaintiffs have disclosed a purported expert, Martin Schmidt, to offer an opinion on the reasonableness of the NGSP's recordkeeping fees. However, Schmidt has never benchmarked administrative fees for a plan anywhere near as large or as complex as the NGSP. The largest plan he has benchmarked was approximately 40,000 participants, or less than half the size of the NGSP. SUF ¶ 129. Moreover,

the objective evidence cited above, and have failed to show that the NGSP could have obtained lower recordkeeping fees for the same services. Although Plaintiffs' expert opines that Defendants "could have" reduced the NGSP's administrative costs had they conducted a burdensome RFP process, without some "indicia of reliability" beyond his purported experience, Schmidt's opinion is mere speculation. SUF ¶ 134; *White*, 2017 WL 2352137, at *12 (rejecting claims based on speculation regarding what plan fiduciaries "could have" done to reduce fees). Accordingly, there is no genuine factual dispute that the fees the NGSP paid to Hewitt were reasonable.

**C.** **Fees paid by Financial Engines to Hewitt did not make Hewitt's fees excessive.**

Plaintiffs' objections to the data connectivity agreement between Hewitt and Financial Engines, which Plaintiffs characterize as a "kickback" arrangement, have been rejected time and again by the courts. *See, e.g., Scott v. Aon Hewitt Fin. Advisors, LLC*, 2018 WL 1384300, at *2 (N.D. Ill. Mar. 19, 2018) (dismissing claims that "Hewitt . . . agreed to a 'pay to play' or improper kickback scheme [with] Financial Engines"); *Patrico v. Voya Fin., Inc.*, 2018 WL 1319028, at *6 (S.D.N.Y. Mar. 13, 2018) (dismissing allegations that a recordkeeper provided "no compensable services" to Financial Engines); *Chendes v. Xerox HR Sols., LLC*, 2017 WL 4698970, at *2 (E.D. Mich. Oct. 19, 2017) (dismissing claim that fees paid to a recordkeeper "from FE 'are not being paid for any substantial services being provided by Xerox HR to FE or to participants of the Plans'"). Plaintiffs' claims in this case fare no better.

First, Plaintiffs' assertion that Hewitt provided "no apparent services" to Financial Engines warranting payment is flatly contradicted by the evidence. The agreement between Hewitt and Financial Engines outlines the services Hewitt

---

Schmidt underestimated the complexity of the NGSP and the services offered by Hewitt in preparing his report. SUF ¶ 132. Most egregiously, in opining on his "range of expected fees" for NGSP recordkeeping services, Schmidt not only offers no range, but uses no market data or comparable plan fees to support his "expected fees." SUF ¶ 133. Ultimately, Schmidt's lack of experience combined with his flawed methodology renders his opinion suspect at best and prejudicial at worst.

provided to Financial Engines in exchange for its connectivity fee—specifically, access to the participant data that Financial Engines required in order to perform its function as investment advisor to plan participants. SUF ¶¶ 112-113. As Financial Engines' corporate representative explained, "the ability to deploy our services was dependent on [] integration with Hewitt, and in turn, we compensated them for that through data connectivity fees." SUF ¶ 112 (Ex. 99, Rubino Dep. 29:23-24 ("We can't deploy our services without the integration with the recordkeeper.")). Even Plaintiffs' expert had to admit that the compensation Hewitt received from Financial Engines was not a gift and that Hewitt clearly provided services in exchange for the fees it received. SUF ¶ 135.

Moreover, courts faced with similar circumstances have noted that it would be problematic under ERISA to impose a requirement that plan fiduciaries monitor the specifics of a service provider's contractual arrangements with other parties. *See Patrico*, 2018 WL 1319028, at *7 (declining to impose such a duty, noting that "[p]laintiff has not presented any law to suggest that ERISA imposes such a heavy burden on plan sponsors."). Instead, when there are multiple service providers at issue, a fiduciary must ensure that the fees it pays from plan assets are reasonable in relation to all of the services provided to the plan and its participants. *Scott*, 2018 WL 1384300, at *11 (citing Best Interest Contract Exemption, 81 Fed. Reg. 21002-01, 201554 (Apr. 5, 2016)). "[T]he standard is a fair market standard," and "there is no requirement to allocate specific compensation to specific services." *Id.* (internal quotation omitted). A fiduciary's duty to monitor service providers' fees, however vague the contours of that duty may be, has never been held to include an obligation to monitor compensation a service provider receives from a third party pursuant to an agreement, as opposed to compensation paid by the plan and its participants.

