# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION IN LIMINE

# REDACTED VERSION FILED AT ECF NO. 167-1

Nancy G. Ross
*nross@mayerbrown.com*
Brian D. Netter
 *bnetter@mayerbrown.com*
Laura Hammargren
*lhammargren@mayerbrown.com*
Samuel P. Myler
 *smyler@mayerbrown.com*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:  312.782.0600
Facsimile:   312.701.7711

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFTON W. MARSHALL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHROP GRUMMAN CORPORATION, et al.<br><br>Defendants. | Case No. 16-CV-6794 AB (JCx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE**<br><br>Date:    March 29, 2019<br>Time:    10:00 a.m.<br>Judge:   Hon. André Birotte Jr. |

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 1

I.    STEVE POMERANTZ ............................................................... 2

II.   DAVID WITZ .......................................................................... 3

ARGUMENT ..................................................................................... 4

I.    POMERANTZ'S TESTIMONY ON THE EM FUND SHOULD BE
EXCLUDED ............................................................................. 4

    A.    Pomerantz lacks the requisite qualifications........................ 4

          1.    Emerging Markets ................................................. 4

          2.    Passive vs ........................................................... 6

          3.    Fiduciary Process................................................. 6

    B.    Pomerantz does not follow any reliable methodology ........ 7

    C.    Pomerantz's report is infected with errors........................ 10

II.   WITZ'S TESTIMONY ON NORTHROP'S REIMBURSEMENT
SHOULD BE EXCLUDED ...................................................... 13

    A.    Witz's opinions regarding the law and the parties' Services
Agreement are not proper subjects for expert testimony.................. 14

          1.    Witz's opinions regarding ERISA fiduciary standards
and prohibited transaction rules are inappropriate legal
testimony............................................................. 14

          2.    Witz's opinion regarding the Administrative Services
Agreement improperly interprets a contract and
summarizes evidence ............................................ 18

    B.    Witz's lack of relevant experience renders his opinion
unreliable............................................................... 20

    C.    Witz's Lack of Familiarity with the NGSP and the Services
Provided by Northrop Further Renders His Opinion Unreliable....... 22

    D.    Witz's Damages Opinion is Inadmissible.......................... 24

III.  CONCLUSION ...................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acosta v. Brain*,
910 F.3d 502 (9th Cir. 2018) ............................................................................ 15

*Alco Indus., Inc. v. Wachovia Corp.*,
527 F. Supp. 2d 399 (E.D. Pa. 2007) ................................................................ 18

*Biotechnology Value Fund, L.P. v. Celera Corp.*,
No. C 13-03248, 2015 WL 138168 (N.D. Cal. Jan. 9, 2015) ........................... 20

*CCM Rochester, Inc. v. Federated Investors, Inc.*,
1:14-cv-03600-VEC, Dkt. 75, slip op. (S.D.N.Y. Aug. 31, 2016) ............... 7, 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ........................................................................................... 1

*Energy Oils, Inc. v. Montana Power Co.*,
626 F.2d 731 (9th Cir. 1980) ............................................................................ 18

*Fifth Third Bancorp v. Dudenhoeffer*,
134 S. Ct. 2459 (2014) ........................................................................................ 7

*Fujifilm Corp. v. Motorola Mobility LLC*,
No. 12–cv–03587–WHO, 2015 WL 757575 (N.D. Cal. Feb. 20,
2015) .................................................................................................................. 19

*Glob. BTG LLC v. Nat'l Air Cargo, Inc.*,
CV 11-1657 ........................................................................................................ 19

*Grove City Veterinary Serv., LLC v. Charter Practices, Int'l LLC*,
No. 3:13-cv-2276-AC, 2016 WL 1573830 (D. Or. Apr. 19, 2016) ..................... 1

*Hughes v. Unumprovident Corp.*,
No. C 07-4088 PJH, 2008 WL 4452140 (N.D. Cal. Oct. 3, 2008) ................... 14

*In re Imperial Credit Indus. Inc. Sec. Litig.*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003) ............................................................ 24

*Kennedy v. Collagen Corp.*,
161 F.3d 1226 (9th Cir. 1998) .......................................................................... 14

ii

*Kumho Tire Co. v. Carmichael*,
　526 U.S. 137 (1999) .......................................................................... 10

*Lewert v. Boiron, Inc.*,
　212 F. Supp. 3d 917 (C.D. Cal. 2016), *aff'd*, 742 F. App'x 282 (9th
　Cir. 2018) ............................................................................................ 8

*Lust v. Merrell Dow Pharms, Inc.*,
　89 F.3d 594 (9th Cir. 1996) ............................................................... 9

*Meiners v. Wells Fargo & Co.*,
　898 F.3d 820 (8th Cir. 2018) ........................................................... 10

*Metro Sales, Inc. v. Core Consulting Grp., LLC*,
　275 F. Supp. 3d 1023 (D. Minn. 2017) ........................................... 25

*Mukhtar v. Cal. State Univ. Hayward*,
　299 F.3d 1053 (9th Cir. 2002) ......................................................... 17

*Murray v. S. Route Mar. SA*,
　870 F.3d 915 (9th Cir. 2017) ............................................................. 1

*Nationwide Transport Fin. v. Cass Info. Sys., Inc.*,
　523 F.3d 1051 (9th Cir. 2008) ................................................... 14, 15

*Patelco Credit Union v. Sahni*,
　262 F.3d 897 (9th Cir. 2001) ........................................................... 17

*Pooshs v. Phillip Morris USA, Inc.*,
　287 F.R.D. 543 (N.D. Cal. 2012) ...................................................... 8

*In re Rezulin Prods. Liability Litig.*,
　309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................. 19

