Nancy G. Ross
*nross@mayerbrown.com*
Brian D. Netter
*bnetter@mayerbrown.com*
Samuel P. Myler
*smyler@mayerbrown.com*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: 312.782.0600
Facsimile: 312.701.7711

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFTON W. MARSHALL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NORTHROP GRUMMAN CORPORATION, et al. <br><br> Defendants. | Case No. 16-CV-6794 AB (JCx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' EVIDENTIARY OBJECTIONS** <br><br> Date: June 7, 2019 <br> Time: 10:00 a.m. <br> Judge: Hon. André Birotte Jr. |

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT ..................................................................................................................... 4

I. SCHMIDT'S TESTIMONY AS TO WHAT CONSTITUTES A REASONABLE RECORDKEEPING FEE, AND ANY OPINION FLOWING FROM HIS REASONABLE FEE CALCULATION, SHOULD BE EXCLUDED. ............................................................................ 4

    A. Schmidt's opinion as to reasonable recordkeeping fees is not based on any relevant experience. ..................................................... 5

    B. Schmidt's opinion as to reasonable recordkeeping fees is not grounded in a reliable analytical method. ........................................... 6

        1. Schmidt has no methodology for applying his experience to this case. ................................................................... 7

        2. Schmidt's expected fee calculation is not replicable ................. 8

        3. The limited support Schmidt points to beyond his experience is not a methodology and does not support his conclusion. ........................................................................... 12

II. SCHMIDT'S TESTIMONY AS TO FIDUCIARIES LEVERAGING THE FEES PAID BETWEEN A RECORDKEEPER AND A FINANCIAL ADVISORY SERVICE PROVIDER SHOULD BE EXCLUDED ................................................................................................ 14

    A. Schmidt impermissibly offers an experience-based opinion without any evidence that he—or anyone else—has had the experience at issue. ..................................................................... 14

CONCLUSION ............................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Elk Glenn, LLC*,
  986 F. Supp. 2d 851 (E.D. Ky. 2013) .................................................................. 10

*AFMS LLC v. UPS*,
  2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) ....................................................... 8

*Bona Fide Conglomeration, Inc. v. SourceAmerica*,
  2019 WL 1369007 (S.D. Cal. Mar. 26, 2019) ....................................................... 6

*Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*,
  2017 WL 1232973 (N.D. Ill. Apr. 4, 2017) ......................................................... 10

*Cabrera v. Cordis Corp.*,
  134 F.3d 1418 (9th Cir. 1998) .............................................................................. 4

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994) .................................................................................. 6

*Colby v. Newman*,
  2012 WL 12885118 (C.D. Cal. Nov. 20, 2012) .................................................... 8

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ........................................................................ *passim*

*Diviero v. Uniroyal Goodrich Tire Co.*,
  114 F.3d 851 (9th Cir. 1997) ................................................................................ 4

*Diviero v. Uniroyal Goodrich Tire Co.*,
  919 F. Supp. 1353 (D. Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997) .............. 9

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .............................................................................................. 6

*GPNE Corp. v. Apple, Inc.*,
  2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ...................................................... 6

*Hutchinson v. Hamlet*,
  2006 WL 1439784 (N.D. Cal. May 23, 2006) ...................................................... 9

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................... 4, 5

*Lovett v. Omni Hotels Mgmt. Corp.*,
    2016 WL 777781 (N.D. Cal. Feb. 29, 2016) ............................................ 14

*In re M/V MSC Flamina*,
    2017 WL 3208598 (S.D.N.Y. July 28, 2017) ............................................ 5

*Opticurrent, LLC v. Power Integrations, Inc.*,
    2018 WL 6727826 (N.D. Cal. Dec. 21, 2018) ......................................... 14

*Perez v. State Farm Mut. Auto. Ins. Co.*,
    2012 WL 3116355 (N.D. Cal. July 31, 2012) ............................................ 8

*Perfect 10, Inc. v. Giganews, Inc.*,
    2014 WL 12597433 (C.D. Cal. Oct. 31, 2014) .......................................... 4

*Pledger v. Reliance Tr. Co.*,
    2019 U.S. Dist. LEXIS 45668 (N.D. Ga. Feb. 25, 2019) ......................... 11

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010) .................... 14

