Nancy G. Ross
  *nross@mayerbrown.com*
Brian D. Netter
  *bnetter@mayerbrown.com*
Samuel P. Myler
  *smyler@mayerbrown.com*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:   312.782.0600
Facsimile:    312.701.7711

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFTON W. MARSHALL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHROP GRUMMAN CORPORATION, et al.,<br><br>Defendants. | Case No. 16-CV-6794 AB (JCx)<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  June 7, 2019<br>Time:  10:00 a.m.<br>Judge: Hon. André Birotte Jr. |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   ARGUMENT ................................................................................. 2

A.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EMERGING MARKETS CLAIM .............................................................................. 2

1.    Plaintiffs' Response Improperly Introduces A New Claim ...... 2

2.    In Any Event, Plaintiffs' New Arguments Fail ........................ 4

3.    Plaintiffs Further Fail to Establish Loss Causation ................ 11

B.    PLAINTIFFS DO NOT SHOW A GENUINE ISSUE OF DISPUTED FACT AS TO THEIR RECORDKEEPING CLAIM ............................................................................ 13

1.    Courts Have Expressly Rejected Fiduciary Breach Claims Alleging a Lack of Competitive Bidding ................... 14

2.    Financial Engines' Payments to Hewitt Do Not Create a Genuine Fact Issue for Trial ................................................... 17

C.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE DUTY OF LOYALTY CLAIMS ............... 21

D.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PROHIBITED TRANSACTION CLAIMS ............................................................................ 22

E.    PLAINTIFFS' FAILURE TO MONITOR CLAIMS ARE CONTRARY TO THE EVIDENCE .............................. 24

F.    THE INDIVIDUAL COMMITTEE MEMBERS ARE ENTITLED TO SUMMARY JUDGMENT ....................... 25

III.  CONCLUSION ........................................................................... 25

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000) ............................................................... 4

*In re Computer Scis. Corp. ERISA Litig.*,
635 F. Supp. 2d 1128 (C.D. Cal. 2009) ................................................. 5

*Concha v. London*,
62 F.3d 1493 (9th Cir. 1995) ................................................................ 7

*Crowhurst v. Cal. Inst. of Tech.*,
1999 WL 1027033 (C.D. Cal. July 1, 1999), *aff'd*, 11 F. App'x 827
(9th Cir. 2001) ...................................................................................... 4

*Cunningham v. Cornell*,
2018 WL 1088019 (S.D.N.Y. Jan. 19, 2018) ..................................... 25

*DeFazio v. Hollister*,
854 F. Supp. 2d 770 (E.D. Cal. 2012) ................................................ 12

*Divane v. Northwestern Univ.*,
2018 WL 2388118 (N.D. Ill. May 25, 2018) ...................................... 22

*Ellis v. Fid. Mgmt. Tr. Co.*,
883 F.3d 1 (1st Cir. 2018) ..................................................................... 5

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ............................................................................ 12

*Friend v. Sanwa Bank Cal.*,
35 F.3d 466 (9th Cir. 1994) ................................................................ 12

*Geddes v. United Staffing All. Emp. Med. Plan*,
469 F.3d 919 (10th Cir. 2006) .......................................................... 6, 7

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2011) ......................................................... 11, 17

-ii-

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) .............................................................. 18

*Kanawi v. Bechtel Corp.*,
  590 F. Supp. 2d 1213 (N.D. Cal. 2008) ............................................. 23

*Kasilag v. Hartford Inv. Fin. Servs.*,
  2017 WL 773880 (D.N.J. Feb. 28, 2017), *aff'd,* 745 F. App'x 452
  (3d Cir. 2018) ..................................................................................... 10

*Loomis v. Cornish*,
  836 F.3d 991 (9th Cir. 2016) ................................................................ 6

*Noa v. Keyser*,
  519 F. Supp. 2d 481 (D.N.J. 2007) ....................................................... 5

*Nolan v. Vilsack*,
  2016 WL 3678992 (C.D. Cal. June 30, 2016) (Birotte, J.) .................. 4

*In re Northrop Grumman Corp. ERISA Litig.*,
  2015 WL 10433713 (C.D. Cal. Nov. 24, 2015) ................................. 23

*Patel v. City of Long Beach*,
  564 F. App'x 881 (9th Cir. 2014) .......................................................... 4

*Patricio v. Voya Fin., Inc.*,
  2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018) ............................... 17, 18

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ............................................................................ 25

*Pelfrensne v. Vill. of Williams Bay*,
  917 F.2d 1017 (7th Cir. 1990) ............................................................ 21

*Pioneer Centres Holding Co. Emp. Stock Ownership Plan and Tr. v.*
  *Alerus Fin., N.A.*, 858 F.3d 1324 (10th Cir. 2017) ......................... 5, 13

*Ronches v. Dickerson Employee Benefits, Inc.*,
  2009 WL 10669571 (C.D. Cal. Oct. 30, 2009) ................................. 12

*Sacerdote v. N.Y.U.*,
  2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ................................... 22

-iii-

*Siskind v. Sperry Ret. Program, Unisys*
  47 F.3d 498 (2d Cir. 1995) ................................................. 22

*Sweda v. Univ. of Pa.*,
  --- F.3d ----, 2019 WL 1941310 (3d Cir. 2019) ................................. 22

*Tibble v. Edison Int'l*,
  639 F. Supp. 2d 1074 (C.D. Cal. 2009), *vacated and remanded on
  other grounds*, 843 F.3d 1187 (9th Cir 2016) ................................. 4, 10

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ................................................. 9

*United States v. Various Slot Machs. on Guam*,
  658 F.2d 697 (9th Cir. 1981) ................................................. 19

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006) ................................................. 4

*White v. Chevron Corp.*,
  2016 WL 4502808 (C.D. Cal. Aug. 29, 2016) ................................ *passim*

*White v. Chevron Corp.*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x
  453 (9th Cir. 2018) ................................................. 23, 24

*Wright v. Or. Metallurgical Corp.*,
  360 F.3d 1090 (9th Cir. 2004) ................................................. 4, 12

**Statutes**

29 U.S.C. § 1104(a)(1) ................................................. 15

29 U.S.C. § 1104(a)(1)(A) ................................................. 21

29 U.S.C. § 1104(a)(1)(B) ................................................. 4

29 U.S.C. § 1106(a)(1) ................................................. 22

ERISA ................................................. *passim*

**Other Authorities**

DOL Adv. Op. 2013-03A (July 3, 2013) ................................................. 18

-iv-

George G. Bogert, George T. Bogert & Amy Morris Hess, *The Law of
    Trusts and Trustees* § 871 (2018) ......................................................................... 12

-v-

## I.     **INTRODUCTION**

The allegations in Plaintiffs' complaint are unsupportable. Plaintiffs' memorandum in opposition therefore does not attempt to supply evidence supporting the complaint's allegations; it attempts to fashion new claims.

