JEROME J. SCHLICHTER (SBN 054513)
jschlichter@uselaws.com
NELSON G. WOLFF (admitted *pro hac vice*)
nwolff@uselaws.com
MICHAEL A. WOLFF (admitted *pro hac vice*)
mwolff@uselaws.com
SEAN S. SOYARS (admitted *pro hac vice*)
ssoyars@uselaws.com
KURT C. STRUCKHOFF (admitted *pro hac vice*)
kstruckhoff@uselaws.com
SCHLICHTER, BOGARD & DENTON LLP
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone:  (314) 621-6115
Facsimile:  (314) 621-5934
*Lead Counsel for All Plaintiffs*

WILLIAM A. WHITE (SBN 121681)
wwhite@hillfarrer.com
HILL, FARRER & BURRILL LLP
One California Plaza, 37th Floor
300 South Grand Avenue
Los Angeles, CA 90071-3147
Telephone: (213) 620-0460
Facsimile:  (213) 620-4840
*Local Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### (Western Division)

| | |
|---|---|
| CLIFTON W. MARSHALL, et al., | Case No. 16-CV-6794 AB (JCx) |
| *Plaintiffs*, | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE** |
| v. | |
| NORTHROP GRUMMAN CORPORATION, et al., | Date: June 7, 2019 |
| | Time: 10:00 a.m. |
| *Defendants*. | Courtroom 7B – 7th Floor |
| | Hon. André Birotte Jr. |

## Table of Contents

INTRODUCTION ..................................................................................... 1

BACKGROUND ...................................................................................... 2

    I.    Plaintiffs' Expert Dr. Steve Pomerantz..................................... 2

        A.    Qualifications.................................................................. 2

        B.    Expert testimony ........................................................... 3

    II.    Plaintiffs' Expert David Witz .................................................. 6

        A.    Qualifications.................................................................. 6

        B.    Expert testimony ........................................................... 8

ARGUMENT ......................................................................................... 10

I.    THE COURT SHOULD ADMIT DR. POMERANTZ'S TESTIMONY. .................................................................................. 11

    A.    Dr. Pomerantz is qualified based on his experience and training in the investment management industry. .......................... 11

    B.    Dr. Pomerantz offers reliable opinions. ............................... 14

    C.    Defendants grossly misrepresent the significance of any errors. ....... 16

II.    THE COURT SHOULD ADMIT MR. WITZ'S TESTIMONY. ................. 17

    A.    Mr. Witz offers opinions relevant to applicable fiduciary practices.................................................................................. 17

    B.    Mr. Witz is qualified to provide expert testimony............................. 20

    C.    Defendants misrepresent Mr. Witz's factual understanding.............. 22

    D.    Mr. Witz's damage opinions are reliable........................................... 24

CONCLUSION........................................................................................ 25

Table of Authorities

**CASES**

*Abarca v. Franklin Cty. Water Dist.,*
761 F.Supp.2d 1007 (E.D. Cal. 2011) ...............................................12, 14, 21, 22

*Acad. of Motion Picture Arts & Scis. v. Godaddy.com, Inc.,*
No. 10-3738 AB (CWX), 2015 WL 12697750 (C.D. Cal. Apr. 10,
2015) ...................................................................................................................... 11

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,*
738 F.3d 960 (9th Cir. 2013) ................................................................................ 25

*Bergen v. F/V St. Patrick,*
816 F.2d 1345 (9th Cir.1987) .........................................................................16, 19

*Berman v. Sink,*
No.13-597, 2016 WL 8730672 (E.D. Cal. May 27, 2016) ................................... 20

*Boeing Co. v. KB Yuzhnoye,*
No. 13-00730 AB (AJWx), 2015 WL 12803452 (C.D. Cal. Nov. 3,
2015) ...................................................................................................................2, 11

*Brotherston v. Putnam Investments, LLC,*
907 F.3d 17 (1st Cir. 2018) .................................................................................. 13

*Brotherston v. Putnam Investments, LLC,*
No. 15-13825, Doc. 138-1 (D. Mass. Mar. 15, 2017) .......................................... 13

*CCM Rochester v. Federated Investors, Inc.,*
No. 14-3600, Doc. 75 (S.D.N.Y. Aug. 31, 2016)................................................. 16

*Daubert v. Merrill Dow Pharms., Inc.,*
509 U.S. 579 (1993) .........................................................................................10, 20

*Dorn v. Burlington N. Santa Fe R.R. Co.,*
397 F.3d 1183 (9th Cir. 2005)............................................................................... 10

*Energy Oils Inc. v. Montana Power Co.,*
626 F.2d 731 (9th Cir. 1980)................................................................................. 20

*Fierro v. Gomez,*
865 F.Supp. 1387 (N.D. Cal. 1994)........................................................................ 2

*Giuliano v. Sandisk Corp.,*
No. 10-02787, 2015 WL 10890654 (N.D. Cal. May 14, 2015) ........................... 24

*Goldenberg v. Indel, Inc.,*
No. 09-5202, 2012 WL 3780555 (D.N.J. Aug. 30, 2012)................................... 13

*Hangarter v. Provident Life & Accident Ins. Co.,*
373 F.3d 998 (9th Cir. 2004)...............................................11, 12, 14, 15, 18, 19

*In re Bard IVC Filters Prod. Liab. Litig.*,
  No. MDL 15-2641, 2017 WL 6523833 (D. Ariz. Dec. 21, 2017) ..................... 18

*In re Northrop Grumman Corp. ERISA Litig.*, No. 06-6213 AB (JCx),
  Doc. 728 (C.D. Cal. Mar. 3, 2017) ........................................................ 1

*In re Salem*
  465 F.3d 767 (7th Cir. 2006) ................................................................ 11

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
  318 F.Supp.2d 879 (C.D. Cal. 2004)(Matz, J.) ............................................ 12, 22

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................ 15

*LaCava v. Merced Irr. Dist.*
  No. 10-00853, 2012 WL 913697 (E.D. Cal. Mar. 16, 2012) ............................. 21

*Lewert v. Boiron, Inc.*,
  212 F.Supp.3d 917 (C.D. Cal. 2016)(Birotte, J.) ........................................ 15

*Madrigal v. Allstate Indem. Co.*,
  No. 14-4242 SS, 2015 WL 12746232 (C.D. Cal. Oct. 29, 2015) ............... 18, 19

*Martin v. Feilen*,
  965 F.2d 660 (8th Cir. 1992) ............................................................... 25

*Network Prot. Scis., LLC v. Fortinet, Inc.*,
  No. 12-1106, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) ........................... 23

*Newmont USA Ltd. v. Am. Home Assurance Co.*,
  No. 09-33, 2011 WL 13192865 (E.D. Wash. Jan. 11, 2011) ........................... 19

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
  No. 10-544, 2011 WL 5417090 (N.D. Cal. Oct. 27, 2011) ............................. 11

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ............................................................... 11

*Rogers v. Raymark Indus., Inc.*,
  922 F.2d 1426 (9th Cir.1991) .............................................................. 11

*Romero ex rel. Ramos v. S. Schwab Co.*,
  No. 15-815, 2017 WL 5885543 (S.D. Cal. Nov. 29, 2017) ........................... 14

*Sivolella v. AXA Equitable Life Ins. Co.*,
  No. 11-4194, 2016 WL 4487857 (D.N.J. Aug. 25, 2016) ............................. 16

*Spano v. Boeing Co.*,
  125 F.Supp.3d 848 (S.D. Ill. 2014) ....................................................... 15

*Thomas v. Newton Int'l Enterprises*,
  42 F.3d 1266 (9th Cir.1994) .......................................................... 11, 12, 20

