1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| CLIFTON W. MARSHALL, et al., | Case No. 2:16-cv-06794-AB (JCx) |
|---|---|
| Plaintiffs, | **ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [168]; AND (2) DENYING DEFENDANTS' MOTION TO EXCLUDE REPORTS AND TESTIMONY OF PLAINTIFFS' EXPERTS DR. STEVE POMERANTZ AND DAVID WITZ [167]** |
| v. | |
| NORTHROP GRUMMAN CORPORATION, et al., | |
| Defendants. | |

## I.    INTRODUCTION

Two motions are before the Court: (1) Defendants'[1] Motion for Partial Summary Judgment ("Defs.' MSJ," Dkt. No. 168) and (2) Defendants' Motion to Exclude Plaintiffs' Experts Dr. Steve Pomerantz and David Witz (Dkt. No. 167). Defendants also filed objections to Martin Schmidt's expert report and testimony.

---

[1] "Defendants" refers to the following entities and individuals: Northrop Grumman Corporation; Northrop Grumman Savings Plan Administrative Committee; Northrop Grumman Savings Plan Investment Committee; Denise Peppard; Michael Hardesty; Kenneth Bedingfield; Kenneth Heintz; Prabu Natarajan; Maria Norman; Mark Caylor; Mark Rabinowitz; Richard Boak; Debora Catsavas; Teri Herzog; Tiffany McConnell King; Christopher McGee; Gary McKenzie; Constance Soloway; Rajender Chandhok; Gloria Flach; James Myers; Sunil Navale; Eric Scholten; and Steven Spiegel.

1.

1   (Dkt. No. 196.) All motions are opposed. Having considered the parties' submissions,

2   the relevant law, the record in this case, as well as the arguments of counsel at oral

3   argument, the Court hereby (1) **GRANTS** in part and **DENIES** in part Defendants'

4   Motion for Partial Summary Judgment and (2) **DENIES** Defendants' Motion to

5   Exclude Dr. Pomerantz and Mr. Witz as moot.

6   **II.    BACKGROUND**[2]

7          This is a putative class action brought under the Employee Retirement Security

8   Act of 1974 ("ERISA") by Plaintiffs Clifton Marshall, Thomas Hall, Manuel

9   Gonzalez, Ricky Hendrickson, Phillip Brooks, and Harold Hylton, former participants

10  in Defendant Northrop Grumman Corporation's 401(k) retirement plan. In this ERISA

11  action, Plaintiffs challenge the decisions and actions of alleged fiduciaries of

12  Northrop's 401(k) retirement plan. Plaintiffs' operative complaint alleges that

13  Defendants breached their fiduciary duties under ERISA in three respects: (1) by

14  using an active-management strategy for the Northrop Grumman Savings Plan's

15  ("NGSP" or "the Plan") Emerging Markets Equity Fund (the "EM Fund") and failing

16  to consider whether to convert the EM Fund to passive management; (2) by

17  authorizing reimbursements to Northrop for services rendered to the NGSP; and (3) by

18  failing to renegotiate a recordkeeping contract for the NGSP. Defendants move for

19  summary judgment on Plaintiffs' EM Fund claim and recordkeeping fee claim.[3]

20  **A.    The Plan**

21         The NGSP is one of the largest defined contribution plans in the country. (SUF[4]

22  2.) As of December 31, 2016, the NGSP had approximately 110,000 participants and

23

24  _____

25  [2] The Court's factual recitation construes conflicting evidence in Plaintiffs' favor and
    does not represent the Court's view of the weight or credibility of the evidence.

26  [3] Defendants' Motion does not address Plaintiffs' remaining claims, which concern
    the authorization of reimbursements to Northrop for services rendered to the NGSP.

27  (Mot. at 1 n.1.)
    [4] "SUF" refers to Defendants' Statement of Uncontroverted Facts in Support of

28  Defendants' Motion for Partial Summary Judgment, Dkt. No. 170-1.

$19 billion in assets.  (*Id.*)  Under the terms of the NGSP, active employees may contribute a portion of their pay to their individual plan accounts on a before tax or after tax basis through payroll withholdings up to the threshold contribution limit established by law.  (SUF 3.) Northrop matches a percentage of such contributions. (*Id.*)

All of the NGSP's investments are participant directed, meaning the participants choose to invest their employee and employer contributions in any combination of the available investment options and can change the investment mix in their account balance on any given business day.  (SUF 4.) The NGSP offers three broad categories of investments.  (SUF 5.)  First, participants can select target date funds. (*Id.*)  Second, participants have access to a brokerage account through which they can select from over 4,700 available mutual funds and individual securities, including a variety of emerging market funds.  (*Id.*)  Third, participants are offered a number of "core" funds in different asset classes, such as U.S. Fixed Income assets or U.S. Equity assets. (*Id.*)  Of these various funds, only the EM Fund is at issue in this case.  (*Id.*)

The Plan documents designate two committees—an "Investment Committee" and an "Administrative Committee"—which, along with their members, are administrators and named fiduciaries of the Plan.  (SUF 8.) Under the NGSP's terms, only a majority of the committee members has the power to act on behalf of either the Administrative Committee or the Investment Committee. (SUF 66.)

Effective September 20, 2011, Northrop's Board of Directors delegated to Northrop's Chief Executive Officer the responsibility to appoint members of the Administrative Committee and the Investment Committee.  (Pl.'s Resp. to SUF[5] 68.)

---

[5] "Pl.'s Resp. to Defs.' SUF" refers to Plaintiffs' Statement of Genuine Disputes in Opposition to Defendants' Statement of Uncontroverted Facts, Dkt. No. 191-1.

