JEROME J. SCHLICHTER (SBN 054513)
jschlichter@uselaws.com
NELSON G. WOLFF (admitted *pro hac vice*)
nwolff@uselaws.com
MICHAEL A. WOLFF (admitted *pro hac vice*)
mwolff@uselaws.com
KURT C. STRUCKHOFF (admitted *pro hac vice*)
kstruckhoff@uselaws.com
SCHLICHTER, BOGARD & DENTON LLP
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
*Counsel for Plaintiffs*

WILLIAM A. WHITE (SBN 121681)
wwhite@hillfarrer.com
HILL, FARRER & BURRILL LLP
One California Plaza, 37th Floor
300 South Grand Avenue
Los Angeles, CA 90071-3147
Telephone: (213) 620-0460
Facsimile: (213) 620-4840
*Local Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFTON W. MARSHALL *et al*., | Case No. 16-CV-6794 AB (JCx) |
| *Plaintiffs*, | **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| NORTHROP GRUMMAN CORPORATION, *et al*., | Hon. André Birotte Jr. |
| *Defendants* | Final Pre-Trial Date: October 4, 2019, at 11:00 a.m. |
| | Trial Date: October 15, 2019, at 8:30 a.m. |

# TABLE OF CONTENTS

FINDINGS OF FACT ......................................................................................... 1

I.   Background................................................................................................. 1

Northrop Grumman Savings Plan ("Plan"). ........................................... 1

Trust Agreement and Trustee. ................................................................. 3

Administrative Committee ....................................................................... 4

Investment Committee............................................................................. 6

Third-Party Service Providers ................................................................ 7

II.  Payments of Plan assets to Northrop....................................................... 8

The Administrative Services Agreements............................................... 8

The ASA General Requirements. .......................................................... 10

The Annual Proposal Requirement. ...................................................... 11

The Independent Consultant Requirement. ........................................... 12

The Request for Payment Requirement. ................................................ 12

The Audit Requirement. ......................................................................... 13

The Committees and Northrop did not comply with the process of the
ASA. ....................................................................................................... 13

Northrop delegated authority to approve payments from the Plan to the
Northrop departments that requested those payments. .......................... 15

Defendants ignored repeated warnings about inadequate services and
excessive compensation to Northrop...................................................... 18

Northrop's payments from the Plan. ...................................................... 20

Termination of payment to Northrop from the Plan. ............................. 21

III. The Emerging Markets Fund.................................................................. 22

The Investment Committee and the EM Fund's investment objective. ........... 22

The Decision to Maintain an Active Strategy in the EM Fund........................ 23

The Plan's Other Core Investment Options. .................................................... 26

The Underperformance of the EM Fund. ......................................................... 27

The Transition to Passive Management in 2014. ...............................................29

CONCLUSIONS OF LAW ...............................................................................30

The Plan and Plan Documents...........................................................................30

Fiduciary Status ................................................................................................30

ERISA's general fiduciary duties. .....................................................................36

    The duty of loyalty. ...................................................................................37

    The duty of prudence..................................................................................38

Prohibited Transactions. ...................................................................................39

    29 U.S.C. § 1106(a) [ERISA § 406(a)] ....................................................40

    The 29 U.S.C. § 1108(b)(2) exemption [ERISA § 408(b)(2)]. .................41

    Necessary service. Excludes settlor expenses. .........................................41

    Reasonable contract or arrangement. .......................................................43

    Reasonable compensation. ........................................................................43

    29 U.S.C. § 1106(b) [ERISA § 406(b)]....................................................44

    The Court must defer to DOL's interpretation of ERISA's prohibited
    transaction provisions. ..............................................................................47

Fiduciary Liability. ...........................................................................................50

Payments of Plan assets to Northrop. ................................................................51

    Breach of the duty of loyalty......................................................................51

    Breach of the duty of prudence. .................................................................53

    Commission of ERISA § 406(a) prohibited transactions............................55

    Commission of ERISA § 406(b) prohibited transactions. ..........................56

The Emerging Markets Fund. ............................................................................58

    Breach of Duty of Prudence. .....................................................................58

Determining Plan losses. ...................................................................................59

Northrop's duty to disgorge Plan assets. ............................................................63

# FINDINGS OF FACT

## I.    Background.

### Northrop Grumman Savings Plan ("Plan").

1.     Plaintiffs and Class Representatives Marshall, Hall, Gonzalez, Hendrickson, Brooks, and Hylton are participants in the Northrop Grumman Savings Plan ("Plan") within the meaning of 29 U.S.C. § 1002(7).

2.     Northrop Grumman Corporation is the plan sponsor of the Plan under 29 U.S.C. § 1002(a)(B).

3.     From August 1, 2010 through September 30, 2013, the Plan was established and maintained under 29 U.S.C. § 1102 by a written instrument titled the "Northrop Grumman Savings Plan." Exhibit 93; Exhibit 373 (amendments).

4.     From October 1, 2013 through December 31, 2014, the Plan was established and maintained under 29 U.S.C. § 1102 by a written instrument titled the "Northrop Grumman Savings Plan." Exhibit 164.

5.     From January 1, 2015 through March 31, 2016, the Plan was established and maintained under 29 U.S.C. § 1102 by a written instrument titled the "Northrop Grumman Savings Plan." Exhibit 659.

6.     Since April 1, 2016, the Plan has been established and maintained under 29 U.S.C. § 1102 by a written instrument titled the "Northrop Grumman Savings Plan." Exhibit 712. These instruments are collectively referred to herein as the Plan Document.

7.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(34).

8.     Under the terms of the Plan Document, active employees may contribute varying amounts of eligible compensation on a before or after tax basis through payroll withholdings up to the threshold as established under the law. Northrop matches a percentage of such contributions.

9.     Since August 1, 2010, the applicable Plan Document provided that the

Plan was intended to be qualified under 26 U.S.C. §§ 401(a) and 401(k). Plan Document § 1.01.

10.     Since August 1, 2010, the Plan Document has provided that the assets of the Plan were not to be used for any purpose other than the exclusive benefit of participants or their beneficiaries, except to the extent permitted by law. Plan Document § 17.01

11.     At the end of 2009, the Plan had 142,768 participants and beneficiaries (133,799 with account balances) and approximately $13.87 billion in net assets. Exhibit 346 at 2, 46.

12.     At the end of 2010, the Plan had 140,701 participants and beneficiaries (132,399 with account balances) and approximately $15.50 billion in net assets. Exhibit 402 at 2, 44.

13.     At the end of 2011, the Plan had 117,487 participants and beneficiaries (109,215 with account balances) and approximately $13.74 billion in net assets. Exhibit 468 at 2, 46.

14.     At the end of 2012, the Plan had 114,043 participants and beneficiaries (105,611 with account balances) and approximately $15.10 billion in net assets. Exhibit 528 at 2, 48.

15.     At the end of 2013, the Plan had 113,378 participants and beneficiaries (102,780 with account balances) and approximately $17.67 billion in net assets. Exhibit 592 at 2, 49.

16.     At the end of 2014, the Plan had 109,825 participants and beneficiaries (101,455 with account balances) and approximately $18.88 billion in net assets. Exhibit 658 at 2, 50.

17.     At the end of 2015, the Plan had 110,463 participants and beneficiaries (102,565 with account balances) and approximately $19.34 billion in net assets. Exhibit 711 at 2, 45.

18.     At the end of 2016, the Plan had 105,849 participants and

beneficiaries (103,692 with account balances) and approximately $20.86 billion in net assets. Exhibit 751 at 2, 46.

19.     At the end of 2017, the Plan had 109,623 participants and beneficiaries (107,471 with account balances) and approximately $24.19 billion in net assets. Exhibit 783 at 2, 44.

20.     Since August 1, 2010, the Plan Document has provided that "[a]ll reasonable and proper expenses of administration of the Trust Fund… will be paid out of the Trust Fund[.]" Plan Document § 16.11.

21.     Since August 1, 2010, the Plan Document has provided that Northrop would indemnify the Administrative Committee and its members for any and all expenses, liabilities, or losses arising out of any act or omission relating to the rendition of services for or the management and administration of the Plan, except in instances of gross misconduct. Plan Document § 17.09(b).

**Trust Agreement and Trustee.**

22.     Since August 1, 2010, the Plan Document has required that all assets of the Plan be held as a special trust in accordance with the terms of a "Trust Agreement" for the benefit of participants and their beneficiaries. Plan Document § 17.01.

23.     Since August 1, 2010, State Street Bank and Trust Company ("SSBT") has been the trustee of the Plan's assets, as well as the assets of other Northrop Grumman defined contribution plans, under a Defined Contribution Plans Master Trust Agreement ("Trust Agreement"). Exhibits 139, 140, 141.

24.     Section 2 of the Trust Agreement provides: "The Trustee shall from time to time on the directions of the Administrative Committee make payments out of the Trust Fund to such persons, including the Administrative Committee, Recordkeepers or Investment Committee in such manner, in such amounts and for such purposes as may be specified in the directions of the Administrative Committee. The Administrative Committee shall be primarily responsible for

insuring that any payment directed under this Article conforms to the provisions of the Plans, this Trust Agreement, and the provisions of the ERISA. Each direction of the Administrative Committee shall be in writing and shall be deemed to include a certification that any payment or other distribution directed thereby is one which the Administrative Committee is authorized to direct, and the Trustee may conclusively rely on such certification without further investigation unless circumstances are such that the Trustee reasonably should have concluded that the direction was unauthorized." Exhibit 139 at 9–10; Exhibits 140, 141.

**Administrative Committee**

25.     The Plan Document provides that the general administration of the Plan is the responsibility of the "Administrative Committee," which was the plan administrator and named fiduciary of the Plan under 29 U.S.C. § 1102(a). Plan Document § 16.01.

26.     The Plan document provides that "[a]ny allocation or delegation of fiduciary responsibilities [of the Administrative Committee] must be approved by majority vote, in a resolution approved by the majority[.]" Plan Document § 16.10(a).

27.     Until October 25, 2011, the Plan Document required the Administrative Committee to constitute three individuals appointed by the Compensation Committee of Northrop's Board of Directors. Exhibit 93 (§ 16.02).

28.     As of October 25, 2011, the Plan Document allowed Northrop's Chief Executive Officer to appoint the members of the Administrative Committee, to serve at the discretion of the CEO. Exhibit 373 at 21 (Eighth Amendment).

29.     From August 1, 2010 until December 21, 2011, Northrop, through its Board of Directors, provided that whatever individuals occupy the following Northrop offices are to be the members of the Administrative Committee: Northrop's Corporate Vice President and Chief Human Resources and Administrative Officer; Northrop's Corporate Vice President, Strategy and

Technology; Northrop's Corporate Vice President and Controller; Northrop's Vice President, Taxation; Northrop's Vice President, Trust Administration and Investments; Northrop's Vice President, Compensation and Benefits; and Northrop's Corporate Director, Benefits Administration and Services. Exhibit 287 at 5.

30.     Effective December 21, 2011, Northrop's Chief Executive Officer was authorized to appoint directors, officers or employees of the Northrop to serve as members of the Administrative Committee. Exhibit 460 at 28.

31.     Not until December 18, 2014 did the Administrative Committee adopt a Charter setting forth the rules governing the Committee's composition, responsibilities, and operations. Exhibit 149 at 5.

32.     Members of the Administrative Committee from September 2010 through November 2017 included the following Defendants: Kenneth Heintz, Corporate Vice President and Controller (2010–11); Kenneth Bedingfield, Northrop's Business Management and Chief Financial Officer Aerospace Systems (formerly Corporate Vice President, Controller and Chief Accounting Officer) (2012–14); Michael Hardesty, Northrop's Corporate Vice President, Controller, and Chief Accounting Officer (formerly Senior Vice President and Chief Financial Officer Northrop Grumman Innovation Systems) (2011–17); Gary McKenzie, Northrop's Vice President, Taxation (2010); Christopher McGee, Northrop's Vice President, Compensation and Benefits (2012); Constance Soloway, Northrop's Vice President, Compensation and Benefits (2016–17); Richard Boak, Northrop's Vice President and Chief Financial Officer (2015–16); Debora Catsavas, Northrop's Vice President, Acting Human Resources Officer (2010–11) (Committee Chair); Maria Norman, Northrop's Vice President, Human Resources and Administration (2010); Denise Peppard, Northrop's Vice President, Human Resources Officer (2011–17) (Committee Chair); Tiffany McConnell King, Northrop's Corporate Director Assistant General Counsel (2011–17); Teri Herzog, Northrop's Corporate

Director of Global Benefits (2013–17). Exhibit 812.

33.     These officers were on the Administrative Committee for 35 Northrop defined benefit and defined contribution retirement plans. Exhibit 287 at 13.

34.     The Administrative Committee did not have a meeting at which only business pertinent to the Plan was discussed. Exhibit 812.