There is no genuine dispute that the Administrative Committee fulfilled its obligation to ensure reasonable compensation paid by the Plan by separately benchmarking the amounts it paid to Hewitt for its recordkeeping services (discussed

-17-

above) and the amounts it paid to Financial Engines for advisory services. The Administrative Committee commissioned an RFP for financial advisory services in 2011 with the assistance of an external consultant. SUF ¶ 96. The committee chose Financial Engines out of several providers and engaged the firm for services starting in 2012. SUF ¶¶ 98-106. In spring 2015, the Administrative Committee again reviewed the results of a fee benchmarking study to assure itself that fees were appropriately renegotiated. SUF ¶ 110 (Ex. 58, May 2015 minutes: "[W]hile Financial Engines fees were reasonable at the time of the initial engagement in 2011, the benchmarking shows a change in the market . . . the Plans are actively renegotiating the investment advisory fees with Financial Engines in order to bring the fees better in line with the benchmarking."). Through that process, NGSP participants saw additional fee reductions. SUF ¶ 111.

Plaintiffs have adduced no evidence that industry practice called for fiduciaries to monitor third-party arrangements. Indeed, the evidence shows that the fee arrangement between Financial Engines and Hewitt was enterprise-wide and was the same for almost all plans that employed both parties. SUF ¶¶ 114-115.[9]

In any event, it is undisputed that the arrangement *did not change* the fees paid by participants or the NGSP. Notwithstanding the remote possibility that Financial Engines would have paid Hewitt more than the market rate demanded for access to its platform, Plaintiffs have no evidence that Defendants could have exercised control over the terms of the data connectivity agreement or used their knowledge of the data connectivity fees to negotiate less expensive recordkeeping or investment advisory services for the NGSP. Defendants are entitled to summary judgment on all claims regarding administrative and recordkeeping fees.

---

[9] Moreover, the undisputed evidence shows that the Administrative Committee and its delegates were aware of the general arrangement between Hewitt and Financial Engines when it chose Financial Engines and executed the agreement with it. SUF ¶¶ 118-122.

### III.   PLAINTIFFS' DUTY-OF-LOYALTY CLAIMS FAIL.

ERISA's duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Thus, "a breach of that duty requires some showing that the fiduciaries' decisions were *motivated by* a desire to serve the interests of [themselves or others] over those of the beneficiaries." *Tibble*, 2010 WL 2757153, at *24 n.19; *accord, e.g.*, *White v. Chevron Corp.*, 2017 WL 2352137, at *4, 23 (N.D. Cal. May 31, 2017) (duty of loyalty claim requires showing that "defendants took [some] actions *for the purpose* of benefitting themselves or some third party . . . at the expense of Plan participants, or that they acted under any actual or perceived conflict of interest.") (emphasis added), *aff'd*, 2018 WL 5919670 (9th Cir. Nov. 13, 2018); *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, at * 5 (S.D.N.Y. Aug. 25, 2017) ("[T]o implicate the concept of 'loyalty,' a plaintiff must allege plausible facts supporting an inference that the defendant acted *for the purpose* of providing benefits to itself or someone else.").  Since Plaintiffs could not plausibly allege facts sufficient to support a duty of loyalty claim, much less come forward with admissible evidence showing that Defendants acted to benefit themselves or others at Plaintiffs' expense, Defendants are entitled to judgment on these claims.

As an initial matter, Plaintiffs' failure to include a single allegation in either Count II or Count III that distinguishes their duty of loyalty claims from their prudence claims justifies entering summary judgment in favor of Defendants on the former.  As Courts have held, "[t]o state a loyalty-based claim under ERISA . . . a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts," *Sacerdote*, 2017 WL 3701482, at *5, but that is all Plaintiffs have done.   For example, Plaintiffs frame their emerging markets claim as a violation of the duty of loyalty, asserting that "Defendants breached their dut[y] of loyalty . . . by failing, until November 2014, to remove underperforming managers and move the Emerging Markets Equity Fund's assets to passive-investing," but they never

allege that in making this decision, Defendants were motivated by a desire to benefit themselves and others at participants' expense.