*Scentsational Techs., LLC v. Pepsi, Inc.*,
　13-cv-8645 (KBF), 2018 WL 910587 (S.D.N.Y. Feb. 14, 2018) .............. 22, 23

*Seawell v. Brown*,
　No. C-1-08-614, 2010 WL 11561287 (S.D. Ohio Sept. 9, 2010) ..................... 23

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
　No. 13–cv–2451, 2015 WL 12803578 (D. Minn. Oct. 15, 2015) ........................ 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Sivolella v. AXA Equitable Life Insurance Company*,
 11-cv-04914-PGS-DEA, 2016 WL 4487857 (D.N.J. Aug. 25,
 2016), *aff'd*, 742 F. App'x 604 (3d Cir. 2018)............................................ 10, 12

*Taylor v. B. Heller & Co.*,
 364 F.2d 608 (6th Cir. 1996) ............................................................................ 24

*United States v. Hankey*,
 203 F.3d 1160 (9th Cir. 2000).................................................................. 4, 6, 22

*United States v. Scholl*,
 166 F.3d 964 (9th Cir. 1999) ............................................................................ 17

*United States v. Vallejo*,
 237 F.3d 1008 (9th Cir. 2001)............................................................................ 7

**Statutes**

29 U.S.C. § 1104(a)(1)(B) .................................................................................... 7

29 U.S.C. § 1108(b)(2) ....................................................................................... 20

29 U.S.C. § 1108(c)(3) ....................................................................................... 15

ERISA § 406(a) .................................................................................................. 18

ERISA § 408(b)(2) .............................................................................................. 18

**Other Authorities**

Luke Smolinski, *Should South Korea Still Be an Emerging Market?*,
 Fɪɴ. Tɪᴍᴇꜱ, Nov. 8, 2013 ..................................................................................... 5

Rule 702............................................................................................................... 14

Rule 702(a) .......................................................................................................... 15

U.S. Dep't. of Labor, Emp. Benefits Sec. Admin. Advisory Opinion
 86-001A (January 2, 1986)................................................................................ 16

U.S. Dep't of Labor, Emp. Benefits Sec. Admin.Advisory Opinion
 1993-06A ........................................................................................................... 16

iv

## INTRODUCTION

In a case involving financial concepts and industry practices, expert testimony can prove invaluable to the trier of fact. But two expert witnesses proffered by Plaintiffs stretch the definition of "expert" beyond recognition. Steve Pomerantz and David Witz do not even approach the level of reliability required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). In fact, they fail all three prongs of the *Daubert* analysis: Lacking relevant experience, they failed to formulate a valid methodology, and even applied their invalid methodology incorrectly.

As a result, the Court should exercise its "active and important role as gatekeeper[]" by "examining the full picture of the experts' methodology" and preventing their "shoddy expert testimony" from being considered at trial. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 923 (9th Cir. 2017). Defendants Northrop Grumman Corp. et al. (collectively, "Northrop") thus respectfully move for an order *in limine* precluding Plaintiffs from relying on their proffered experts' opinions.[1]

## BACKGROUND

Plaintiffs' operative complaint alleges that Northrop breached ERISA's fiduciary duties in three respects: by using an active-management strategy for the Northrop Grumman Savings Plan's ("NGSP's" or the "Plan's") Emerging Markets Equity Fund (the "EM Fund"); by authorizing reimbursements to Northrop for

---

[1] While Defendants move to exclude the testimony and initial reports of Pomerantz and Witz, since "a party may not use rebuttal reports to advance its case-in-chief," if the Court excludes Pomerantz and Witz for Plaintiffs' case-in-chief, the experts' rebuttal reports fall too. *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, No. 13–cv–2451 (DWF/SER), 2015 WL 12803578, at *3 (D. Minn. Oct. 15, 2015). *See also Grove City Veterinary Serv., LLC v. Charter Practices, Int'l LLC*, No. 3:13-cv-2276-AC, 2016 WL 1573830, at *21 (D. Or. Apr. 19, 2016) (excluding rebuttal report "used to establish a case-in-chief").

services rendered to the NGSP; and by supposedly failing to appropriately renegotiate recordkeeping fees for the NGSP.  Plaintiffs have offered three separate experts for those three areas of the case; only the first two are at issue in this motion:

## I.    STEVE POMERANTZ

Plaintiffs designated Steve Pomerantz as an expert on their EM Fund claim. Since 2000, Pomerantz has been a full-time expert witness, appearing in more than 92 matters, including at least 10 brought by the same Plaintiffs' attorneys. Pomerantz has never served as a fiduciary to a retirement plan. Ex. B, Pomerantz Dep. 39:4-6.  He has never worked on or studied emerging markets in particular, on which he opines here.  And he has never studied the explicit distinction in this case between active and passive fund management, or advised any client on the topic. *Id.* at 17:1-18:5, 20:1-3, 21:3-7, 39:4-6, 39:12-40:2.

For his report, Pomerantz did not conduct any research into emerging markets or methodologies for deciding whether to employ active versus passive management.  Rather, aside from what was produced in discovery—i.e., the analysis generated by NGSP fiduciaries weighing at various times the pros and cons of moving the EM Fund entirely to passive management—Pomerantz considered just one document, which provided the performance rank of a single, passively managed emerging markets index fund at a single point in time. *See Id.* at 96:3-97:2.  In his "professional career[,] [Pomerantz] never used the Morningstar rank of a Vanguard index funds to advise a client as to whether to organize a fund as actively or passively managed." *Id.* at 126:7-15. ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  As shown

2

below, such reasoning betrays a methodology formulated in hindsight in order to support his client's preferred outcome.