*Sun-Mate Corp. v. Koolatron Corp.*,
    2011 WL 3322597 (C.D. Cal. Aug. 1, 2011) ............................................. 5

*In re Toyota Motor Corp.*,
    978 F. Supp. 2d 1053 (C.D. Cal. 2013) ..................................................... 6

*Troudt v. Oracle Corp.*,
    2019 WL 1398053 (D. Colo. Jan. 31, 2019) .......................................... 7, 8

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ............................................................... 14

*United States v. King*,
    703 F. Supp. 2d 1063 (D. Haw. 2010) ....................................................... 5

*Wyatt Tech. Corp. v. Malvern Instruments, Inc.*,
    2010 WL 11505684 (C.D. Cal. Jan. 25, 2010), *aff'd in part*, 526 F.
    App'x 761 (9th Cir. 2013) ......................................................................... 9

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) .............................................................................................. 9

**Other Authorities**

Rule 702 ................................................................................................................. 3, 4, 9, 10

iv

# INTRODUCTION

This motion centers on a simple question: can an expert witness reliably answer a data-driven question simply by invoking his generalized "experience" in a related industry? Plaintiffs proffer Martin Schmidt as an expert on recordkeeping fees. Schmidt, in turn, purports to offer a remarkably precise opinion about recordkeeping fees that supposedly could have been achieved for the Northrop Grumman Savings Plan ("NGSP" or "Plan"). Schmidt has professional experience helping retirement plan fiduciaries (of plans far smaller than the NGSP) conduct searches for recordkeepers. But Schmidt did not follow the methodology here that he follows for his clients; instead, he eyeballed the NGSP and seeks to testify, based on his "experience," about how he "felt" the market would have priced the NGSP.

Under *Daubert* and its progeny, even an expert with "experience" must disclose and follow a reliable methodology. An expert cannot simply intuit an answer and ask the court to take his word for its accuracy. Thus, in circumstances materially identical to the situation here—including a case about an expert witness seeking to testify on 401(k) recordkeeping fees—courts have excluded the testimony of putative experts who disclose no verifiable methodology.

This Court should follow suit and not allow Schmidt's ipse dixit calculations and conclusions drawn from those calculations through the gates of admissibility. Nor should the Court allow Schmidt's experience-based testimony on leveraging fees between a financial advisory service provider and plan recordkeeper when he has no experience doing so himself.[1]

---

[1] Defendants file this motion at this time because it addresses evidentiary issues related to the Court's consideration of Defendants' Motion for Summary Judgment, specifically Plaintiffs' improper reliance on Schmidt to support their opposition to Defendants' Motion for Summary Judgment.

1

# BACKGROUND

Plaintiffs' operative complaint alleges that Northrop breached ERISA's fiduciary duties in three respects: by using an active-management strategy for the NGSP's Emerging Markets Equity Fund; by authorizing reimbursements to Northrop for services rendered to the NGSP; and by supposedly paying excessive recordkeeping fees. Second Amended Complaint ¶¶ 105-121 (Dkt. 132). Plaintiffs have offered three separate experts for those three areas of the case; Defendants have previously challenged Plaintiffs' experts on the first two areas. Dkt. 167. This motion addresses Plaintiffs' remaining expert witness, on recordkeeping fees.

On recordkeeping fees, Plaintiffs offer Schmidt to essentially act as a magician—pulling numbers out of thin air and asking the audience to believe what he says is real without knowing how he performed the act. In lieu of methodology, Schmidt offers his experience. He worked at Hewitt with a focus on defined contribution plans from 1984 to 2005, when he was, as he put it, "laid off." Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 75:6-8, 85:10-17). After working at Buck Consulting for two years trying to grow their defined contribution practice, Schmidt started his own benefits consulting firm, where he currently is the only employee and services four to six clients a year. *Id.* at 46:7-9, 49:14-15, 72:18-73:8). In the last three years, however, Schmidt has made 25-60% of his money offering expert opinions on behalf of ERISA fiduciary-breach plaintiffs.[2] *Id.* at 95:12-96:8. He has never served as a fiduciary on any retirement plans, has never served as an in-house ERISA fiduciary for a plan sponsor, and has never worked in-house at a plan sponsor. *Id.* at 90:15-24.