On Plaintiffs' breach of fiduciary duty claims related to the Emerging Markets Fund ("the EM Fund"), they abandon the complaint's theory that Defendants never evaluated whether the EM Fund should have been switched to passive management. With good reason: there is abundant evidence that Defendants engaged in sophisticated analyses of the EM Fund's structure and made changes as circumstances warranted. With their original theory foreclosed, Plaintiffs seek to invent a new one: that the analyses of the EM Fund were conducted by the ***wrong*** people. But even if such a claim were present in the complaint, Plaintiffs' new theory is devoid of both legal and factual merit.

On Plaintiffs' claim that Hewitt was overpaid, Plaintiffs have abandoned their allegation that Defendants failed to negotiate per-participant fees (which Defendants, in fact, did). And their response otherwise ignores the Plan's 2006 contract with Hewitt, which entitled Hewitt to millions of dollars in early termination fees if the Plan terminated them prior to July 2014. The question is not whether a theoretical fiduciary should renegotiate its fees at particular intervals; the question is whether a fiduciary in similar circumstances—*i.e.*, a fiduciary that could change vendors only by paying a multi-million dollar penalty—would have acted differently. On that critical question, Plaintiffs have no evidence to support the claim that Defendants breached their fiduciary duty and no evidence that alleged breaches resulted in Plan losses. To wit, even if Plaintiffs' expert were correct that a new recordkeeper could have reduced the Plan's fees, not even Plaintiffs' expert opines that the fee reduction would have covered the early termination fee owed to Hewitt.

At bottom, Plaintiffs' allegations that Defendants failed to properly manage the EM Fund and to monitor the Plan's recordkeeping costs are irreconcilable with the discovery record and dependent upon flawed legal premises. This holds true regardless of how many new theories Plaintiffs try to introduce at the eleventh hour.

## II.   ARGUMENT

### A.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EMERGING MARKETS CLAIM

#### 1.   *Plaintiffs' Response Improperly Introduces A New Claim*

Defendants moved for summary judgment on Count V of Plaintiffs' Second Amended Complaint on the ground that Plaintiffs' allegations—that Defendants failed to evaluate or implement a passive strategy for the EM Fund until November 2014—were inconsistent with, and in fact directly contradicted by, the discovery record. As Defendants explained in their accompanying memorandum of law, the purported misconduct forming the basis for this claim **simply never occurred**. Contrary to Plaintiffs' allegations, Defendants in fact thoroughly evaluated a passive management approach for the EM Fund when they reviewed the Plan's other funds in 2010 (as well as on multiple additional occasions thereafter). (ECF No. 168-1, Summ. J. Mem., at 2-3.) Furthermore, while Plaintiffs alleged that Defendants did not implement a passive management approach for the EM Fund until November 2014, the discovery record reveals, exactly to the contrary, that passive management was actually implemented years earlier. As of 2009, Defendants had allocated 25% of the EM Fund's assets to passive management, and then increased the allocation to 50% in April 2011. (SUF ¶¶ 27, 37-41.)[1]

---

[1] All "SUF" references are to the consolidated Defendants' Statement of Facts, Plaintiffs' Responses, and Defendants' Replies thereto filed contemporaneously with this memorandum.

-2-

Confronted with this incontrovertible evidence, Plaintiffs cannot genuinely dispute that the alleged fiduciary breach they pleaded—that Defendants failed to evaluate or implement a passive strategy for the EM Fund until November 2014—was untrue.[2] (*See, e.g.*, ECF No. 132, Second Amended Complaint ("SAC") ¶ 84 (alleging that "Defendants took no action and continued to mandate an active investment strategy" for the EM Fund in 2010)). Instead, they attempt to sidestep summary judgment by recasting their allegations to fit the mold of an entirely different theory—that Defendants breached their fiduciary duties, not by failing to review the EM Fund's investment strategy, but by failing to adequately vet the analysis and recommendations of Northrop's Investment and Trust Administration Department ("ITA"). In other words, whereas the theory Plaintiffs pleaded challenged ***whether*** Defendants evaluated passive management for the EM Fund before November 2014, their new theory focuses on ***who*** performed that evaluation. (*See* Summ. J. Opp., at 16 ("[T]he Investment Committee failed to exercise its own judgment, instead reflexively and uncritically adopting the ITA's advice.")).

Although their "improper delegation theory" is as legally and factually deficient as their original theory, its merits (or lack thereof) are irrelevant at this stage of the case because Plaintiffs failed to plead it in their complaint. It is axiomatic that litigants cannot change their claims, theories, or allegations in the midst of litigation without amending their pleadings. This is particularly true at summary judgment, at which point the parties have completed discovery and are focused on

---

[2] The only evidence Plaintiffs cite to dispute this fact is the Plan's Investment Policy Statement (IPS), which provided that the EM Fund's "investment objective is an incremental total return of capital appreciation net of fees over the benchmark while attempting to avoid significant underperformance." (ECF No. 187, Summ. J. Opp., at 16-17.) This argument fails for two reasons. First, Plaintiffs do not plead a breach alleging a failure to follow the Plan's IPS. Second, the IPS language does not create a genuine dispute of fact with respect to the EM Fund's investment strategy because, notwithstanding the IPS language, the evidence shows that the actual asset allocation for the EM Fund was as passively managed as it was actively managed. (SUF ¶ 42.)

-3-

narrowing, not expanding upon, the issues for trial. *See Patel v. City of Long Beach*, 564 F. App'x 881, 882 (9th Cir. 2014); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). Time and again, this Court has rejected litigants' attempts to evade dismissal by raising new theories or allegations in opposition to summary judgment. *See Nolan v. Vilsack*, 2016 WL 3678992, at *3 (C.D. Cal. June 30, 2016) (Birotte, J.) (collecting cases and discussing standard). "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citations omitted). The Court should refuse to entertain the new claim Plaintiffs have just now unveiled.

## 2.    *In Any Event, Plaintiffs' New Arguments Fail*

Even if Plaintiffs' new claim at this stage of the case were proper, it would not withstand summary judgment. As Plaintiffs concede, they bear the burden of establishing that Defendants breached their fiduciary duties. *See* Summ. J. Opp., at 10. This requires, at a minimum, that they identify some act or omission that fell below the fiduciary standard of "care, skill, prudence, and diligence under the circumstances then prevailing[.]" 29 U.S.C. § 1104(a)(1)(B). This inquiry focuses on whether the fiduciary "employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983); *Crowhurst v. Cal. Inst. of Tech.*, 1999 WL 1027033, at 19 (C.D. Cal. July 1, 1999), *aff'd*, 11 F. App'x 827 (9th Cir. 2001) (quoting *Donovan*, 716 F.2d at 1232). Applying this standard, courts have regularly granted summary judgment where plaintiffs fail to present sufficient evidence of the prevailing fiduciary standards under the circumstances.[3] Although the contours of

---

[3] *See, e.g., Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1118 (C.D. Cal. 2009), *vacated and remanded on other grounds*, 843 F.3d 1187 (9th Cir 2016) (awarding

-4-

Plaintiffs' new claim are poorly defined, each of the theories Plaintiffs attempt is either contradicted by the discovery record, devoid of any evidentiary support, or insufficient to support a claim as a matter of law.