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) ............................................................. 25

*Tibble v. Edison Int'l,*
 No. 07-5359 SVW (AGRx), 2010 WL 2757153 (C.D. Cal. July 8,
 2010) .................................................................................................. 13

*Tibble v. Edison Int'l,*
 No. 07-5359 SVW (AGRx), 2017 WL 3523737 (C.D. Cal. Aug. 16,
 2017) .................................................................................................. 21

*Tussey v. ABB, Inc.,*
 No. 06-4305, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012) ..................... 13, 25

*Tyco Thermal Controls, LLC v. Redwood Industrials, LLC,*
 No. 06-7164, 2012 WL 2792435 (N.D. Cal. July 9, 2012) ............................... 16

*United States v. Bilson,*
 648 F.2d 1238 (9th Cir. 1981) ......................................................................... 12

*United States v. Diaz,*
 876 F.3d 1194 (9th Cir. 2017) ......................................................................... 18

*United States v. Flores,*
 901 F.3d 1150 (9th Cir. 2018) ......................................................................... 11

*United States v. Garcia,*
 7 F.3d 885 (9th Cir. 1993) ......................................................................... 14, 22

*United States v. Hankey,*
 203 F.3d 1160 (9th Cir. 2000) ................................................................... 10, 15

*United States v. Heller,*
 551 F.3d 1108 (9th Cir. 2009) ......................................................................... 11

*United States v. Scholl,*
 166 F.3d 964 (9th Cir. 1999) ........................................................................... 18

*Victorino v. FCA US LLC,*
 No. 16-1617, 2018 WL 2551312 (S.D. Cal. June 4, 2018) .................. 11, 12, 20

*Wolkowitz v. Lerner,*
 No. 07-777 CAS, 2008 WL 1885770 (C.D. Cal. Apr. 21, 2008) ..................... 11

*Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health,*
 No. 09-3032, 2012 WL 12951706 (E.D. Wash. June 27, 2012) ..................... 16

**STATUTES**

29 U.S.C. §1106(b) ................................................................................................. 9

29 U.S.C. §1108(b)(2) ............................................................................................. 7

**RULES**

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................... 20

1

Fed. R. Evid. 702 .................................................................................... 10

2

**REGULATIONS**

3

29 C.F.R. §2550.408b-2(f) ..................................................................... 19

4

**OTHER AUTHORITIES**

5

DOL Adv. Op. 97-03 .............................................................................. 19

6

*False Discoveries in Mutual Fund Markets: Measuring Luck in*
   *Estimated Alphas*, J. OF FIN., Vol. LXV, Feb. 2010 ............................ 17

7

8

Fiduciary360, *Prudent Practices for Investment Stewards*, Practice
   4.1.1 ...................................................................................................... 15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Defendants have moved in *limine* to exclude all opinions and testimony of two of Plaintiffs' experts, Dr. Steve Pomerantz and David Witz.[1] Rather than specifying specific opinions with citation to the experts' reports they seek to exclude, Defendants filed an "amorphous" motion seeking to bar these experts from offering *any* opinions at trial. *In re Northrop Grumman Corp. ERISA Litig.,* No. 06-6213 AB (JCx), Doc. 728 at 2 (C.D. Cal. Mar. 3, 2017)("*Grabek*"). Indeed, they filed their motion more than *six weeks* before they knew what specific evidence Plaintiffs would rely on when opposing Defendants' motion for partial summary judgment. *See* Docs. 172, 187. And their motion with respect to Mr. Witz's testimony is premature at this stage because Defendants did *not* move for summary judgment on Plaintiffs' unlawful reimbursement claims, which his testimony concerns. *See Grabek*, Doc. 606 at 65 n.182.[2] The Court therefore does not need to consider his testimony in deciding summary judgment. The appropriate time for Defendants to move in *limine* to exclude Mr. Witz's trial testimony is at the Final Pretrial Conference. *See* Doc. 179 (reminding the parties to set future motions in *limine* with the Final Pretrial Conference). Regardless, Defendants' broad-brush motion should be denied because it forces the Court to "'rule in a vacuum' on the admissibility of evidence." *Grabek*, Doc. 728 at 2 (citation omitted).

Apart from their disfavored motion, Defendants' generalized attacks on Plaintiffs' experts are misguided and lack merit. Dr. Pomerantz and Mr. Witz each have over 30 years of relevant experience in their respective fields in the retirement

---

[1] Dr. Pomerantz and Mr. Witz were anticipated to testify at trial on behalf of the *Grabek* plaintiffs. *Grabek*, Doc. 683 at 4 (ECF 5) (witness list). Mr. Witz intended to offer the same or substantially similar opinions as he intends to offer here.

[2] Because the court did not rely on the testimony of any expert in deciding defendants' motion for summary judgment, the court denied the parties' motions to strike expert testimony as moot. *Id.*

industry. Although Defendants insist that these experts lack sufficiently *specific* experience to offer testimony in this case, that overly narrow view is not the standard. They are generally qualified to satisfy the minimum threshold necessary to offer opinions in this case. And their opinions are adequately supported by their experience, relevant documents produced during the litigation, and other objective data that will be useful to the Court in understanding the claims at issue. Because this is a bench trial, Doc. 146 at 11–12, the Court can make any reliability determinations during trial after allowing vigorous cross-examination and presentation of contrary evidence. That is the "better approach" when the Court sits as the trier of fact. *Boeing Co. v. KB Yuzhnoye*, No. 13-730 AB (AJWx), 2015 WL 12803452, at 4 (C.D. Cal. Nov. 3, 2015)(*citing Fierro v. Gomez*, 865 F.Supp. 1387, 1395 n.7 (N.D. Cal. 1994)). Defendants' motion should be denied.

## BACKGROUND

### I.       Plaintiffs' Expert Dr. Steve Pomerantz.

Dr. Pomerantz will testify in support of Plaintiffs' claim that Defendants breached their duties by maintaining an actively managed Emerging Markets Equity Fund ("Emerging Markets Fund") in the Plan. Doc. 132 ¶¶117–121 (Count IV). He intends to offer testimony regarding the Fund's underperformance relative to its benchmark index and peer group, Defendants' decision to retain its actively managed strategy when they decided to transition other core investment options to a passive strategy in late 2010 and early 2011, and the Plan's losses caused by Defendants' actions. Doc. 172-3 (Ex. D), ¶¶12, 14.

### A.       Qualifications.

Dr. Pomerantz has over 30 years of experience in the investment management industry. Ex. D ¶1. He has held positions in research and management for fixed income, equities, derivatives and alternative investments at several major investment management firms, including Morgan Stanley, Citibank, Weiss Peck & Greer LLC, Nomura Securities, and New York Life Investment Management. *Id.*

He has provided portfolio management and risk management services to both traditional and alternative investments, including as a portfolio manager for fixed income, equity and hedge fund accounts. *Id.* ¶¶1, 3.

Since 2000, Dr. Pomerantz has advised investment management firms and companies on risk management and portfolio strategy. *Id.* ¶4. For years and in different positions at investment management firms, he managed portfolios that invested in emerging markets securities and performed due diligence to support such portfolios, which included evaluating the investment managers and analyzing the performance of the portfolio (or "performance attribution"). Struckhoff Decl. ¶2, Ex. 1 (Pomerantz Dep. 18:1–19:6, 19:23–25, 32:1–12); Ex. D ¶5. He has provided investment and asset allocation advice to a wide range of clients, including large institutional clients and defined contribution plans with assets over $1 billion. Ex. D ¶¶1, 4. For one client with approximately $1 billion in assets, he provided advice on the use of actively or passively managed strategies and the selection of investment options offered in the client's 401(k) plan. Ex. 1, Pomerantz Dep. 32:25–33:23, 34:12–14, 39:12–19.