1          **1.      The Investment Committee**

2          Throughout the relevant time period, the Investment Committee included

3   senior-level Northrop personnel.  (SUF 12.)  A number of the individual defendants in

4   this case also served on the Investment Committee at some point between 2010 and

5   2016, including Debora Catsavas (2010-2011);  Mark Rabinowitz (2011-2012); Mark

6   Caylor (2011-2017); Constance Soloway (2016-2017); Gloria Flach (2011-2012);

7   James Myers (2011-2016); Sunil Navale (2011-2016); and Steven Spiegel (2013-

8   2016).  (SUF 12.)

9          The NGSP provides that the Investment Committee is the named fiduciary for

10  investment matters. (SUF 8.) As such, the Investment Committee is responsible for

11  approving the plan investment alternatives and investment fund objectives, and

12  delegating investment responsibilities to persons within the Investments and Trust

13  Administration Department ("the ITA").  (*Id.*) The specific duties of the Investment

14  Committee, as delegated by the Board, are outlined in the NGSP plan documents, the

15  2007 Investment Policy Statement ("the IPS"), and the 2015 update to the IPS. (*Id.*)

16         The Investment Committee delegated certain investment oversight

17  responsibilities to the ITA, including the selection and evaluation of investment

18  managers. (SUF 10.) The plan documents, however,  do not expressly authorize the

19  Investment Committee to delegate any of its fiduciary responsibilities for investment

20  matters. (SUF 8.)  Plaintiffs thus contend that any claimed delegations set forth in the

21  IPS (Exs. 10, 14), Board of Directors resolutions (Exs. 11-13), or the December 15,

22  2014 Investment Committee Charter (Ex. 5) are "ineffective" and "improper." (Pl.'s

23  Resp. to SUF 8.)  The parties disagree as to whether the Investment Committee is

24  authorized to delegate any of its fiduciary responsibilities. (*See* Pl.'s Resp. to SUF 10.)

25         **2.      The Administrative Committee**

26         Members of the Administrative Committee from September 2010 through April

27  2016 included: Debora Catsavas (2010-2011) (Committee Chair); Kenneth Heintz

28  (2010-2011); Gary McKenzie (2010-2010); Maria Norman (2010-2011); Ken

Bedingfield (2011-2013); Denise Peppard (2011-2016) (Committee Chair); Michael Hardesty (2011-2016); Tiffany McConnell King (2011-2016); Rich Boak (2015-2016); Tiffany King (2015-2016); Constance Soloway (2016); and Teri Herzog (2013-2016). (SUF 69; Pl.'s Resp. to SUF 69.)  The Administrative Committee held formal meetings periodically throughout the year and discussed issues from time to time informally.  (SUF 70.) Administrative Committee members received an agenda in advance of Administrative Committee meetings. (SUF 71.)

The Plan document for the NGSP provides that the Administrative Committee is the "plan administrator" and the "named fiduciary" with responsibility for the management of the Plan for all purposes other than investment matters.  (SUF 65.) The Plan document authorizes the Administrative Committee to, among other things, prescribe rules for the operation of the Plan; determine eligibility for benefits; construe and interpret the Plan; enter into contracts on behalf of the Plan; and prepare and distribute other communications to participants and beneficiaries.  (SUF 67.)

**B.    The Emerging Markets Fund**

Throughout the relevant time period, the NGSP offered the EM Fund as one of eight core fund options. (SUF 16.)  The EM Fund's stated objective provided:

> This fund is designed to achieve a high total return through capital appreciation over the long term by investing primarily in a diversified portfolio of stocks issued by companies based in developing countries. The risk profile of this option is high.  This option has a lower correlation with the U.S. Equity, Small Cap and International Equity Funds.  *The fund's investment objective is an incremental total return of capital appreciation net of fees over the benchmark while attempting to avoid significant underperformance*. The benchmark for this option is the MSCI Emerging Market Index.

 (Pl.'s Resp. to SUF 16.) In 2005, the EM Fund was 100% actively managed. (SUF 19.) In 2009, 25% was transitioned to passive management; in early 2011, a 50% passive and 50% active split was instituted; and by November 2014, the EM Fund was 100% passively managed. (SUF ¶¶ 27, 42, 52.)

### C.    Hewitt's Recordkeeping Services

401(k) plans generally require "recordkeeping services" to maintain participant accounts, process contributions, withdrawals, and distributions, to enroll and terminate participants, and prepare required disclosures.  (*See* SUF 64.)

#### 1.    Retention of Hewitt Associates ("Hewitt")

In 2005, an external consultant issued a request for proposals ("RFPs") to various third-party administrators for recordkeeping services for all of Northrop's benefit plans, including the NGSP.  (SUF 66.) From June 27 through July 28, 2005, TPI reviewed five bids for recordkeeping services. (SUF 77.) TPI and a team of Northrop benefits personnel narrowed the bidders to three candidates and went on site visits. (SUF 78.) In January 2006, after a competitive bidding process, Northrop retained Hewitt as the recordkeeper for all of Northrop's benefit plans, including the NGSP.  (SUF 79.)