35.     From 2010 through 2017, the Administrative Committee met as the "Benefit Plan Administrative Committees" for all qualified retirement benefit plans, non-qualified benefit plans, and health and welfare benefit plans maintained by Northrop Grumman Corporation and/or its subsidiaries and affiliates. Exhibit 812.

**Investment Committee**

36.     The Plan Document provides that an Investment Committee is the "named fiduciary" responsible for all investment-related activities. Plan Document § 17.05.

37.     Until October 25, 2011, the Plan Document required the Investment Committee to constitute three individuals appointed by Northrop's Board of Directors. Exhibit 93 (Plan Document § 17.05).

38.     As of October 25, 2011, the Plan Document allowed Northrop's Chief Executive Officer to appoint the members of the Investment Committee, to serve at the discretion of the CEO. Exhibit 373 at 21 (Eighth Amendment).

39.     From August 1, 2010 until December 21, 2011, Northrop, through its Board of Directors, provided that whatever individuals occupy the following Northrop offices are to be the members of the Investment Committee: Northrop's Corporate Vice President and Chief Financial Officer; Northrop's Corporate Vice President and Chief Human Resources and Administrative Officer; Northrop's Corporate Vice President and Treasurer; Northrop's Vice President, Investments and Trust Administration. Exhibit 285 at 1.

40.     Effective December 21, 2011, Northrop's Chief Executive Officer was authorized to appoint directors, officers or employees of the Northrop to serve as

members of the Investment Committee. Exhibit 460 at 28.

41.     Not until December 15, 2014 did the Investment Committee adopt a Charter setting forth the rules governing the Committee's composition, responsibilities, and operations. Exhibit 144 at 4.

42.     Members of the Investment Committee from September 2010 through May 2017 included the following Defendants: Debora Catsavas (2010–11); Constance Soloway (2016–17); Mark Rabinowitz, Northrop's Corporate Vice President and Treasurer (2010–11) (Committee Chair); Mark Caylor, Northrop's Corporate Vice President and Treasurer (2011–17) (Committee Chair); Rajender Chandhok, Northrop's Vice President, Investments and Trust Administration (2010–11, 2016–17); Gloria Flach, Northrop's Corporate Vice President and Chief Operating Officer (2011–12); James Myers, Northrop's Vice President, Enterprise Initiatives (2011–16); Sunil Navale, Northrop's Vice President, Enterprise Initiatives (2011–16); Steven Spiegel, Northrop's Director, Assistant Treasurer (2013–16); and Eric Scholten, Northrop's Vice President & Controller (2016–17).

43.     These officers were the Investment Committee for over 20 Northrop retirement plans. Exhibit 285 at 4; Exhibit 69 at 3–4.

44.     The Investment Committee had one meeting at which only business pertinent to the Plan was discussed. Exhibit 811.

45.     From 2010 through 2017, the Investment Committee met as the "Investment Committees of the Plans Sponsored by Northrop Grumman Corporation and its subsidiaries". Exhibit 811 at 17.

**Third-Party Service Providers**

46.     The keeping of records of individual participant account transactions and balances in the plans (recordkeeping) has been performed by a hired recordkeeper, who from 2006 until May 20, 2015 was Hewitt Associates LLC. Exhibits 96, 97, 105. Since May 20, 2015, Fidelity Workplace Services LLC has been the recordkeeper. Exhibit 161 at 8.

47.    The monitoring of the investment results of the Plan's investment options has been performed by a hired investment consultant, who since 2005 has been Callan Associates, Inc. ("Callan"). Exhibits 305, 472. Callan provided performance measurement and performance analytical services for the Investment Committee consisting of issuing monthly and quarterly reports on performance and other quantitative metrics at the manager level, asset class level and total fund level. *Id.* These reports were provided to Northrop's Investment Trust & Administration department.

## II.    Payments of Plan assets to Northrop.

### The Administrative Services Agreements.

48.    Northrop was informed by outside legal counsel that it could not provide services to the Plan or receive any compensation from the Plan without violating ERISA and would have to meet strict requirements to qualify for the exemption of ERISA § 408(b)(2) (29 U.S.C. §1108(b)(2)). Exhibits 260, 259, 255. *See* Conclusions of Law, "Prohibited Transactions," *infra*.

49.    Northrop was informed that it could not be reimbursed for any cost from providing a service to the Plan unless Northrop would not have incurred the cost but for the Company's provision of services to the Plans. Exhibit 260 at 1 ("In practice, the concept of direct expenses is best understood as a 'but for' rule: if a cost would not have been sustained 'but for' the Company's provision of services to a plan or plans, then the plan or plans may reimburse the Company for that cost.").

50.    Northrop was informed that it could be reimbursed only for employees whom Northrop would not employ but for the work those employees did for the Plan. Northrop could not receive compensation if it would have retained that employee even if Northrop provided no services to the Plan. Exhibits 260, 259, 255.

51.    Northrop was informed that whether a particular expense was

reimbursable was a factual determination that had to be made by the appropriate plan fiduciaries based on all the relevant facts and circumstances. Exhibits 260, 259, 255.

52.   Northrop was informed that the appropriate plan fiduciaries had to determine, among other things, that the expense from having Northrop provide services to the Plan was the same as or lower than what a third party would charge and that the services were equal to or better than a third party's services. Exhibit 260 at 2; Exhibit 259 at 1–2.

53.   Northrop's in-house counsel advised Northrop that "[i]n general, an expense is considered to be reasonable if it is no greater than the prevailing charge for similar items or services that are provided to the plan sponsor or to plan unrelated to the plan". Exhibit 158 at 19.

54.   Northrop was informed that it could not decide to have itself reimbursed for employee expenses or influence Plan fiduciaries to do so, but instead must have an independent fiduciary make that decision. Exhibit 255 at 5–6.

55.   To avoid violating ERISA, upon advice of counsel, Northrop entered into an Administrative Services Master Contract (referred to as an ASA) that specified the process by which Northrop Grumman could provide services to the Plan and be reimbursed for direct expenses incurred in providing those services without violating ERISA. Exhibits 52, 94.

56.   The Administrative Committee and Northrop entered into an Administrative Services Master Contract ("Admin. ASA") dated 1999. Exhibit 94.

57.   The Investment Committee and Northrop entered into an Administrative Services Master Contract ("Inv. ASA") dated July 2, 1999. Exhibit 52.

58.   The Admin. ASA and the Inv. ASA contain the same contractual language, apart from the signatories on the last page. (Collectively, "ASA".)

59.   The ASA spells out the arrangement whereby persons in various

benefits departments would provide services to the different plans, for which the individual plans would provide reimbursement.

60.     The ASA remained in effect until superseded by a Benefits Plan Services And Loan Agreement executed in December 2014, effective January 1, 2015. Exhibit 66.

**The ASA General Requirements.**

61.     Under the terms of the ASA, Northrop would provide administrative and investment services to certain of Northrop's plans in exchange for reimbursement by the plans of Northrop's salary and fringe benefit costs and other expenses incurred in the provision of the services only under strict conditions. Exhibit 94, § 2; Exhibit 52, § 2.

62.     The ASA approved only the following departments within Northrop to provide services to the Plan (Exhibit 94, § 8; Exhibit 52, § 8):

> Dept. 129 – Benefits Administration and Services
> Dept. 158A – Benefits Accounting and Analysis
> Dept. 158C – Benefits Compliance
> Dept. 159 – Investments and Trust Management.

63.     The Admin. ASA required the Administrative Committee to approve the reimbursement of expenses to Northrop departments 129, 158A and 158C. Exhibit 94, § 13(c).

64.     The Inv. ASA required the Investment Committee to approve the reimbursement of expenses to Northrop department 159. Exhibit 52, § 13(c).

65.     The ASA does not specify either the services Northrop was supposed to provide or the amount Northrop was supposed to be paid for those services. Exhibit 94, §§ 6, 7; Exhibit 52, §§ 6, 7.

66.     The ASA does not specify which benefit plans Northrop was supposed to provide services to or receive payment from. Exhibit 94, § 1(e); Exhibit 52, § 1(e).

67.     The only plans whose assets could be used to reimburse Northrop were those plans specified in an Annual Proposal. Exhibit 94, § 1(e); Exhibit 52, § 1(e).

**The Annual Proposal Requirement.**

68.     By the end of the second quarter of each year, Northrop was required to present for approval to the Administrative and Investment Committees a detailed proposal ("Annual Proposal") containing the following with respect to that year (Exhibit 94, § 4; Exhibit 52, § 4):

(a) A description of the services to be rendered to the Plans;
(b) The names, positions, and duties of those personnel with respect to whom the Company will be reimbursed, as well as a breakdown of the annual salary and fringe benefit cost for those employees;
(c) The expenses for which reimbursement will be sought, such as travel expenses and seminar costs; and
(d) Estimates of total costs.

69.     Each Annual Proposal was supposed to include a Schedule 1, which was supposed to list the Northrop retirement and welfare plans for which Northrop was to provide services and receive reimbursements under the Contracts. Exhibit 94, § 1(e); Exhibit 52, § 1(e).

70.     Each Annual Proposal had to identify the services to be provided by Northrop in separate "Schedule 6" documents for each authorized department. Exhibit 94, § 6; Exhibit 52, § 6.

71.     Each Annual Proposal had to identify the personnel for whom Northrop would seek payment, their positions and duties, and a breakdown of their annual base salary and fringe benefit costs in separate "Schedule 8" documents for each authorized department. Exhibit 94, § 8(a); Exhibit 52, § 8(a).

72.     Each Annual Proposal had to identify the expenses for which Northrop would seek reimbursement in separate "Schedule 11" documents for each authorized department. Exhibit 94, § 11(a); Exhibit 52, § 11(a).

73.     The Committees were prohibited from paying to Northrop any amount for reimbursements or expenses to the extent not substantiated with receipts or

similar documentation and substantiated in accordance with these Schedules. Exhibit 94 § 11(b), § 11(c), § 12(a); Exhibit 52 § 11(b), § 11(c), § 12(a).

74.    The Administrative Committee and the Investment Committee each were allowed to approve an Annual Proposal only if they concluded that given the cost, kind, and quality of services rendered, Northrop was offering a reasonable arrangement that was comparable to market options. Exhibit 94, § 5; Exhibit 52, § 5.

**The Independent Consultant Requirement.**

75.    The Administrative Committee and the Investment Committee each was required to retain an independent consultant to advise it on whether the services Northrop provided were necessary for administration and management of the Plans, and whether the quality and level of charges are equivalent to those that would be provided under a third-party arrangement. Exhibit 94, § 14(a); Exhibit 52, § 14(a).

76.    The independent consultant was required to make a prudent investigation including comparing the costs Northrop proposed to charge for its services to the costs charged by third-party vendors for the same services. The ASA required the independent review to encompass both salary and fringe benefit costs and expenses and be provided at least annually. Exhibit 94, § 14(a); Exhibit 52, § 14(a).

**The Request for Payment Requirement.**

77.    Each year Northrop was required to submit a Request for Payment accompanied by timesheets, expense substantiation and such other information as was necessary to verify the costs for which Northrop sought payment from the Plans. Exhibit 94, § 13(c); Exhibit 52, § 13(c).

78.    The Administrative Committee and the Investment Committee each were allowed to approve a Request for Payment only if the Committee determined that the services and reimbursements were reasonable. Exhibit 94, § 13(b); Exhibit 52, § 13(b).

**The Audit Requirement.**

79.     Northrop was required to arrange for quarterly limited-scope audits of salary and fringe benefits costs and other expenses to verify that there was sufficient documentation for these charges and that the methods for allocating these charges were reasonable. Exhibit 94, § 14(b); Exhibit 52, § 14(b).

80.     Northrop was required to make the quarterly audit report available to the Administrative and Investment Committees. Exhibit 94, § 14(b); Exhibit 52, § 14(b).

81.     Northrop was required to obtain an annual external audit of the salary and fringe benefit costs and other expenses reimbursed pursuant to the ASA to verify that there was sufficient documentation for these charges and that the methods for allocating these costs were reasonable. Exhibit 94, § 14(c); Exhibit 52, § 14(c).

82.     Northrop was required to make the annual audit report or results available to the Administrative and Investment Committees. Exhibit 94, § 14(c); Exhibit 52, § 14(c).

**The Committees and Northrop did not comply with the process of the ASA.**

83.     Members of the Committees were informed of their duty to "[o]bserve meeting and decision making formalities" Exhibit 53 at 8. They were also informed to demonstrate "procedural prudence" in all of their actions. Exhibit 53 at 7–9; Exhibit 54 at 14; Exhibit 160 at 17.

84.     Members of the Committees were informed of their duty to "[c]arefully document *all* actions and processes. If you are challenged the court or Dept. of Labor will evaluate your documented decision making process more than actual decision." Exhibit 53 at 9. Again, they were told to ask themselves, "Have you documented how you arrived at your decision?" Exhibit 53 at 19.