Dismissing this unsubstantiated claim is all the more appropriate at this stage of the case since Plaintiffs have had ample opportunity to develop this claim through discovery but still cannot offer a plausible theory, much less admissible factual evidence, to support a finding that Defendants acted to benefit themselves or others at Plaintiffs' expense.

## IV. THE FAILURE TO MONITOR CLAIM IS SIMILARLY BELIED BY THE EVIDENCE.

Plaintiffs' claim that Northrop failed to appropriately monitor its appointees to the Administrative Committee and Investment Committee, and that the committees in turn failed to monitor individuals or groups to whom they delegated fiduciary tasks is entirely derivative of Plaintiffs' prudence claims. SAC ¶¶ 146–148 (alleging that each fiduciary breached its duty to monitor by failing to prevent its delegates and co-fiduciaries from engaging in the fiduciary breaches alleged elsewhere in the complaint). Without an underlying fiduciary breach, Plaintiffs' claim dies on the vine. *See, e.g.*, *Dorman v. Charles Schwab Corp.*, 2018 WL 6803738, at *7 (N.D. Cal. Sept. 20, 2018) ("The duty to monitor claim is essentially derivative of the breach of fiduciary duty claim. Because the breach of fiduciary duty cause of action fails to state a claim, this cause of action does as well."); *In re Computer Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1144 (C.D. Cal. 2009) ("[B]ecause Plaintiffs' prudence claim fails . . . their monitoring claim also fails."); *Monper v. Boeing Co.*, 104 F. Supp. 3d 1170, 1180 (W.D. Wash. 2015) ("[F]ailure to monitor [claims] are derivative claims that necessarily fail where there is no underlying violation."); *In re Bank of Am. Corp. ERISA Litig.*, 756 F. Supp. 2d 330, 359 (S.D.N.Y. 2010) ("[A] failure to monitor claim fails where the plaintiffs do not successfully allege a breach of the duty of prudence.").

Even had Plaintiffs been able to substantiate their underlying claims, summary

judgment would still be warranted because Plaintiffs have not adduced "significantly probative" evidence of any failure in monitoring. *Anderson*, 477 U.S. at 255. The duty to monitor requires that a fiduciary "review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards." *Dorman*, 2018 WL 6803738, at *7; *see also Computer Scis. Corp.*, 635 F. Supp. 2d at 1144 ("Under ERISA, fiduciaries have a *limited* duty to monitor and review the performance of their appointed fiduciaries[.]") (emphasis added). As this Court put it, Plaintiffs survived the motion-to-dismiss stage by "essentially alleg[ing] Defendants did nothing at all to monitor their appointed fiduciaries." Dkt. 146, at 9. But at summary judgment, Plaintiffs must show actual evidence raising a genuine dispute of material fact as to whether Northrop failed appropriately to monitor its appointees to the committees.[10]   Plaintiffs cannot do so because the undisputed evidence shows ongoing review by Northrop's Board as to the performance of committee appointees. *See* SUF ¶ 9.   Plaintiffs have no evidence to show that a prudent Board of a comparable company would have done more.

The same is true as to Plaintiffs' claim challenging monitoring by the Administrative Committee and Investment Committee.  Indeed, the evidence shows a pattern of regular meetings by the respective committees in which they considered the exact issues of which Plaintiffs complain. *See, e.g.*, SUF ¶¶ 30, 38, 59, 70, 94. This indisputable documentary evidence is backed up by the testimony of Northrop employees regarding the regular involvement that individuals at all levels had in monitoring the NGSP and its investment options on a day-to-day basis. SUF *See, e.g.*, ¶¶ 12, 20, 56, 74, 75, 90.