## II.   **DAVID WITZ**

Plaintiffs designated David Witz as an expert on their claim related to reimbursements for administrative services paid to Northrop by the NGSP.  The problem is that Witz has no experience administering a benefit plan as a fiduciary, let alone a plan as large and complex as the NGSP.  Nor does he have any experience advising a corporation on servicing its benefit plan.  *See, e.g.,* Ex. A, Witz Dep. 47:6-12, 59:23-60:5.

Not only has Witz never served as an in-house fiduciary to a retirement plan—unlike the Defendants whose conduct he criticizes here—the only fiduciary role he has held with respect to a retirement plan has been to advise on investments. *Id.* at 57:1-59:1. That has no relevance to the reimbursement of Northrop's administrative services to the NGSP.  Moreover, except for a six-week assignment on one plan with assets above $1 billion dollars, the plans on which he advised have had no more than $330 million in assets.  In fact, Witz readily admitted that nearly all (95 percent) of his clients' plans have less than $20 million in assets. *Id.* at 38:6–16.

In addition to his lack of relevant general experience, Witz testified in his deposition that he had little knowledge of the actual services that Northrop provided to the Plan. *Id.* at 67:18–68:7, 83:17–84:1, 86:3-6, 256:19–22, 293:24–297:6, 297:18–301:7. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████.

## ARGUMENT

## I. POMERANTZ'S TESTIMONY ON THE EM FUND SHOULD BE EXCLUDED.

### A. Pomerantz lacks the requisite qualifications.

To qualify as an expert, a witness must possess "some special knowledge, skill, experience, training or education on th[e] subject matter" of his testimony. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). Here, Pomerantz proposes to testify regarding three subject matters—the characteristics of emerging markets, the distinction between active and passive management, and fiduciary process.[2] But he flatly lacks the requisite qualifications to provide expert testimony on any of those topics.

1. Emerging Markets

Although the focus of his testimony is the prudence of employing an active management strategy for the EM Fund, Pomerantz has no experience, training, or education whatsoever in emerging markets. Ex. B, Pomerantz Dep. 17:1-18:4. He has never taken a class on the finance of emerging markets. *Id.* at 17:1-3. He has never conducted research "specifically targeted to emerging markets." *Id.* at 17:16-19. And he has never been hired to provide advice to fiduciaries of a 401(k) plan that even offered emerging markets investments. *Id.* at 39:12-40:3. There is no evidence that Pomerantz ever even *thought* specifically about emerging markets before this case. When asked if emerging markets investments constitute an appropriate component of a balanced portfolio, Pomerantz stated that that question is "not really something I have thought about." *Id.* at 41:23-42:19.

This lack of basic knowledge about emerging markets thoroughly infects Pomerantz's analysis. As a cursory review of emerging markets materials demonstrates, a key threshold question in assessing emerging markets funds is

---

[2] ████████████████████████████████████████

4

which markets qualify as emerging in the first place. To take the most prominent example, depending on who is asked, South Korea and Taiwan are either two of the biggest components of an emerging markets portfolio or developed markets that are not emerging markets at all.[3]  But Pomerantz admitted that he could not identify whether particular markets were "emerging markets."  *Id.* at 46:19-23. And when shown that Northrop's plan tracked a benchmark that, according to Vanguard, allocated more than 15% of its assets to South Korea while other emerging-markets benchmarks allocated nothing at all to South Korea, Pomerantz surmised that it may have been a "typo" because "it seems to me to be very odd there's such a – such a difference between" the benchmarks. *Id.* at 55:6-20 (*discussing* Ex. F, Vanguard Global Benchmarks at 7).  Pomerantz, however, did not expose a "typo" by Vanguard—he exposed his own ignorance of emerging markets.

This ignorance of emerging markets is reflected in Pomerantz's unreliable methodology and analysis. *See infra* at 7-10. For example, the disagreement about what countries constitute emerging markets causes the performance of emerging markets benchmarks to vary widely—a fact that must be accounted for when analyzing emerging market funds.[4] Yet Pomerantz consistently had no idea what benchmarks were used by the sources he selected. *See* Ex. B, Pomerantz Dep.

---

[3] *See, e.g.*, Christopher Woods, Classifying South Korea as a Developed Market (FTSE White Paper Report 2013), https://www.ftse.com/products/downloads/FTSE_South_Korea_Whitepaper_Jan2013.pdf; Luke Smolinski, *Should South Korea Still Be an Emerging Market?*, Fin. Times, Nov. 8, 2013, https://www.ft.com/content/f50ca2b2-87fb-30c1-9f87-0f017a793e9c.

[4] Pomerantz treats the emerging markets benchmarks as if they were interchangeable. Considering South Korea and Taiwan constitute 26% of one emerging markets benchmark and 0% of others, Pomerantz's analysis is akin to using the S&P 500 interchangeably with a benchmark that has only the 141 largest of those funds.

5

200:13-15 (Q: "And do you know if [the S&P emerging BMI] is the benchmark that's used for SPIVA?" A: "I – I don't know"), 149:15-25 (Q: "What benchmarks were used for the SPIVA data?" A: "I don't know what SPIVA uses"). This undisguised ignorance precludes his testimony. *See, e.g.*, *Hankey*, 203 F.3d at 1168.

### 2. Passive vs. Active

Compounding his inexperience with emerging markets, Pomerantz similarly lacks any experience evaluating the differences between passive and active funds. Before he began his work as a litigation consultant, Pomerantz did due diligence for actively managed funds.  He never "evaluated any passive emerging markets portfolios" (Ex. B, Pomerantz Dep. 20:1-3) and never "advised a client that it was imprudent to actively manage an emerging markets fund" (*id.* at 20:4-8). To the contrary, he was "actually *seeking* actively managed funds to invest in." *Id.*

More broadly, Pomerantz could not remember whether any of his former employers offered any passively managed products, and whether he had any "engagement[] that pertained to the distinctions between active and passive investment vehicles." *Id.* at 29-33. And with respect to the particular issue in this case, he never "analyze[d] whether an emerging markets fund should be structured as actively managed or passively managed." *Id.* at 21:3-7. Again, this is hardly the experience expected of an expert.