Schmidt's opinion in this case covers three different topics. First, he opines on the frequency with which plans should put out recordkeeping services for

---

[2] Schmidt worked for the defense on one case between two businesses in a software dispute. Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 92:2-9).

2

competitive bid. Second, he hypothesizes how plans should leverage the fees paid from Financial Engines to a plan recordkeeper for the benefit of plan participants. Third, he calculates an exact dollar value for "expected fees for recordkeeping and administrative services" for the NGSP per year, per participant and concludes the NGSP should not have paid more than these amounts. Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶¶ 149-159) (dkt 187). While Defendants disagree with Schmidt's testimony as to the first topic, this challenge is limited to the admissibility of his opinion on the second topic as well as his reasonable fee calculation and the conclusion that the NGSP should not have paid more than these amounts.

At best, Schmidt's "methodology" for his expected fee calculation amounts to gut intuition based on non-comparable experience and his review of the materials produced in this case. *See* Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 138:23-139:5). Schmidt did not conduct any survey of market data or any other data for the time period in which he calculates expected fees. *Id.* at 139:15-19. He summarizes the entirety of his methodology as one where he: "looked at the information. . . I was provided for the plan, took those factors into account, and then based on my experience said here's what I felt was reasonable that the plan would be paying these fees." *Id*. at 139:19-24. As shown below, Schmidt's feelings are inadmissible; no amount of experience can render an unfalsifiable, non-replicable methodology sufficiently reliable to survive *Daubert* and Rule 702.

3

**ARGUMENT**

I. **SCHMIDT'S TESTIMONY AS TO WHAT CONSTITUTES A REASONABLE RECORDKEEPING FEE, AND ANY OPINION FLOWING FROM HIS REASONABLE FEE CALCULATION, SHOULD BE EXCLUDED.**

Federal Rule of Evidence 702 permits expert witnesses to convey "scientific, technical, or other specialized knowledge." But "something doesn't become 'scientific knowledge' just because it's uttered by a scientist" (*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995) ("*Daubert II*")), so Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable'" (*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589)). "The reliability inquiry applies to all forms of expert testimony, whether based on scientific, technical, or other forms of specialized knowledge." *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 12597433, at *2 (C.D. Cal. Oct. 31, 2014).

Under Rule 702, an expert may not testify to "unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997). Rather, he must follow an acknowledged process that is understood to produce reliable results. To that end, "[t]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420-21 (9th Cir. 1998). As such, courts look to whether an expert is deploying a process developed outside of litigation and known to generate conclusions that can be trusted.

Therein lies the problem here. Schmidt offers no methodology—just speculation about what results a methodology would have yielded. Plaintiffs accordingly cannot supply "objective, independent validation of the expert's methodology" (*Daubert II*, 43 F.3d at 1316), nor the requisite showing that Schmidt would "employ[] in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field" (*Kumho Tire*, 526 U.S. at 152). Schmidt's proposed testimony is just the sort of *ipse dixit* that *Daubert* forbids.

### A. Schmidt's opinion as to reasonable recordkeeping fees is not based on any relevant experience.

For starters, "any opinion testified to by an expert must fall within his or her area of expertise." *United States v. King*, 703 F. Supp. 2d 1063, 1068 (D. Haw. 2010). The expert's "expertise and area of proffered opinions should be closely related," lest there be "a possibility of cloaked unreliability." *In re M/V MSC Flamina*, 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017). Although Schmidt has worked in benefits consulting, he has limited experience with large plans. In fact, during the class period, the NGSP had between 101,455 and 133,799 participants. Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶ 78) (dkt. 187). Schmidt has never consulted for a plan with more than 40,000 participants. Ross Decl. ¶2, Ex. 1 (Schmidt Dep. at 56:8-12, 57:23-58:2). Schmidt has consulted for only five or six plans with more than 15,000 participants. *Id.* at 57:15-25.