**a.**   The crux of Plaintiffs' reconceptualized EM Fund claim is that "the Investment Committee [never] made a reasoned, deliberate decision to maintain an active management strategy for the EM Fund in late 2010[.]" Summ. J. Opp., at 15. But this assertion is flatly contradicted by the discovery record, which demonstrates that throughout the relevant time period the Investment Committee was closely involved in ITA's review of the Plan's funds and its analysis of passive and active management. (SUF ¶¶ 21, 23, 27, 29-30, 38-41, 48-52).

With respect to the 2010 decision to change the allocation of passive management across the NGSP funds, the Investment Committee explicitly approved of the ITA's recommendation to employ a "passive approach for investment options/asset classes in which [a] passive approach is deemed effective in replicating index performance [and] meeting the operational needs of the Plan" and authorized the implementation of that approach. (SUF ¶¶ 28-30; Ex. 36 (Update/Recommendation for 401(k) Options; Ex. 20 (May 17, 2010 IC Minutes) ("After general discussion, the Committee approved the recommendation . . .")).

---

summary judgment where plaintiffs' expert failed to provide basis for opinion that defendants' conduct fell below relevant fiduciary standards); *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 10 (1st Cir. 2018) (upholding district court's decision granting summary judgment to defendant on duty of prudence claims related to appropriate investment choices); *Pioneer Centres Holding Co. Emp. Stock Ownership Plan and Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1338 (10th Cir. 2017) (granting summary judgment on ERISA claim because plaintiff "failed to come forward with any evidence from which the jury could find causation without engaging in speculation"); *Noa v. Keyser*, 519 F. Supp. 2d 481, 492 (D.N.J. 2007) (holding at summary judgment that "on this record there is insufficient evidence for a finder of fact to conclude that Defendants breached their fiduciary duties of prudence under section 404 of ERISA"); *In re Computer Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1136 (C.D. Cal. 2009).

-5-

The ITA presented its findings on the effectiveness of passive management for the NGSP's funds at the August 27, 2010 Investment Committee meeting and proposed increasing the allocation of passive management for the EM Fund. (SUF ¶¶ 38-41; Ex. 38 (August 27, 2010 Update on Implementation of Passive Investment Strategy) (listing lower EM Fund fees with proposed increase in passive allocation); Ex. 20 (August 27, 2010 IC Minutes ) ("Mr. Newberry updated the Committee on the implementation of the passive investment strategy[.]"). When the ITA ultimately terminated one of the EM Fund's active managers and transitioned the fund to 50% passive management, it did so "[p]er decision by investment committee to maintain a mix of passive and active funds for the emerging markets fund." (SUF ¶ 30; Ex. 28 (September 2010 EM Fund Active Management Termination presentation); *see also* Ex. 30 (December 2011 DC Emerging Markets Fund Review) ("[i]n August 2010, investment committee made decision to maintain a mix of passive and active funds for the Emerging Markets Fund.")). Plaintiffs' theory that Defendants failed to make a "reasoned, deliberate decision" is nothing more than "[m]ere allegation and speculation [that] do not create a factual dispute for purposes of summary judgment." *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) (citations omitted).

Plaintiffs' fabricated challenge to ITA's role and the propriety of the Investment Committee's delegations also rings hollow. It is well settled that plan fiduciaries are given wide berth to delegate their discretionary authority or plan administration responsibilities to consultants, subordinates, or other third parties. *Geddes v. United Staffing All. Emp. Med. Plan*, 469 F.3d 919, 925 (10th Cir. 2006) (holding that consistent with "long-accepted trust doctrine" a fiduciary's authority to delegate is "inherent in the fiduciary-trustee"). Moreover, there is no requirement that the delegation be in writing or that the authority to delegate be expressly set forth in the plan documents for these delegations to be effective. *See Concha v.*

-6-

*London*, 62 F.3d 1493, 1501–02 (9th Cir. 1995) (holding "there need not be an express delegation of fiduciary duty in the Plan instrument itself for persons performing duties of a fiduciary nature to be considered fiduciaries"). Nor is there any requirement that a plan fiduciary delegate responsibilities only to other fiduciaries. *Geddes*, 469 F.3d at 927 ("[T]here is nothing in the language of the ERISA statute . . . or the background principles of trust law that requires fiduciaries, when delegating authority, to delegate only to other fiduciaries. Indeed, we would go so far as to say the plain language of the ERISA statute and the venerable body of trust law say just the opposite."). Plaintiffs' argument that Defendants breached their fiduciary duties or otherwise acted improperly by delegating matters to ITA or by relying on ITA for assistance is dependent upon a non-existent legal requirement they have constructed from whole cloth.[4]

Here, to the extent Plaintiffs purport to challenge the scope of ITA's authority or the effect of the relevant delegations, the discovery record establishes that ITA has long been duly authorized to analyze and implement the EM Fund's investment strategy. (*See* SUF ¶ 10; Exs. 12, 13 (2003 and 2004 Investment Committee Resolutions) (delegating "authority to oversee and direct the day-to-day investment and all other related activities of the Plans and the Trusts" to the Vice-President of the ITA); Ex. 11 (2007 Board of Directors Charter) (providing the Investment Committee with authority to "take any and all other steps necessary or appropriate to invest and manage assets of the plans," including delegating the power to "appoint and terminate investment managers"); Ex. 5 (Investment Committee Charter)

---

[4] Plaintiffs take issue with the delegation of investment matters to ITA on the ground that it was not expressly permitted by the plan documents, and therefore allegedly did not comport with the requirements of § 1105(c)(2). (Summ. J. Opp. at 13.) Section 1105(c)(2) relieves a fiduciary of responsibility for a co-fiduciary's conduct when there is a formal delegation of all authority. But Defendants have not argued that they are relieved of liability under § 1105(c)(2); rather, our argument is that the Plan's fiduciaries acted prudently, individually and collectively. Section 1105(c)(2) therefore does not bear on any relevant question.