As a consultant, Dr. Pomerantz develops risk and pricing models, advises on portfolio strategy issues, and performs qualitative and quantitative due diligence on traditional and alternative investments. Ex. D ¶6. He has authored articles relating to investment management and spoken at investment seminars on various issues, including portfolio management. *Id.* ¶7 and rpt. ex. 3. He received his Ph.D. in Mathematics from the University of California at Berkeley and a B.A. in Mathematics from Queens College of the City University of New York. *Id.* In addition to this matter, he has testified as an expert witness regarding a wide variety of financial issues throughout the United States. *Id.* ¶9.

### B. Expert testimony.

In 2010, Defendants decided to move all Plan core investment options evaluated to a passive or index-based strategy, but decided to continue using active

management in the Emerging Markets Fund at a higher cost and despite its history of sustained and consistent underperformance. Doc. 192-1 at 2 (ECF 9). Dr. Pomerantz provides his opinion that the information available to Defendants at the time did not justify their decision and would have compelled a reasonable fiduciary to also move the Emerging Markets Fund to lower-cost passive management. Ex. D ¶¶14, 80–81, 85–97; Doc. 172-4 (Ex. E), ¶¶2, 4–7.

Based on the historical performance and peer ranking data reported for the Emerging Markets Fund at the time Defendants decided to maintain its active strategy in 2010, Dr. Pomerantz will show that the Emerging Markets Fund's strategy was ineffective and failed to provide value to justify its significantly higher fees in comparison to lower-cost passive management. Ex. D ¶¶42–44, 55–57, 62, 80–81. Dr. Pomerantz concludes that because Defendants decided to employ a passive strategy across all core investment options in the Plan as of 2010, the same decision would have been reached for the Emerging Markets Fund had they applied a consistent decision-making process. *Id.* ¶¶85, 92, 97; Ex. E ¶2. [3]

In reaching these conclusions, Dr. Pomerantz applies his expertise and experience in the investment management industry and examines quantitative data for the Emerging Markets Fund and the Plan's other core investments, as well as data on their respective asset classes. Ex. D ¶¶10, 14; Ex. 1, Pomerantz Dep. 35:21–36:4. He analyzes peer ranking data reported by Morningstar for various Vanguard index funds for 1-, 3-, 5-, and 10-year periods ending December 31, 2009. Ex. D ¶¶87–92. This data demonstrates that active strategies in emerging markets were consistently unable to generate returns that exceeded passively managed funds. *Id.*

[3] Defendants do not challenge Dr. Pomerantz's testimony that the Investment Committee failed to make a decision to maintain an active investment strategy in the Emerging Markets Fund or that the information provided to the Committee was inadequate to enable it to make a prudent determination for maintaining an active strategy in the Fund. Ex. D ¶¶14(a), 76–81. They also do not challenge the accuracy of his performance damage calculations.

If a decision was made to index other asset classes, including the small cap asset class which had a history of active managers outperforming passive funds, then it would logically follow that the Emerging Markets Fund should have been indexed as well. *Id.* ¶89. This conclusion also is supported by an evaluation of the historical performance of the Emerging Markets Fund and other Plan investments as of December 31, 2009. *Id.* ¶96. In other asset classes that Defendants transitioned to passive management, these funds outperformed over 3 and 5 years while the Emerging Markets Fund underperformed. *Id.* However, Defendants kept the Emerging Markets Fund in an active strategy. *Id.*

Dr. Pomerantz also examines the returns and peer ranking data of the Emerging Markets Fund and the Plan's International Equity Fund that was reported by Northrop's investment consultant as of March 31, 2010 and March 31, 2009. *Id.* ¶¶93–94. This data shows that actively managed international funds were more likely to outperform their benchmark index than actively managed emerging markets funds. *Id.* Because international equity funds are comparable to emerging markets funds in that they include exposure to emerging markets, Dr. Pomerantz concludes that a decision to employ a passive strategy for international would apply to emerging markets. *Id.* ¶97; Ex. 1, Pomerantz Dep. 42:5–11, 160:5–14.

Dr. Pomerantz also considers a 2009 survey produced by Standard & Poor's that measures the performance of actively managed funds against their benchmark index, called the SPIVA Scorecard. Ex. E ¶5. He analyzed the emerging markets asset class and four other asset classes that Defendants transitioned to passive management in late 2010 and early 2011. *Id.* ¶6. This data shows that actively managed emerging markets funds were least likely to outperform their benchmark. *Id.*¶7. Other independent research confirms these findings. *Id.* ¶¶11–12, 17. Again, if more effective active strategies were transitioned to passive management, then the same should have occurred for the Emerging Markets Fund. *Id.*

Dr. Pomerantz calculates the Plan's losses caused by Defendants' decision to

maintain an actively managed investment strategy in the Emerging Markets Fund. Ex. D ¶¶98–100. Had Defendants implemented a passive strategy for the Emerging Markets Equity Fund as of December 2010, the Plan participants would not have lost over $28 million of their retirement savings. *Id.* ¶100.

## II.   Plaintiffs' Expert David Witz.

Mr. Witz will testify in support of Plaintiffs' claim that Defendants breached their fiduciary duties and committed prohibited transactions by causing the Plan to distribute Plan assets to Northrop as putative payment for services performed by Northrop employees. Doc. 132 ¶¶105–110, 122–134 (Counts I, IV–V). Mr. Witz intends to offer the same or substantially similar opinions as he was going to provide in *Grabek* regarding the appropriate process for using an employer to provide services or receive payment from a plan and for administering the plan, and the reasonable compensation for any services not outsourced to third parties. Doc. 172-2 (Ex. C), ¶¶10, 11, 13–17.

### A.   Qualifications.

Mr. Witz has over 36 years of experience in the employee benefits industry. *Id.* ¶1.  He has provided independent fiduciary, recordkeeping, and consulting services to retirement plans, including advice to fiduciaries of plans in carrying out their fiduciary obligations. *Id.* From his experience with retirement plans, he has developed an understanding of the practices and procedures to be followed by fiduciaries in carrying out their fiduciary obligations. *Id.* ¶18. He has witnessed fiduciary practices of numerous ERISA-governed plans and has personal knowledge of the manner in which prudent and loyal fiduciaries comply with those standards. *Id.* When advising clients, he relies on Department of Labor regulations, advisory opinions, field assistance bulletins and other guidance to plan fiduciaries. *Id.* ¶¶18–38; Struckhoff Decl. ¶3, Ex. 2 (Witz Dep. 28:9–30:13).

Mr. Witz previously worked for four different administrators (Beall Garner Screen & Geare ("BGS&B"), CBIZ, Geller & Wind, and Newport Group) that

provided recordkeeping and administrative services to ERISA retirement plans. Ex. C ¶¶2, 4. He owned and personally ran one of them, Corporate Benefit Planning. *Id.* ¶4.  For over 10 years, he performed administrative services for defined contribution plan clients. *Id.*; Ex. 2, Witz Dep. 62:9–10, 139:8–22. While at Geller & Wind and Newport Group, Mr. Witz acted as a fiduciary under 29 U.S.C. §1002(21)(A) when providing recommendations to clients. Ex. 2, Witz Dep. 57:10–58:20. Although Mr. Witz is no longer employed by a third party administrator, he is still involved in benchmarking administrative costs and consulting with clients on those services. *Id.* 136:18–137:19.