Northrop and Hewitt executed an administrative services agreement (the "Hewitt ASA"), which provided for an initial term commencing on January 1, 2006. (SUF 80.) It took more than one year for Hewitt to become the recordkeeper for the NGSP.  (*Id.*) Pursuant to the agreement, Hewitt received $500,000 per month in exchange for the services it provided to the NGSP and Hewitt would charge $37 per participant for participants in excess of 152,000. (SUF 81.) At the time of the agreement, there were 115,157 participants. (*Id.*) The agreement included an early termination fee that ranged from $30 million to $15 million across all Northrop Grumman plans if NGSP terminated the contract with Hewitt before June 30, 2011 or $2.5 million to $1 million if NGSP terminated the contract after June 30, 2011.  (*Id.*) Section IX of the agreement specified that, after June 30, 2011, the NGSP may hire a third-party consultant "mutually agreed upon by both parties" to perform a benchmarking analysis.  (Pls.' Resp. to SUF 83.)  If the benchmarking analysis demonstrated that the fees are more than 15% above or below "recognized price ranges, the parties agree[d] to discuss the findings." (*Id.*)

6.

### 2. 2011 Hewitt Benchmarking and Amendment

In 2010, Northrop contemplated a corporate spinoff, which would potentially reduce the number of participants in the Northrop benefit plans. (SUF 85-86.) Northrop engaged a consultant to benchmark how Hewitt should be compensated after part of the Plan was divested. (SUF 86-89.) The consultant concluded that comparable plans paid a base recordkeeping fee ranging $25 to $45 per participant. (SUF 88.) As of April 1, 2011, Northrop and Hewitt amended their agreement to replace the flat monthly fee with a per-participant fee of $45 per year.  (SUF 90.)

### 3. Recordkeeping RFP and Transition to Fidelity

In August 2014, the Administrative Committee initiated an RFP process and retained another consultant, herronpalmer, to conduct the RFP. (SUF 91.) In September 2014, herronpalmer issued an RFP for recordkeeping services.  (SUF 92.) In November 2014, the Northrop RFP Review team and herronpalmer reviewed the RFP responses from four candidates—Hewitt, Fidelity, Voya, and Towers Watson. (SUF 93.) In February 2015, herronpalmer summarized the proposals of three finalists, and on May 20, 2015, Defendants selected Fidelity as a total benefits outsourcing provider to replace Hewitt.  (SUF 94.)  The NGSP transitioned all recordkeeping and administrative services to Fidelity effective April 1, 2016.  (*Id.*)

### 4. Retention of Financial Engines

In July 2011, the Administrative Committee retained Callan, a benefits consulting firm, to conduct a "Request for Information" ("RFI") for an investment advisory provider for the NGSP.  (SUF 96.) In August 2011, Callan received proposals from four providers of investment advisory services: Hewitt, Financial Engines, Guided Choice, and Morningstar.  (SUF 98.) As part of the RFP process, Callan asked each provider about the data connectivity fee they would have with the NGSP's recordkeeper. (SUF 99.) Callan also emailed Hewitt about the fee arrangement between Hewitt and Financial Engines, asking for confirmation of "how much revenue goes to Aon Hewitt Financial Advisors and how much goes to

Financial Engines?" (*Id.*) In response, Hewitt answered: "Hewitt receives 20% of the bps fee and 25% of the platform fees.  This percentage may increase in the future if total assets in the overall advisory services program increase beyond certain thresholds." (*Id.*; *see also* Ross Decl. ¶¶ 89-91, Exs. 92-94.)

Northrop personnel selected Financial Engines for its advisory service. The NGSP executed an agreement with Financial Engines effective December 19, 2011, and Financial Engines began offering services to participants in around June or July 2012.  (SUF 106; Pl.'s AMF 282.) The Financial Engines Agreement specified that Financial Engines would charge $6.50 per participant for online advice and an asset-based fee for managed accounts.  (Pl.'s AMF 282.) From July 2012 through April 1, 2016 (when Hewitt was replaced as recordkeeper), Financial Engines paid Hewitt $6,845,932. (*Id.*) Of this amount, $6,198.233 was paid in connection with managed account services, and $6,47,699 was paid in connection with the platform fee for online advice. (*Id.*)

### 5.    Benchmarking of Financial Engines

Three years later, in 2014, the Administrative Committee conducted a RFP to find a third party to benchmark various service providers used by the NGSP, including the financial advisory services provided by Financial Engines.  (SUF 108.) Ultimately, the Administrative Committee selected herronpalmer, which completed its benchmarking review of various providers on January 27, 2015.  (SUF 109.) This analysis assessed the market for investment advisory services and evaluated the fees then being paid to Financial Engines.  (*Id.*)

Based on this benchmarking, Financial Engines' fees were renegotiated in September 2015 and effective in 2016.  (SUF 111.) The NGSP paid a lower fee to Financial Engines following the renegotiations.  (*Id.*)

### 6.    Data Connectivity Fee Paid by Financial Engines to Hewitt

In 2009, Financial Engines entered into a "data connectivity agreement" with Hewitt—two years before Financial Engines was hired by the NGSP. (SUF 112.)

8.

Pursuant to this agreement, Financial Engines would receive up-to-date participant data in a timely manner and format. (*Id.*) Financial Engines would use this information to provide participants investment advice and services, and Financial Engines would pay Hewitt a portion of the fees it received from the particular plan it was servicing. (SUF 113.) Neither Northrop, the Administrative Committee, nor any other Defendant in this case were a party to the agreement between Hewitt and Financial Engines. (SUF 116.)