85.     They were informed to "[b]e able to show the process used to take an action (or monitor action taken) was a prudent one: carefully document (or be fully

briefed on) what alternatives were evaluated and if any available ones were not (and why), what data was used in the decision making process, [and] what action was taken (recommended) and why that action was chosen." Exhibit 54 at 14; Exhibit 160 at 17. They also were advised to "[b]e informed about service providers to plans" and "[m]onitor that these choices have been determined to be the best among the available options and how often that is evaluated". Exhibit 54 at 16; Exhibit 160 at 19.

86.     The Committees did not receive, review, or approve any Annual Proposal as called for by the ASA.

87.     The Committees did not receive any of the Schedules 6, 8, or 11 called for by the ASA.

88.     The Committees did not receive or approve a Request for Payment as called for by the ASA for any year from 2010 through 2015.

89.     The Committees did not receive or review a quarterly or annual audit as called by the ASA for any year from 2010 through 2015.

90.     The Committees did not determine what service any specific Northrop employee was to provide to the Plan or whether that service was necessary for the establishment or operation of the Plan.

91.     The Committees did not determine that each Northrop employee that provided a service to the Plan would not have been employed by Northrop but for the fact that Northrop provided that service to the Plan.

92.     The Committees did not determine that the services Northrop provided to the Plan were equal to or greater than the services that could have been provided by an outside company.

93.     The Committees did not determine that the amounts paid to Northrop for the services it provided to the Plan were equal to or lower than what would have been charged by an outside company.

94.     The Committees did not obtain any audit to verify that there was

sufficient documentation to verify that the method for allocating Northrop's costs to the Plan was accurate and reasonable.

95.     The Committees did not engage the services of an independent consultant as called for by the ASA.

96.     The Committees did not engage the services of an independent consultant as called for by the ASA.

97.     The Committees did not engage the services of an independent consultant or independent fiduciary to determine whether the services provided by Northrop were necessary for the establishment and operation of the Plan and that Northrop's charges for those services were comparable to what an outside company would have charged.

98.     The Committees did not solicit bids from outside companies to provide to the Plan the services that Northrop was providing.

99.     No independent consultant or independent fiduciary determined that the services Northrop provided to the Plan were necessary to the establishment or operation of those plans or were properly charged to the Plan.

100.    No independent consultant or independent fiduciary determined that the quality and level of Northrop's services and charges to the Plan were equivalent or better to those that could have been provided by an outside company.

101.    No independent consultant or independent fiduciary determined that Northrop's charges for the services it provided to the Plan were reasonable compared to what an outside company would have charged.

102.    Defendants did not terminate the ASAs until they replaced the ASAs with a Benefits Plan Services and Loan Agreement that went into effect in 2015. Exhibit 66.

**Northrop delegated authority to approve payments from the Plan to the Northrop departments that requested those payments.**

103.    In September 2001, the Administrative Committee delegated to

Northrop's Vice President of Compensation and Benefits and Northrop's Director of Benefits Administration and Services authority to approve all payments from Northrop's benefit plans (including the Plan) to Northrop's Benefits Administration and Services Department. Exhibit 818.

104.   The Administrative Committee did not delegate its authority to approve payments from the Plan to Northrop's Investment Trust & Administration department (ITA).

105.   The Administrative Committee delegated to Northrop's Vice President of Compensation and Benefits and Northrop's Director of Benefits Accounting authority over the financial books and records of Northrop's plans and the trust, authority to oversee billings to the trust and the timekeeping systems for trust reimbursable activities, authority to appoint or employ such agents, accountants, computer software consultants and other service providers and to purchase or contract for such goods as they deemed necessary and proper, and authority to delegate their authority to any other individual. Exhibit 817.

106.   On November 22, 2004, the Administrative Committee delegated to Sandra Wright (Northrop Vice President and Controller), Dick Underhill (Northrop Vice President of Compensation and Benefits), Gary McKenzie (Northrop Vice President of Taxation), Dennis Wootan (Benefits Administration and Services), and Chris Ranieri (Benefits Accounting) unlimited authority to issue instructions to the Plan's Trustee to disburse Plan assets. Exhibit 75. The vice presidents and Ranieri were given "unlimited" authority to approve the disbursement of funds. Exhibit 75.

107.   The November 2004 Delegation of Authority was not amended until August 1, 2014. Exhibit 241; Exhibits 148, 149.

108.   From 2010 to 2015, members of the Administrative Committee and the Investment Committee, the Corporate Vice President, Compensation and Benefits, the Corporate Vice President, Chief Human Resources and Administration Officer, Corporate Vice President and Controller, and the Vice President, Trust

Administration and Investments were the direct supervisors over the very Northrop departments that were paid for out of Plan assets.

109.   The Administrative Committee and Investment Committee allowed the departments who provided services to the Plan to approve their own payments for those services out of the Plan.

110.   The Administrative Committee and Investment Committee did not monitor, review, or approve any payments made from the Plan to Northrop.

111.   The Administrative Committee allowed Northrop to be paid reimbursements for corporate departments that were not provided for in the ASAs and were not approved for providing services that were necessary to the establishment or operation of the Plan or charging reasonable amounts for direct expenses.

112.   Northrop charged the Trust (including the assets of the Plan, as well as Northrop's other defined contribution plans) a percentage (at one time 33%, later 20%) of any expense that could not definitively be allocated to one of Northrop's benefit plans. Exhibit 90 at 12; Exhibit 318; Exhibit 815 at 23.

113.   Northrop charged to the Trust (including the assets of the Plan, as well as Northrop's defined contribution plans) fringe benefits paid to Northrop's employees that were determined based on a Trust Recovery or Department fringe rate (*e.g.,* 44%) of employee salaries rather than the amount of fringe benefits actually paid to Northrop's employees. *E.g.,* Exhibits 515, 579, 587.

114.   The Administrative Committee and Investment Committee did not have their own independent counsel, but instead relied on Northrop Grumman's attorneys for legal advice regarding the Plan, what services Northrop could provide to the Plan, and what the Plan could or should pay Northrop for those services, if anything.

115.   Northrop Grumman's attorneys attended the meetings of the Administrative Committee and the Investment Committee and provided advice to

the Committees and other Northrop executives on ERISA compliance.

116.   The Northrop executives who decided what to pay Northrop out of the Plan's assets as a result of the Administrative Committee's delegations (or lack of delegation) and inaction acted cavalierly in charging Northrop expenses to the Plan for the benefit of Northrop and without regard to what was in the interest of the Plan and its participants and beneficiaries and whether the services were necessary for the operation of the Plan or the charges reasonable or lawful.

117.   These Northrop executives instructed Northrop employees about "[m]axing the trust charge aspect" of work Northrop employees performed that may have benefited the Plan, indicating a desire to transfer as much Northrop corporate expenses as possible onto the Plans for their and Northrop's corporate benefit. Exhibit 294.

118.   These Northrop executives recognized it was "naive to think the Admin Committee has the final control over the plan's expenditures when the company's management exercises the purse string controls." Exhibit 295.

119.   Northrop executives and in-house counsel repeatedly sought to get payments to Northrop even for employees whom Northrop would not have terminated but for their work on the Plans, evading ERISA's strict requirements in this regard. Exhibit 322; Exhibit 324; *see* Findings of Fact ¶ 49, Conclusions of Law ¶ 261.

**Defendants ignored repeated warnings about inadequate services and excessive compensation to Northrop.**

120.   A 2000 examination by outside auditors Deloitte & Touche revealed that there was no process in place to ensure compliance with the ASA (and hence with ERISA's prohibitions against employer payments from the Plan). Exhibit 130. That report noted the "perception that expenses charged to the plan trusts are not 'real money.'" Exhibit 267 at 54.

121.   An internal Northrop audit in 2004 revealed similar ongoing problems.

Exhibit 303. It noted "no independent review occurs of the accuracy and
appropriateness of invoices entered ... for payment by the trust." *Id.* at 7.

122.   This perception was recognized again in a 2004 email, in which a
Northrop executive recognized, it was "naive to think the Admin Committee has the
final control over the plan's expenditures when the company's management
exercises the purse string controls." Exhibit 295 at 1. A Northrop employee
responded to Dennis Wootan, then Northrop Director of Benefits Administration
and Services, that he did not understand why anyone would think "management
would do anything different than what you would recommend for the Benefit
expenses." *Id.* This exchange shows the fiduciaries were cavalier about increasing
expenses because the expenses were paid by the Plan rather than Northrop or its
officers.

123.   An outside consultant (Gildner & Associates) examined the Plan's
total administrative expenses in 2002 and 2004 and found that the Plan's total
administrative expenses were outside its benchmark range, even though the Plan's
outside recordkeeper was receiving low compensation. Exhibit 278 at 5–7; Exhibit
300 at 6. This indicated that the administrative expenses being paid to Northrop
were excessive compared to other plans.

124.   In November 2007, another outside consultant (Technology Partners
International, Inc. or TPI) conducted a benefits staffing analysis related to internal
administrative services performed by Northrop employees. For a 100,000
participant defined contribution plan, TPI concluded that only 4 full-time
employees were necessary to perform similar services. Exhibit 325 at 6.

125.   Prior to the adoption of passively managed investment options in the
Plan, another outside consultant (CEM Benchmarking Inc.) showed that the Plan's
total investment management and administrative fees exceeded its benchmarks.
Exhibit 342 at 16; Exhibit 448 at 16.

126.   A 2005 examination by Ernst & Young identified problems with the

services Northrop performed, including those related to organizational structures and process, leadership, people, and technology. Exhibit 333 at 9.

127.    Despite these warnings, neither the Administrative Committee, the Investment Committee, nor the other defendants took any action to balance the relevant factors and come to a reasoned decision as to whether the Plan was properly having Northrop provide services, whether Northrop was receiving reasonable compensation, whether these services could be provided better and for less by the Plan's recordkeeper or other third parties with experience in such services, whether to put these services out for competitive bidding, or whether to have an independent, non-conflicted fiduciary determine whether Northrop should provide services to the plans, ensure only services necessary to the operation of the Plan were provided and charged to the Plans, only direct "but for" expenses were reimbursed, and Northrop's charges were reasonable.

**Northrop's payments from the Plan.**

128.    In late 2015, Northrop decided not to seek reimbursement from the Plan for expenses incurred in providing services to the Plan.

129.    Northrop received $7,616,258 in plan assets from the Plan from 2010 to 2015. Exhibits 402, 468, 528, 492, 658, 711. From September 9, 2010 to 2015, the amount is $6,138,135.

130.    Northrop received payments for reimbursement of the salaries and benefits of nearly 100 employees, and at times more than 100 employees. *E.g.,* Exhibit 702; Exhibits 525, 578; Exhibit 243.

131.    Northrop received payments for reimbursement of salaries and benefits for employees (and departments) that worked less than 75% of their time on tasks associated with the Plan. *E.g.,* Exhibit 823; Exhibits 525, 578; Exhibit 1063.

132.    Defendants failed to prove that any of the employees for whom Northrop received reimbursement would not have been employed by Northrop had they provided no service to the Plan.

133.   When Northrop hired an independent consultant to evaluate the services provided by Northrop employees on behalf of the Northrop employee benefit plans, the consultant informed Northrop that only four Northrop employees devoted all of their time to the Plan. Exhibit 815 at 23.

134.   To the extent any additional monitoring services were required for this fully outsourced plan, only four employees would be required for such administrative services at a cost of $57,000 – $59,820 per employee and only one employee would be required for any investment-related services at a cost of approximately $122,505.

**Termination of payment to Northrop from the Plan.**

135.   In *Grabek v. Northrop Grumman Corp. (In re Northrop Grumman Corp. ERISA Litigation)*, No. 2:06-cv-06213-AB (JCx) (C.D. Cal.), participants in the Plan sued the Plan fiduciaries for breach of fiduciary duties and prohibited transactions in having Northrop provide services to the Plan and delivering Plan assets to Northrop. *See id.*, Doc. 721 (Pla. Proposed Findings Of Fact And Conclusions Of Law). On November 24, 2015, the Court declined to enter summary judgment in favor of the defendant-fiduciaries on that claim. *Id.*, Doc. 606. The Court approved a settlement of those claims on October 24, 2017. *Id.*, Doc. 804.

136.   The *Grabek* Plaintiffs sought authority to provide information from that case to DOL in response to a subpoena. *Grabek*, Doc. 537 (May 12, 2014). The Secretary of Labor also sought to intervene in *Grabek* and modify the protective order to allow Plaintiffs' attorneys to respond to the DOL's subpoenas. *Id.*, Doc. 545 (June 11, 2014). The Secretary of Labor noted that it was investigating potential ERISA violations from Plan payments to Northrop putatively as administrative expenses and sought documents from the plaintiffs' attorneys because of Northrop's delay in responding to its own subpoena. *Id.* at 6–8.