---

[10] Importantly, Northrop may not be held responsible for the actions of its appointees on a theory of *respondeat superior*; there must be evidence that Northrop itself insufficiently monitored them. *See Monper*, 104 F. Supp. 3d at 1181 ("[T]he Ninth Circuit has plainly signaled that common law theories, such as *respondeat superior*, are not to be imported into ERISA actions so as to expand the bases for liability that the statute provides.") (collecting cases).

## V.   PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS FAIL AS A MATTER OF LAW AND ARE TIME BARRED.

Plaintiffs attempt to repackage their prudence claims as "prohibited transactions" claims under 29 U.S.C. § 1106(a)(1). They allege that the NGSP's "hiring" of Hewitt, Financial Engines, and the EM Fund's active managers, as well as "the payment of fees" to those entities, constitutes a prohibited transaction under § 1106(a). SAC ¶ 136. But other courts have rejected as a matter of law the same effort by the same plaintiffs' counsel. *See Sacerdote*, 2017 WL 3701482, at *13–14; *Sweda v. Univ. of Pa.*, 2017 WL 4179752, at *11 (E.D. Pa. Sept. 21, 2017); *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *9–10 (S.D.N.Y. Sept. 29, 2017); *Divane v. Nw. Univ.*, 2018 WL 2388118, at *9–10 (N.D. Ill. May 25, 2018).

Section 1106 "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42 (2000). Specifically, Section 1106(a) bars certain transactions between a plan and a "party in interest," a term defined to include, among other things, "a person providing services to [a] plan." 29 U.S.C. § 1102(14)(B). But Plaintiffs stretch these provisions beyond their breaking point by suggesting that the very transaction that *makes* Hewitt, Financial Engines, and the active managers into parties in interest—that is, payment for their services—is *itself* a prohibited transaction with a party in interest. As one court explained, "[t]his cannot be correct," because "[i]f such an argument were true, then any time plan administrators contracted with another party to provide services to plan participants in exchange for money (which includes the basic elements of retirement plans, including making mutual funds available or recordkeeping services) it would qualify as a prohibited transaction." *Sweda*, 2017 WL 4179752, at *11. Or, as yet another court put it:

> [P]ayment of a fee for services rendered is a core aspect of a pension plan under ERISA—and most retirement savings plans. Depending on the circumstances, overpayment of fees may be an issue under other provisions of ERISA, but a payment for services rendered cannot be a

-22-

'prohibited transaction.'

*Sacerdote*, 2017 WL 3701482, at *13; *see also Divane*, 2018 WL 2388118, at *10 ("[I]t would be nonsensical to let a party state a claim for a prohibited transaction in violation of ERISA merely by alleging a plan paid a person for a service."). As in *Sweda*, then, "[t]he plaintiffs' attempts to shoehorn their fiduciary duty claims into the prohibited transaction provision simply fail as a matter of law." 2017 WL 4179752, at *11.

Even if this were not the case, summary judgment would still be required because the payments alleged by Plaintiffs fall into the statutory safe harbor of 29 U.S.C. § 1108(b), which explicitly exempts from the prohibited transaction rules "[c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." After discovery, the undisputed evidence demonstrates that the fees paid to Hewitt and Financial Engines were entirely reasonable. *See supra* at 18-19. And as for the EM Fund's active managers, Plaintiffs do not even allege that their compensation was anything other than reasonable. *See generally* SAC.

Furthermore, Plaintiffs' prohibited transaction claims are barred by ERISA's six year statute of repose, which provides that "[n]o action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty or obligation . . . six years after [ ] the date of the last action which constituted a part of the breach or violation."  29 U.S.C. § 1113(1)(A).[11] That period begins to run "when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted." *David v. Alphin*, 704 F.3d 327, 339 (4th Cir. 2013). For a

---

[11]     ERISA also contains a three-year statute of limitations that is triggered "after the earliest date on which the Plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113. Defendants believe that *Sulyma v. Intel Corp. Investment Policy Committee*, 909 F.3d 1069 (9th Cir. 2018), wrongly narrowed the definition of "actual knowledge" and preserve for appeal the argument that Plaintiffs had actual knowledge of their claims under the circumstances present here.

prohibited transaction claim like the one here, the only relevant "specific event" is the initial engagement of the service provider. *Id.* at 341; *see also Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1068 (M.D. Tenn. 2018) ("[T]here is no such thing as a continuing prohibited transaction[.]").