### 3. Fiduciary Process

The final topic covered by Pomerantz's report is fiduciary process. In this discussion, Pomerantz frequently distinguishes between Northrop's Investment Committee (which he viewed as "the fiduciary") and Northrop's Investments and Trust Administration Department, which he viewed as "being advisory." *Id.* at 92:18-93:6. ████████████████████████████████

██████████████████████████████████████████████████████████████

6

██████████████████████████████████████████████████████

████████   ██████████████████████████████████████████████5

But Pomerantz has no experience that would entitle him to opine on the structure of Northrop's fiduciary process.  He has no demonstrated training in the law or on fiduciary matters; indeed, he has never served as an ERISA fiduciary and has never consulted on behalf of ERISA fiduciaries. Ex. B, Pomerantz Dep. 39:4-6. This is particularly problematic since by law, the test for fiduciary prudence is what "a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)). Without ever having served as an ERISA fiduciary or having been responsible for determining the prudence of offering a passive or active emerging markets fund in such a plan, Pomerantz's opinion is neither relevant nor reliable.  *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001) ("Expert testimony must be both relevant and reliable.").

## B.   **Pomerantz does not follow any reliable methodology.**

Pomerantz's lack of a legitimate investigatory process or a methodology that could remotely be characterized as reliable discredits his report and lays bare an analysis crafted only to achieve his repeat client's desired opinion. The Court should exclude his opinion on this independent basis as well—as other courts have not hesitated to do. *See CCM Rochester, Inc. v. Federated Investors, Inc.*, 1:14-cv-

---

5 ████████████████████████████████████████████

██████████████████████████████████████

█████████████   Pomerantz also blatantly ignores deposition testimony on delegation issues.  *See, e.g.,* Ex. H, Newberry Dep. 24:2-5 (the IC "ha[d] authority for selection and oversight investment managers, which they delegated down to members of the ITA department"). For this reason alone, Pomerantz's opinion on fiduciary process is irrelevant and unreliable.

7

03600-VEC, Dkt. 75, slip op. at 12 (S.D.N.Y. Aug. 31, 2016) (finding "Pomerantz did not exercise the level of intellectual rigor that characterizes the practice of other experts in his field" and excluding his asset allocation opinion as unreliable).

"[S]cientific evidence is reliable if it is based on an assertion that is grounded in methods of science—the focus is on principles and methodology, not [on] conclusions." *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 546 (N.D. Cal. 2012) (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001)). Courts will typically look to markers such as "general acceptance and error rate," and "whether an expert has adequately accounted for obvious alternative explanations." *Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 929 (C.D. Cal. 2016), *aff'd*, 742 F. App'x 282 (9th Cir. 2018).

Here, Pomerantz's conclusion that ██████████████████████ ████████████████████████████████████████████████████ ████████ is supported by *exactly one* piece of analysis, which—by Pomerantz's own admission—"takes about three minutes" to prepare (Ex. B, Pomerantz Dep. 121:5-6). ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Because Vanguard's passive emerging markets index did not perform noticeably worse than Vanguard's other indices, Pomerantz concluded that Northrop could not reasonably have decided to maintain an active strategy for its EM Fund. *Id.*

This approach is utterly unreliable. First, Pomerantz did not "consult any academic literature in preparing [his] report" (Ex. B, Pomerantz Dep. 97:9-13 or even "review any commentary about emerging markets funds" (*id.* at 97:14-23). That might be acceptable if he had used a methodology developed from his professional experience—but he did not. In fact, in his "professional career," Pomerantz "*never* used the Morningstar rank of a Vanguard index fund to advise a

client as to whether to organize a fund as actively or passively managed." Ex. B, Pomerantz Dep. 126:6-15. And he provides no explanation or evidence that prudent fiduciaries make investment decisions on the basis of Vanguard's peer-group rankings. Instead, Pomerantz offers an approach that he created out of whole cloth, for this case only. *See, e.g.*, *Lust v. Merrell Dow Pharms, Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) ("One very significant fact is whether the expert has developed [his] opinions expressly for purposes of testifying[.]") (quotation marks omitted).

What's more, Pomerantz appears to have cherry-picked the one data point he does rely on. Only two years prior to the rankings he draws from, the median actively managed emerging markets fund had *out*performed its benchmark by 2.83% during the previous decade, while the median passively managed fund *under*performed by 0.61%. *See* Ex. I, 2007 EM Fund Review at 3. Nor did Pomerantz assess how actively managed EM funds were projected to perform in the future. Ex. B, Pomerantz Dep. 103:14-105:25. This divergence underscores the unreliability inherent in looking to a single piece of data, as Pomerantz has done.

Finally, Pomerantz has not accounted for the fact that some benchmarks—unlike the Plan's emerging markets benchmark—does not consider South Korea to be an emerging market and therefore excludes South Korean equities. *See* Ex. F, Vanguard Global Benchmarks at 7. This is not a minor oversight: Three common emerging markets benchmarks differed by more than 6% in 2009 (the year evaluated by Pomerantz), in large part because of their inclusion or exclusion of South Korea. *See* Ex. B, Pomerantz Dep. 202:4-13.[6] Pomerantz's only response when confronted with this fact was that he would be "surpris[ed] if there were such a wide disparity in these benchmarks"—which there is. *Id.* at 56:1-4. That

---

[6] Even Pomerantz admitted that to determine how successful an index fund is at replicating a particular index, one would need to compare the index fund to the index that it is actually trying to replicate. *Id.* at 84:25-85:5.