Schmidt himself took the position that plans with 40,000 participants were not relevant to the pricing of the NGSP because they "are smaller plans." *Id.* at 265:15-24. Suffice it to say, then, that Schmidt could not possibly have experience-based knowledge of pricing dynamics for plans like the NGSP, which he has never encountered outside the litigation context. *Cf. Sun-Mate Corp. v. Koolatron Corp.*, 2011 WL 3322597, at *6 (C.D. Cal. Aug. 1, 2011) (finding an expert unqualified despite over thirty years of experience in the "general[ ]" "relevant discipline [of] product design" because she lacked any experience in the "more specific[ ]" subject of the patents, which was "design of the prior art—1950s refrigerators and

soda cans"). Schmidt's lack of experience with plans the size of NGSP is reason enough to exclude his experience-based fee calculation.

### B. Schmidt's opinion as to reasonable recordkeeping fees is not grounded in a reliable analytical method.

Under *Daubert*, the court's gatekeeping function requires more than "taking the expert's word for it." *Bona Fide Conglomeration, Inc. v. SourceAmerica*, 2019 WL 1369007, at *7 (S.D. Cal. Mar. 26, 2019) (citing *Daubert II,* 43 F.3d at 1319). Thus, an expert's opinion is not reliable and should be excluded where the expert has not applied reliable principles and methods. *In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1067-68 (C.D. Cal. 2013) (excluding expert's opinion that was "not based on a reliable foundation or methodology" but instead amounted solely to expert's "*ipse dixit*"); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (expert opinions cannot be "connected to existing data only by the *ipse dixit* of the expert").

Having a reliable methodology requires having a methodology. At a minimum, an expert must explain how he reached his conclusions (*Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)), which must be supported by the sources he relied on. *See*, *e.g.*, *Gen. Elec. Co.* 522 U.S. at 144-47. Schmidt relies on his "more than 30 years of experience," but there is no methodology for applying that experience to the facts of the case and no explanation of how he reached his expected fee conclusions. Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶ 150) (dkt. 187); *See also GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (finding that an expert's "'30 years of experience' alone does not constitute a sufficiently reliable and testable methodology to prevent exclusion under *Daubert*"). This makes his approach impossible to replicate or verify. The limited evidence he does reference undermines his fee calculation and only adds to the mystery of his method.

### 1. Schmidt has no methodology for applying his experience to this case.

Schmidt's "experience" does not constitute a sufficient methodology to justify his precise determination of the fees that the NGSP could historically have paid. Earlier this year, in an excessive-recordkeeping-fees case brought by the same Plaintiffs' counsel, a federal district court excluded the fee calculations and related testimony of the plaintiffs' putative expert under strikingly similar circumstances. *See Troudt v. Oracle Corp.*, 2019 WL 1398053 (D. Colo. Jan. 31, 2019). In *Troudt*, the plaintiffs sought to offer an expert on the recordkeeping fee that Oracle supposedly should have attained for its 401(k) plan. The court found there to be "no question but that [the expert] possesses impressive credentials and extensive experience in a relevant field." *Id.* at *2.

But the court nevertheless excluded the expert's testimony as to the fees that Oracle supposedly should have been paying because "the facts on which [the opinion] is based are wholly opaque." *Id*. In particular, the court rejected the plaintiffs' contention that the expert's opinion was appropriately "premised on the experience and knowledge of the relevant industry he gained during his employment" with a recordkeeper. *Id*. The expert had "proffered no 'model … or a spreadsheet … or an analysis … where [a third party] could insert different data points and re-create [his] results" and had "repeatedly claimed either that he did not recall specific facts or data supporting his opinions in this regard or that confidentiality agreements … prevented him from making such disclosures." *Id*. Holding that "experience is not a methodology," the Court found that the expert's attribution of a particular recordkeeping fee to Oracle was supported only by the expert's *ipse dixit*, and needed to be excluded. *Id.* (citing *Dean v. Thermwood Corp.*, 2012 WL 90442 at *7 (N.D. Okla. Jan. 11, 2012).

*Troudt* is consistent with Ninth Circuit precedent enforcing *Daubert*. *See Daubert II*, 43 F.3d at 1319 ("We've been presented with only the experts'

qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."); *Perez v. State Farm Mut. Auto. Ins. Co.,* 2012 WL 3116355, at *5 (N.D. Cal. July 31, 2012) ("When asked how one would be able to judge whether he selected the right data to include, Mr. Wood replied that 'my experience and my report speak for itself.' The Court finds, however, that this is precisely the type of *ipse dixit* that is not permissible under *Daubert*."); *AFMS LLC v. UPS*, 2014 WL 12515335, at *7 (C.D. Cal. Feb. 5, 2014) (concluding that because the expert could not "define or explain the methodology, it is impossible for the Court to determine whether it was applied correctly" and excluding the expert); *Colby v. Newman*, 2012 WL 12885118, at *6 (C.D. Cal. Nov. 20, 2012) (excluding financial expert whose report asserted damages based on accounting errors because he "fail[ed] to explain his methodology behind the deductions," so court could not "ascertain whether [the] deductions … are based on a reliable methodology").