-7-

(providing that the Investment Committee or its chair "may delegate any or all of the Committee's duties, responsibilities and powers to. . . Company employees"); Ex. 2 (2010 Savings Plan Document) (permitting the Investment Committee to "employ counsel, including investment counsel, as it may require in carrying out its duties under the Plan"); Ex. 10 (2007 Investment Policy Statement) (the Investment Committee delegated to ITA the responsibility to "[r]ecommend and implement investment policies and investment fund objectives," and "[s]elect, appoint, terminate and enter into agreements with investment managers"). Pursuant to these delegations, the ITA recommended in 2010 to "[e]mploy passive approach for investment options/asset classes in which passive approach is deemed effective"—a recommendation the Investment Committee approved—and implemented this recommendation by transitioning the EM Fund to 50% passive management and other funds to 100% passive management. SUF ¶¶ 29, 30.

**b.**     As for the merits of Defendants' evaluation of the EM Fund, Plaintiffs' only challenge is that the ITA's presentation to the Investment Committee omitted a "comparison of the historical performance of the Plan's current Emerging Markets Fund to the performance of a passively managed equivalent." Summ. J. Opp., at 17 (citing Pomerantz Rpt. ¶¶ 79-81). But Plaintiffs' expert pointedly offers no opinion on the question of whether a reasonable fiduciary would have changed the EM Fund to 100% passive management. Pomerantz Rpt. ¶ 81 ("[T]his comparative historical performance data . . . would have enabled the Investment Committee ***to evaluate*** whether maintaining an active strategy for emerging markets was justified[.]") (emphasis added). His opinion is only that Defendants' analysis was insufficient to support the decision to not immediately convert the entire EM Fund to passive management. Plaintiffs are thus left only with speculation to satisfy their burden of proving causation. They have no competent evidence that, despite the robust analysis

-8-

conducted by ITA and the materials considered by the Investment Committee, *see*
SUF ¶¶ 21 23, 30, 38, 48, 52, the provision of this single additional piece of
information would or should have caused the Investment Committee to distrust
ITA's recommendation and insist on an entirely passive approach. Plaintiffs' empty
speculation on this element of their claim is insufficient to create a genuine dispute.

Plaintiffs further contend that they have evidence that actively managed
emerging markets failed to outperform their benchmark indices. Summ. J. Opp., at
17-18. They are wrong. On the facts, and contrary to Plaintiffs' allegations, the
discovery record shows that the emerging markets active managers ***regularly
outperformed*** the relevant benchmarks and passive management. (SUF ¶¶ 16, 22,
44, 48) (*See, e.g.*, 2007 Emerging Markets Fund Review, September 20, 2010 DC
Emerging Markets Fund Review; Dep. of A. Tsao 130:23-131:4 (Explaining chart
in 2014 presentation showing that "over the ten-year basis, passive [EM Funds] have
all underperformed the index. . . on the ten-year basis, seven-year basis, five-year
basis, three-year basis, and one-year basis, so passive underperformed in every time
period versus the market universe of [active] managers"). But even if that were not
true, Plaintiffs cannot establish a fiduciary breach merely by identifying
performance outcomes. In order to prevail on a breach of fiduciary claim, Plaintiffs
must identify some flaw in the "fiduciary's conduct preceding the challenged
decision—not the results of that decision." *Tussey v. ABB, Inc.*, 746 F.3d 327, 335
(8th Cir. 2014). The duty of prudence does not demand that a fiduciary take a
particular course of action or reach the "prudent" or the "correct" decision; they must
only employ a prudent process for making the decision. *White v. Chevron Corp.*,
2016 WL 4502808, *17-18 (C.D. Cal. Aug. 29, 2016) *("White I")*. Thus, Plaintiffs'
arguments that a fiduciary would have made a different decision based on the data
available to Defendants in 2010 are insufficient to create a genuine dispute for trial.

*Id.*; *see also Tibble*, 639 F. Supp. 2d at 1116 ("Even assuming that the retail funds underperformed, however, underperformance alone is insufficient to show a breach of the duty of prudence.")

The process-based legal standard is particularly apt here because emerging markets benchmarks are not investable. *See, e.g., Kasilag v. Hartford Inv. Fin. Servs.,* 2017 WL 773880, at \*11 (D.N.J. Feb. 28, 2017), *aff'd,* 745 F. App'x 452 (3d Cir. 2018) (noting that "one cannot invest in a benchmark"). For that reason, one of Defendants' considerations was the historical disparity between the performance of actively managed emerging markets funds and passively managed equivalents—which themselves underperformed the benchmarks by considerable margins. (SUF ¶¶ 16, 44 (*See* September 20, 2010 DC Emerging Markets Fund Review)). Additionally, it is indisputable that passive management presented various weaknesses that made it a poor substitute for active management. (SUF ¶¶ 16, 25 (*See* November 24, 2008 DC Emerging Markets Structure Recommendation)). Thus, it is not surprising that Defendants, consistent with the approach taken by the majority of U.S. institutions investing in emerging markets, decided to employ active management. (SUF ¶¶ 16-17 (*See* Lundblad Rpt. ¶ 13 ("Actively managed emerging markets funds represented 90% of emerging markets funds and 76% of emerging markets funds assets in 2006, and 73.2% of all emerging markets funds and 57.9% of assets in 2017."))

Finally, Plaintiffs wrongly argue that the decision to transition entirely to passive management in 2014 is proof that the decision to implement a mixed approach in 2010 was imprudent because "nothing *changed* in 2014 that rendered active management imprudent in the emerging markets segment." Summ. J. Opp., 18. In fact, the discovery record demonstrates that ***there were changes*** in 2014 that did make it practical to transition to an entirely passive approach at that time. (SUF

-10-

¶ 50). In particular, in 2014 ITA identified a number of specific "drivers of improved passive EM performance" that justified an entirely passive approach, such as improvements in "emerging markets depth and liquidity," "lower transaction costs," and "[f]ull replication" of the underlying indices. *Id.* Whether intentionally or negligently, Plaintiffs again overlook key facts in the record.

Plaintiffs' effort to pigeon-hole this case into one of the few in which Plaintiffs' counsel have actually prevailed does not work. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) involved claims by plan participants that Kraft did not evaluate and make a determination regarding whether it should have adopted a "direct" investment structure for investments in the company's stock funds, as opposed to maintaining the "unitized" structure in place at the time. *Id.* at 799. The Seventh Circuit reversed and remanded the district court decision granting summary judgment for Kraft, concluding that while there was ample evidence the issue was evaluated, there was no evidence that a decision was made, ***by anybody***. *Id.* at 801. The Seventh Circuit expressed concern that the status quo was maintained due to inertia, rather than any actual decision that doing so was in participants' best interests. The indisputable record evidence demonstrating that changes were made to the EM Fund's passive allocation proves that this case is, in fact, the opposite of *George*. (*See* SUF ¶¶ 27, 42, 52 (describing changes to EM Fund investment strategy and Investment Committee approval of same)).