Since 2004, Mr. Witz has provided custom risk management solutions and consulting services to fiduciaries and service providers of defined contribution plans through Fiduciary Risk Assessment LLC (FRA) and PlanTools. Ex. C ¶¶6–8. Through FRA, Mr. Witz provides a variety of consulting services, including assessments on the qualifications of advisors, compliance evaluations under 29 U.S.C. §1108(b)(2), assistance with issuing requests for proposals ("RFPs") for plan services, and benchmarking plan expenses. *Id.* ¶7; *see also* Ex. 2, Witz Dep. 128:10–130:23.

During his professional career, Mr. Witz has assessed internal and external expenses charged to retirement plans. Ex. 2, Witz Dep. 46:6–49:18, 59:13–60:1, 216:11–24. He has assessed the reasonableness of administrative expenses for a defined contribution plan with $4.2 billion in assets and over 100,000 participants, including expenses charged by the plan sponsor. *Id.* 31:5–7, 33:7–9, 47:18–49:18. He has consulted with employers during his career regarding whether they should charge expenses to their plans. *Id.* 40:6–41:9. Mr. Witz also is the Chief Fiduciary Officer for two independent retirement plan consulting firms. Ex. C at p. 33. In that capacity, he regularly counsels the firms' advisors regarding whether the employers should charge their plans for services provided to their plans. Ex. 2, Witz Dep. 45:13–47:5, 144:22–145:25. He also sits on one of the firm's investment

committees. *Id.* 149:3–25.

He has been awarded the Accredited Investment Fiduciary designation from the Center for Fiduciary Studies and the Global Fiduciary Strategist designation from the Thunderbird School of Global Management at Arizona State University. Ex. C at p. 32. He has been published in numerous industry publications and served as a guest speaker at industry conferences. *Id.* at pp. 32–44. He graduated from Pennsylvania State University with a Bachelor of Science degree in Economics, Insurance and Real Estate. *Id.* In addition to this matter, he has served as an expert witness in retirement plan litigation. *Id.*at pp. 44–45.

**B.     Expert testimony.**

Mr. Witz will testify that the process and procedures followed by Defendants deviated from industry practices and caused the Plan to pay Northrop for unnecessary and unreasonable expenses. *See* Ex. C ¶13. In reaching that conclusion, Mr. Witz relies on his 30-plus years of experience in the retirement industry as a consultant and advisor to clients. *Id.*¶¶12, 18, 34, 37, 38, 93. He also bases his conclusions on Department of Labor regulations, advisory opinions, field assistance bulletins and other guidance to plan fiduciaries, which were cited throughout his report. *Id.* ¶¶18–38.

Mr. Witz will evaluate the terms of the Administrative Services Agreement ("ASA") between the Plan's Administrative Committee and Investment Committee and Northrop for services to be performed by Northrop employees. *Id.* ¶¶13, 70–81.[4] He will assess the services performed by Northrop employees in Northrop's benefits departments and Investment Trust & Administration department ("ITA") based on documents produced by Defendants that purportedly outlined those

---

[4] To avoid ERISA violations, the ASA set forth the terms and conditions that must be followed by the Plan fiduciaries in order for Northrop to obtain reimbursement from Plan for salaries and fringe benefits. Ex. C ¶54; *Grabek*, Doc. 721-1 ¶¶90–140; Doc. 132 ¶¶52–56 (discussing ASA).

services and the Plan's Forms 5500. *Id.*¶¶68, 99, 100 n.109 (*citing* NGC0286711 and NGC0302474, among others).

Mr. Witz will show that the Northrop benefits departments purportedly performed "general day-to-day administrative functions, such as coordinating the delivery of participant communications, responding to participant inquiries, providing education to employees, supporting plan enrollment and new hires, managing the relationship with service providers, and supporting plan audits", which in his experience are overwhelmingly performed by the plan's recordkeeper. *Id.*¶100. Based on his specialized knowledge of providing recordkeeping and administrative services to defined contribution plans, Mr. Witz will explain how these services could have been provided by 4 full-time employees instead of 70+ employees Northrop used. *Id.* ¶¶101–03; Ex. 2, Witz Dep. 249:14–254:5, 254:17–255:24. Mr. Witz will also note that his opinion was independently supported by a third party consultant hired by Northrop to assess the required staffing levels to perform internal administrative services for the Plan. Ex. C ¶104.

Mr. Witz will describe the services that Northrop's ITA department performed in the general oversight over Plan investments based on Northrop's internal records produced during discovery, *id.* ¶105, and explain how these services were duplicative of similar services performed by Northrop's outside investment consultant. *Id.*¶106. Given the Plan's mostly passive structure, he will explain how only one full-time employee would be needed to perform those services, not the 16 employees Northrop used. *Id.* ¶¶107–09; *see also* Ex. 2, Witz Dep. 256:23–257:24.[5]

Mr. Witz calculates the Plan's losses from the unreasonable and unnecessary payments to Northrop. Ex. C ¶111. If the Court determines that Defendants violated 29 U.S.C. §1106(b), and all amounts paid to Northrop must be returned to the Plan, Mr. Witz will provide that amount from September 9, 2010 through the date that

---

[5] Defendants do not challenge his opinions related to the ITA's services.

Northrop no longer received payment from the Plan. *Id.* ¶112. Bringing those amounts forward using the S&P 500 index fund to account for lost investment opportunity, the Plan's total losses are $13,722,844. *Id.* ¶113.

To the extent the Court finds that Defendants only committed a violation of §1104(a) or §1106(a), and are entitled to an offset for reasonable expenses, Mr. Witz provides that calculation. *Id.* ¶¶115–17. He determines a reasonable fee based on publicly available surveys reporting median annual salaries for employees who perform similar services to those provided by Northrop employees, and then accounts for the number of full-time employees necessary to perform those tasks. *Id.* ¶116. For internal administrative services, Mr. Witz relies on median salaries for "Compensation, Benefits, and Job Analysis Specialists" reported by the Department of Labor. *Id.* ¶116 n. 119. For services performed by the ITA, Mr. Witz relies on salaries reported by the Association for Investment Management and Research and the CFA Institute. *Id.* Based on this data, Mr. Witz will show that Northrop was paid $11,042,929 in unreasonable expenses. *Id.*¶117.

## ARGUMENT

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. The Court has "broad discretion to decide whether to admit expert testimony". *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, adv. comm. notes (2000). The standard for admissibility under Rule 702 is "flexible". *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). *Daubert* is "not overly concerned about the prospect that some dubious scientific theories may pass the gatekeeper". *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert*, 509 U.S. at 596, rather than "exclusion", *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir.

2010). *Daubert's* gatekeeping obligation is "lessened where, as here, this Court sits as the trier of fact." *Boeing*, 2015 WL 12803452 at 4; *see also United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018).

Accordingly, motions in *limine* to exclude expert testimony in advance are "generally superfluous" in bench trials. *Acad. of Motion Picture Arts & Scis. v. Godaddy.com, Inc.*, No. 10-3738 AB (CWX), 2015 WL 12697750, at 2 (C.D. Cal. Apr. 10, 2015)(*quoting United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009)). "[T]he question of reliability need not be determined in advance of trial." *Wolkowitz v. Lerner*, No. 07-777 CAS, 2008 WL 1885770, at 5 (C.D. Cal. Apr. 21, 2008)(citations omitted). The better approach is for the Court to admit testimony "subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *Flores*, 901 F.3d at 1165 (*quoting In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)); *Boeing,* 2015 WL 12803452 at 4.