### 7.   Hewitt/Financial Engines Master Service Agreement

Hewitt and Financial Engines entered into a Master Service Agreement effective March 13, 2009 in which Hewitt agreed to provide data connectivity services and other services to enable Financial Engines to pursue sales opportunities within Hewitt's existing and potential client base.  (Pl.'s AMF 275.) Financial Engines and Hewitt agreed to a "Client Engagement Protocol" under which Hewitt agreed to provide "Target Client Data," including a list of all Hewitt plan sponsor clients with over 1,000 participants, total plan assets of those clients, and client contact information. (Pl.'s AMF 276.) Hewitt also committed that Financial Engines would be the "Preferred Provider" of advisory services to its clients with more than 1,000 participants, which required Hewitt to feature Financial Engines "exclusively" in all relevant marketing and other sales materials and to agree not to promote or offer services of other investment advisory service providers. (*Id.*)

Except in limited circumstances, Hewitt agreed to include an offer to provide advisory services in all of its sales and marketing materials subject to Financial Engines's approval.  In accordance with the "Sales Protocol," Hewitt agreed to notify Financial Engines "as soon as reasonably practicable" if one of its clients contacts Hewitt to request information about investment advisory services.  (*Id.*) Financial Engines committed not to agree to any terms with a client that would impact the amount Financial Engines agreed to pay Hewitt without Hewitt's express authorization.  (*Id.*)

### III.    LEGAL STANDARD

#### A.    Motion for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id*. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

#### B.    Statutory Framework Under ERISA

"ERISA is designed to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans.'" *Wright v.*

10.

*Oregon Metallurgical Corp.*, 360 F.3d 1090, 1093 (9th Cir. 2004) (quoting 29 U.S.C. § 1001(b)).  Section 1104(a)(1) of ERISA imposes four general duties on plan fiduciaries. ERISA fiduciaries must (1) discharge their duties with "prudence"; (2) act "solely in the interest of the participants" and for the "exclusive purpose" of providing benefits to those participants; (3) diversify investments to "minimize the risk of large losses"; and (4) act in accordance with the terms of the plan. Plaintiffs claim that Defendants breached the first two of these duties.

ERISA also expressly prohibits certain transactions where the potential for abuse is particularly acute. Section 1106 of ERISA forbids a fiduciary from engaging in a transaction that the fiduciary "knows or should know" is a transaction with a party in interest. *Id.* § 1106(a).

## IV.   EVIDENTIARY OBJECTIONS

Defendants move to exclude three of Plaintiffs' experts: Dr. Steve Pomerantz, David Witz, and Martin Schmidt. (Dkt. Nos. 167, 196.) The Court will address each expert in turn.

### A.   Defendants' Motion to Exclude Dr. Steve Pomerantz

Plaintiffs designated Dr. Steve Pomerantz as an expert on their EM Fund claim. (*See* Dkt. No. 187-1 ("Struckhoff Decl.") ¶¶ 6-7, Exs. P5-P6; Dkt. Nos. 231-36 ("Pomerantz Rep."),  231-37 ("Pomerantz Rebuttal Rep.").) In his initial report, Dr. Pomerantz opines that Northrop's Investment Committee "failed to make a reasoned determination to maintain an active investment strategy for the Plan's Emerging Markets Fund" in 2010 "when Defendants decided to implement" a "fully passive strategy for the Plan's other core investment options." (Pomerantz Rep. ¶ 14.) Pomerantz also opines that Defendants failed to employ "a consistent decision making process."  (Dkt. No. 172-3 ("Pomerantz Rep.") ¶ 14(b).)

The Court **DENIES** Defendants' Motion to Exclude Dr. Pomerantz as moot because the Court did not rely upon Dr. Pomerantz's testimony in resolving Defendants' Motion for Summary Judgment.

**B.** **Defendants' Motion to Exclude David Witz is <u>Denied</u> as Moot.**

Plaintiffs designated David Witz as an expert on their claim related to reimbursements for administrative services paid to Northrop by the NGSP. Witz offers opinions on the following topics: (1) what "fiduciary standards . . . must be satisfied before Northrop was permitted to seek reimbursement of direct expenses" incurred in administering the NGSP; (2) whether the arrangement between Northrop and the NGSP amounted to a prohibited transaction; (3) whether Defendants violated the terms of an Administrative Services Agreement ("ASA") between Northrop and the NGSP; and (4) what "industry standards" or "best practices" are applicable to chargeback arrangements, and whether Northrop's process and the transactions at issue comport with "industry standards" and "best practices." (Witz Rep. ¶¶ 11, 13-17.)  Defendants move to exclude Witz's testimony and opinion on issues (1) through (3) as irrelevant, arguing these issues "are either inappropriate commentary on matters of law or mere summaries of facts of which Witz lacks any personal knowledge." (Dkt. No. 167 at 13.)  Defendants also move to exclude Witz's testimony and opinion on issue (4) on the ground that his lack of experience renders his opinion unreliable. (*Id.* at 13, 19-20.)

Defendants did not move for summary judgment on Plaintiffs' unlawful reimbursement claims. The Court therefore **DENIES** Defendants' Motion to Exclude Witz as moot because the Court does not rely on Witz's testimony in resolving Defendants' Motion for Summary Judgment.

**C.** **Defendants' Evidentiary Objections to Martin Schmidt**

Plaintiffs proffer Martin Schmidt as an expert on recordkeeping fees.  Schmidt offers an opinion on three topics: (1) the frequency with which plans should put out recordkeeping services for competitive bid; (2) how plans should leverage the fees from Financial Engines to a plan recordkeeper for the benefit of plan participants; and (3) a calculation for "expected fees for recordkeeping and administrative services" for the NGSP per year, per participant and concludes the NGSP should not have paid

12.

more than these amounts. Defendants move to exclude Schmidt's expert report and testimony on topics two and three on the grounds that he is unqualified and his opinions are unreliable. (Dkt. No. 196-1 at 5-6, 15.) Defendants argue Schmidt's opinion as to reasonable recordkeeping fees is not based on any relevant experience or reliable methodology (Dkt. No. 196-1 at 5-6) and his testimony as to fiduciaries leveraging the fees paid between a recordkeeper (Hewitt) and a financial advisory service provider (Financial Engines) is an "experience-based opinion" about "a practice for which he has no experience." (*Id.* at 15.)  Plaintiffs did not file an opposition or otherwise respond to Defendants' arguments with regard to Schmidt's report prior to oral argument. *See* C.D. Cal. L.R. 7-12[6] (noting consequences of failure to file required documents).