137.   In December 2016, Northrop settled the DOL's investigation regarding

its payments from the Plan. Exhibit 153; *Axis Reinsurance Co. v. Northrop Grumman Corp.*, No. 2:17-cv -8660-AB, 2018 WL 6431874, at *2–3 (C.D. Cal. Nov. 21, 2018) (Doc. 107 (redacted)). Northrop stopped receiving payment from the Plan after 2015. Exhibit 151 at 2; Exhibit 711 at 11.

## III.  The Emerging Markets Fund.

### The Investment Committee and the EM Fund's investment objective.

138.   The Investment Committee's duties include "establish[ing] a number of different investment funds or other investment options" for participants to invest their accounts and to formulate "investment policies" for each option. Plan Document §§ 9.01, 17.05.

139.   In 2007, the Investment Committee adopted an Investment Policy Statement (IPS). Under the IPS, the Investment Committee was responsible for "approv[ing] appropriate investment policies, plan investment options, and investment fund objectives", and "appoint[ing] and terminat[ing]…investment managers". Exhibit 70 at 5.

140.   The Investment Committee established the Emerging Markets Equity (EM) Fund as a core investment option in the Plan. It is a separately managed account for which Plan fiduciaries hire investment managers to invest Plan assets that participants allocate to that Fund. The Investment Committee and IPS set as the objective of the EM Fund: "an incremental total return of capital appreciation net of fees over the benchmark while attempting to avoid significant underperformance. The benchmark for this option is the MSCI Emerging Market Index." Exhibit 70 at 11 (Appendix A). The Investment Committee thus sought to exceed the benchmark return for the EM Fund by hiring investment managers who were supposed to exceed the returns through active management, instead of just investing the same or similar funds to the index, called passive management.

141.   Active management investment managers charge higher fees and incur more expenses than passive investment managers.

142.     The Investment Committee did not change the policy for the EM Fund until the end of 2104, effective as of 2015, when it adopted a new Investment Policy Statement that provided, for the EM Fund, "The Fund is being managed using 'passive' or 'indexing' investment approach." Exhibit 71 at 7.

143.     Although the Plan Document provides the Administrative Committee authority to delegate its fiduciary responsibilities to the Plan (Plan § 17.08), the Plan Document does not provide the Investment Committee authority to delegate its fiduciary responsibilities to the Plan (Plan §§ 16.08–16.09).

144.     The Investment Committee assigned to Northrop's Investment Trust & Administration department (ITA) responsibility to "[r]ecommend and implement investment policies and investment fund objectives", and to "[s]elect, appoint, terminate, and enter into agreements with investment managers". Exhibit 70 at 5. The ITA's authority to hire and fire managers of the EM Fund was limited by the investment objective for the Fund as stated in the IPS. Exhibit 70 at 2 (§ IV), 3 (§ VI).

**The Decision to Maintain an Active Strategy in the EM Fund.**

145.     In May 2010 the ITA presented to the Investment Committee its "recommendation to employ a passive approach for certain core options" for the Plan. The Investment Committee approved the recommendation. Exhibit 811 at 2. The ITA did not provide a specific recommendation for any investment option in the Plan. *Id.*; Exhibit 29 at 8.

146.     The ITA and Investment Committee recognized that passive investing has an "[o]bjective of providing the lowest absolute investment management fees" and relies on the "[b]elief that passive approach mitigates fiduciary risk by reducing chance of significant and/or chronic underperformance to benchmark". In contrast, an active approach relies on the "[b]elief in potential long-term return benefits of active management". Exhibit 29 at 6.

147.     The ITA's presentation showed the effectiveness of passive

management based on the annualized performance and tracking error of passive investment vehicles for each asset class in the Plan. Exhibit 29 at 7. Tracking error measures the degree by which a passive index fund investment return varies from the index. Because the index fund charges fees and expenses that are not included in index, the index fund necessarily will not exactly match the returns of the index.

148.    As of December 31, 2009 the tracking error for the State Street MSCI EM Index Fund in the preceding three and five years (0.77% and 0.64%) was lower than the tracking error for the State Street MSCI EAFE Index Fund, the index fund for the Plan's International Equity Fund that was converted to passive (1.37% and 1.05%). Exhibit 29 at 7.

149.    In August 2010 the Investment Committee was informed that the predicted tracking error for State Street (SSgA) EM index fund (0.15%–0.30%) was similar to the predicted tracking error for the State Street International Equity index fund (0.10%–0.20%). Exhibit 37 at 119, 154.

150.    Prior to the May 2010 Investment Committee meeting, State Street informed the ITA in April 2010 that 89.55% of active managers in emerging markets underperformed their benchmarks over the prior five-year period, the use of derivatives minimizes tracking error, there has been a "significant improvement in liquidity" for the asset class, "over time positive and negative tracking will often offset each other, resulting in tight tracking of the Index", and "passive management has had a district advantage over higher fee active strategies in all asset classes". Exhibit 359 at 2, 8, 9.

151.    State Street's observation regarding "how difficult it is for active managers to beat their benchmarks" was based on Standard and Poor's Indices Versus Active Funds (SPIVA) Scorecard for year-end 2009. Exhibit 359 at 1; Exhibit 352. This research report was published in March 2010. Exhibit 352.

152.    When the ITA assessed the success of active managers across all major equity asset classes based on long-term mediation active returns, the research

illustrated that only 32% of active managers for emerging markets produced excess returns over the prior 15 years ended December 2012. Exhibit 225 at 4.

153.   In November 2008 the Investment Committee amended its Investment Management Agreement with State Street Global Advisors (SSgA) to provide for the allocation of Plan assets to the SSgA Daily Emerging Markets Index Non-Lending Series Fund (SSgA index fund), a passive index fund whose objective was to match as closely as possible the performance of the MSCI Emerging Markets Free Index. Exhibit 328. In January 2009, 25% of the EM Fund was allocated to the SSgA index fund. Exhibit 40 at 4.

154.   As of April 2010 the Plan's SSgA index fund had grown from approximately $75 million in assets to roughly $2.6 billion. Exhibit 359 at 10. SSgA's emerging markets index funds also experienced "significant improvement in liquidity". *Id.*

155.   The SSgA index fund met and would continue to meet the operational needs of the Plan. Exhibit 37 at 148. A fully passive investment strategy could have been implemented for the EM Fund since at least August 2010.

156.   In August 2010 the ITA provided an "update[]" to the Investment Committee "on the implementation of passive investment Strategy for the core options of the Defined Contribution Master Trust". Exhibit 811 at 4. The Investment Committee did not make a decision to maintain the active managers in the EM Fund during this meeting.

157.   In September 2010 the ITA decided to allocate 50% of the EM Fund to the SSgA index fund. Exhibit 40 at 3. The ITA did not evaluate the performance of the SSgA index fund relative to the EM Fund's active managers nor perform an optimization analysis to determine the percentage of EM Fund assets that should be allocated to the managers. The transfer of 50% of the EM Fund's assets to the SSgA index fund was completed on April 1, 2011. Exhibit 414 at 39.

158.   The EM Fund was the most expensive investment option in the Plan. A

transition to passive management would have provided the Plan the largest potential fee savings in comparison to other core investment options that were considered for transition to passive management. Exhibit 32 at 11.

159.   The fees charged by one of the EM Fund's active managers (GMO) consistently exceeded the survey averages of both Callan and CEM. Exhibit 411 at 4; Exhibit 461 at 8; Exhibit 39 at 17.

160.   During 2010, the Investment Committee did not make a decision whether to maintain an active investment strategy in the EM Fund, to allocate 50% of the assets in the EM Fund to the SSgA index fund, or to convert the EM Fund entirely to passive investment. Exhibit 811 at 1–6 (2010 meeting minutes). The ITA never made any such recommendation to the Investment Committee for approval.

161.   Until the end of 2014, the Investment Committee never considered whether the SSgA index fund was suitable to be the sole manager of the EM Fund.

**The Plan's Other Core Investment Options.**

162.   In December 2010 and January 2011, the Investment Committee changed all core investment options in the Plan to passive management, except for the EM Fund. Exhibit 71 at 6–7; Exhibit 901 at 90–92.

163.   The Investment Committee changed other core investment options to passive management even though the active management of those options had resulted in better performance relative to their benchmarks than the EM Fund.

164.   As of March 31, 2010, the International Equity fund outperformed over 5 years; the U.S. Fixed Income fund outperformed over one-year, three-year, five-year, and ten-year periods; and the U.S. Equity fund outperformed over one-year, three-year, five-year, and ten-year periods. Exhibit 354 at 28.

165.   As of June 30, 2010, the U.S. Equity fund outperformed over one-year, three-year, and ten-year periods; the International Equity Fund outperformed over one year; and the U.S. Fixed Income Fund outperformed over one-year, three-year, five-year, and ten-year periods. Exhibit 368 at 29.

166.   As of September 30, 2010, the U.S. Equity Fund outperformed over one-year, three-year, and ten-year periods; the Small Cap Equity Fund outperformed over one year; the International Equity Fund outperformed over one year; and the U.S. Fixed Income Fund outperformed over one-year, three-year, five-year, and ten-year periods. Exhibit 387 at 30.

167.   In contrast, the EM Fund under an active management investment strategy regularly underperformed its index. Exhibit 27 at 9 (Dec. 31, 2009); Exhibit 354 at 21 (Mar. 31, 2010); Exhibit 368 at 23 (June 30, 2010); Exhibit 393 at 2 (Sep. 30, 2010).

**The Underperformance of the EM Fund.**

168.   The Investment Committee did not compare the historical performance or characteristics of specific EM index funds to the actively management EM Fund. Had it done so, it would have seen that many index funds were far less expensive than the EM Fund managers and consistently outperformed the EM Fund and were prudent options for changing the EM Fund to passive management as of August 2010. Exhibit 37 at 151, 154, 157, 167–82 (passive index funds); Exhibit 354 at 28 (2010Q1); Exhibit 37 at 164 (index fund fees); Exhibit 40 at 10–11 (EM Fund fees).

169.   The EM Fund consistently failed to meet its IPS objectives of beating its benchmark net of fees. As of December 31, 2009, the EM Fund underperformed its benchmark index over all reporting periods. Exhibit 226 at 27. The EM Fund ranked in the 82nd, 70th, 69th, 92nd, and 97th percentiles of its peer group for the rolling 1, 3, 5, 7, and 9 ¾ year periods, respectively. Exhibit 227 at 35.

170.   As of March 31, 2010, the EM Fund underperformed its benchmark index over all reporting periods. Exhibit 354 at 28. The EM Fund ranked in the 83rd, 66th, 67th, 89th, and 94th percentiles of its peer group for the rolling one, three, five, seven, and ten years, respectively. Exhibit 355 at 29.

171.   As of June 30, 2010, the EM Fund underperformed its benchmark

index over all reporting periods. Exhibit 368 at 29. The EM Fund ranked in the 79th, 75th, 75th, 88th, and 98th percentiles of its peer group for the rolling one, three, five, seven, and ten years, respectively. Exhibit 366 at 32.

172.   Overall, for the five consecutive quarters between December 31, 2009 and December 31, 2010, the EM Fund underperformed its benchmark index for the year, three years, five years, and/or ten years. Accordingly, the EM Fund failed to meet its investment objective. Exhibit 226 at 27 (2009Q4), Exhibit 354 at 28 (2010Q1), Exhibit 368 at 29 (2010Q2), Exhibit 387 at 20 (2010Q3), Exhibit 399 at 30 (2010Q4); *see also* Exhibit 43 at 15 (2013Q3).

173.   As of September 30, 2011, the ITA recognized that the EM Fund's three and five year performance results were "hampered by severe underperformance in 2009", when the Fund "underperformed by 600 bps" in that year and the active managers underperformed by 373 to 775 bps. Exhibit 39 at 9. (One basis point is equal to 0.01%.) The SSgA index fund trailed the benchmark index by only 19 bps since inception. *Id.* at 11.

174.   An outside consultant (CEM Benchmarking Inc.) informed the ITA that the active management in the EM Fund provided negative value added. "Negative total value added implies that your options did not perform as well as an indexed/passive alternative." CEM Benchmarking Inc. reached this determination based on performance results as of December 31, 2009 (Ex. 342 at 12), December 31, 2010 (Ex. 448 at 12), and December 31, 2011 (Ex. 506 at 12).

175.   In March 2005 the ITA adopted a "Fiduciary Oversight Policy" (FOP) setting forth certain guidelines governing the monitoring of the Plan's investment options. Exhibit 72. Active managers of the EM Fund breached the FOP based on their underperformance.