Plaintiffs' prohibited transaction claim with respect to Hewitt's fees depends entirely on the allegation that Hewitt was compensated for recordkeeping services at a fixed rate of $500,000 per month, a transaction that was entered into in 2006, well before the limitations period.[12] SUF ¶ 80. The same is true with respect to the EM Fund's active managers, who were retained in 2003, 2005, and 2006, respectively. SUF ¶ 19. Given this lapse of time, Defendants are entitled to summary judgment based on ERISA's statute of repose.

## VI.   THE INDIVIDUAL DEFENDANTS WERE NOT ERISA FIDUCIARIES.

Although Plaintiffs unnecessarily expanded their claims to name the Northrop employees who served on the fiduciary committees as defendants, Plaintiffs have adduced no facts suggesting that they single-handedly bear fiduciary responsibility. In denying Defendants' motion to dismiss the claims against the individual defendants, the Court held that Plaintiffs' allegations "that the Individual Defendants may have exercised discretionary authority over the Plan and the Committees during the class period" were "sufficient at this stage of the proceedings." Dkt. 146, at 10. Now, after discovery, Plaintiffs have failed to uncover evidence that any one of the individual defendants either had or exercised discretionary authority over any of the transactions or decisions that Plaintiffs are challenging.[13]   SUF ¶ 66; *see Wright v.*

---

[12]   As for Financial Engines, Plaintiffs challenge nothing about that transaction except to allege the engagement increased *Hewitt*'s purportedly unreasonable fee; Plaintiffs plead no independent basis for a prohibited transaction by the Plan stemming from its engagement of Financial Engines.

[13]   Although various Northrop employees were delegated certain responsibilities related to the NGSP, its investments, and its recordkeeping arrangements, these delegations involved responsibilities or duties that are not at issue in this case, and therefore cannot form the basis for an individual breach of fiduciary duty claim. *Pegram*, 530 U.S. at 226 ("[I]n every case charging breach of ERISA fiduciary duty,

*Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) ("An individual or entity performs a 'fiduciary' function with respect to a pension plan when 'exercis[ing] any discretionary authority or discretionary control respecting management of such plan or exercise[ing] any authority or control respecting management or disposition of its assets.'") (quoting 29 U.S.C. § 1002(21)(a)). Here, the Plan document entitles "the Committee" to administer the Plan. SUF ¶¶ 65, 66. Irrespective of whether that makes the Committee's members fiduciaries for some purposes, Plaintiffs must adduce evidence that the individual defendants were "performing a fiduciary function *when taking the action subject to the complaint*." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Here, the Court has found that "fiduciary status must be determined in the context of the specific fiduciary duties asserted to have been breached." Dkt. 146, at 10.  The *sine qua non* of fiduciary status is discretion, but Plaintiffs have no evidence that any individual Defendant exercised individual discretion respecting the EM Fund or in negotiating Hewitt fees. To the contrary, only a majority of committee members "has the power to act for the entire Administrative [or Investment] Committee." SUF ¶ 66, Ex. 2. The committees, not the individuals who comprise them, are the NGSP's fiduciaries.[14] As such, the individuals named as Defendants are entitled to summary judgment.

## CONCLUSION

For the reasons above, Defendants request that the Court grant summary judgment to Defendants on Counts II, III, VI, and VII; and to the individual defendants on all counts in the Second Amended Complaint.

---

the threshold question  is . . . whether [the defendant] was performing a fiduciary function *when taking the action subject to the complaint*.") (emphasis added).

[14] This lack of factual basis should come as no surprise, since—as the Court has recognized—Plaintiffs' counsel has made clear that the individual defendants were joined merely for tactical reasons, and has admitted that they "did not act on their own." Dkt. 146, at 10.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: February 1, 2019

MAYER BROWN LLP
Nancy G. Ross
Brian D. Netter
Laura Hammargren
Samuel P. Myler

By:  */s/ Nancy G. Ross*
      Nancy G. Ross

*Attorneys for Defendants*