Pomerantz's only analysis is an apples-to-oranges comparison is fatal to his reliability as a matter of law. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice.").

In short, Pomerantz has completely failed to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The Court should exclude his testimony.

## C.   Pomerantz's report is infected with errors.

Even on its own terms, Pomerantz's report reflects a carelessness that precludes expert status. Again, other courts have stricken Pomerantz's opinion on this precise basis. *See Sivolella v. AXA  Equitable Life Insurance Company*, 11-cv-04914-PGS-DEA, 2016 WL 4487857, at *15 (D.N.J. Aug. 25, 2016) ("From the Court's perspective, the mathematical error showed a lack of proper prior preparation on a critical point in this case. It undermines his credibility on all issues."), *aff'd*, 742 F. App'x 604 (3d Cir. 2018).

Here, Pomerantz's damages calculation is infected by errors in tabulating data, including a striking $1 billion blunder. These calculations required copying already-reported data on various NGSP's funds' assets and returns. The chart below shows *eight* mistakes Pomerantz made in simply entering this data correctly into his damages spreadsheet:[7]

---

[7] *See* Ex. J, Pomerantz Damages Calculations (setting forth assets, returns, and allocation assumptions for NGSP investments). *See* Ex. K, 2010 Plan Investment Measurement Data, at CALLAN0011750-51; Ex. L, 2013 Plan Measurement Data at NGC0180333 and NGC0180336; Ex. M, 2014 Plan Measurement Data, at NGC0337457; Ex. N 2016 Plan Measurement Data at NGC0223104; Ex. O, Callan Plan Measurement Data at NGC0337008.

10

The carelessness of these errors is apparent from a cursory glance at Pomerantz's spreadsheet. ██████████████████████████████████ ███████████████████████████ when the correct number was $1,489,773,818, as seen in the 2013 plan financial data prepared by Callan. *See* Ex. L, 2013 Plan Measurement Data at NCGO0180333. Pomerantz was off by an entire order of magnitude. ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████ ████████████████████ This is what Pomerantz's spreadsheet looked like:[8]

████████████████████████████████████████████████

The mistake jumps off the page.

---

[8] The column names have been moved to be adjacent to the Small Cap Fund for this illustration.

Pomerantz's rebuttal report betrays a comparable lack of attention to sound scientific process.  He continues to draw conclusions from sample sizes of one. ▮

▮ Ex. B, Pomerantz Dep. 202:14-25 (using a SPIVA scorecard to support his conclusion of the "difficulty experienced by actively managed Emerging Markets funds" because they underperform "their benchmarks," even though the SPIVA scorecard does not compare funds to their benchmarks). ▮

▮; Ex. B, Pomerantz Dep. 154:14-18, 158:18-23 (expecting about .6% of funds would significantly underperform a benchmark based on a study where .6% of funds statistically *over*performed while that same study showed an *under*performance rate of 24%).

\*       \*       \*

As in past cases, Pomerantz's report "suffer[s] from incorrect dates,[9] untimely benchmarks,[10] and calculation errors."[11] *Sivolella*, 2016 WL 4487857, at \*18.  And as in past cases, "Pomerantz's expert opinion. . . . is not admissible because it does not employ the rigor one would expect from an expert in his field

---

[9] *See* ▮.

[10] *Cf* Ex. B, Pomerantz Dep. 46:19-23, 55:6-11  (not knowing if South Korea was part of the emerging markets benchmark used by Northrop and wrongly asserting Vanguard made a typo regarding the percentage of the benchmark South Korea constitutes).

[11] *See supra* at 10-11.

12

nor a reasoned manipulation of numbers—it is based on premises and data that are simply inadequate to support the conclusions he reaches." *CCM Rochester,* 14-cv-03600-VEC, Dkt. 75 at 8.  He has no specialized knowledge on emerging markets; no experience comparing actively managed funds to passive ones; and no credentials to opine on fiduciary process. Even if he had the requisite experience, Pomerantz has not reliably applied the data and method he invented for this litigation. When the parts of his opinion rendered worthless by these failings are stricken, nothing remains. The Court should therefore exclude the entirety of Pomerantz's opinion.

## II.     WITZ'S TESTIMONY ON NORTHROP'S REIMBURSEMENT SHOULD BE EXCLUDED.

Witz's testimony and opinions on issues (1), (2), and (3) should be excluded as irrelevant; they are either inappropriate commentary on matters of law or mere summaries of facts of which Witz lacks any personal knowledge. While Witz's opinions on issue (4) do not suffer from the same threshold relevance problems, he is not qualified to testify regarding the arrangement at hand. These opinions, too, are therefore unreliable and must also be excluded.

**A.    Witz's opinions regarding the law and the parties' Services Agreement are not proper subjects for expert testimony.**

For an expert opinion to be admissible, it must assist the trier of fact in reaching a conclusion necessary to the case. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998). Witz's opinions and testimony on the first three topics noted above, which do nothing more than summarize purported legal standards or rehash facts of which he lacks personal knowledge, fail to satisfy this threshold requirement. In adding his unnecessary and inappropriate testimony into the record, Witz impedes, rather than assists with, the resolution of the ultimate issues in this case.

1.    Witz's opinions regarding ERISA fiduciary standards and prohibited transaction rules are inappropriate legal testimony.