Schmidt seeks to rely on his "experience" as the sole support for his remarkably specific assertion that the NGSP could have obtained a per-participant fee of $34 per participant from 2010–12; $28 per participant in 2013; $24 per participant in 2014; and $26 per participant since 2016. Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶149) (Dkt 187). He offers no model, spreadsheet, or analysis allowing a third party to recreate his analysis. He provides only two examples from his thirty-plus years of experience and does not explain how these examples support his conclusions. The examples are not even mentioned in his report beyond being attached as exhibits. All the court has is Schmidt's word, which is not sufficiently reliable for a calculation.

### 2. Schmidt's expected fee calculation is not replicable.

Without a methodology, Schmidt's expected fee calculation is almost by definition not replicable as there is nothing to recreate. *See Troudt,* 2019 WL

8

1398053 at *2 (excluding an expert "because the relevant methodology by which he reached his conclusions remains undisclosed, making it impossible to conclude whether [his reasonable recordkeeping fee] opinion is reliable"). Replicability is a fundamental requirement of Rule 702 across a wide-array of disciplines and an independent reason to exclude expert testimony, even if the expert had a methodology. *See, e.g., Wyatt Tech. Corp. v. Malvern Instruments, Inc.*, 2010 WL 11505684, at *6 (C.D. Cal. Jan. 25, 2010), *aff'd in part*, 526 F. App'x 761 (9th Cir. 2013) (observing that when an expert's work is "conducted in a way that does not allow any other expert to replicate them, the expert's conclusions are unreliable and should be excluded"); *Hutchinson v. Hamlet*, 2006 WL 1439784, at *2 (N.D. Cal. May 23, 2006) (excluding expert opinion in part because expert "failed to record his data, so it cannot be reviewed or tested"); *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, 1360 (D. Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997) (excluding expert "even. . . with his years of technical expertise" because "his assertions are conclusory and remain unreliable" and agreeing with the finding that the expert's "methodology [was] deficient because his analysis could not be replicated. . ."). Without replicability, a court is left with "expert intuition," which is "neither normal. . . nor testable—and conclusions that are not falsifiable aren't worth much to. . . the judiciary." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

Schmidt's opinion is not replicable because he does not show the work he conducted for his expected fee calculation nor does he identify the data that informs his experience beyond two examples. *See* Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 144:12-25). ("[M]y reliance is upon 30 years -- my 30 years within the industry. . . . I relied on [Plan A and Plan B], but I relied on a lot of information throughout forming my opinion."). Indeed, Schmidt refused to answer questions that would reveal his methodology and give the Court or an opposing expert an

9

opportunity to test his conclusions. *See Id.* at 185:4-12 (when asked how his reasonable fee calculation would change if there were 30,000 participants instead of over 100,000, Schmidt said "I'm not going to sit here and speculate what that is because you're asking a hypothetical and I'm not going to engage in hypotheticals at this point"); Id. at 222:23-223:6 (when asked at what dollar amount he started to include the fees from Financial Engines to Hewitt as part of his expected fee calculations, Schmidt said "it's an art, not a science" and did not provide a dollar amount).[3]

Schmidt's repeated response that calculating expected recordkeeping fees is an "art, not a science" does not release him from Rule 702's requirement that his methodology be reliable and replicable. *Id.* at 184:15-17, 205:11-12; 223:3-4; *see Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *5-6 (N.D. Ill. Apr. 4, 2017) (observing that appraisals are "art, not science" but nonetheless requiring experts to "use[] sufficiently reliable methodology to withstand Rule 702 scrutiny"); *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 860 (E.D. Ky. 2013) ("Determining the before-and-after value of real estate is an art, not a science" and upholding an expert who used an "accepted appraisal method. . . [that] looks at how comparable properties fared on the market") (citing *National R.R. Passenger Corp. v. Certain Temporary Easements*, 357 F.3d 36, 39 (1st Cir. 2004)). Rather, his repeated assertion that his opinion was based on what he "felt" was a fair price just proves that his opinion is subjective—which alone requires the exclusion of his testimony. Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 139:19-23)