### 3.   *Plaintiffs Further Fail to Establish Loss Causation*

Plaintiffs' new claim fails for the additional reason that they have not presented any evidence whatsoever that ITA's role in evaluating and transitioning the EM Fund to passive management caused any plan losses. Although Plaintiffs try to avoid having to present any evidence of causation, their arguments to this effect fly in the face of controlling precedent, well-recognized principles of trust law, and

common sense. This Court and the Ninth Circuit have held on multiple occasions that Plaintiffs bear the burden of establishing a connection between the alleged breach and any alleged losses where plaintiffs are seeking monetary relief.[5] *Friend v. Sanwa Bank Cal.*, 35 F.3d 466, 469 (9th Cir. 1994) (granting summary judgment on the ground that plaintiff "has not presented a genuine issue of material fact that this act caused the Plans' losses" and holding that "ERISA holds a trustee liable for a breach of fiduciary duty only to the extent that losses to the plan result from the breach."); *Ronches v. Dickerson Employee Benefits, Inc.*, 2009 WL 10669571, at *22 (C.D. Cal. Oct. 30, 2009) (quoting *Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998)) ("The statutory phrase 'resulting from' indicates that there must be some causal link between the alleged breach of fiduciary duties and the loss plaintiff seeks to recover."); *DeFazio v. Hollister*, 854 F. Supp. 2d 770, 808 (E.D. Cal. 2012) ("To seek damages under § 1132(a)(2) and (a)(3), plaintiffs generally have the burden of proving the harm caused by defendants' breaches of their fiduciary duties by a preponderance of the evidence.").

The Ninth Circuit's requirement that Plaintiffs prove causation tracks well-recognized principles of trust law, which Plaintiffs incorrectly claim place the burden of disproving causation on Defendants, Summ. J. Opp., at 11. *See* George G. Bogert, George T. Bogert & Amy Morris Hess, *The Law of Trusts and Trustees* § 871 (2018) ("A beneficiary seeking to obtain relief for a breach of trust must plead and prove facts which show the existence of a fiduciary duty and the failure of the trustee to perform it, and that consequently the court should grant the requested

---

[5] Contrary to Plaintiffs' attempt to distinguish *Wright*, 360 F.3d 1090, nothing in the Ninth Circuit's opinion suggests that the burden of establishing loss causation is limited to employer stock cases or that the obligation to establish the requisite "causal link" was derivative of the "presumption of prudence." While the Supreme Court rejected the "presumption of prudence," *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014), it did not interfere with the basic trust law requirement that plaintiffs asserting claims for monetary damages establish that the alleged breach caused losses.

-12-

remedy. If he seeks damages, a part of his burden will be proof that the breach caused him a loss.").

Here, Plaintiffs offer no evidence establishing a causal link between their allegation that Defendants failed to make a "reasoned, deliberate decision" and any plan losses. In fact, their response contains just a single sentence on this issue. They contend that "[h]ad the Investment Committee engaged in such a review in 2010, it would have concluded at that time that a 100% passive investment strategy for the EM Fund would best serve the Plan." Summ. J. Opp., at 16. Such a conclusory and speculative assertion does not create a genuine dispute of material fact with respect to causation. As the discovery record shows, ITA evaluated the EM Fund's investment approach over many years and regularly collaborated with the Investment Committee in making changes to the EM Fund's allocation. (SUF ¶¶ 27, 30, 38-42, 52). In light of this evidence, there is no principled reason to believe that had the Investment Committee engaged in a further in-depth analysis to supplement that conducted by ITA, (SUF ¶ 21), the outcome would have been different. *See, e.g.*, *Pioneer Centres Holding Co. ESOP*, 858 F.3d at 1338 (granting summary judgment on ERISA claim because plaintiff "failed to come forward with any evidence from which the jury could find causation without engaging in speculation").

## B. PLAINTIFFS DO NOT SHOW A GENUINE ISSUE OF DISPUTED FACT AS TO THEIR RECORDKEEPING CLAIM

Plaintiffs' recordkeeping claim was founded on three distinct allegations: that Defendants should have renegotiated recordkeeping fees in connection with a competitive bidding process, that the renegotiated fees should have been on a per-participant basis, and that Defendants failed to account for payments received by Hewitt from Financial Engines. Plaintiffs have abandoned the middle issue: they do not dispute that Defendants *did* succeed in renegotiating their agreement with Hewitt

-13-

in 2011 to provide for per participant fees.[6] (SUF ¶ 90). Plaintiffs' Financial Engines claim is similarly meritless: there is no obligation to monitor such fees, which did not affect the reasonableness of Defendants' arrangement with Hewitt.[7] Finally, Plaintiffs fail to adduce sufficient evidence that fiduciary standards required Defendants to conduct an RFP prior to 2014 or that the Plan suffered losses attributable to Defendants' purported delay.

### 1.   *Courts Have Expressly Rejected Fiduciary Breach Claims Alleging a Lack of Competitive Bidding*

As Plaintiffs concede, "nothing in ERISA compels periodic competitive bidding." *White I*, 2016 WL 4502808, at *14. Because there is no *per se* rule requiring competitive bidding at all, much less at any particular interval, the mere fact that Defendants did not conduct a bidding process between 2007, when Hewitt started as the Plan's recordkeeper, and 2014 is insufficient to support a claim for breach of fiduciary duty. Instead, to create a triable issue, Plaintiffs must present evidence that "under the circumstances then prevailing," fiduciary standards demanded that Defendants conduct more frequent RFPs. Plaintiffs' only evidence

---

[6] Although Plaintiffs do not dispute that Defendants negotiated a per participant contract in 2011, Plaintiffs characteristically raise new theories not pleaded in their complaint related to the purported imprudence of these negotiations to avoid summary judgment. Summ. J. Opp., at 19 (identifying "other flaws" associated with the 2010-11 renegotiation of the Hewitt agreement). But Plaintiffs' new challenges of the negotiation process are nothing more than an attempt to dodge their mistaken allegation that Hewitt fees were never renegotiated. *Compare* SAC ¶ 69 ("From 2010 to 2015, Hewitt was compensated for recordkeeping services at a fixed rate to $500,000 per month") *with* SUF ¶ 90, Ex. 76 (First Amendment to Hewitt Agreement) (changing recordkeeping fees to $45 per participant).