**I.    The Court should admit Dr. Pomerantz's testimony.**

**A.    Dr. Pomerantz is qualified based on his experience and training in the investment management industry**.

An expert's qualifications are construed broadly under Rule 702. *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir.1994). "A witness can qualify as an expert through practical experience in a particular field, not just through academic training." *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir.1991). "The threshold for qualification is low". *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. 10-544, 2011 WL 5417090, at 4 (N.D. Cal. Oct. 27, 2011)(*citing Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004), *Thomas*, 42 F.3d at 1269). "Any challenges to his qualifications, including his lack of specialization, affects the weight of the testimony and may be made at trial." *Victorino v. FCA US LLC*, No. 16-1617, 2018 WL 2551312, at 5 (S.D. Cal. June 4, 2018)(citations omitted). Excluding expert testimony "solely on the ground that the witness's qualifications are not sufficiently

specific" is an abuse of discretion "if the witness is generally qualified." *In re Silicone Gel Breast Implants Prod. Liab. Litig.,* 318 F.Supp.2d 879, 889 (C.D. Cal. 2004)(Matz, J.)(citation omitted).

Defendants claim that Dr. Pomerantz in not qualified as an expert witness because he lacks specialized experience targeted to passively managed emerging markets funds. Doc. 172-1 at 4 [Doc. 167-1 (redacted)]. That overly narrow view is not the standard. "Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert". *Thomas*, 42 F.3d at 1269. The Rule "only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" *Abarca v. Franklin Cty. Water Dist.,* 761 F.Supp.2d 1007, 1028–29 (E.D. Cal. 2011)(citation omitted). General qualifications and expertise are sufficient. *Victorino,* 2018 WL 2551312 at 4–5 (although expert did not have "specific experience or certification" with the manual transmission at issue, his general background and expertise qualified him as an expert); *Hangarter*, 373 F.3d at 1015–16 (finding the district court did not abuse its discretion in permitting expert witness with general qualifications in insurance field to testify specifically about bad faith claims); *United States v. Bilson*, 648 F.2d 1238, 1239 (9th Cir. 1981)(expert testimony regarding psychological tests admissible despite the fact that the expert was "not a licensed psychologist").[6]

Dr. Pomerantz satisfies this standard. He has broad and relevant experience in the investment management industry. Over his 30 year professional career, he has

---

[6] *Accord United States v. Newmont USA Ltd.,* No. 05-020, 2007 WL 4856859, at 2 (E.D. Wash. Nov. 16, 2007)(historian qualified to opine on areas of corporate organization because "his background appears to provide sufficient expertise upon which his opinions, as a general matter, are based"); *In re Zicam Cold Remedy Mktg., Sales Practices, & Products Liab. Litig.,* No. 09-2096, 2011 WL 798898, at 5–6 (D. Ariz. Feb. 24, 2011)(despite lack of experience "with nasal drug delivery systems", expert qualified based on general qualifications).

held various positions in research and management at major investment management firms, acted as a portfolio manager for different asset classes, performed qualitative and quantitative due diligence on portfolios offered to investors, and advised large institutional clients, including defined contribution plans, on the selection of investment options. *E.g.,* Ex. D ¶¶1–6. His testimony will assist the Court in understanding the inferior performance of the Emerging Markets Fund, whether Defendants employed a consistent process when they retained an actively managed investment strategy in the Fund, and the amount of losses the Plan suffered as a result of Defendants' actions.

Other district courts, including this District, have admitted Dr. Pomerantz's testimony on matters related to the selection and oversight of ERISA plan investments. *Tibble v. Edison Int'l,* No. 07-5359 SVW (AGRx), 2010 WL 2757153, at 30 (C.D. Cal. July 8, 2010)(monitoring of share classes of mutual funds in 401(k) plan); *Goldenberg v. Indel, Inc*., No. 09-5202, 2012 WL 3780555, at 17 (D.N.J. Aug. 30, 2012)(appropriate asset allocation); *Tussey v. ABB, Inc*., No. 06-4305, 2012 WL 1113291, at 37 (W.D. Mo. Mar. 31, 2012)(calculation of losses caused by unlawful removal of 401(k) fund option).

In fact, in another ERISA fiduciary breach case, Dr. Pomerantz was permitted to testify at trial on a similar subject matter regarding the amount of losses a 401(k) plan suffered as a result of the fiduciaries' decision to retain *actively* managed funds. In *Brotherston v. Putnam Investments, LLC*, Dr. Pomerantz calculated plan losses based on a comparison of the performance of actively managed funds to passively managed Vanguard index funds. 907 F.3d 17, 34 (1st Cir. 2018). The First Circuit determined that Dr. Pomerantz's approach of calculating losses was admissible, which specifically included a calculation for an actively managed emerging markets fund. *Id.* at 34; *Brotherston v. Putnam Investments, LLC*, No. 15-13825, Doc. 138-1 at 25 (D. Mass. Mar. 15, 2017)(report).

Defendants are incorrect that Dr. Pomerantz has no experience "whatsoever"

with emerging markets. Doc. 172-1 at 4.[7] As previously indicated, Dr. Pomerantz has managed portfolios that invested in emerging markets securities and performed due diligence to support such portfolios. Ex. 1, Pomerantz Dep. 18:1–19:6, 19:23–25, 32:1–12. Defendants also challenge Dr. Pomerantz's opinions based on claimed differences between the benchmarks selected by emerging market funds, or differences between active and passive funds. Doc. 172-1 at 5–6. Defendants fail to explain how any of those differences impact his opinions or their admissibility.

Regardless, Defendants' generalized attacks on Dr. Pomerantz's qualifications only affect the weight of his testimony. *United States v. Garcia,* 7 F.3d 885, 889 (9th Cir. 1993)("lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert"); *Abarca,* 761 F. Supp.2d at 1028 ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony"); *Romero ex rel. Ramos v. S. Schwab Co.,* No. 15-815, 2017 WL 5885543, at 4 (S.D. Cal. Nov. 29, 2017)("lack of specialization affects the weight of his or her testimony").

It is not entirely clear the basis for Defendants' assertion that Dr. Pomerantz is not entitled to offer opinions on the "structure of Northrop's fiduciary process", Doc. 172-1 at 7, since Dr. Pomerantz has not opined on the fiduciary governance structure. Defendants appear only to challenge certain assumptions or observations Dr. Pomerantz made based on his review and analysis of documents. Although Defendants may disagree with Dr. Pomerantz's interpretation of relevant evidence, that is not grounds for exclusion. *See Hangarter,* 373 F.3d at 1017 n.14 ("the factual basis of an expert opinion goes to the credibility of the testimony").

### B.     Dr. Pomerantz offers reliable opinions.

The test for reliability is "flexible" and "the court has 'broad latitude' in applying it." *Lewert v. Boiron, Inc.*, 212 F.Supp.3d 917, 925 (C.D. Cal.

---

[7] They also are incorrect that he never served in a fiduciary capacity. Ex. D ¶3.

2016)(Birotte, J.)(*quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–42 (1999). The "*Daubert* factors (peer review, publication, potential error rate, etc.)" are not applicable to testimony "whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology behind it." *Hangarter,* 373 F.3d at 1017 (*citing Hankey*, 203 F.3d at 1169). "[T]he relevant reliability concerns may focus upon personal knowledge or experience". *Kumho Tire*, 526 U.S. at 150. The district court has broad discretion in testing an expert's reliability. *Hankey,* 203 F.3d at 1168.