The Court is persuaded by Defendants' argument. Schmidt's opinion that "[p]rudent fiduciaries monitor all sources of compensation to the recordkeeper, including additional income it receives from the advisory services provider" is particularly troublesome. The Court is not aware of any evidence that Schmidt has any expertise with these types of fees. While Schmidt contends that he has experience leveraging fees for "advisory services" to negotiate recordkeeping fee adjustments, (Schmidt Rep. ¶ 146), this experience is not germane to whether prudent fiduciaries have successfully leveraged the type of third-party fees at issue here in order to reduce recordkeeping fees. Accordingly, the Court **GRANTS** Defendants' motion to preclude Schmidt from opining as to how plans should leverage the fees from Financial Engines to a plan recordkeeper for the benefit of plan participants.

## V.    DISCUSSION

Plaintiffs seek summary judgment on Counts II, III, VI, and VII of Plaintiffs' Second Amended Complaint. These four counts arise from Defendants' actions with

---

[6] This is an additional ground upon which the Court grants Defendants' motion to exclude Schmidt.

respect to the Plan's EM Fund, fees paid to Hewitt, and Defendants' duty to monitor other Plan fiduciaries. The Court addresses each count in turn.

## A. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Emerging Markets Claim (Count III).

Defendants move for summary judgment on Plaintiffs' EM Fund claim on the ground that Plaintiffs' allegation—that Defendants maintained "active management" strategy for the EM Fund until November 2014 and failed to evaluate or implement a passive strategy for the EM Fund until November 2014—is "inconsistent with," and "directly contradicted by," the record in this case. (Reply at 2; Mot. at 7-8.) Defendants' Motion is based on two principal arguments: (1) Plaintiffs "pleaded a claim based on allegations that Defendants had *no* process and took *no* action" and "may not switch their theory of the case" in response to Defendants' Motion for Summary Judgment and (2) Defendants' decision-making process is prudent as a matter of law. (Mot. at 8-9.)

### 1. The Duty of Prudence

An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a "prudent" person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Under this "prudent person" standard, courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983). The prudence analysis "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996). "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "This duty of prudence extends to both the initial selection of an investment and the continuous

14.

monitoring of investments to remove imprudent ones." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1069-70 (N.D. Cal. 2017); *see Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("[T]he duty of prudence involves a continuing duty to monitor investments and remove imprudent ones.").

"[C]ost-conscious management is fundamental to prudence in the investment function, and should be applied not only in making investments but also in monitoring and renewing investments. A fiduciary's decision to invest in a fund that charges higher fees to a beneficiary will shrink the beneficiary's original investment." *Tibble v. Edison Int'l*, No. CV-07-5359-SVW (AGRx), 2017 WL 3523737, at *10-11 (C.D. Cal. Aug. 16, 2017) (internal quotation marks and citation omitted). "Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (citation omitted).

To determine whether an investment decision is prudent, "a fiduciary has a duty to investigate," and "may secure independent advice from financial advisors or other experts in the course of the investigation." *Tibble*, 2017 WL 3523737 at *11. But "the fact that a fiduciary secured independent advice does not necessarily indicate that he acted prudently." *Id.*; *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (reversing grant of summary judgment for defendants on breach of prudence claim because "relying on the advice of consultants" is not a complete defense).

### 2. Plaintiffs' Do Not Improperly Introduce a New Claim.

Defendants accuse Plaintiffs of "attempt[ing] to sidestep summary judgment by recasting their allegations to fit the mold of an entirely different theory—that Defendants breached their fiduciary duties, not by failing to review the EM Fund's investment strategy, but by failing to adequately vet the analysis and recommendations of Northrop's Investment and Trust Administration Department."

1  (Reply at 3.) Defendants reason that Plaintiffs' pleaded theory "challenged **whether**

2  Defendants evaluated passive management for the EM Fund before November 2014"

3  and their "new theory focuses on **who** performed the evaluation." (*Id.*)

4      The Court disagrees with Defendants that Plaintiffs failed to plead that

5  Defendants breached their fiduciary duties by failing to adequately vet the analysis

6  and recommendations of Northrop's ITA and make a decision. Plaintiffs' theories

7  have shifted significantly over the course of this litigation. Rule 8(a)(2), however,

8  requires only a "short and plain statement of the claim showing the pleader is entitled

9  to relief."  Fed. R. Civ. P. 8(a)(2).

10     Here, the Second Amended Complaint emphasizes that "[p]rudent fiduciaries

11 must make a reasoned decision as to whether it is in the participants' interest to offer

12 an actively managed option for the particular investment style and asset class,

13 considering the expected returns relative to passive options net of fees." (SAC ¶ 83.)

14 Plaintiffs allege Defendants "changed the investment strategy . . . from an active

15 investment strategy to a passive investment strategy" for certain other funds, but "took

16 no action and continued to mandate an active investment strategy" for the EM Fund.