176.   As of December 31, 2009, two of the active managers (GMO and SSgA) breached the FOP. Exhibit 357 at 31. GMO violated the policy due to underperformance relative to its benchmark index over prior three and five years;

underperformance relative to its peer group over prior three years; and its five year risk-adjusted return was below the median of its peer group. *Id.* SSgA violated the policy due to underperformance relative to its benchmark index over prior three years; and underperformance relative to its peer group over the prior 3 years. *Id.*

177.    Similarly, as of June 30, 2011, both of the active managers (GMO and Wellington) violated the FOP. Exhibit 444 at 50. GMO violated the policy due to underperformance relative to its benchmark index over prior three and five years; underperformance relative to its peer group over three and five years; and its five year risk-adjusted return below the median of its peer group. *Id.* Wellington violated the policy due to underperformance relative to its benchmark index over prior three years; and underperformance relative to its peer group over prior three years. *Id.*

**The Transition to Passive Management in 2014.**

178.    The Investment Committee did not examine whether the EM Fund was meeting its IPS objective or whether the EM Fund should be passively managed like the rest of the Plan core investment options until May 2014. Exhibit 811 at 30. In May 2014 the Investment Committee "requested an evaluation of continuing to offer an emerging markets fund and what is the most effective approach to implement–passive or active management." *Id.*

179.    At that time, the Investment Committee was informed that the EM Fund underperformed its benchmark index over the prior 1 year ending March 31, 2014. Exhibit 45 at 14. The EM Fund also underperformed its benchmark index over 3, 5, and 10 years. Exhibit 608 at 45.

180.    The Investment Committee made their request to the ITA for an evaluation of emerging markets after the Committee was reminded in November 2013 that their role and responsibility was to "[e]stablish plan investment options, investment fund objectives and appropriate investment policies". Exhibit 43 at 4; Exhibit 811 at 27.

181.    In August 2014 the ITA recommended to the Investment Committee to "change" the EM Fund "to be completely passively managed." Exhibit 811 (Aug. 19, 2014); Exhibit 47. The Investment Committee "approved" the recommendation. Exhibit 811 at 34–35. This decision "[b]rings EM offering in-line with the rest of the DC offering" and provides a "Significant" reduction in the EM Fund's expenses charged to the Plan. Exhibit 47 at 7–9.

182.    As of June 30, 2014, the EM Fund underperformed its benchmark index for the past three and five years. Exhibit 616 at 4. The SSgA index fund outperformed the EM Fund's active managers over the prior five years. *Id.*

183.    Had the Investment Committee moved the EM Fund to passive management using the SSgA index fund as the sole manager, the EM Fund would have had $28,473,041 more in retirement assets for participants as of December 2017.

## CONCLUSIONS OF LAW

**The Plan and Plan Documents**

184.    The Northrop Grumman Savings Plan is defined contribution, individual account, employee pension benefit plans that are governed by the Employee Retirement Income Security Act (ERISA). 29 U.S.C. § 1002(2)(A), § 1002(34).

185.    An employee pension benefit plan must be "established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). These written instruments are commonly called "plan documents."

186.    Exhibit 93 is the Plan Document for August 1, 2010 through September 30, 2013. Exhibit 164 is the Plan Document for October 1, 2013 through December 31, 2014. Exhibit 659 is the Plan Document for January 1, 2015 through March 31, 2016. Exhibit 712 is the Plan Document since April 1, 2016.

**Fiduciary Status**

187.    The Plan Document must "provide for one or more named fiduciaries

who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

188.   A "named fiduciary" is the entity who is named in the Plan Document. 29 U.S.C. § 1102(a)(2).

189.   A "named fiduciary" also is the entity that is identified by the employer as a fiduciary pursuant to a procedure specified in the Plan Document. 29 U.S.C. § 1102(a)(2).

190.   Any person who "exercises any discretionary authority or discretionary control respecting management of such plan" is a fiduciary under ERISA. 29 U.S.C. § 1002(21)(A)(i).

191.   Any person who "exercises any authority or control respecting management or disposition of [plan] assets" is a fiduciary under ERISA. 29 U.S.C. § 1002(21)(A)(i).

192.   Any person who "has any discretionary authority or discretionary responsibility in the administration of such plan" is a fiduciary under ERISA. 29 U.S.C. § 1002(21)(A)(iii).

193.   The Plan Document may expressly provide for a procedure for named fiduciaries to designate persons other than named fiduciaries to carry fiduciary responsibilities under the Plan. 29 U.S.C. § 1105(c)(1). If that procedure is followed, the designated person becomes a fiduciary. 29 U.S.C. § 1002(21)(A).

194.   A named fiduciary cannot designate another person to carry out responsibilities to manage or control the assets of the plan. 29 U.S.C. § 1105(c).

195.   "To help fulfill ERISA's broadly protective purposes, Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993). "ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). The

term "fiduciary" therefore must be broadly construed. *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1461 (9th Cir. 1995)

196.   Deciding whether to pay particular expenses out of plan assets is a fiduciary act. DOL Advisory Opinion 97-03A (Jan. 23, 1997) ("it is a fiduciary determination as to whether to pay particular expenses out of Plan assets").[1]

197.   The Administrative Committee and each of its members is a fiduciary because they are named fiduciaries in the Plan Documents (29 U.S.C. § 1102(a), Plan § 16.01) and because they had and exercised discretionary authority and discretionary control respecting management of the Plan and had and exercised authority and control over the disbursement of the assets of the Plan (29 U.S.C. § 1002(21)(A)).

198.   The Investment Committee is a fiduciary because it is named the fiduciary in the Plan Documents  (29 U.S.C. § 1102(a)) and because it had and exercised discretionary authority and discretionary control respecting management of the Plan and had and exercised authority and control over the disbursement of the assets of the Plan and investment of the assets of the Plan (29 U.S.C. § 1002(21)(A)). By causing the Investment Committee to act as it did, the members of the Investment Committee are fiduciaries because they had and exercised discretionary authority and discretionary control respecting management of the Plan and had and exercised authority and control over the disbursement of the assets of the Plan and investment of the assets of the Plan (29 U.S.C. § 1002(21)(A)).

199.   The Administrative Committee unlawfully attempted to delegate to Northrop executives responsibility for controlling the assets of the Plan by attempting to delegate to them the authority to direct distribution of Plan assets to Northrop.

200.   The Investment Committee unlawfully attempted to delegate to

---

[1] https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/1997-03a

Northrop executives responsibility for controlling the assets of the Plan by attempting to delegate to them the authority to approve investment policies, plan investment options, and investment fund objectives to Northrop.

201.   Denise Peppard is a fiduciary because she exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because she is a named fiduciary in the Plan Document.

202.   Michael Hardesty is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because he is a named fiduciary in the Plan Document.

203.   Kenneth Bedingfield is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because he is a named fiduciary in the Plan Document.

204.   Kenneth Heinz is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because he is a named fiduciary in the Plan Document.

205.   Gary McKenzie is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because he is a named fiduciary in the Plan Document.

206. Christopher McGee is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because he is a named fiduciary in the Plan Document.

207. Richard Boak is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because he is a named fiduciary in the Plan Document.

208. Teri Herzog is a fiduciary because she exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because she is a named fiduciary in the Plan Document.

209. Tiffany McConnell King is a fiduciary because she exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because she is a named fiduciary in the Plan Document.

210. Maria Norman is a fiduciary because she exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Administrative Committee and because she is a named fiduciary in the Plan Document.

211. Debora Catsavas is a fiduciary because she exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan

both individually and as a member of the Administrative Committee and the
Investment Committee and because she is a named fiduciary in the Plan Document.

212.   Constance Soloway is a fiduciary because she exercised discretionary
authority and discretionary control respecting management of the Plan and
exercised authority and control respecting the disposition of the assets of the Plan
both individually and as a member of the Administrative Committee and the
Investment Committee and because she is a named fiduciary in the Plan Document.

213.   Prabu Natarajan is a fiduciary because he exercised discretionary
authority and discretionary control respecting management of the Plan and
exercised authority and control respecting the disposition of the assets of the Plan
both individually and as a member of the Investment Committee.

214.   Mark Caylor is a fiduciary because he exercised discretionary
authority and discretionary control respecting management of the Plan and
exercised authority and control respecting the disposition of the assets of the Plan
both individually and as a member of the Investment Committee.

215.   Mark Rabinowitz is a fiduciary because he exercised discretionary
authority and discretionary control respecting management of the Plan and
exercised authority and control respecting the disposition of the assets of the Plan
both individually and as a member of the Investment Committee.

216.   Rajender Chandhok is a fiduciary because he exercised discretionary
authority and discretionary control respecting management of the Plan and
exercised authority and control respecting the disposition of the assets of the Plan
both individually and as a member of the Investment Committee.

217.   Gloria Flach is a fiduciary because she exercised discretionary
authority and discretionary control respecting management of the Plan and
exercised authority and control respecting the disposition of the assets of the Plan
both individually and as a member of the Investment Committee.

218.   James Myers is a fiduciary because he exercised discretionary

authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Investment Committee.

219.   Sunil Navale is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Investment Committee.

220.   Eric Scholten is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Investment Committee.

221.   Steven Spiegel is a fiduciary because he exercised discretionary authority and discretionary control respecting management of the Plan and exercised authority and control respecting the disposition of the assets of the Plan both individually and as a member of the Investment Committee.

**ERISA's general fiduciary duties.**

222.   "Congress enacted ERISA to protect 'the interests of participants in employee benefit plans and their beneficiaries by setting out substantive regulatory requirements for employee benefit plans and to provide for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Rollins v. Dignity Health*, 830 F.3d 900, 904–05 (9th Cir. 2016) (quoting *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208 (2004)). ERISA was enacted "to protect working men and women from abuses in the administration and investment of private retirement plans and employee welfare plans." *Donovan v. Dillingham*, 688 F.2d 1367, 1370 (11th Cir. 1982); *Chao v. Graf*, No. 01-698, 2002 WL 1611122, at *5 (D. Nev. Feb. 1, 2002).

223.   The assets in an ERISA plan must be held in trust "for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1).

Except in circumstances not applicable to this case, "the assets of a plan shall never inure to the benefit of any employer[.]" *Id.*

224.   ERISA imposes stringent duties on plan fiduciaries that are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc, quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

**The duty of loyalty.**

225.   A "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries[.]" 29 U.S.C. § 1104(a)(1).

226.   The fiduciary owes a duty of loyalty to the plan to act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" 29 U.S.C. § 1104(a)(1)(A).

227.   Fiduciaries must "act with complete and undivided loyalty to the beneficiaries of the trust and with an eye single to the interests of the participants and beneficiaries[.]" *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984) (quotation marks and citations omitted); *Donovan v. Mazzola*, 716 F.2d 1226, 1238 (9th Cir. 1983).

228.   "Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (quotation marks and citation omitted).

229.   Although an officer of the corporate employer and plan sponsor can be a fiduciary to a plan and in that sense wear "two hats"—one corporate, and one fiduciary—"ERISA does require, however, that the fiduciary with two hats *wear only one at a time*, and wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000) (emphasis added).

230.   "When it is 'possible to question the fiduciaries' loyalty, they are

obliged at a minimum to engage in an *intensive and scrupulous independent investigation* of their options to insure that they act in the best interests of the plan beneficiaries.'" *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (emphasis added, quoting *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984)).

231.  Good faith is not a defense to a breach of the duty of loyalty. *Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir. 1984).

**The duty of prudence.**

232.  A fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *see also* 29 C.F.R. § 2550.404a-1.

233.  "The duty of prudence involves a continuing duty to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828–29 (2015). Courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983).

234.  "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

235.  A prudent investigation requires a reasoned decision-making process that considers all relevant factors. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011). "Under ERISA, a fiduciary's failure to exercise his or her discretion—*i.e.*, to balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care." *Id.* (citing

*DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 420–21 (4th Cir. 2007) and
*Armstrong v. LaSalle Bank N.A.,* 446 F.3d 728, 733–34 (7th Cir. 2006)).

236.   "'Wasting beneficiaries' money is imprudent. In devising and
implementing strategies for the investment and management of trust assets, trustees
are obliged to minimize costs.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th
Cir. 2016) (*en banc*, quoting Unif. Prudent Investor Act § 7).

237.   While a fiduciary may secure advice from consultants or other experts
in the course of the investigation, *Tibble v. Edison Int'l*, No. 07-5359-SVW
(AGRx), 2017 WL 3523737, at *11 (C.D. Cal. Aug. 16, 2017), such advice is not a
"whitewash" or "magic wand that fiduciaries may simply wave over a transaction
to ensure that their responsibilities are fulfilled", *Howard v. Shay*, 100 F.3d 1484,
1489–90 (9th Cir. 1996) (citation omitted); *see also George v. Kraft Foods Global,
Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) ("relying on the advice of consultants" is
not a complete defense).

238.   A fiduciary "cannot reflexively and uncritically adopt investment
recommendations." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1138 (9th Cir. 2011),
*vacated on other grounds*, 135 S.Ct. 1823 (2015). Rather, the fiduciary has a "duty
to exercise his own judgment in the light of the information and advice which he
receives." *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983) (citation
omitted).

**Prohibited Transactions.**

239.   In addition to its general fiduciary duties, ERISA identifies certain
transactions that are "*per se* violations of ERISA." *Barboza v. Cal. Ass'n of Prof'l
Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015) (quoting *Waller v. Blue Cross of
Cal.*, 32 F.3d 1337, 1345 (9th Cir. 1994)); 29 U.S.C. § 1106.