"It is well-settled that allowing an expert to opine on an issue of law usurps the authority of the court." *Hughes v. Unumprovident Corp.*, No. C 07-4088 PJH, 2008 WL 4452140, at *6 (N.D. Cal. Oct. 3, 2008) (citing *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999). Nevertheless, Witz's report opines extensively on a variety of purely legal issues that, ████████████████ ████████████████████████████████████████████ ████████████████████████, are not admissible under Rule 702. *Nationwide Transport Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008). ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

14

1   ███████████████████████████████████████████████████████. This

2   testimony is irrelevant—and therefore inadmissible under Rule 702(a)—because

3   "[r]esolving doubtful questions of law is the distinct and exclusive province of the

4   trial judge." *Nationwide*, 523 F.3d at 1058 (quotation omitted).

5       Worse, many of Witz's legal conclusions are wrong. *See Nationwide*, 523

6   F.3d at 1059 (Where an expert's "legal conclusions . . . constitute[] erroneous

7   statements of the law, . . . [e]xpert testimony [is] not only superfluous but

8   mischievous.") (quotation marks omitted). Witz's improper (and often erroneous)

9   legal interpretations include the following:

10  • ***Conflicts of interest.*** ████████████████████████████████

11  ████████████████████████████████████████████████████

12  █████████████████████████████  But ERISA expressly recognizes that

13  corporate employees may serve as fiduciaries to the plan. *See* 29 U.S.C. §

14  1108(c)(3) ("Nothing in section 1106 . . . shall be construed to prohibit any

15  fiduciary from serving as a fiduciary in addition to being an officer,

16  employee, agent, or other representative of a party in interest."). Witz also

17  disregards the long history of ERISA's "two hat" rule, which holds that

18  corporate officers *can* meet their fiduciary obligation to act in the best

19  interests of plan participants, despite their role in the corporation. Witz's

20  suggestion that corporate officers have a *per se* conflict of interest is simply

21  incorrect. *See, e.g.*, *Acosta v. Brain*, 910 F.3d 502, 517–18 (9th Cir. 2018).

22  • ***"Direct" expenses.*** ██████████████████████████████████

23  ████████████████████████████████████████████████████

24  ███████████████████████  ███████████████████████████████████

25  ███████████████████████████████████████████████████

26  ███████████████████████████████████████████████████

27  ████████████████████████████████████████

28

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████   *See* U.S.

Dep't of Labor, Advisory Opinion 1993-06A. (Mar. 11, 1993,

https://www.dol.gov/agencies/ebsa/employers-and-

advisers/guidance/advisory-opinions/1993-06a.)

- ***Employee Time Allocation.*** ████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████   But Witz admits that the DOL has never set a particular

percentage threshold.  *See* Ex. A, Witz Dep. 224:20–226:8.  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████   However, the DOL has made it clear that multiple ERISA

plans can be aggregated for the purpose of meeting the "but for" test.  *See,*

*e.g.*, U.S. Dep't. of Labor, Emp. Benefits Sec. Admin. Advisory Opinion 86-

001A (January 2, 1986).  This opinion, too, is a mischaracterization of the

law.

- ***Documentation****.* ████████████████████████████

████████████████████████████████████████

████████████████████   He also states that plan sponsors

must maintain both "written documentation to justify that . . . [a]n

employee's job would be in jeopardy if it were not for services solely

rendered on behalf of the plan" and "a daily segregated list of all expenses

attributable to each person for whom reimbursement is sought[.]"  *Id.* ¶¶ 34–

35.  These purported requirements, however, are based on nothing more than

Witz's own interpretation of Department of Labor *guidance* unrelated to reimbursement arrangements between plans and service providers. *Id. See also Patelco Credit Union v. Sahni*, 262 F.3d 897, 908 (9th Cir. 2001) ("ERISA Advisory Opinion Letters are not binding on the Court."). As the Ninth Circuit has repeatedly noted, while experts are permitted to "interpret and analyze *factual evidence*," *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (emphasis added), they are not permitted to interpret or analyze the law. "[T]he judge's special legal knowledge is presumed to be sufficient[.]" *Id.* (quoting *United States v. Brodie*, 858 F.2d 492, 496-97 (9th Cir. 1988).

Witz's report also runs roughshod over the well-recognized rule that an expert "cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002). In addition to the above examples of what Witz claims is the law, he improperly offers legal conclusions, including that "the transactions between the plan and Northrop are prohibited under ERISA [Section] 406(b)," (*id.* ¶ 17), and that he "did not see Northrop Grumman comply with 408(b)(2) in terms of complying with the rules, dealing with their contract, the services that they render and in providing that information," Ex. A, Witz Dep. 181:21–25. These are all legal questions beyond the province of an expert witness.[12] Because Witz's expert report "is essentially a brief on the ultimate legal issues *sans* case citations," it must be excluded as impermissibly invading the province of the court. *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 409 (E.D. Pa. 2007).

---

[12] Witz offers his opinions in this case and provides his legal conclusions regarding the propriety of Northrop's reimbursement arrangement despite expressly acknowledging that he is not qualified to render such opinions.

17

2.  Witz's opinion regarding the Administrative Services Agreement improperly interprets a contract and summarizes evidence.

Approximately half of Witz's report is taken up by the irrelevant recitations and incorrect interpretations of the law discussed above. The remaining half is comprised of an equally irrelevant recitation and summary of cherry-picked factual evidence related to the ASA. This factual narrative, and Witz's ultimate conclusion that Northrop failed to comply with the terms of the agreement, is particularly troublesome given Witz's admitted lack of familiarity with such arrangements between corporations and their plans, and lack of experience overseeing the administration of plans of this size. *See, e.g.*, *id.* at 47:6–12, 58:24–59:1, 60:1–5, 154:11–156:16.