---

[3] Among the many reasons it is impossible to replicate Schmidt's calculation, it is unclear what factors he considered and when, including if he considered Financial Engines as part of his 2012 expected fee calculation. *See* Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 204:2-6) (stating his 2012 calculation "doesn't include anything with Financial Engines because they just added Financial Engines in 2012, the amount of revenue that was received was so small it didn't really influence [my expected fee calculation]"). His report does not resolve the tension in the above-mentioned statement and "didn't really influence" is far from the precision one would expect of an expert who landed on exactly $28 as the expected fee for 2012.

10

("[W]hat I felt was reasonable that the plan would be paying these fees"), *Id.* at 141:6-7 ("I'm – provided my opinion as to what I felt was reasonable for the years that are listed"), *Id.* at 143:11-12 ("[C]oming up with what I felt was a reasonable fee"), *Id.* at 148:14-16 ("Came up with what I felt was reasonable"), *Id.* at 167:10-14 ("[B]ecause it really gets down to what was the fee that ultimately – that I felt was appropriate for – for the plan").

Indeed, Schmidt's testimony is internally inconsistent. On the one hand, he insists that fiduciaries must conduct requests for proposals to reliably determine what fee levels the market will support. *See* Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶ 68) (Dkt. 187) (claiming RFPs are "the only way a plan fiduciary can determine with certainty how the market will price a plan for administrative services"). On the other hand, he seeks to testify that he just *knows* intuitively what the results of an RFP would have been. Those conflicting assertions would merit deep skepticism in the abstract and have been a basis for excluding a purported recordkeeping expert. *See Pledger v. Reliance Tr. Co.*, 2019 U.S. Dist. LEXIS 45668, at *49 (N.D. Ga. Feb. 25, 2019) (excluding a recordkeeping expert's reasonable fee calculation who "did not perform a 'competitive [RFP] bidding process' which, according to him, is the 'only reliable way' to determine a reasonable fee" and who "[i]nstead purports to calculate a precise reasonable fee using his 'knowledge of the marketplace'"). It is impermissible for a recordkeeping expert to "contend[] that he is a walking benchmark and is able to conjure the *exact dollar figures* the Plan allegedly should have paid." *Id.* at *49-50 (emphasis in original).

Here, there is more than Schmidt's conflicting assertions—there is evidence that Schmidt's raw intuition is inaccurate. Northrop *did* conduct an RFP for a recordkeeper in 2016. Northrop retained Fidelity as a result of that RFP process. Schmidt "felt" that an RFP in 2016 would have yielded a contract for $26 per

participant, but the *actual* contractual fee amount was for $34 per participant. Administrative Service Agreement between Northrop Grumman and Fidelity (Ross Decl. ¶78, Ex. 81 at NGC0015367); Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶ 149) (Dkt. 187). This difference between the "only way" to "determine with certainty" the market price for recordkeeping fees and Schmidt's intuition is proof positive that Schmidt's assertion has no basis in reality.

### 3. The limited support Schmidt points to beyond his experience is not a methodology and does not support his conclusion.

In deriving the "reasonable" recordkeeping fee that forms the basis of his expert opinion, Schmidt does not purport to have conducted any analysis using real-world data. But he did append to his report term sheets from two plans with which he had personal experience—plans he described as "Plan A" and "Plan B." By Schmidt's telling, he included these exemplars only because they had been "generated by a court order from a prior case." Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 126:3-7).

Reviewing only two sources of data because he was forced to produce that data in a prior case is not a reliable methodology for determining the NGSP's expected recordkeeping fees in this case. Even if Schmidt could identify a reason beyond happenstance for including the Plans A and B, the disclosed data does not support his expected fee calculation. Schmidt stated that these plans were cited "to show [an] example," but he never explains how he used the examples or even why they are relevant examples. *Id.* at 126:13-14; Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶ 78, Ex. 3 at 1, 3, Ex. 4 at 1) (Dkt. 187) (█████████████████████████████████████████████████████████).