[7] In furtherance of the concerns with Schmidt's opinion expressed here, Defendants have contemporaneous with this reply filed evidentiary objections and moved to exclude Schmidt's opinion on leveraging fees from Financial Engines to Hewitt and his reasonable recordkeeping fee calculation. *See* Schmidt Evid. Objections. Because Schmidt's report and testimony is the only evidence Plaintiffs have adduced in support of their Hewitt fee claims, and since Schmidt has no opinion on if Defendants should have issued an RFP for the Plan more frequently considering the multi-million dollar early termination fee, if Defendants' motion to exclude Schmidt is granted, Defendants' motion for summary judgment on this claim should be granted as well.

-14-

on this issue, the opinion of their recordkeeping expert, Martin Schmidt, does not make the grade.

Schmidt's unsubstantiated opinion that most fiduciaries conduct an RFP "every 3-5 years" fails to account for ERISA's admonition that a fiduciary's actions must be evaluated "under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1). In fact, Schmidt does not even acknowledge the prevailing circumstances in his conclusions. He does not address the time and costs associated with conducting an RFP for a plan as complex as the one at issue. (SUF ¶¶ 129, 132, 134). Nor does he address the difference between a single plan RFP, which is the focus of his report, and a "total benefits outsourcing" RFP, which is what Hewitt was retained to provide. Ex. 109 at ¶¶ 128-141 (Schmidt Report). Most notably, however, Schmidt completely ignores the fact that the terms of the Hewitt recordkeeping agreement precluded Northrop from changing recordkeepers prior to July 2014 without incurring millions of dollars in termination fees—far more than what Defendants could have expected to save through a change in recordkeepers by Schmidt's own calculations. (SUF ¶¶ 81, 313) (comparing termination costs with purported savings associated with Schmidt's "reasonable" fee).

In addition to failing to present sufficient evidence on the issue of whether Defendants breached their fiduciary duties by not conducting an RFP prior to 2014, Plaintiffs have presented no evidence that the purported breach caused any plan losses. *See supra* at Section II.A.3 (discussing Plaintiffs' burden of proving loss causation). Plaintiffs' contention that the Plan paid higher fees because Defendants failed to conduct "regular" competitive bidding is entirely speculative and devoid of any logical, much less evidentiary, connection to the alleged breach. Although Plaintiffs purport to rely on the opinion of their expert on this issue, nowhere in Schmidt's report does he identify which providers would have responded to an RFP,

-15-

how those providers would have structured their fee arrangements across Northrop's various plans (i.e., health, welfare, pension, and defined contribution plans), or whether the bidding providers could offer the same level of service. Moreover, Schmidt's opinion that one of Hewitt's competitors would have proposed a lower fee is entirely speculative and based on vague allusions to his "years of experience," Schmidt Rpt. ¶ 150, rather than actual facts or a credible methodology. In fact, what little tangible evidence Schmidt does offer squarely contradicts his opinion that a competitive bidding process would have resulted in lower fees. (*Compare* Ex. 109 Schmidt Rpt., Exhibit 3 (noting fees of between ███ and ███ per year for purportedly comparable plans) *to* SUF ¶ 123 (noting NGSP fees of between $39.47 and $45 per participant over relevant time period)).

Notwithstanding the above, the most glaring omission is again Schmidt's failure to address the elephant in the room: the fact that Defendants could not terminate the Hewitt agreement any earlier without subjecting Plan participants to millions of dollars in termination fees. *See* Ex. 65 (Hewitt Administrative Services Agreement), at 18 (noting early termination fees of between $15 million and $1 million depending upon timing of termination). Plaintiffs and Schmidt do not attempt to explain how the NGSP suffered a loss by failing to conduct an RFP when the cost and expense of changing recordkeepers would have eclipsed even Plaintiffs' most optimistic estimates of what an RFP would have saved. At the outset of the class period, for example, Plaintiffs contend that $34 per participant was a reasonable fee. While Schmidt's own data demonstrate that this fee is not reasonable, *see* Ex. 109 (Schmidt Report, Ex. 3) (noting fee proposals of between ███ and ███ for Schmidt's clients in response to ██████), even if it were, the Plan would have saved $5,124,717 by changing recordkeepers while paying $15,000,000 to terminate the Hewitt agreement. (SUF ¶¶ 81, 313) (comparing termination costs with

-16-

purported savings associated with Schmidt's "reasonable" fee). Not only does Plaintiffs' math regarding the alleged Plan losses fail to add up, imposing Schmidt's view of prudent plan administration would, in fact, have harmed participants far more.

Plaintiffs' attempt to compare the undisputed facts at issue here and Schmidt's opinion on recordkeeping issues to the facts and expert opinion offered in *George* fares no better. As the Seventh Circuit made clear in *George*, its decision to remand the case was based on the fact that defendants did not conduct an RFP or even renegotiate their recordkeeping agreement for 15 years. *White I*, 2016 WL 4502808, at *15 (discussing *George*). The Seventh Circuit concluded that this decade-and-a-half of inactivity created a genuine dispute for trial, particularly in light of the opinion of the plaintiffs' expert that the defendants should have conducted an RFP after just three years (*i.e.*, 12 years earlier). *George*, 641 F.3d at 798. Here, by contrast, Defendants renegotiated their recordkeeping agreement just four years after Hewitt started recordkeeping the NGSP (SUF ¶¶ 80, 90) *and* conducted an RFP three years after that (SUF ¶ 91). Moreover, Plaintiffs' expert in this case, unlike the expert in *George*, does not opine that an RFP is necessary every three years; instead, he states that fiduciaries generally (not Defendants specifically) should engage in a competitive bidding process "every 3 to 5 years." Schmidt Rpt. ¶ 44.

### 2. *Financial Engines' Payments to Hewitt Do Not Create a Genuine Fact Issue for Trial*

Plaintiffs do not deny that courts have repeatedly dismissed claims similar to theirs challenging Financial Engines' payments to a recordkeeper. Summ. J. Mem., at 16. Rather, Plaintiffs attempt to distinguish those cases on the ground that "the primary issue in those cases was whether a *recordkeeper* acts as a fiduciary when it negotiates an agreement with Financial Engines." Summ. J. Opp., at 21. But the opinions in those cases were not so limited. For example, in *Patricio v. Voya Fin.,*

*Inc.*, 2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018), the court addressed, *inter alia*, whether the Plan's fiduciary (Nestle) violated ERISA by paying certain fees to the plan's recordkeeper for recordkeeping and administrative services, who then paid a portion of those fees to Financial Engines. *Id.* at *7. The court rejected the plaintiffs' claim, holding that there was nothing "per se improper" about the payment arrangement. The court went on to note that adopting Plaintiffs' position would have the effect of "requir[ing] plan sponsors to monitor not only their own agreements with service providers but also their service providers' agreements with third parties." *Id.* Nothing in ERISA, the court held, "imposes such a heavy burden on plan sponsors." *Id.*