In determining that "successful active management in the emerging markets asset class is the most difficult to achieve", Dr. Pomerantz did not simply rely on "*exactly one* piece of analysis." Doc. 172-1 at 8. He analyzed peer ranking data for Vanguard index funds for emerging markets and other asset classes that Defendants transitioned to passive management, the historical performance of the Emerging Markets Fund compared to the Plan's International Equity Fund and the Plan's other core investments, as well as an industry survey reporting the success of active managers across different asset classes.  Ex. D ¶¶85–97; Ex. E ¶¶6–7.

Defendants apparently claim that peer ranking data is irrelevant to a fiduciary's evaluation of investment options. Doc. 172-1 at 8–9. This data is considered by fiduciaries when making investment decisions, including by Dr. Pomerantz. Ex. 1, Pomerantz Dep. 123:16–125:4; Fiduciary360, *Prudent Practices for Investment Stewards*, Practice 4.1.1 (noting comparison to peer group).[8] It is also relevant to Court's determination of whether Defendants acted imprudently in retaining the Emerging Markets Fund. *Spano v. Boeing Co.*, 125 F.Supp.3d 848, 870 (S.D. Ill. 2014)(fund peer rankings relevant to assess fiduciaries' alleged imprudence in maintaining fund). Defendants' assertion is further belied by the fact that they were required to consider that data when making investment decisions and Dr.

---

[8] https://www.fi360.com/main/pdf/handbook_steward.pdf.

Pomerantz used the same peer ranking data that was provided by Northrop's own investment consultant. *See, e.g.,* Doc. 170-16 at 5–6 (ex. 17); Ex. D ¶¶93, 94.

Defendants' other challenges to Dr. Pomerantz's analysis, such as the time period of his data or failing to account for differences in benchmarks, again go to the weight of his testimony. *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n. 5 (9th Cir.1987)("the weakness in the underpinnings of [expert] opinions may be developed upon cross-examination," as "such weakness goes to the weight and credibility of the testimony" as opposed to its admissibility)(internal quotation marks and citation omitted); *Tyco Thermal Controls, LLC v. Redwood Indus., LLC*, No. 06-7164, 2012 WL 2792435, at 4 (N.D. Cal. July 9, 2012)(challenging factual foundation of expert's opinion appropriate through cross-examination). The same is true for their challenges to any "perceived deficiencies in the thoroughness of [Dr. Pomerantz's] research". *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, No. 09-3032, 2012 WL 12951706, at 2 (E.D. Wash. June 27, 2012).

### C. Defendants grossly misrepresent the significance of any errors.

Defendants go to lengths trying to create the appearance of material mathematical errors from a table containing close to *400 data points*. Doc. 172-1 at 11–12; Doc. 172-8 (Ex. J)(spreadsheet). The calculation referenced by Defendants pertained to Dr. Pomerantz's calculation of the *Plan's total return*. Doc. 172-8 (Ex. J). That had nothing to do with his calculation of the Plan's losses caused by Defendants' retention of the Emerging Markets Fund, which Defendants concede has no errors.[9] The separate calculation of the Plan's returns was done to enable

---

[9] For this reason, *Sivolella v. AXA Equitable Life Ins. Co.* is inapt because Dr. Pomerantz made no errors on any "critical point" in this case and the court assessed his credibility *at trial* after permitting him to testify. No. 11-4194, 2016 WL 4487857, at 15 (D.N.J. Aug. 25, 2016). Similarly, *CCM Rochester v. Federated Investors, Inc.* was decided in the context of a *jury trial* and his primary opinion evaluated by the court (referred to as "asset allocation") was also excluded under Fed. R. Evid. 403, which is not an issue in this bench trial. No. 14-3600, Doc. 75 at 12 (S.D.N.Y. Aug. 31, 2016). However, the court did *not* exclude his opinions

Plaintiffs' *other* experts (Mr. Witz and Mr. Schmidt) to perform an *alternative calculation* of the Plan's lost investment opportunity. Ex. C ¶114 and n.118; Doc. 170-90 (Ex. 109), ¶159. These calculations are not at issue in Defendants' motion.

The entries identified by Defendants also have no material impact on his Plan return calculation. The three entries related to the asset balances (Nos. 1–3, Doc. 172-1 at 11) do *not* affect the calculation because the returns were determined by summing the product of the annual returns and the asset allocation percentages of the Plan investments.[10] Likewise, the entry related to the return of Retirement Path 2060 (No. 6) has no impact because the asset allocation percentage was 0%, thus resulting in a product of 0. The other entries had very small differences. *See, e.g.,* No. 4 (0.03%), No. 5 (0.21%), No. 7 (0.32%), and No. 8 (0.02%). Overall, the impact of these changes was less than $50,000 for each of Plaintiffs' recordkeeping fee calculation and their unlawful payment calculation, differences of less than *0.50%* compared to the initial calculations. *See* Struckhoff Decl. ¶4, Ex. 3.

Defendants' assertion that Dr. Pomerantz misstated the likelihood a fund will underperform by a factor of 4,000 is wrong. Dr. Pomerantz correctly pointed out from the academic study that only 0.6% of mutual funds "exhibited statistically significant outperformance." Ex. E ¶19 n.23; Russell Wermers, et al., *False Discoveries in Mutual Fund Markets: Measuring Luck in Estimated Alphas*, J. OF FIN., Vol. LXV, Feb. 2010, at 181, 183 (only 0.6% of managers are "skilled", meaning they have the ability to generate positive returns after fees).

## II.   The Court should admit Mr. Witz's testimony.

### A.   Mr. Witz offers opinions relevant to applicable fiduciary practices.

Mr. Witz made clear that he is not offering legal conclusions. Ex. 2, Witz Dep.

---

related to the poor performance of the subject funds. *Id.* at 4, 14.

[10] The asset allocation numbers were directly inputted and were not dependent on the asset balances inputted for the investment options.

27:24–29:19. That is the province of the Court. *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999). During his professional career as a consultant and adviser in the retirement industry, Mr. Witz developed an understanding of the practices and procedures to be followed by fiduciaries in carrying out their fiduciary obligations. *E.g.,* Ex. C ¶18. As in his work, he relies on Department of Labor regulations, advisory opinions, field assistance bulletins and other guidance to plan fiduciaries in forming his opinions in this case. *Id.* ¶¶18–38; Ex. 2, Witz Dep. 28:9–30:13. Indeed, the Department of Labor publishes this guidance to educate fiduciaries on their obligations and the applicability of ERISA standards to particular factual circumstances.[11]

Mr. Witz's testimony regarding industry practices and his understanding and application of the Department's guidance as a retirement plan professional will assist the Court in understanding the appropriate process a fiduciary should follow when seeking reimbursement of expenses from a plan. *Madrigal v. Allstate Indem. Co.,* No. 14-4242 SS, 2015 WL 12746232, at 5–6 (C.D. Cal. Oct. 29, 2015)(permitting expert testimony on industry practices); *In re Bard IVC Filters Prod. Liab. Litig.*, No. 15-2641, 2017 WL 6523833, at 6 (D. Ariz. Dec. 21, 2017)(permitting testimony on FDA regulations and the legal requirements the FDA may impose on manufacturers). The fact that Mr. Witz refers to the law or DOL regulations does not automatically render his opinions inadmissible. *Hangarter*, 373 F.3d at 1017 ("a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible")(citation omitted); *United States v. Diaz*, 876 F.3d 1194, 1198 (9th Cir. 2017)("it is sometimes impossible" to render an opinion "without resorting to language that recurs in the applicable legal standard").

---

[11] https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance. *See also* https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/retirement.