17 (SAC ¶ 84.) Plaintiffs further allege that Defendants "failed to engage in a prudent

18 process to determine whether maintaining the [EM] Fund's active strategy was likely

19 to result in the fund outperforming its benchmark, net of fees" and "failed to make a

20 reasoned decision that maintaining the actively managed strategy was in the best

21 interest of Plan participants" even though the EM Fund "continued to underperform its

22 benchmark" in 2013 and 2014.  (SAC ¶¶ 87-88.) The Second Amended Complaint

23 pleads that "[a]t no point during this time, however, did Defendants as part of their

24 monitoring of th[e] [EM] Fund, determine whether it was prudent and in the best

25 interest of the participants to continue their active investment strategy for this Fund."

26 (SAC ¶ 88.)

27     Regardless of the ITA's involvement in the process, these allegations put

28 Defendants on notice about the crux of Plaintiffs' EM Fund claim—the Investment

16.

1   Committee's alleged failure to engage in a reasoned determination regarding the

2   retention of an active investment strategy. *See Concha v. London*, 62 F.3d 1493, 1503

3   (9th Cir. 1995) ("[T]he circumstances surrounding alleged breaches of fiduciary duty

4   may frequently defy particularized identification at the pleading stage . . . the events

5   constituting the alleged misconduct . . . will frequently be in the exclusive possession

6   of the breaching fiduciary."); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070

7   (N.D. Cal. 2017) ("Even in the absence of direct allegations" regarding "the

8   fiduciary's knowledge, methods, or investigations at the relevant times," a "court may

9   be able to reasonably infer from the circumstantial factual allegations that the

10  fiduciary's decision-making process was flawed." (citation omitted)).

11              **3.      Whether the Investment Committee Failed to Make a**

12                       **Reasoned Decision Regarding the EM Fund's Transition from**

13                       **Active to Passive Management Is Genuinely Disputed.**

14          Defendants argue that the Investment Committee members acted as reasonably

15  prudent fiduciaries when they considered but ultimately chose not to transition the EM

16  Fund to a 100% passive investment strategy in 2010, and subsequently transitioned to

17  a 100% passive investment strategy in 2014.  Defendants claim the alleged conduct

18  forming the basis for Plaintiffs' EM Fund claim is contrary to the evidence, which

19  demonstrates that Defendants considered the relative strengths and weaknesses of

20  passive and active management and decided to transition the EM Fund from active to

21  passive management over time and in phases beginning in 2009. (Mot. at 7; Reply at

22  2.) Plaintiffs respond that Defendants breached their duty because the Investment

23  Committee either "failed to exercise its own judgment" and "reflexively and

24  uncritically" adopted the ITA's recommendations or made no decision at all. (Opp'n

25  at 14-15.)  Plaintiffs further argue that the Investment Committee did not consider the

26  relative strengths and weaknesses of passive and active management over the EM

27  Fund for several years after 2010.  (Opp'n at 15.) Plaintiffs have demonstrated a

28  triable issue of material fact.

The Investment Committee did not have an absolute duty, as a matter of law, to offer an EM Fund operating under passive management. The reasonably prudent fiduciary standard "merely requires that fiduciaries reach a well-reasoned decision after weighing the risks and benefits and considering other alternatives." *Cryer v. Franklin Resources, Inc.*, No. 16-cv-04265-CW, 2018 WL 6267856 at *9 (N.D. Cal. Nov. 16, 2018); *Wright*, 360 F.3d at 1097 (stating a court's task in evaluating a fiduciary's compliance with the prudence standard is to inquire "whether, at the time they engaged in the challenged transactions" the fiduciary "employed the appropriate methods to investigate the merits of the investment and to structure the investment." (citation omitted)).

Here, the parties rely on, among other things, reports and presentations prepared by the ITA (*see* SUF 21-29), Investment Committee minutes (*see* Dkt. No. 232-8, Compendium of Meeting Minutes), and declarations of various ITA members (*see* Newberry Decl.). The Court has reviewed the voluminous record in this case.[7] The parties overstate the value of numerous pieces of evidence, and there are significant gaps in the record as to whether the Investment Committee considered, adopted, or

---

[7] The parties have literally buried the Court in paper. The Court notes that almost all of the parties' filings violate the local rules and the Court's Standing Order. The Court will not address every deficiency—there are far *too* many. Some, however, are particularly egregious and therefore noteworthy. Counsel on both sides consistently file motions, oppositions, and reply briefs in excess of the page limit set forth in Local Rule 11-6. Plaintiffs omit spaces between paragraph and section symbols in their opposition; Defendants filed a twenty-six page *reply* brief; and both parties interpret the Local Rules as excluding signature blocks from the word count. The Court reminds counsel that the page limit excludes only indices and exhibits, *not* signature blocks or conclusions. The Court will not tolerate the parties' blatant disregard for the Local Rules and Standing Order. The Court therefore **STRIKES** page 26 of Defendants' Motion for Summary Judgment; pages 16 through 26 of Defendants' Reply in Support of Defendants' Motion for Summary Judgment; pages 16 through 18 of Defendants' Reply in Support of Defendants' Motion to Exclude Dr. Pomerantz and Mr. Witz (Dkt. No. 223); page 26 of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment; and page 26 of Plaintiffs' Opposition to Defendants' Motion to Exclude Dr. Pomerantz and Mr. Witz (Dkt. No. 202).

1    rejected most of the ITA's recommendations and/or presentation materials.

2         A trier of fact could reasonably view the ITA's evaluations and discussions in

3    Investment Committee meetings insufficient to disprove a breach of Defendants'

4    fiduciary duties because the Investment Committee failed to adequately weigh the

5    costs and benefits of an active management strategy against a passive management

6    strategy. *George, Inc.*, 641 F.3d at 795 ("Despite all this discussion . . . we can find

7    nothing in the record indicating that defendants ever made a decision on these matters

8    –i.e., that they actually determined whether the costs of making changes . . .