240.   Section 1106 "supplements the fiduciary's general duty of loyalty to
the plan's beneficiaries, § 404(a) [29 U.S.C. § 1104(a)], by categorically barring
certain transactions deemed likely to injure the pension plan[.]" *Harris Trust &*

*Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000) (quotes omitted).

241.   The prohibitions of § 1106 must be read broadly, given "Congress' overriding concern with the protection of plan beneficiaries[.]" *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984); *see also M & R Inv. Co. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir. 1982) ("The result is a broad per se prohibition of transactions ERISA implicitly defines as not arm's-length").

242.   Good faith is a not a defense to a prohibited transaction. *Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir. 1984).

243.   The prohibitions of § 1106 apply "regardless of whether the transaction is 'fair' to the plan." *Reich v. Compton*, 57 F.3d 270, 288 (3d Cir. 1995) (Alito, J.).

**29 U.S.C. § 1106(a) [ERISA § 406(a)]**

244.   ERISA prohibits any transaction between a plan and a party in interest. ERISA § 406(a) provides that "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106(a)(1)(C) and (D).

245.   A party in interest includes a fiduciary, an employer such as Northrop Grumman, an employee, officer, or director of Northrop Grumman, and any person providing services to the plan. 29 U.S.C. § 1002(14)(A)–(C), (H).

246.   ERISA's definition of "party in interest" is intentionally broad so as to "include all 'those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries[.]'" *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015) (quoting *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000)).

**The 29 U.S.C. § 1108(b)(2) exemption [ERISA § 408(b)(2)].**

247.   ERISA exempts certain transactions that otherwise would be prohibited under § 406(a). The prohibitions of ERISA § 406(a) "shall not apply to ... (2) Contracting or making reasonable arrangements with a party in interest for ... services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2) [ERISA § 408(b)(2)]. This is the only exemption that Defendants contend they meet.

248.   Defendants have the burden of proving that they qualify for this exemption. *Fish v. Greatbanc Trust Co.*, 749 F.3d 671, 685–86 (7th Cir. 2014); *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987); *see also Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (applying to 29 U.S.C. § 1108(e)).

249.   To satisfy the exemption of § 408(b)(2), Defendants must prove that each service provided by Northrop was (1) "necessary for the establishment or operation of the plan" and (2) "furnished under a contract or arrangement which is reasonable," and (3) "[n]o more than reasonable compensation is paid for such ... service." 29 C.F.R. § 2550.408b-2(a) (2009).

250.   The DOL has consistently stated, "The appropriate plan fiduciary(ies) must determine, based on all of the relevant facts and circumstances, whether the conditions of 408(b)(2) are satisfied." DOL Advisory Opinion 97-03A (Jan. 23, 1997), 1997 WL 28100, at *2; DOL Adv. Op. 89-09A (June 13, 1989), 1989 WL 206414, at *4; DOL Adv. Op. 88-03A (Feb. 22, 1988), 1988 WL 192819, at *4; DOL Adv. Op. 86-01A (Jan. 2, 1986), 1986 WL 38841, at *3.

**Necessary service. Excludes settlor expenses.**

251.   A service is "necessary for the establishment or operation of the plan" if the service is "appropriate and helpful to the plan obtaining the service in carrying out the purposes for which the plan is established or maintained." 29 C.F.R. § 2550.408b-2(b).

252.   A plan cannot pay for direct expenses that relate to the formation, rather than the management, of a plan. DOL Adv. Op. 97-03A (Jan. 23, 1997), 1997 WL 28100; DOL Adv. Op. 2001-01A (Jan. 18, 2001), 2001 WL 125092. Such settlor functions "include decisions relating to the establishment, design and termination of plans" and are not fiduciary activities. DOL Adv. Op. 97-03A; DOL Adv. Op. 2001-01A. Expenses for these activities are "for the benefit of the employer and would involve services for which an employer could reasonably be expected to bear the cost in the normal course of its business or operations." DOL Adv. Op. 97-03A; DOL Adv. Op. 2001-01A.

253.   Where expenses relate to activities that benefit both the employer and the plan and where one party appears to be acting in both a settlor capacity on behalf of the employer and in a fiduciary capacity on behalf of the plan's participants and beneficiaries, the fiduciary must have an *independent fiduciary* determine how to allocate the expenses attributable to those benefits to avoid violations under § 406(b)(1) and § 406(b)(2). DOL Adv. Op. 97-03A, 1997 WL 28100, at *4 ("Where, as here, there are benefits to be derived by both the plan sponsor (or the estate of the plan sponsor) and the plan, and where one party appears to be acting in both a settlor capacity on behalf of the plan sponsor (or the estate of the plan sponsor), and in a fiduciary capacity on behalf of the plan's participants and beneficiaries, it would generally be necessary, in order to avoid violations of ERISA sections 406(b)(1) and 406(b)(2), to *have an independent fiduciary determine how to allocate the expenses attributable to those benefits*.")(emphasis added).

254.   Expenses incurred in amending plan documents that are not required by law are settlor expenses that cannot be paid from a plan. DOL Adv. Op. 2001-01A, 2001 WL 125092, at *2.

255.   The named fiduciary acting in its fiduciary capacity, not the plan sponsor, must review each service to be provided to a plan to determine whether the

service is a "necessary service" for which reimbursement is lawful. DOL Adv. Op. 93-06A (Mar. 11, 1993), 1993 WL 97262, at *6; DOL Adv. Op. 89-09A (June 13, 1989), 1989 WL 206414, at *5; DOL Adv. Op. 88-03A (Feb. 22, 1988), 1989 WL 192819, at *5; DOL Adv. Op. 86-01A (Jan. 2, 1986), 1986 WL 38841, at *4.

256.   Expenses for services that are provided to multiple plans must be allocated to particular plans in a manner that reflects the actual service provided to that plan. DOL Adv. Op. 93-06A (Mar. 11, 1993); DOL Adv. Op. 89-09A (June 13, 1989); DOL Adv. Op. 88-03A (Feb. 22, 1988).

257.   Fiduciaries must maintain records that are adequate to verify that the allocation methods employed properly allocate expenses to the plans from which reimbursement is obtained. DOL Adv. Op. 93-06A (Mar. 11, 1993).

**Reasonable contract or arrangement.**

258.    The contract or arrangement by which payments are made to an employer from a plan for services furnished by the employer must be reasonable. 29 C.F.R. § 2550.408b-2(a)(2). What is a reasonable contract or arrangement depends upon the particular facts and circumstances of the transactions.

**Reasonable compensation.**

259.   Whether compensation is reasonable "depends on the particular facts and circumstances of each case." 29 C.F.R. § 2550.408c-2(b)(1); 29 C.F.R. § 2550.408b-2(d).

260.   A "fiduciary who is already receiving full-time pay from an employer" cannot receive any compensation from a plan "except for the reimbursement of direct expenses properly and actually incurred and not otherwise reimbursed." 29 C.F.R. § 2550.408c-2(b)(2).

261.   To be a "direct expense," the expense must have been incurred by the fiduciary only because of the service the fiduciary provided to the plan. "An expense is not a direct expense to the extent it would have been sustained had the service not been provided or if it represents an allocable portion of overhead costs."

29 C.F.R. § 2550.408c-2(b)(3). This is a "but for" test—an expense is a direct expense only if the employer would not have incurred it but for the fact that the employer provided services to the plan.

262.   Even if a transaction is exempt under § 408(b)(2), if the fiduciary's decision to retain an employer's services and to reimburse for those services is not prudent and solely in the interest of plan participants and beneficiaries, the fiduciary would be liable for any loss resulting from such breach of fiduciary responsibility. DOL Adv. Op. 93-06A (Mar. 11, 1993), 1993 WL 97262, at *6; DOL Adv. Op. 89-09A (June 13, 1989), 1989 WL 206414, at *6; DOL Adv. Op. 88-03A (Feb. 22, 1988), 1988 WL 192819, at *5; DOL Adv. Op. 86-01A (Jan. 2, 1986), 1986 WL 38841, at *4.

**29 U.S.C. § 1106(b) [ERISA § 406(b)]**

263.   ERISA § 406(b) provides, in relevant part, that "A fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, [or] (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries[.]" 29 U.S.C. § 1106(b)(1)–(2).

264.   An employee or officer of Northrop Grumman "has an interest" in Northrop Grumman for purposes of the transactions prohibited by ERISA § 406(b). 29 C.F.R. § 2550.408b-2(e)(1); 29 U.S.C. § 1002(14)(C) and (H).

265.   A fiduciary commits a prohibited transaction of acting on behalf of a party or representing a party whose interests are adverse to the plan or participants "even if the groups controlling the plan and the adverse party are not identical." *Reich v. Compton*, 57 F.3d 270, 289 (3d Cir. 1995) (Alito, J.).

266.   ERISA § 406(b) "relat[es] to acts involving conflicts of interest by fiduciaries." 29 C.F.R. § 2550.408b-2(e)(1).

267.   "Section 406(b) prohibits a plan fiduciary from engaging in various

forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J., quoting H.R. Rep. No. 93-1280 (1974)).

268.   Section 406(b) "needs to be broadly construed and ... liability may be imposed even where there is no taint of scandal, hint of self-dealing, no trace of bad faith[.]" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J., quoting *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987), quotation marks omitted).

269.   The per se prohibition of § 406(b) is "consistent with the remedial purpose of ERISA, for 'at the heart of the fiduciary relationship is the duty of complete and undivided loyalty to the beneficiaries of the trust[.]'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J., quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1238 (9th Cir. 1983)).

270.   There are no exemptions from the prohibited transaction provisions of § 406(b). 29 C.F.R. § 2550.408b-2(a) ("408(b)(2) does not contain an exemption from acts described in [§ 406(b).] Such acts are separate transactions not described in 408(b)(2)."); 29 C.F.R. § 2550.408b-2(e)("If the furnishing of ... a service involves an act described in [§] 406(b) ... (relating to acts involving conflicts of interest by fiduciaries), such an act constitutes a separate transaction which is not exempt under [§] 408(b)(2)"); *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 886 (9th Cir. 2019) (citing *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015), and *Patelco Credit Union v. Sahni*, 262 F.3d 897, 910–11 (9th Cir. 2001)); DOL Adv. Op. 89-09A (June 13, 1989), 1989 WL 206414, at *5.

271.   "The prohibitions of 406(b) supplement the other prohibitions of 406(a) ... by imposing on parties in interest who are fiduciaries a duty of undivided loyalty to the plans for which they act." 29 C.F.R. § 2550.408b-2(e)(1).

272.   "These prohibitions are imposed upon fiduciaries to deter them from

exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries." 29 C.F.R. § 2550.408b-2(e)(1); *see also Freund v. Marshall & Isley Bank*, 485 F. Supp. 629, 637–38 (W.D. Wis. 1979).

273.   "A fiduciary may not use the authority, control, or responsibility which makes such person a fiduciary to cause a plan to pay an additional fee to such fiduciary (or to a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) to provide a service." 29 C.F.R. § 2550.408b-2(e)(1).

274.   "Nor may a fiduciary use such authority, control, or responsibility to cause a plan to enter into a transaction involving plan assets whereby such fiduciary (or a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) will receive consideration from a third party in connection with such transaction." 29 C.F.R. § 2550.408b-2(e)(1).

275.   A fiduciary can avoid transactions prohibited by § 406(b) only "if the fiduciary does not use any of the authority, control or responsibility which makes such person a fiduciary to cause a plan to pay additional fees for a service furnished by such fiduciary or to pay a fee for a service furnished by a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary." 29 C.F.R. § 2550.408b-2(e)(2).

276.   "This may occur, for example, when one fiduciary is retained on behalf of a plan by a second fiduciary to provide a service for an additional fee. However, because the authority, control or responsibility which makes a person a fiduciary may be exercised 'in effect' as well as in form, mere approval of the transaction by a second fiduciary does not mean that the first fiduciary has not used any of the authority, control or responsibility which makes such person a fiduciary

to cause the plan to pay the first fiduciary an additional fee for a service." 29 C.F.R.
§ 2550.408b-2(e)(2).

277.   Corporate officers must recuse themselves from any fiduciary decision
over the engagement of the corporation to provide services to a plan or receive
payment from a plan. 29 C.F.R. § 2550.408b-2(f) (Example 7).

278.   "When it is 'possible to question the fiduciaries' loyalty, they are
obliged at a minimum to engage in an *intensive and scrupulous independent
investigation* of their options to insure that they act in the best interests of the plan
beneficiaries.'" *Howard v. Shay*, 100 F.3d 1484, 1488–89 (9th Cir. 1996) (emphasis
added, quoting *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984)).