To begin, despite dedicating nearly half of his report to the administrative services agreement and Northrop's purported failure to comply with its terms (an inappropriate legal opinion), at no point does Witz explain why this agreement, which predates the transactions at issue by more than a decade, is relevant to the claims in this case. Witz assumes without explanation that the ASA was in effect throughout the relevant period; that ERISA required the NGSP and Northrop to execute such an agreement; and that any transaction between the parties was a *per se* violation of ERISA § 406(a) unless the parties were in strict compliance with its terms. But these are all legal questions for the Court— ████████████ ████████████████████████████████████████████████ ██████ As the Ninth Circuit has long recognized, "[t]he construction of written agreements belongs to the court," not expert witnesses. *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 737 n.11 (9th Cir. 1980). *See also Glob. BTG LLC v. Nat'l Air Cargo, Inc.*, CV 11-1657 JGB (JCGx), 2013 WL 12121982, at *3 (C.D. Cal. Sept. 5, 2013) ("[I]t is generally the fact-finder's role to determine matters of contract interpretation.") (quotation marks omitted).

18

Moreover, Witz's report reads frighteningly like a judicial opinion summarizing evidence. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But "[w]here expert testimony simply rehashes otherwise admissible evidence about which the expert has no personal knowledge, such evidence—taken on its own—is inadmissible." *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12–cv–03587–WHO, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015) (quotation marks omitted); *accord, e.g.*, *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("Examples of 'expert' testimony that courts have excluded on this basis include factual narratives and interpretations of conduct or views as to the motivation of parties.").

Witz's conclusions about what did or did not occur in this case is thus inappropriate expert testimony, particularly where those conclusions are based on a limited review of evidence handpicked by one party's attorneys. And his testimony regarding Northrop's compliance with the ASA does nothing to help the Court understand what constitutes prudent conduct or whether the reimbursement arrangement was reasonable.

**B.    Witz's lack of relevant experience renders his opinion unreliable.**

What little remains of Witz's report after excluding the irrelevant legal and factual opinions identified above includes passing references to industry customs and fiduciary practices, topics on which courts have allowed witnesses to opine. *See, e.g.*, *Biotechnology Value Fund, L.P. v. Celera Corp.*, No. C 13-03248, 2015

19

WL 138168, at *4 (N.D. Cal. Jan. 9, 2015).  However, Witz lacks the
qualifications or experience necessary to testify to such matters.

Witz's deposition testimony highlights the paucity of his actual experience
with the type of services at issue here.  Witz admits that he has never served as a
fiduciary to any plan for administration purposes.  Ex. A, Witz Dep. 57:1–58:23.
And his limited experience providing plan administrative services predates 2000.
*Id.* at 135:12–137:4 (Witz testified: "I stopped personally, doing [third-party
administration] work back in '98, '99 when we sold to CBIZ. . . . [F]or me
personally putting my hands on it and actually doing the administration or
overseeing the team and instructing, I haven't done that since 2000.").  Since 2004,
Witz has operated a consultancy business mainly for investment advisory firms and
spends a significant percentage of his time serving as an expert witness—issuing
25 to 30 expert reports in the last ten years.  *Id.* at 15:5–9, 15:24–16:9.

Nor has Witz demonstrated any expertise with the reimbursement of fees to
a plan for services by an employer—the central issue in this case.  Witz admits that
he has never been retained to provide advice or assistance to a client regarding the
prudence of a reimbursement arrangement or whether an otherwise prohibited
transaction qualified for an exemption under 29 U.S.C. § 1108(b)(2).  *See, e.g.*, *id.*
at 47:6–12, 58:24–59:1, 60:1–5, 154:11–156:16.  Nor has Witz ever been retained
to provide an opinion on whether services provided by a party-in-interest were
necessary or whether the amount paid to the party-in-interest for those services was
reasonable.  As Witz admitted: "I have not been engaged directly by a Plan
Sponsor to go through the reimbursement process. . . . [N]one of the plans that I
provided an opinion on involved a Plan Sponsor charging their fees back to the
plan itself.  They were all utilizing a third party." *Id.* at 47:6–12, 60:1–5.[13]

---

13 ██████████████████████████████████████████████████

Moreover, Witz has not discussed chargebacks with any regulator such as DOL or the IRS. *Id.* at 275:25–276:18. That he has done "nothing regarding the reimbursement of fees," never published any material, presented at any conferences, or been quoted in any publications, shows his lack of the necessary experience to provide the opinion he attempts to state here. *Id.* at 161:9–23, 275:15–24.

When pressed to identify any engagement involving a plan sponsor that was reimbursed for services provided to the plan, Witz could only point to two, and each involved the administration of a "multiemployer plan" (*id.* at 222:12–17)—a type of plan whose administration involves transactions entirely unlike those at issue in this case. As Witz himself noted, multiemployer plans consist of thousands of small plans, each sponsored by a small employer and providing benefits to as few as two participants. *See id.* at 55:12–15. Even more tellingly, Witz's experience even with multiemployer plans was limited to performing routine benchmarking of administrative costs. *Id.* at 55:12–56:10, 51:2-52:19, 221:17-222:17 (describing the engagement as "spot checking" the fees paid by the plans within the multi-employer plan arrangement). In other words, even if these plans technically involved "chargeback" arrangements, Witz was not retained to assess the reasonableness of those arrangements, did not evaluate the necessity of the services, and did not provide the plans' fiduciaries with any advice regarding prudent practice or compliance with prohibited-transaction rules. *Id.* at 50:9–17, 51:11–53:9, 59:13–60:5, 216:7–10. Witz thus lacks the "special knowledge, skill,



experience, training or education on th[e] subject matter" required for expert status. *Hankey*, 203 F.3d at 1168.