Moreover, Plan A contains recordkeeping data for two years: █████████
█████████████████████████████████████████████████████████

12

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████. *See Id. at* ¶¶ 99, 140. Nor does Schmidt provide an explanation of why he did not look at data from the three other large plans (which Schmidt terms as "mega"—the same category as the NGSP) that he had worked on. Ross Decl. ¶2, Ex. 1 (Schmidt Dep. 126:8-12; 144:23-25) ("I did not go back and look at any other information other than what's listed here in plan A and plan B").

In short, the two mega plans that Schmidt does identify as exemplars of his experience each have data for two years, and in three out of the four years those plans paid the same or more than the NGSP. ███████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████. There is not a shred of evidence to suggest that the NGSP overpaid—and, critically, not a shred of evidence to explain Schmidt's year-by-year assertion of market rates for what the NGSP should have paid in recordkeeping fees. One can only imagine that the other three mega plans with which Schmidt has experience—for which he did not disclose any data— would support his report even less.

13

## II. SCHMIDT'S TESTIMONY AS TO FIDUCIARIES LEVERAGING THE FEES PAID BETWEEN A RECORDKEEPER AND A FINANCIAL ADVISORY SERVICE PROVIDER SHOULD BE EXCLUDED

### A. Schmidt impermissibly offers an experience-based opinion without any evidence that he—or anyone else—has had the experience at issue.

While experience alone may provide a sufficient foundation to testify about customary practices, there are "of course. . . limits to an expert's ability to testify about customary practice." *Lovett v. Omni Hotels Mgmt. Corp.*, 2016 WL 777781, at *4 (N.D. Cal. Feb. 29, 2016). "For example, a proffered travel industry expert may not be in the position to testify about the customs of the cruise line business specifically if he or she never worked for a cruise line." *Id.* (citing *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011)). Schmidt opines that "based on [his] experience," Northrop should have renegotiated its recordkeeping contract because of the addition of a financial advisory service provider, as is the "practice[] of knowledgeable and diligent fiduciaries." Struckhoff Decl. ¶31, Ex. P30 (Schmidt Rep. ¶¶ 142-146) (Dkt. 187). But he does not cite a single example in his expert report of ever having done so himself, nor does he point to any other fiduciary who has. An opinion about customary practice is not reliable when there is "*no* evidence—experience-based or otherwise" that the practice is in fact customary. *United States v. Frazier*, 387 F.3d 1244, 1283 (11th Cir. 2004) (emphasis in original); *see also Opticurrent, LLC v. Power Integrations, Inc.*, 2018 WL 6727826, at *13 (N.D. Cal. Dec. 21, 2018) (finding "experience-based opinions" that "are not premised in facts or data apparent in [the expert's] report" to be an independent basis to exclude an expert).

In some areas, "when a relevant experience base is unavailable," experts can use their experience in analogous contexts to "mak[e] a sound judgment." *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010), *as amended* (Apr. 27, 2010).

14

Here, however, the unavailability of relevant experience compels one conclusion: the kind of renegotiation described by Schmidt is not a common fiduciary practice. That Schmidt has experience leveraging revenue sharing fees, which are paid from plan assets, subject to fiduciary control, and compensate the recordkeeper for investment advisory services provided to the plan and its participants, does not give him experience renegotiating with a recordkeeper because of the addition of a financial advisory service provider. The fees paid from a financial advisory service provider to a recordkeeper, by contrast, are *not* paid out of plan assets, *not* subject to fiduciary control, and *not* exchanged for plan services. Schmidt's experience-based opinion on a practice for which he has no experience must be excluded.

## CONCLUSION

For the foregoing reasons, the Court should enter an order excluding the portions of Martin Schmidt's reports and testimony regarding the typicality of leveraging fees paid between a recordkeeper and a financial advisory service provider, as well as his reasonable recordkeeping fee calculations and conclusions stemming from those calculations.

Dated: May 10, 2019

MAYER BROWN LLP
Nancy G. Ross
Brian D. Netter
Samuel P. Myler

By: */s/ Nancy G. Ross*
     Nancy G. Ross

*Attorneys for Defendants*