Plaintiffs' attempt to analogize the data connectivity fees Hewitt received from Financial Engines to revenue sharing fees belies important differences. In a revenue sharing arrangement, a plan recordkeeper is compensated for the services it provides to a plan and its participants by collecting asset-based fees built into the expense ratio for certain mutual funds. *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009) (explaining the structure of revenue sharing). The duty to monitor these revenue sharing fees is derived from the fact that the plan's fiduciaries have control over these payments, the payments are paid out of plan assets, and the payments are for services provided to the plan and its participants. *See* DOL Adv. Op. 2013-03A (July 3, 2013) (noting that plan fiduciaries must act prudently in deciding to enter into such a relationship, selecting investment options that include a revenue sharing fee, and "negotiat[ing] the specific formula and methodology under which revenue sharing will be credited to the plan"). Because a fiduciary has control over the revenue sharing amounts a recordkeeper might collect as compensation for plan services, the Department of Labor has recognized a duty to assess whether the recordkeeper's revenue sharing compensation is commensurate

-18-

with the level and quality of service it provides. *See id.* In contrast, neither the DOL nor any court has held that there is a duty to monitor fees for services that are not provided to the plan and over which the fiduciary has no control. Summ. J. Mem., at 16. The data connectivity fees are similarly not subject to fiduciary control, are not paid out of plan assets, and are for services Hewitt provides to Financial Engines as the result of a business arrangement between the two entities. For good reason, no court has embraced the argument Plaintiffs make here.

Martin Schmidt's conclusory assertion that "[t]he amount of additional income received from Financial Engines should have been taken into account by the [Administrative Committee] in evaluating the total compensation that Hewitt received for recordkeeping and administrative services," Summ. J. Opp., at 20, is the type of paradigmatic *ipse dixit* opinion that courts have time-and-again held is insufficient to defeat summary judgment. *United States v. Various Slot Machs. on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) ("[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts."). Schmidt provides no explanation regarding what a prudent monitoring process would have entailed, how Defendants' process deviated from that standard, or the basis for his opinion that the data connectivity fee was excessive. Simply put, his opinion is not based on any apparent facts, data, reliable methodology, or relevant experience. *See* Defs.' Schmidt Evid. Objts., at 14-15.

In fact, there is no evidence that Schmidt has *any* expertise with these types of fees. While Schmidt claims without elaboration that he has experience leveraging fees for "advisory services" to negotiate recordkeeping fee adjustments, Schmidt Rpt. ¶ 146, this experience has no bearing on whether prudent fiduciaries have successfully leveraged the type of third-party fees at issue in this case to reduce recordkeeping fees. Unlike the data connectivity fees at issue here, advisory service

-19-

fees are direct payments *by plan participants* for investment advisory services and are subject to the plan fiduciaries' control. *See* Ex. 89 (Callan Advice and Managed Account Presentation) (managed account fees for investment advisory services are "[o]nly applied to participants who use the service" and showing different rate options for plan fiduciaries to select based on an opt-in or opt-out structure). Moreover, not only does Schmidt lack personal experience, he fails to identify ***any*** plan fiduciary that achieved an offset in recordkeeping fees by "accounting for" and "leveraging" data connectivity fees or similar forms of third-party compensation. Ex. 117, Gissiner Rebuttal Rpt. ¶¶ 49-51.

Lastly, Plaintiffs again fail to proffer any evidence on the causation element of their claim. As explained in Defendants' summary judgment memorandum, even if the Court were to find an issue as to whether the data connectivity fees were "excessive" or that Financial Engines overpaid for the amount of work Hewitt performed (an issue for which Plaintiffs fail to provide any support), Plaintiffs present no evidence that Defendants' failure to monitor the fees resulted in plan losses. In their response, the only putative evidence Plaintiffs identify is Schmidt's opinion that Defendants should have "used that information to negotiate a fee reduction." Summ. J. Opp., at 20. But neither Schmidt nor Plaintiffs explain how Defendants could have "leveraged" that information to lower recordkeeping fees. Ultimately, Schmidt's unsubstantiated opinion boils down to his subjective belief that Hewitt would have discounted or rebated millions of dollars in fees it received from a third party as an act of corporate largesse. *See* Schmidt Rpt. ¶¶ 142-146 ("At no time, did [Defendants] consider requesting that Hewitt return that revenue in whole or part, or leverage that revenue in the form of reduced recordkeeping and administrative fees paid by Plan participants."). Again, Schmidt presents no evidence that this has ever occurred. Ex. 117, Gissiner Rebuttal Rpt. ¶¶ 49-51.

-20-

## C.   **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE DUTY OF LOYALTY CLAIMS**

Plaintiffs' argument that a duty of loyalty claim does not require them to present any evidence on Defendants' state of mind or motivations is untenable. As explained in Defendants' memorandum in support of summary judgment, courts have repeatedly held that in order to state a duty of loyalty claim, there must be some evidence that the fiduciaries were motivated by a desire to serve the interests of others over those of the beneficiaries. Summ. J. Mem., at 19 (collecting cases). While Plaintiffs purport to dispute the existence of this requirement, claiming that "ERISA does not require proof that a fiduciary had a certain state of mind in order to find a breach of 29 U.S.C. § 1104(a)(1)(A)," they fail to cite to any authority or even offer any reasoned argument in support of this position. Plaintiffs' vacuous response is tantamount to no response at all. *See, e.g.*, *Pelfrensne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. . . . [The courts] will not do his research for him.").

Plaintiffs' attempt to proffer evidence of Defendants' conflicted motives is insufficient to create a genuine dispute of fact. Neither of Plaintiffs' speculative arguments—*i.e.*, that Northrop benefitted from the retention of an active manager because it discounted the fees it charged to manage pension plan investments, or that Northrop benefited from the retention of Hewitt by obtaining discounted pension or health plan administrative services—is supported by any evidence. Summ. J. Opp., at 22. Plaintiffs do not present any proof either that any active manager actually discounted its pension plan fees due to the Plan's engagement, or that Northrop in fact paid less for pension, health, or welfare plan recordkeeping because the Plan retained Hewitt. Nor is there any evidence that Defendants were ***motivated by***

-21-

whatever savings they allude to. Finally, even had Northrop received incidental benefits due to its arrangements with service providers, such benefits do not support a breach of fiduciary duty claim. *See, e.g.*, *Siskind v. Sperry Ret. Program, Unisys* 47 F.3d 498, 504 (2d Cir. 1995) ("ERISA plan trustees are not prohibited from acting in a way that incidentally benefits the employer").