To the extent Defendants take issue with certain opinions they construe as legal conclusions, they can "point out those issues in the crucible of cross-examination" during trial. *Boeing,* 2015 WL 12803452 at 3.[12] That is the recognized procedure "[i]n light of the relaxed gatekeeping obligations this Court has in connection with a bench trial". *Id.*; *see also Madrigal*, 2015 WL 12746232 at 5–6 (allowing moving party to reassert objections at trial); *Newmont USA Ltd. v. Am. Home Assurance Co.*, No. 09-33, 2011 WL 13192865, at 2 (E.D. Wash. Jan. 11, 2011)(declining to "parse expert reports line-by-line" and would revisit the admissibility of the proposed testimony "if utilized at later and appropriate stages of this case").

Although Defendants may disagree with Mr. Witz's testimony, or claim he failed to consider other material or authority, their challenges to the "underpinnings" of his opinions merely go to the weight of his testimony. *See Bergen*, 816 F.2d at 1352 n.5; *Hangarter,* 373 F.3d at 1017 n.14. Defendants also are incorrect in their assertions. For instance, the principle that a corporate fiduciary must recuse himself from any fiduciary decision to hire an affiliated party for plan services to avoid §1106(b) violations is set forth in 29 C.F.R. §2550.408b-2(f). *See* 29 C.F.R. §2550.408b-2(f)(ex. 7); Ex. C ¶33 n.21 (*citing* regulation and example). Northrop's own outside counsel reached the same conclusion. Ex. C ¶53. And contrary to Defendants' interpretation, Advisory Opinion 97-03 specifically notes that "it would generally be necessary to avoid violations" of §1106(b)(1) and (b)(2) to have "an independent fiduciary" determine whether to pay expenses from plan assets. DOL Adv. Op. 97-03; *see also* Ex. C ¶26 n.8 (*citing* Adv. Opinions 93-06A, 89-09A, 88-02A, and 86-01A, all noting that §2550.408b-2 prohibits a fiduciary from using the authority that makes him a fiduciary to cause the plan to enter into a

---

[12] Defendants' expert offers opinions regarding whether Defendants complied with the prohibited transaction exemption, 29 C.F.R. §2550.408b-2, which is just as much asserting a "legal conclusion". Doc. 183-1 ¶¶13–14, 86–98, p. 39.

transaction for plan services when such fiduciary has an interest).[13]

The Court should disregard Defendants' criticism of Mr. Witz for offering opinions related to Defendants' failure to comply with the terms of the ASA. Doc. 172-1 at 18–19. Mr. Witz is not testifying to the "legal effect" of the ASA or "subjective intent of the parties". *Cf. Energy Oils Inc. v. Montana Power Co.*, 626 F.2d 731, 737 n. 11 (9th Cir. 1980).[14] Rather, Mr. Witz offers opinions that Defendants failed to follow the unambiguous terms of the ASA governing the reimbursement of expenses to Northrop for services performed by Northrop employees. Ex. C ¶¶70–81. Mr. Witz should be permitted to testify regarding relevant facts that form the basis of his opinions. Fed. R. Civ. P. 26(a)(2)(B); *Berman v. Sink*, No.13-597, 2016 WL 8730672, at 8 (E.D. Cal. May 27, 2016)("[p]recluding the experts from offering their interpretation of the video would be prohibiting them from stating the basis of their opinion"). To the extent Defendants believe Mr. Witz offers an incomplete interpretation of the facts, "[v]igorous cross-examination [and] presentation of contrary evidence" are the appropriate method for pointing out such flaws. *Daubert,* 509 U.S. at 596.

### B.    Mr. Witz is qualified to provide expert testimony.

Like their challenges to the testimony of Dr. Pomerantz, Defendants take an overly restrictive view of the standard for an expert to be qualified under Rule 702. *Thomas*, 42 F.3d at 1269 (Rule 702 "contemplates a broad conception of expert qualifications"); *Victorino*, 2018 WL 2551312 at 5 ("admissibility standard for an expert's qualification is low"). Contrary to their assertions, Doc. 172-1 at 20–22,

---

[13] Contrary to Defendants' suggestion, Mr. Witz noted that the *text* of the advisory opinions *suggests* that at least 80% of an employee's time is required to be performed on behalf of a plan. *See* Ex. C ¶34 n.23.

[14] Defendants offer no evidence to support their unfounded assertion that the ASA was not in effect during the relevant period. The ASA was only replaced by a new "Benefit Plans Services and Loan Agreement" in December 2014. Doc. 170-48 (Ex. 58) at pdf 61 (NGC0012083).

Mr. Witz has relevant experience bearing on the process that should be followed when a fiduciary charges expenses to a plan and the necessary services that are required to administer a plan. The fact that he has not served as an in-house fiduciary for a plan that sought reimbursement of expenses for services performed by its employees is immaterial. He is generally qualified on the subject matter at issue. *See LaCava v. Merced Irr. Dist.,* No. 10-853, 2012 WL 913697, at 5 (E.D. Cal. Mar. 16, 2012)("[w]hether an expert is the 'best' qualified or has sufficient specialized knowledge is generally a matter of weight").

During his professional career, he has assessed the reasonableness of *internal* and external fees charged to retirement plans. Ex. 2, Witz Dep. 46:6–49:18, 59:13–60:5, 216:11–24. He has consulted with clients regarding whether they should continue to charge expenses back to their plans. *Id.* 40:6–41:9. As the Chief Fiduciary Officer for two independent consulting firms, he regularly counsels the firms' advisors regarding whether the clients should charge expenses for their services to their plans. Ex. 2, Witz Dep. 45:13–47:5, 144:22–145:25. His testimony will "advance[] the [Court's] understanding to any degree" of these issues. *Abarca*, 761 F.Supp. 2d at 1029. This District also has previously found Mr. Witz's testimony admissible. *Tibble v. Edison Int'l*, No. 07-5359 SVW (AGRx), 2017 WL 3523737, at 13 (C.D. Cal. Aug. 16, 2017)(testifying regarding a service provider's ability to facilitate a share class change for mutual funds).

In addition, Mr. Witz has experience *actually* performing recordkeeping and administrative services for defined contribution plans. Ex. C ¶¶2–5. This includes administering thousands of plans at two separate third party administrators. *Id.* ¶101. As such, he has specialized knowledge regarding the provision of administrative services that would be necessary to administer a defined contribution plan. He illustrated that expertise when pressed during deposition. *See, e.g.,* Ex. 2, Witz Dep. 249:14–254:5, 254:17–255:24. Although Defendants may claim that Mr. Witz lacks "particularized expertise" or specialization, such issues goes to the

weight afforded to his testimony. *Garcia,* 7 F.3d at 889; *In re Silicone Gel Breast Implants Prod. Liab. Litig.,* 318 F.Supp.2d at 889. During the bench trial, Defendants can develop any perceived "[g]aps" in his qualifications or experience through cross examination. *Abarca,* 761 F.Supp.2d at 1028.

### C.   Defendants misrepresent Mr. Witz's factual understanding.

Defendants cannot credibly claim that Mr. Witz failed to consider relevant information regarding the administrative services performed by Northrop employees. Nor could they based on the documentation actually maintained by Northrop. As Mr. Witz indicated in his report, the ASA governing the services performed by Northrop's benefits departments does not specify the administrative services Northrop employees were to provide to the Plan. Ex. C ¶100; Struckhoff Decl. ¶5, Ex. 4 (Dep. Ex. 94 [Tr. Ex. 97]); *Grabek,* Doc. 606 at 11. Had Northrop followed the terms of the ASA, and presented an Annual Proposal that required a "description of the services" and the "names, positions, and duties" of Northrop employees for whom Northrop sought reimbursement, Mr. Witz would have had additional materials related to Northrop's services. Ex. C ¶¶70–72, 84–86, 88–92.