9    outweighed the benefits, or vice versa.").

10        Finally, to the extent Plaintiffs argue that Defendants improperly delegated

11   matters to the ITA, the Court rejects Plaintiffs' argument because a Plan instrument

12   need not set forth an express delegation of authority.[8]   *See Concha*, 62 F.3d at 1501-

13   02 ("[T]here need not be an express delegation of fiduciary duty in the Plan

14   instrument itself for persons performing duties of a fiduciary nature to be considered

15   fiduciaries. It is true that a person designated in the Plan as a 'named fiduciary' is

16   subject to liability. *See* 29 U.S.C. §§ 1102(a)(1) and 1105. Defendants are not correct,

17   however, in asserting that the Plan instrument must set forth an express delegation of

18   authority, if anyone other than a named fiduciary is to be held liable for breach of

19   fiduciary duty.").

20        Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment

21   on Plaintiffs' EM Fund claim.

22

23

24

25   _____

26   [8] Insofar as Defendants argue that Plaintiffs' cannot demonstrate that Defendants
27   caused any plan losses, the Court rejects the argument as premature. Plaintiffs have
     presented enough evidence to survive Defendants' motion.
28

**B.      Defendants Are Entitled to Summary Judgment on the Recordkeeping Fees Claim (Count II).**

Plaintiffs allege that Defendants breached the duty of prudence and caused the NGSP to pay excessive fees to Hewitt, its recordkeeper, from 2010 until the NGSP switched recordkeepers in April 2016.  Plaintiffs recordkeeping claim is based on three distinct theories: (1) Defendants should have renegotiated recordkeeping fees in a competitive bidding process; (2) the renegotiated fees should have been on a per-participant basis; and (3) Defendants failed to account for payments received by Hewitt from Financial Engines. As noted by Defendants, Plaintiffs have abandoned their second theory because they do not dispute that "Defendants did succeed in renegotiating their agreement with Hewitt in 2011 to provide for per participant fees." (Reply at 13-14; *see* Opp'n at 18-22.) The Court addresses Plaintiffs' two remaining theories below.

**1.      Whether Defendants Were Required to Renegotiate Recordkeeping Fees in a Competitive Bidding Process.**

Drawing all inferences in Plaintiffs' favor, the Court concludes that no reasonable trier of fact could find that Defendants breached their fiduciary duty of prudence by failing to monitor and renegotiate recordkeeping fees in a competitive bidding process every three to five years.

"[T]he allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation." *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016). "[N]othing in ERISA compels periodic competitive bidding." *Id.* Plaintiffs rely heavily upon *George v. Kraft Foods Glob., Inc.*, 641 F.3d at 798. In *George,* the court held that the failure to solicit competitive bids *might* be imprudent where (1) plaintiffs presented concrete evidence about the objective level of fees and why they were unreasonable; and (2) the plan fiduciaries had not renegotiated their recordkeeping arrangement for more than fifteen years. *Id.* at 798-99 (based on evidence adduced in the case, a triable

20.

issue of fact existed regarding the prudence of the plan fiduciaries' decision not to solicit competitive bids).

Here, Defendants conducted an RFP before hiring Hewitt, benchmarked Hewitt's fees using an external consultant in 2010, and renegotiated recordkeeping fees in 2011. After the early-termination fee expired, NGSP's fiduciaries put its recordkeeping contract out to bid in 2014, conducted an RFP, and entered into a new contract with Fidelity effective April 2016. (SUF 91-94.) Thus, even assuming fiduciaries have a duty to conduct frequent fee reviews and renegotiate fees in a competitive bidding process, Defendants meet the requirement because Defendants benchmarked Hewitt and renegotiated fees starting in 2010 and 2011, and the new RFP for recordkeeping services issued in 2014.

## 2. Whether Financial Engines' Payments to Hewitt Creates a Triable Issue

Plaintiffs challenge the data connectivity agreement and Master Service Agreement (Ex. P46; Ex. 98) between Hewitt and Financial Engines as "kickback" arrangements. Plaintiffs argue that Defendants' breached their fiduciary duties to monitor all sources of compensation to Hewitt (the recordkeeper), including additional income it receives from Financial Engines (the advisory services provider). Plaintiffs' theory regarding Financial Engines's payments to Hewitt fails for two reasons. First, Plaintiffs' claim rises and falls with Mr. Schmidt's excluded opinion on this subject. Second, ERISA does not require, as a matter of law, that fiduciaries leverage the type of third-party fees at issue here in order to reduce recordkeeping fees. Plaintiffs try to analogize the data connectivity fees Hewitt received from Financial Engines to revenue sharing fees because fiduciaries have a duty to monitor revenue sharing fees. (Opp'n at 21 (citing *Tussey*, 746 F.3d at 336).) But there are important differences between revenue sharing plans and the data connectivity fees here. Under a revenue sharing agreement, a plan recordkeeper is compensated for the services it provides to a plan and plan participants by collecting asset-based fees, which are built into the

21.

expense of certain mutual funds. A plan's duty to monitor revenue sharing fees makes sense because plan fiduciaries *have control* over these payments, payments are paid out of plan assets, and payments are for services provided to the plan and its participants.  Data connectivity fees, by contrast, are *not subject to* fiduciary *control*, the fees are not paid out of plan assets, and are for services Hewitt provides to Financial Engines out of an independent business arrangement.