279.   DOL has repeatedly noted that a fiduciary engages in a § 406(b)
transaction by paying plan assets to the corporate plan sponsor or even executives
of the corporate plan sponsor. In Prohibited Transaction Exemption 96-23 (61 Fed.
Reg. 15975 (Apr. 10, 1996)), DOL noted that a manager of plan assets that was a
subsidiary of the corporate employer who sponsored the plan (an in-house asset
manager, or INHAM) could not invest plan assets in land owned by the
corporation's president without engaging in self-dealing prohibited by § 1106(b)
because the transaction benefited a person in whom the manager had "an interest
that may affect the exercise of its best judgment as a fiduciary." 61 Fed. Reg.
15975, 15979 (example 2). In Prohibited Transaction Exemption 84-14 (49 Fed.
Reg. 9494 (Mar. 13, 1984)) (example 3), DOL noted that a corporate fiduciary
could not hire an outside asset manager and have that asset manager buy a
commercial building owned by a subsidiary of the corporate fiduciary without
engaging in a prohibited transaction because that subsidiary was an affiliate of the
fiduciary who had authority to appoint or terminate the manager.

**The Court must defer to DOL's interpretation of ERISA's prohibited
transaction provisions.**

280.   "When Congress, through express delegation or the introduction of an

interpretive gap in the statutory structure, has delegated policymaking authority to [the DOL], the extent of judicial review of the agency's policy determinations is limited." *Pauley v. Bethenergy Mines*, 501 U.S. 680, 696 (1991) (citing *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 864–66 (1984) and *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990)).

281.   Where legislation "has produced a complex and highly technical regulatory program" that "necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns[,]" it is appropriate for courts to "defer to the agency entrusted by Congress to make such policy determinations." *Pauley v. Bethenergy Mines*, 501 U.S. 680, 697 (1991) (giving deference to DOL regulations interpreting statute).

282.   Where "Congress has not 'directly spoken to the precise question at issue,'" a court must "sustain the [DOL's] approach so long as it is 'based on a permissible construction of the statute.'" *Auer v. Robbins*, 519 U.S. 452, 457 (1997) (quoting *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984)).

283.   Courts must give deference to the "reasonable views" expressed by the DOL in notices of proposed rulemaking. *Mass. v. Morash*, 490 U.S. 107, 116–17 (1989).

284.   If a DOL regulation is ambiguous, the Court must defer to the agency's reasonable interpretation of that regulation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019).

285.   Courts must defer to the DOL's interpretation of its own regulations where there is "no reason" to "suspect that [the] interpretation' is merely a '*post hoc* rationalizatio[n]' of past agency action, or that it 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416–18 (2019).

286.   The DOL's "interpretation of its own regulations is controlling unless

plainly erroneous or inconsistent with the regulations being interpreted." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted); *see also Solis v. Washington*, 656 F.3d 1079, 1085 (9th Cir. 2011) (same).

287.   Courts may give *Chevron* deference even to the preamble of a final DOL rule. *Tibble v. Edison Int'l*, 711 F.3d 1061, 1071 (9th Cir. 2013), *vacated on other grounds*, 135 S.Ct. 1823 (2015)).

288.   "[T]he Department of Labor's opinion letters, as interpretations of that agency's own regulations, are entitled to 'great judicial deference.'" *Bassiri v. Xerox Corp.*, 463 F.3d 927, 933 (9th Cir. 2006) (citing *Zurich Am. Ins. Co. v. Whittier Props., Inc.*, 356 F.3d 1132, 1137 (9th Cir. 2004)). "Special deference is due" where "'the letters reflect a consistent view over an extended period of time.'" *Id.* (quoting *Archuleta v. Wal-Mart Stores, Inc.*, 394 F.3d 1177, 1186 (10th Cir. 2005)).

289.   Courts "must give deference to the DOL's interpretation of its own regulations through, for example, Opinion Letters." *Miller v. Farmers Ins. Exch.*, 481 F.3d 1119, 1129 (9th Cir. 2007); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (deference applies to authoritative or official positions). "This is particularly true where the DOL's position 'has been consistent over the years.'" *Tsyn v. Wells Fargo Advisors, LLC*, No. 14-2552, 2016 WL 612926, at *3 (N.D. Cal. Feb. 16, 2016) (citing *Miller*, 481 F.3d at 1129).

290.   "DOL issues advisory opinions on ERISA coverage questions, and because DOL is an agency that administers portions of ERISA, its opinions are entitled to substantial weight." *Kendall v. Standard Ins. Co.*, 17 F.Supp.2d 1128, 1131 (E.D. Cal. 1998) (citing *Bance v. Alaska Carpenters Ret. Plan*, 829 F.2d 820, 827 (9th Cir. 1987)).

291.   Even where *Auer* deference is not appropriate, courts must still afford DOL's interpretation "a measure of deference proportional to the thoroughness

evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1036 (9th Cir. 2013) (internal quotation marks omitted, quoting *Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2169 (2012)).

**Fiduciary Liability.**

292.   "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a).

293.   A fiduciary also is liable for the losses caused by the breach of other fiduciaries, "(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with [29 USC. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a).

294.   Even if a named fiduciary designates someone else to carry out its fiduciary responsibilities under a procedure expressly provided for in a Plan Document, that named fiduciary is liable for the breach of the designee under the circumstances of § 1105(a) and if the named fiduciary breached its duty under § 1104(a)(1) with respect to that designation, with respect to the establishment or implementation of that procedure, or in continuing the designation. 29 U.S.C. § 1105(c)(2).

295.   "To establish a claimed breach of fiduciary duty, an ERISA plaintiff must prove a breach of a fiduciary duty and a prima facie case of loss to the plan. 'Once the plaintiff has satisfied these burdens, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by ... the breach of duty.'" *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995)(quoting *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994)); *see also Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992) (applying same standard); *Perez v. City Nat'l Corp.*, 176 F.Supp.3d 945, 947 (C.D. Cal. 2016); *DeFazio v. Hollister, Inc.*, 854 F.Supp.2d 770, 808 (E.D. Cal. 2012).

296.   Once a plaintiff has made a prima facie case of breach of fiduciary duty and loss to a plan, defendant has the burden of proving that the plan's losses were not caused by his breach or that a "hypothetical prudent fiduciary would have made the same decision anyway." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356–57, 362, 364 (4th Cir. 2014) (citations omitted); *see also Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 39 (1st Cir. 2018) (citing *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014)).

297.   "[I]t is generally recognized that one who acts in violation of his fiduciary duty bears the burden of showing that he acted fairly and reasonably." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014) (quoting *Brink v. DaLesio*, 667 F.2d 420, 426 (4th Cir. 1982)).

298.   "Put another way, a plan fiduciary carries its burden by demonstrating that it would have reached the same decision had it undertaken a proper investigation." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 364 (4th Cir. 2014).

**Payments of Plan assets to Northrop.**

**Breach of the duty of loyalty.**

299.   The Administrative Committee and the Investment Committee breached their duty of loyalty to the Plan by allowing Northrop to determine for

itself what services it would provide to the Plan how much to reimburse itself for

those services, and by allowing the assets of the Plan to be distributed to Northrop

for services that did not benefit the Plan and in amounts that were not reasonable.

300.   The Administrative Committee and the Investment Committee had a

conflict of interest in being staffed by Northrop executives appointed by Northrop's

board of directors (and later CEO), deciding whether and how to compensate

Northrop for services provided to the Plan, and in delegating authority over the

provision of services and payment from the Plan to the very departments of

Northrop that would benefit from those payments. The Administrative Committee

and the Investment Committee relied on the conflicted advice of Northrop's own

in-house counsel regarding whether and how much to pay Northrop, instead of

seeking the advice of their own independent counsel. In that way also the

Administrative Committee and the Investment Committee breached their duty of

loyalty by not acting exclusively in the interest of participants and for the sole

purpose of providing benefits or defraying reasonable expenses of administering the

Plan.

301.   Given the conflicted nature of Northrop executives approving

payments of Northrop executives and the repeated warnings of improper and

excessive charges to the Plan, it certainly was "possible to question the fiduciaries'

loyalty," yet the Administrative Committee, the Investment Committee and the

other defendants, did not "engage in an intensive and scrupulous independent

investigation of their options to insure that they act in the best interests of the plan

beneficiaries.'" *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (emphasis

added, quoting *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984)).

302.   The Administrative Committee and the Investment Committee did not

"display throughout the administration of the trust complete loyalty to the interests

of the beneficiary and [did not] exclude all selfish interest and all consideration of

the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000)

(quotation marks and citation omitted).

303.   The Administrative Committee and the Investment Committee did not act with "complete and undivided loyalty to the beneficiaries of the trust and with an eye single to the interests of the participants and beneficiaries[.]" *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984) (quotation marks and citations omitted); *Donovan v. Mazzola*, 716 F.2d 1226, 1238 (9th Cir. 1983).

304.   To the extent the entities to whom the Administrative Committee and the Investment Committee purported to delegate their fiduciary responsibilities were fiduciaries, those entities likewise breached their duty of loyalty to the Plan by causing the Plan to pay Northrop for services that were not beneficial to the Plan and were not reasonable, and for benefitting Northrop at the cost of the Plan. The Administrative Committee and the Investment Committee participated knowingly in that breach, knowing such acts were a breach, enabled that breach by their own failure to perform their fiduciary duties, and had knowledge of that breach but failed to make reasonable efforts under the circumstances to remedy the breach.

305.   The individual defendant Administrative Committee members (*supra* ¶¶ 201–212) are liable for these breaches because they participated knowingly in these breaches, knowing such acts were a breach, enabled these breaches by their own failure to perform their fiduciary duties, and had knowledge of these breaches but failed to make reasonable efforts under the circumstances to remedy them.

306.   The individual defendant Investment Committee members (*supra* ¶¶ 211–221) are liable for these breaches because they participated knowingly in these breaches, knowing such acts were a breach, enabled these breaches by their own failure to perform their fiduciary duties, and had knowledge of these breaches but failed to make reasonable efforts under the circumstances to remedy them.

**Breach of the duty of prudence.**

307.   The Administrative Committee and the Investment Committee breached their duty of prudence to the Plan by failing to follow a prudent process

for determining what services Northrop could provide to the Plan and what amounts Northrop could be reimbursed for those services and instead allowing Northrop to determine for itself what services it would provide to the Plan how much to reimburse itself for those services and by allowing the assets of the Plan to be distributed to Northrop for services that did not benefit the Plan and in amounts that were not reasonable.

308.    The ASA is evidence of a prudent process for ensuring that Northrop received only lawful reimbursement of direct expenses, in that it was crafted by Northrop upon the advice of outside counsel, yet the Administrative Committee and the Investment Committee did not comply with the ASA and did not terminate the ASA until 2015 with the execution of the Benefit Plans Services And Loan Agreement in December 2014 (Exhibit 66).

309.    Prudent fiduciaries in similar situations obtain the advice of independent consultants or independent fiduciaries to determine whether services an employer proposes to provide to its employees' plan are necessary for the operation of the plan and whether the charges for those services are lawful reimbursement only of direct expenses and reasonable in light of what outside professional companies could have provided, yet the Administrative Committee, the Investment Committee and the other defendants did not seek that advice.

310.    To the extent the entities to whom the Administrative Committee and the Investment Committee purported to delegate their fiduciary responsibilities were fiduciaries, those entities likewise breached their duty of prudence to the Plan by failing to follow a prudent process for determining what services Northrop could provide to the Plan and what amounts Northrop could be reimbursed for those services and instead causing the Plan to pay Northrop for services that were not beneficial to the Plan and were not reasonable, and for benefiting Northrop at the cost of the Plan. The Administrative Committee and the Investment Committee participated knowingly in that breach, knowing such acts were a breach, enabled

that breach by their own failure to perform their fiduciary duties, and had knowledge of that breach but failed to make reasonable efforts under the circumstances to remedy the breach.

311.   The individual defendant Administrative Committee members (*supra* ¶¶ 201–212) are liable for these breaches because they participated knowingly in these breaches, knowing such acts were a breach, enabled these breaches by their own failure to perform their fiduciary duties, and had knowledge of these breaches but failed to make reasonable efforts under the circumstances to remedy them.

312.   The individual defendant Investment Committee members (*supra* ¶¶ 211–221) are liable for these breaches because they participated knowingly in these breaches, knowing such acts were a breach, enabled these breaches by their own failure to perform their fiduciary duties, and had knowledge of these breaches but failed to make reasonable efforts under the circumstances to remedy them.

**Commission of ERISA § 406(a) prohibited transactions.**

313.   The Administrative Committee and the Investment Committee committed prohibited transactions under 29 U.S.C. § 1106(a)(1)(C) and (D) by causing the Plan to engage in transactions they knew or should have known constituted a direct or indirect furnishing of services between Northrop and the Plan and a transfer to Northrop of assets of the Plan.

314.   The Administrative Committee and the Investment Committee failed to prove that they met the requirements for the exemption from this prohibited transaction as provided in 29 U.S.C. § 1108(b)(2).