### C.   Witz's Lack of Familiarity with the NGSP and the Services Provided by Northrop Further Renders His Opinion Unreliable

Furthermore, Witz demonstrates an astonishing lack of knowledge about the structure and complexity of the NGSP and the administrative services that Northrop provided, despite their essential role in evaluating the necessity and reasonableness of Northrop's chargebacks. Lacking this factual grounding, Witz's conclusions are unreliable. *See Scentsational Techs., LLC v. Pepsi, Inc.*, 13-cv-8645 (KBF), 2018 WL 910587, at *6 (S.D.N.Y. Feb. 14, 2018) (finding that opinions of an expert unsupported by any methodology and "neither supported by data or analysis nor clearly connected to underlying facts" are mere *ipse dixit* and should be excluded).

Witz missed the mark on a number of central points. Witz testified that he thought there were only four NGSP sub-plans. Actually, there are nine. Upon being told that, Witz admitted that he had no idea "there were that many." Ex. A, Witz Dep. 87:11–20. Next, Witz did not know and made no effort to determine the full-time equivalent number of Northrop employees charging to the NGSP specifically (*id.* at 94:10–96:12, 284:10–16); the amount of time they spent working on the NGSP (*id.* at 94:10–12); or even the amount or manner of their compensation (*id.* at 70:21–74:16, 247:4–15). Witz also did not know the structure of the Northrop benefits groups (*id.* at 103:10–16) or the precise delegations of responsibilities (*id.* at 234:25–235:24).

Witz even conceded that he did not "have an idea of all the services" provided by Northrop, and that to understand the services provided he would need to conduct a "forensic analysis"—which he admits he did not do. *Id.* at 255:25-256:22. But he did not let that lack of knowledge stop him from concluding that

those services were duplicative of those provided by the Plan's third-party

recordkeeper:

> Q.   So notwithstanding the fact that you don't know what was included in each of these categories, you are opining that these services [provided by Northrop] are overwhelmingly provided by the plan's record keeper?

> A.   That is correct.

*Id.* at 297:2–6. Witz stood by this opinion despite being unable to recall whether he

reviewed the scope-of-work statement appended to the third-party Hewitt

agreement, which identifies the respective administrative responsibilities of

Northrop and Hewitt as well as the areas of shared responsibility. *Id.* at 80:10–

81:9.

Witz's "lack of relevant information concerning the Plan" thus "calls into

question his ability to evaluate [Northrop's] performance under any theory."

*Seawell v. Brown*, No. C-1-08-614, 2010 WL 11561287, at *7 (S.D. Ohio Sept. 9,

2010); *accord Scentsational Techs.*, 2018 WL 910587, at *6.  He should not be

permitted to offer an opinion as to whether the services Northrop provided were

necessary, whether its fees were reasonable, or whether the arrangement was

consistent with industry practice.

Witz offered further unsubstantiated opinions in the same vein. ██████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████ In contrast, the NGSP had upwards of

100,000 participants in 2010–2014 and approximately $14 billion in assets in 2010.

Ex. A, Witz Dep. 86:7–21.  Notwithstanding the NGSP's twice-as-many

23

participants, ██████████████████████████████████████

██████████████████████████

Finally, rather than independently analyze the services, fees, and steps constituting the reimbursement arrangement at issue, Witz relies on a limited set of reports and presentations prepared by consultants retained by Northrop years before the period covered by this case. ████████████████████████

████████████████████████████████████████

██████████████████████████████ Witz relied on this report knowing that the relevant time period in this begins in 2010.  Am. Compl. ¶ 100.

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████ To the extent Witz's opinion is based on hearsay evidence contained within third-party reports, it is inherently unreliable and therefore inadmissible.  *See Taylor v. B. Heller & Co.*, 364 F.2d 608, 613 (6th Cir. 1996) (excluding expert report regarding value of business that was based on an appraisal prepared by an unidentified third party unrelated to the litigation); *In re Imperial Credit Indus. Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1011-12 (C.D. Cal. 2003) (finding expert report inadmissible because it simply relied on excerpts and data in a report authored by an expert in another litigation).

## D.     Witz's Damages Opinion is Inadmissible

Following a consistent pattern, Witz's opinions regarding the amount of damages owed by Defendants are also "founded on unwarranted assumptions" and are therefore unreliable.  *Metro Sales, Inc. v. Core Consulting Grp., LLC*, 275 F. Supp. 3d 1023, 1055 (D. Minn. 2017) (excluding proffered opinion regarding

24

future lost profits). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ However, during his deposition, Witz concedes that he does not actually have an opinion "as to whether or not it's more appropriate to use the S&P 500 or the plan returns to determine the losses." Ex. A, Witz Dep. 261:16–19.

Witz also bases his damages calculation on his opinion that four full-time employees could service the NGSP.  As shown above, that conclusion is pulled from thin air.  In addition, despite his use of Bureau of Labor Statistics ("BLS") salary data as the basis for his calculations, Witz admitted that he does not know, and did not seek to ascertain, whether or not he correctly matched the BLS job titles and responsibilities with those of Northrop employees.  *See, e.g.*, *id.* at 262:5–263:1 ("I didn't compare the services. . . . I can't say for certain that the job descriptions of one matched the other or not.").  Witz's flagrant disregard for exact comparisons permeates all aspects of his opinion, rendering it unreliable and therefore inadmissible.  *See, e.g.*, *Metro Sales*, 275 F. Supp. 3d at 1055. The Court should exclude his damages testimony as well.

## III.   CONCLUSION

For the foregoing reasons, the Court should enter an order *in limine* excluding the reports and testimony of Steve Pomerantz and David Witz.

Dated:  February 1, 2019

MAYER BROWN LLP
Nancy G. Ross
Brian D. Netter
Laura Hammargren
Samuel P. Myler

By:   */s/  Nancy G. Ross*
       Nancy G. Ross

*Attorneys for Defendants*