### D.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PROHIBITED TRANSACTION CLAIMS

Plaintiffs allege that Defendants engaged in prohibited transactions in violation of 29 U.S.C. § 1106(a)(1) by virtue of the simple fact that they hired Hewitt, Financial Engines, and the EM Fund active managers and paid them to provide the services for which they were hired. In other words, Plaintiffs contend that a plan fiduciary violates ERISA anytime they retain and pay a service provider for any type of administrative service. As a number of courts have instructed, including the Third Circuit just this month, such an "absurd" and "nonsensical" interpretation of ERISA's prohibited transaction rules would enable any plan participant to file a federal lawsuit alleging violations of 29 U.S.C. § 1106(a)(1) any time a plan fiduciary retains a third-party service provider to provide any administrative service. *Sweda v. Univ. of Pa.*, --- F.3d ----, 2019 WL 1941310, at *11 (3d Cir. 2019) ("Interpreting § 1106(a)(1) to prohibit necessary services would be absurd[.]"); *Divane v. Northwestern Univ.*, 2018 WL 2388118, at *10 (N.D. Ill. May 25, 2018) ("A number of courts have recognized the circularity of the statute and have rejected attempts to state a claim for a prohibited transaction under that theory unless a plaintiff also alleges something more, such as self-dealing or that the payments were secret."); *Sacerdote v. N.Y.U.*, 2017 WL 3701482, at *13 (S.D.N.Y. Aug. 25, 2017) ("It would be nonsensical to read § 406(a)(1)(A)'s proscription on the transfer of 'property' to include the revenue sharing or fee payments from plan investments to recordkeepers[.]").

-22-

Plaintiffs' feeble response underscores the absurdity of their claim. While Plaintiffs fault Defendants for citing non-binding opinions from other courts, basic logic and reasoning are not bound by district or circuit. The reasoning of these courts is compelling regardless of jurisdiction. While Plaintiffs attempt to identify support for their position, Summ. J. Opp., at 23-24, the only case they cite involved allegedly prohibited transactions that were separate and distinct from those that made the defendant a "party-in-interest" in the first place. *See*, *e.g.*, *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1222 (N.D. Cal. 2008) (financial advisor deemed a party-in-interest by virtue of having been created and owned by plan fiduciary, not by mere receipt of fees from plan). The claim in *Kanawi* lacks the circularity of the one Plaintiffs have presented here and does not implicate the concerns raised by the courts in the cases Defendants cite.

Finally, Plaintiffs attempt to circumvent precedent establishing that their prohibited transaction claims are time-barred by citing an inapposite case. *In re Northrop Grumman*, which Plaintiffs rely upon, dealt with vendor proposals that were submitted and approved on an annual basis. *In re Northrop Grumman Corp. ERISA Litig.*, 2015 WL 10433713, at *26 (C.D. Cal. Nov. 24, 2015) (discussing Vanguard proposals being challenged). As courts have noted in subsequent cases, these actions, which occurred each year, are different from the type of "static" decisions at issue here—specifically, retaining Hewitt in 2006 and retaining the EM Fund's active managers in 2003, 2005, and 2006, respectively. Defs.' SUF ¶ 80. *See White v. Chevron Corp.*, 2017 WL 2352137, at *22 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (finding the *In re Northrop Grumman* ruling on prohibited transactions "inapposite" because that case involved "annual proposals" that were renewed on an annual basis, whereas the decision to hire a recordkeeper was a "static decision"). As a court in this jurisdiction has held, there

-23-

is "no such thing as a 'continuing' prohibited transaction—as the plain meaning of 'transaction' is that it is a point-in-time event." *Id.* (citing *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004)).

### E.   PLAINTIFFS' FAILURE TO MONITOR CLAIMS ARE CONTRARY TO THE EVIDENCE

Defendants are entitled to summary judgment on Plaintiffs' claim that they failed to prudently monitor the Plan's fiduciaries. As an initial matter, Plaintiffs' claim flounders for the simple reason that their theory that Defendants did "essentially nothing at all to monitor their appointed fiduciaries," ECF No. 146, Mot. Dism. Order, at 9, is irreconcilable with the discovery record. As Defendants explained in their summary judgment memorandum, the evidence indisputably shows that the Board monitored both the Plan and its fiduciaries in a variety of ways throughout the relevant time period. Summ. J. Mem., at 24-25.

Facing this evidence, Plaintiffs characteristically change course and raise a new theory, claiming that the Board did not receive "written documentation" on certain plan performance metrics and that the memoranda provided to the Board were not prepared frequently enough. As explained above, Plaintiffs cannot avoid summary judgment by raising new allegations for the first time at summary judgment. *See supra* at p.4.

Even if Plaintiffs could raise this theory, it would nevertheless be subject to dismissal for want of evidentiary support. To prevail on a claim for failure to monitor, Plaintiffs must demonstrate that Defendants "failed to review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards." *White I*, 2016 WL 4502808, at *18. Plaintiffs have presented no evidence, either in the form of expert testimony or otherwise, as to the prudent process of a monitoring fiduciary. Without any such evidence, Plaintiffs cannot carry

-24-

their burden of establishing that Defendants' conduct (here, the failure to demand and review "written documentation" on certain plan matters) was a fiduciary breach. Nor have Plaintiffs presented any evidence showing a loss as a result of the monitoring failure they allege. Plaintiffs' catch-all claim that there was no monitoring process does not present a fact issue warranting trial.

### F.   THE INDIVIDUAL COMMITTEE MEMBERS ARE ENTITLED TO SUMMARY JUDGMENT

As this Court has noted, "fiduciary status must be determined in the context of the specific fiduciary duties asserted to have been breached." Mot. Dism. Order, at 10. *See also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Here, all of the conduct Plaintiffs identify as a fiduciary breach involves the allegedly improper exercise of discretionary authority by the Committee as a whole, not some individual committee member. Because Plaintiffs have not identified any individual misconduct, let alone harm suffered as a result, but rather alleged failures by the Committees to fulfill the discretionary responsibilities they were delegated, there is no basis for imposing individual liability. Plaintiffs' superficial allegations that individual committee members "participated" in the Committees' conduct is no reason to force hard-working employees to trial. *See Cunningham v. Cornell*, 2018 WL 1088019, at *1 (S.D.N.Y. Jan. 19, 2018) ("Plaintiffs shall address why they need to name 29 additional individuals as defendants other than . . . to harass these individuals because they will be required to list the lawsuit on every auto, mortgage or student financial aid application they file.").

## III.   CONCLUSION

For the reasons above, Defendants request that the Court grant summary judgment to Defendants on Counts II, III, VI, and VII, and to the individual defendants on all counts in the Second Amended Complaint.

-25-

1

2      Dated: May 10, 2019                    MAYER BROWN LLP

3                                             Nancy G. Ross
                                              Brian D. Netter
4                                             Samuel P. Myler

5                                             By: */s/ Nancy G. Ross*
                                                    Nancy G. Ross

6                                             *Attorneys for Defendants*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                       -26-