Defendants completely ignore the fact that in forming his opinions Mr. Witz relies on specific documents produced by Defendants during this litigation that described the services purportedly performed by Northrop employees. *See* Ex. C ¶100 n. 109 (*citing* NGC0286711 and NGC0302474, among others); Struckhoff Decl. ¶¶6–7, Ex. 5 (NGC0286711), Ex. 6 (NGC0302474).[15] Indeed, one of the documents was the *same* document that Defendants' expert *solely* relied on in describing the administrative services performed by Northrop. Doc. 176-2 ¶32 nn.

---

[15] Contrary to Defendants' assertion, Mr. Witz believed he reviewed Hewitt's statement of work but did recall relying on the actual administrative services agreement that outlined the services performed by Hewitt. Doc. 167-3 at 27 (80:15–81:6). The statement of work, which was a trial exhibit from *Grabek* (Tr. Ex. 799) was listed as one of the documents Mr. Witz's considered in forming his opinions. Ex. C (ex. 2)(listing *Grabek* trial exhibits).

28–29 (*citing* NGC0286711). He also reviewed the job responsibilities of Northrop employees and the services performed by the Plan's recordkeeper. *E.g.,* Ex. 2, Witz Dep. 66:16–67:16, 75:13–18, 79:1–10; Ex. C ¶100; Doc. 167-3 at 27 (80:7–11). The fact that Mr. Witz did not recite with specificity all facts during his deposition only affects his credibility and "does not necessarily mean that the analysis in his *report* was flawed." *Network Prot. Scis., LLC v. Fortinet, Inc.*, No. 12-1106, 2013 WL 5402089, at 5 (N.D. Cal. Sept. 26, 2013)(emphasis in original). He also is not required to have "firsthand knowledge" to testify. *Daubert,* 509 U.S. at 592.

     Defendants' cited excerpts from Mr. Witz's deposition do not demonstrate a lack of understanding on purported "central points". Doc. 172-1 at 22. Mr. Witz testified that he recalled four defined contribution plans sponsored by Northrop, Ex. 2, Witz Dep. 87:11–14, which was consistent with the Plan's recordkeeping agreement cited by Mr. Witz. *See* Doc. 170-63 (Ex. 76) at pdf 9 (NGC0166700) (cited at Ex. C ¶78 n.82).[16] Although Mr. Witz recalled at his deposition the approximate number of Northrop employees who billed their time to the Plan, Ex. 2, Witz Dep. 67:18–25, he listed those details with citation to the record in his report. Ex. D ¶¶81, 103. Defendants fail to explain how any perceived deficiencies in Mr. Witz's testimony regarding the structure of Northrop's departments or delegations otherwise affect the admissibility of his opinions.

     Defendants dispute Mr. Witz's opinion that only 4 full-time employees (if any) would be needed to perform the non-recordkeeping services for the Plan. Ex. C ¶102. He bases this opinion on 36 years of experience in the retirement industry, including his specialized knowledge of providing recordkeeping and administrative services to thousands of defined contribution plans. *Id.* ¶¶99, 101. He explained in detail the responsibilities of each of those four employees. Ex. 2, Witz Dep. 104:18–106:3, 249:14–254:5, 254:17–255:24. He also adequately explained that

---

     [16] Even if there were nine "subplans", that did not affect his analysis. *See* Ex. 2, Witz Dep. 249:2–13.

more employees were required to administer 2,500 separate plans at his prior

employer because those tasks were administratively more complex. For instance,

each of those plans required separate Form 5500 filings, had different matching

formulas, had different plan provisions, and had different eligibility provisions. *Id.*

248:3–23. Although Defendants may disagree with the opinions derived from his

experience, that is not a basis for excluding his testimony.

Moreover, Mr. Witz's opinions were supported by Northrop's independent

third-party consultants and outside auditor. Ex. C ¶¶94–96, 104 (*citing* Tr. Exs. 103,

130, 535, 536).[17] There is no indication that these conclusions, and specifically

those related to the number of employees necessary to perform non-recordkeeping

services, would not apply to the time period after 2010. *Id.* ¶104. And Defendants

have presented no evidence suggesting otherwise.

These independent reports addressing the reasonableness of the expenses and

services performed by Northrop for the Plan are relevant to the claims asserted

herein. *See Grabek,* Doc. 802 at 6 (finding that the discovery in *Grabek* was

relevant in this case, "regardless of the different time periods the two cases may

represent"). If these business records were inadmissible hearsay, Defendants

certainly would have objected to their admission in *Grabek*. *See Grabek*, Doc. 748

at 8, 10, 28 (admitting Exs. 103, 130, 535, 536). Regardless, the Court can evaluate

the reliability of any evidence relied on by Mr. Witz during cross-examination.

*Giuliano v. Sandisk Corp.*, No. 10-2787, 2015 WL 10890654, at 8 (N.D. Cal. May

14, 2015)("[Q]uestions regarding the evidence relied upon by [the expert] go to the

weight, not the admissibility, of his opinion.").

### D.    Mr. Witz's damage opinions are reliable.

Defendants' final attacks are unavailing. Mr. Witz used the S&P 500 as one

measure to calculate lost investment opportunity. The appropriate measure for lost

---

[17] The Court modified the protective order in *Grabek* to allow Plaintiffs to use documents produced in *Grabek* in this matter. *Grabek,* Doc. 802.

investment opportunity, such as the S&P 500, is an issue to be decided by the Court. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016)(lost investment opportunity); *Tussey*, 2012 WL 1113291 at 36, *rev'd on other grounds*, 746 F.3d 327 (8th Cir. 2014)(upholding use of S&P 500 index to calculate lost investment opportunity). Mr. Witz also did not "pull[] from thin air" the basis for his opinion that only four-time employees would be needed to perform administrative services to the Plan. Doc. 172-1 at 25. Northrop's own consultant reached the same conclusion. Ex. C ¶104 (*citing* Tr. Ex. 536).

In determining the reasonable cost for Northrop to provide administrative services, Mr. Witz appropriately relies on median salaries for "Compensation, Benefits, and Job Analysis Specialists" reported by the Department of Labor's Bureau of Labor Statistics. *Id.* ¶116 n.119.[18] These specialists "[c]onduct programs of compensation and benefits and job analysis for employer", and "[m]ay specialize in specific areas", such as "pension programs". Dept. of Labor, BLS, 13-1141 Compensation, Benefits and Job Analysis Specialists.[19] The job title and description alone show the reliability of Mr. Witz's opinion, and Defendants present no contrary evidence that his comparisons were inapt. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013)(challenges to the comparator used for the underlying damages assessments "go to the weight of the testimony and its credibility"). And contrary to Defendants' claims, Mr. Witz is not required to present "exact" damage calculations. *See Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992)("it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate").

## CONCLUSION

Defendants' motion should be denied.

---

[18] Mr. Witz similarly relied on median salaries reported by BLS in *Grabek*. Doc. 634-2 ¶16 (sealed).

[19] https://www.bls.gov/oes/2017/may/oes131141.htm.

1    May 17, 2019                    Respectfully submitted,

2                                    By:  /s/ Kurt C. Struckhoff

3                                    Kurt C. Struckhoff (*pro hac vice*)
                                     SCHLICHTER, BOGARD & DENTON
4                                    *Lead Counsel for Plaintiffs*

5
                                     William A. White (SBN 121681)
6                                    HILL, FARRER & BURRILL LLP
7                                    *Local Counsel for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28