With regard to the Master Service Agreement, it is undisputed that Northrop had no control over the agreement because it was not a party to the agreement. The agreement is between only Hewitt and Financial Engines and, like data connectivity fees, it provides for services that Hewitt provides to Financial Engines out of a separate, freestanding agreement. And, as emphasized by defense counsel at oral argument, if the Court takes Plaintiffs' argument to its logical extension, a plan sponsor must take into account all income that the recordkeeper is obtaining from third parties when it negotiates recordkeeping fees.

Accordingly, the Court **GRANTS** summary judgment on Plaintiffs' Recordkeeping Fees claim.

### C.   Defendants Are Entitled to Summary Judgment on Plaintiffs' Duty of Loyalty Claims.

Plaintiffs' Second Amended Complaint also frames the EM Fund claim and recordkeeping fee claim as a breach of the duty of loyalty.  Defendants move for summary judgment on the duty of loyalty theory because Plaintiffs failed to present facts from which disloyalty can be inferred. (Mot. at 19-20.)

The duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

In their opposition, Plaintiffs argue Northrop benefitted from the retention of (1) an active manager because it discounted the fees it charged to manage pension plan

22.

investments and (2) Hewitt by obtaining discounted pension or health plan administrative services. (Opp'n at 22.) Plaintiffs, however, fail to present evidence that Northrop benefitted from retaining an active account manager because active managers discounted their pension plan management fees. Plaintiffs also fail to show that Northrop benefitted from retaining Hewitt by obtaining discounted pension or health plan administrative services. (*See* Dkt. No. 237-13, Defs.' Resp. to AMF 321.) Plaintiffs rely on portions of Exhibits 20 and 28 but neither suggest that Wellington discounted the fees it charged Northrop for managing the pension plan. Nor does Albert Tsao's deposition suggest that the EM Fund discounted pension plan fees because it also managed the EM Fund. (*See* Ex. P3 at 50:7-25, 52:9-7.) Finally, Plaintiffs have not directed the Court to any evidence that Defendants were motivated by the foregoing discounts.

Accordingly, the Court **GRANTS** Summary Judgment with regard to Plaintiffs' duty of loyalty claims.

### D.    Defendants Are Entitled to Summary Judgment on the Failure to Monitor Claim (Count VII).

Defendants move for summary judgment on Count VII on two grounds. First, Defendants argue they are entitled to summary judgment on this claim because Plaintiffs' "failure to monitor" claim is derivative of the underlying breach of fiduciary duty claims.  (Defs.' MSJ at 20.) But Plaintiffs' other claims have, at least in part, survived summary judgment such that judgment on Count VII is not warranted.

Second, Defendants argue that Plaintiffs "have not adduced 'significantly probative' evidence of any failure in monitoring." (Defs.' MSJ at 21.) The Court agrees for the reasons set forth in Defendants' Motion. Plaintiffs attempt to shift gears and raise a new theory—the Board did not receive "written documentation" on certain plan performance metrics and that the memoranda provided to the Board were not prepared frequently enough. (Opp'n at 23.) Plaintiffs have not alleged any facts in the complaint to put Defendant on notice of the theories that Plaintiff now advances. "And

the Court will not consider claims raised for the first time in summary judgment which Plaintiff did not raise in his Complaint." *Nolan v. Vilsack*, No. CV-14-08113-AB (FFMx), 2016 WL 3678992, at *4 (C.D. Cal. June 30, 2016). Nor will the Court grant Plaintiffs leave to amend their Complaint to change the course of this lawsuit at this late stage. The Court therefore **GRANTS** Defendants' Motion for Summary Judgment on Plaintiffs' failure to monitor claim.

### E.    Prohibited Transaction Claim Between The Plan and Its Service Providers (Count VI)

Plaintiffs allege Defendants engaged in prohibited transactions in violation of 29 U.S.C. § 1106(a) by *hiring* Hewitt, Financial Engines, and the EM Fund active managers and for paying them fees to provide services for which they were hired. (SAC ¶ 136.) Section 1106(a) bars certain transactions between a plan and a "party in interest." 29 U.S.C. § 1106. ERISA defines a "party in interest" to include a person furnishing "services" to a plan. *See id.*

The Court finds that Plaintiff's contention that Defendants engaged in a prohibited transaction by paying a party in interest—Hewitt, Financial Engines, and EM Fund managers—for services rendered to the Plan is unpersuasive. "[I]t is circular to suggest that an entity which becomes a party in interest by providing services to the Plan[ ] has engaged in a prohibited transaction simply because the Plan[ ] ha[s] paid for those services." *Sacerdote v. N.Y.U.*, No. 16 Civ. 6284, 2017 WL 3701482, at *13 (S.D.N.Y. Aug. 25, 2017); *see White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2017 WL 2352137, at *21-22 (N.D. Cal. May 31, 2017), *aff'd,* 752 F. App'x 453 (9th Cir. 2018), *cert. denied,* 139 S. Ct. 2646 (2019).

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiffs' prohibited transactions claim.

## VI.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Partial Summary Judgment. The Court hereby:

24.

- **DENIES** Defendants' Motion for Summary Judgment with regard to the duty of prudence on Plaintiffs' EM Fund claim;

- **GRANTS** Defendants' Motion for Summary Judgment with regard to Plaintiffs' duty of loyalty claims;

- **GRANTS** Defendants' Motion for Summary Judgment with regard to the duty of prudence for Plaintiffs' recordkeeping fees claim;

- **GRANTS** Defendants' Motion for Summary Judgment on Plaintiffs' failure to monitor claim; and

- **GRANTS** Defendants' Motion for Summary Judgment on Plaintiffs' prohibited transaction claim.

The Court also **DENIES** Defendants' Motion to Exclude Dr. Pomerantz and Mr. Witz as moot.

Dated:  August 14, 2019

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

25.