315.   To the extent that the entities to whom the Administrative Committee and the Investment Committee delegated any of their responsibilities were fiduciaries, those fiduciaries engaged in the same prohibited transactions by causing the Plan to engage in transactions they knew or should have known constituted a direct or indirect furnishing of services between Northrop and the Plan and a transfer to Northrop of Plan assets. The Administrative Committee and the

Investment Committee participated knowingly in those prohibited transactions,
knowing such acts were prohibited, enabled the transactions by their own failure to
perform their fiduciary duties, and had knowledge of the prohibited transactions but
failed to make reasonable efforts under the circumstances to remedy them.

316.   The individual defendant Administrative Committee members (*supra*
¶¶ 201–212) are liable for these prohibited transactions because they participated
knowingly in them, knowing such acts were prohibited, enabled the prohibited
transactions by their own failure to perform their fiduciary duties, and had
knowledge of these prohibited transactions but failed to make reasonable efforts
under the circumstances to remedy them.

317.   The individual defendant Investment Committee members (*supra*
¶¶ 211–221) are liable for these prohibited transactions because they participated
knowingly in them, knowing such acts were prohibited, enabled the prohibited
transactions by their own failure to perform their fiduciary duties, and had
knowledge of these prohibited transactions but failed to make reasonable efforts
under the circumstances to remedy them.

**Commission of ERISA § 406(b) prohibited transactions.**

318.   The Administrative Committee and the Investment Committee acted as
agents for Northrop by dealing with the assets of the Plan in their own interest or
for their own account and acted on behalf of Northrop, whose interests were
adverse to the Plan and their participants and beneficiaries by allowing Plan assets
to be delivered to Northrop in the guise of reimbursement of expenses for services
rendered to the Plan.

319.   The Administrative Committee and the Investment Committee had
dual loyalties and could not act for the benefit of the participants and beneficiaries
of the Plan, but did not engage an independent fiduciary to determine whether it
was in the Plan's interest for Northrop to provide any services or be compensated
and whether Northrop's compensation was reasonable.

320.   To the extent that the entities to whom the Administrative Committee and the Investment Committee delegated any of their responsibilities were fiduciaries, those fiduciaries engaged in the same prohibited transactions by dealing with the assets of the Plan in their own interest or for its own account and acted on behalf of Northrop.

321.   The Administrative Committee participated knowingly in those prohibited transactions, knowing such acts were prohibited, enabled the transactions by its own failure to perform its fiduciary duties, and had knowledge of the prohibited transactions but failed to make reasonable efforts under the circumstances to remedy them.

322.   The Investment Committee participated knowingly in those prohibited transactions, knowing such acts were prohibited, enabled the transactions by its own failure to perform its fiduciary duties, and had knowledge of the prohibited transactions but failed to make reasonable efforts under the circumstances to remedy them.

323.   The individual defendant Administrative Committee members (*supra* ¶¶ 201–212) are liable for these prohibited transactions because they participated knowingly in them, knowing such acts were prohibited, enabled the prohibited transactions by their own failure to perform their fiduciary duties, and had knowledge of these prohibited transactions but failed to make reasonable efforts under the circumstances to remedy them.

324.   The individual defendant Investment Committee members (*supra* ¶¶ 211–221) are liable for these prohibited transactions because they participated knowingly in them, knowing such acts were prohibited, enabled the prohibited transactions by their own failure to perform their fiduciary duties, and had knowledge of these prohibited transactions but failed to make reasonable efforts under the circumstances to remedy them.

**The Emerging Markets Fund.**

**Breach of Duty of Prudence.**

325.   The Investment Committee breached its duty of prudence to the Plan by failing to follow a prudent process for maintaining the active managers in the EM Fund when the Investment Committee determined that active management was unlikely to produce returns net of fees that would exceed passive management and therefore converted all of the Plan's core investment options to passive management, with the exception of the EM Fund.

326.   The Investment Committee never made a reasoned decision considering all the relevant factors to maintain the active managers in the EM Fund until late 2014.

327.   The Investment Committee did not convert the EM Fund to entirely passive management even though, by the end of 2010, the active management caused the EM Fund to underperform its benchmark over the preceding one-year, five-year, and ten-year periods. Through an active management investment strategy, the EM Fund failed to meet its IPS investment objective.

328.    To the extent the entities to whom the Investment Committee purported to delegate their fiduciary responsibilities were fiduciaries, those entities likewise breached their duty of prudence to the Plan by failing to follow a prudent process for maintaining the active managers in the EM Fund. The Investment Committee participated knowingly in that breach, knowing such acts were a breach, enabled that breach by their own failure to perform their fiduciary duties, and had knowledge of that breach but failed to make reasonable efforts under the circumstances to remedy the breach.

329.   The individual defendant Investment Committee members (*supra* ¶¶ 211–221) are liable for the breach because they participated knowingly in it, knowing such acts were a breach, enabled this breach by their own failure to perform their fiduciary duties, and had knowledge of this breach but failed to make

1   reasonable efforts under the circumstances to remedy it.

2   **Determining Plan losses.**

3   330.   The Court has full authority to provide the Plan such equitable and
4   remedial relief, in addition to restoration of the Plan's losses, as the Court deems
5   appropriate, including removal of a breaching fiduciary. 29 U.S.C. § 1109(a).

6   331.   Plan participants subject to unreasonable fees "lose not only the money
7   spent on higher fees, but also 'lost investment opportunity'; that is, the money that
8   the portion of their investment spent on unnecessary fees would have earned over
9   time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc).
10  Accordingly, an award of the Plan's losses must take into account what the Plan
11  would have earned from the investment of Plan assets unlawfully distributed from
12  the Plan and imprudently invested in the active managers in the EM Fund. *Donovan*
13  *v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985); *cf. Blankenship v. Liberty Life*
14  *Assur. Co.*, 486 F.3d 620, 628 (9th Cir. 2007) (awarding prejudgment interest on
15  wrongfully withheld benefits using investment fund return in which those funds
16  would have been invested).

17  332.   The Plan should be restored to the position it would have been in had
18  there been no breach. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).
19  "A trustee who breaches his or her duty could be liable for loss of value to the trust
20  or for any profits that the trust would have accrued in the absence of the breach."
21  *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012)
22  (citing Restatement (Third) Trusts § 100(a) and Restatement (Second) Trusts
23  § 205).

24  333.   This is based on the principle in the common law of trusts that a
25  "trustee is liable for 'any profit which would have accrued to the trust estate if there
26  had been no breach of trust[.]'" *Donovan v. Bierwirth*, 754 F.2d 1049, 1054 (2d Cir.
27  1985) (quoting Restatement (Second) of Trusts § 205(c) (1959)). "In determining
28  the contours of an ERISA fiduciary's duty, courts often must look to the law of

trusts[.]" *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015).

334.   "When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered." *Cal. Ironworkers, Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001) (citing *Sutton v. Earles*, 26 F.3d 903, 918 (9th Cir. 1994)).

335.   "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985). "This is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer." *Id.*; *see also DeFazio v. Hollister, Inc.*, 854 F. Supp. 2d 770, 808 (E.D. Cal. 2012) ("uncertainty should be resolved against the breaching fiduciary") (quoting *Sec'y of DOL v. Gilley*, 290 F.3d 827, 830 (6th Cir. 2002)).

336.   "It is a principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee." *Confederated Tribes v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001) (citations omitted); *Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984).

337.   "Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) (quoting *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir. 1979)).

338.   "[T]he District Court should presume that, but for the breach, the funds would have been invested in the most profitable of the alternatives and that the

errant fiduciary bears the burden of proving that the fund would have earned less than this amount." *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1244 (2d Cir. 1989) (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)).

339. "[T]he measure of damages from Defendants' breach "need not be exact—'it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)); *see also Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 285 (2d Cir. 1992).

340. These standards are based Congress's intent in enacting ERISA, "to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty." *Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985) (quoting *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978), citing S. Rep. No. 127, 93d Cong., 1st Sess., reprinted in 1974-3 U.S. Code Cong. & Ad. News 4838, 4871). They are based on the clear "need to deter abuses" in areas "where the temptation to misuse funds often may be especially strong." *Id*. at 1055 (citing *Brink v. DaLesio*, 667 F.2d 420, 427 (4th Cir. 1982)).

341. Defendants have failed to demonstrate that any amount Northrop received from 2010 through 2015 was properly paid from the Plan. Therefore, the Plan's losses from Defendants' breach are $7,616,258 from the beginning of 2010 through the end of 2015. From September 9, 2010 through the end of 2015, Northrop unlawfully took from the Plan $6,138,135.

342. Calculating the exact amount the Plan would have gained had Northrop not received unlawful payments from Plan assets is difficult to calculate accurately because the Plan's total return is not readily available and because a portion of the Plan included the EM Fund which was imprudently managed and thus did not provide as much of a return to the Plan as it could have under prudent

management.

343.   The S&P 500 index is recognized as a proxy for how funds invested in a plan would have performed. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 1113291, at *36 (W.D. Mo. Mar. 31, 2012), *aff'd*, 746 F.3d 327, 337 (8th Cir. 2014) (reversed on other grounds). The Vanguard Institutional Index Fund (VIIIX) is an institutional investment in the S&P 500 index that fairly approximates the Plan's lost investment returns.

344.   Accounting for the Plan's lost investment returns through August 31, 2018, the Plan's losses caused by Northrop's unlawful receipt of Plan assets using the return of VIIIX through August 31, 2018 is $13,722,884. To calculate the Plan's losses as of the date of judgment, the Court will multiply $13,722,884 times the return of VIIIX from September 1, 2018 to the date of judgment.

345.   Defendants have failed to demonstrate that they made a prudent determination to maintain the active managers in the EM Fund from December 2010 through December 2014. Therefore, the Plan's losses from Defendants' breach are $28,473,041.

346.   To calculate the Plan's losses from this breach through December 31, 2017, the SSgA index fund was used to calculate lost investment opportunity. To calculate the Plan's losses as of the date of judgment, the Court will multiply $28,473,041 times the return of the SSgA index fund from January 1, 2018 to the date of judgment.

347.   In the event of uncertainty in the calculation of Plan damages, the Court may set the method for calculating those damages and order the parties to provide a calculation that incorporates that method. *Tibble v. Edison Int'l*, No. 07-5359-SVW, Doc. 567 at 24 (C.D. Cal. Aug. 16, 2017); *id.*, Doc. 570 (Sep. 5, 2017) (stipulation).

348.   Judgment will be entered against the Defendants jointly and severally for all Plan losses described above.

**Northrop's duty to disgorge Plan assets.**

349.   A participant may bring an action against a non-fiduciary party to obtain appropriate equitable relief and enforce the terms of the Plan or ERISA. 29 U.S.C. § 1132(a)(3)(B). This includes an action in restitution to recover from the non-fiduciary Plan assets that it knew or reasonably should have known resulted from prohibited transactions by Plan fiduciaries or an otherwise unlawful transaction. *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 253 (2000).

350.   Northrop was the employer who sponsored the Plan and thus is a party in interest under 29 U.S.C. § 1002(14)(C), (E).

351.   Northrop received $6,138,135 in Plan assets during the time at issue in this lawsuit.

352.   Northrop appointed its executives to be the fiduciaries of the Administrative Committee and Investment Committee. Northrop and those executives were informed by their legal counsel that they could not have Northrop provide any services to the Plan or receive any putative payments from the Plan without committing prohibited transactions under 29 U.S.C. § 1106. In response, Northrop's executives caused the Plan to enter into the ASAs to establish a procedure to comply with the prohibited transaction exemption under 29 U.S.C. § 1108(b)(2). Northrop's executives did not comply with the ASAs and delegated to other Northrop executives authority to offset corporate expenses onto the Plan and pay Northrop putative reimbursements of the salaries and an additional amount putatively for fringe benefits for employees who claimed to have provided a service to the Plan. The process by which Northrop received $6,138,135 was a clear violation of 29 U.S.C. § 1106 that Northrop's executives transacted knowing, or reasonably should have known, that those transactions were prohibited.

353.   The transactions described above also constituted the inurement of Plan assets to Northrop.

1

2

3

4

354.   Because a corporation can act only through its executives, the knowledge of Northrop's executives is Northrop's knowledge and Northrop therefore received $6,138,135 in Plan assets under circumstances that it knew, or reasonably should have known, violated ERISA.

5

6

7

8

9

10

355.   Northrop also must disgorge any profits it earned from the receipt of these Plan assets. *Harris*, 530 U.S. at 250. "An accounting and disgorgement of profits is a classic form of restitutionary relief. *CFTC v. Crombie*, 914 F.3d 1208, 1216 (9th Cir. 2019). Therefore, the Court orders Northrop to provide an accounting on all profits it earned on the $6,138,135 in Plan assets it received. All such profits must be delivered to the Plan.

11

12

13

14

15

DATED:  September 13, 2019

Respectfully submitted,

By: /s/ Michael A. Wolff
Michael A. Wolff *admitted p.h.v.*
SCHLICHTER, BOGARD & DENTON LLP
*Lead Counsel for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28